FILED
2018 Jul-23  PM 04:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| LAKEISHA CHESTNUT, an individual; MARLENE MARTIN, an individual; BOBBY DUBOSE, an individual; RODNEY LOVE, an individual; JANICE WILLIAMS, an individual; KAREN JONES, an individual; RODERICK CLARK, an individual; JOHN HARRIS, an individual, MINNIE AUSTIN, an individual; JOSEPH BOYKINS, an individual,<br><br>            Plaintiffs,<br><br>   v.<br><br>JOHN H. MERRILL, in his official capacity as Alabama Secretary of State,<br><br>            Defendant. | Civil Action No. 2:18-cv-907-KOB |

## AMENDED COMPLAINT

1.      Plaintiffs bring this voting rights action to challenge Alabama Act No. 2011-518 ("S.B. 484"), now codified at Ala. Code § 17-14-70, on the grounds that it violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

2.      Under S.B. 484, the Alabama legislature carefully distributed African-American voters between four congressional districts, diluting African-American voting strength and confining African-American voting power to one majority-minority district.

3.      S.B. 484 "packs" African-American voters into the Seventh Congressional District ("CD 7") and "cracks" African-American voters among three other congressional districts—Congressional Districts 1, 2, and 3—despite the fact that the African-American population in these areas could have been united to form an additional majority-minority congressional district in which African-American voters would have the opportunity to elect

their candidates of choice. In this way, S.B. 484 violates Section 2 of the Voting Rights Act.

4.     CD 7 was established as a majority-minority district in the wake of Congress's 1982 amendment to the Voting Rights Act, which prohibited voting practices that produced racially discriminatory results, regardless of whether the challenged practice had been adopted with the intent to discriminate. As a result, in 1992, for the first time since Reconstruction, African-American voters who lived in CD 7 were able to elect their candidate of choice—Earl F. Hilliard, an African American—to Congress. Today, CD 7 is represented by Democratic Representative Terri Sewell, an African American who was first elected in 2010.

5.     Under Act No. 2002-57, which was enacted in 2002 and established Alabama's congressional redistricting plan following the 2000 Census, the Black Voting Age Population ("BVAP") of CD 7 was 58.33%. Under S.B. 484, which was enacted in 2011 and established Alabama's congressional redistricting plan following the 2010 Census, the legislature increased the BVAP of CD 7 from 58.33% to 60.91%.

6.     The African-American population in Alabama is sufficiently numerous and geographically compact to form a majority of eligible voters—meaning, a majority of the voting age population —[1] in two congressional districts.

7.     African-American residents of Alabama, including in the Black Belt, have

---

[1] The phrases "majority of eligible voters" and "majority of the voting age population" have been used by courts interchangeably when discussing the threshold requirements of a vote-dilution claim under Section 2 of the Voting Rights Act. *See, e.g.*, *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) ("[T]he first *Gingles* precondition . . . requires only a simple ***majority of eligible voters*** in a single-member district." (emphasis added) (internal quotation marks omitted)); *Terrebonne Parish Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 428 (M.D. La. 2017) ("At the *Gingles* One stage, the Supreme Court requires only a simple ***majority of eligible voters*** in the single-member district." (emphasis added) (internal quotation marks omitted)).  Hereinafter, the phrase "majority of eligible voters" when used in this Complaint shall also refer to the "majority of the voting age population."

suffered from a long history of marginalization and discrimination, including, as alleged here, the dilution of African-American voting strength through redistricting. When African Americans have less opportunity than other members of the electorate to elect a representative of their choice to the U.S. House of Representatives to advocate on their behalf, the result is systemic neglect of their needs and concerns.

8.      As evidenced by an array of factors, such as the history of racial discrimination in voting, the perpetuation of racial appeals in Alabama elections, and the socio-economic effects of decades of discrimination against African Americans that hinder their ability to participate effectively in the political process, Alabama's failure to create a second majority-minority congressional district in S.B. 484 has resulted in the dilution of African-American voting strength in violation of Section 2 of the Voting Rights Act.

9.      Accordingly, Plaintiffs seek an order (i) declaring that S.B. 484 violates Section 2 of the Voting Rights Act; (ii) enjoining Defendant from conducting future elections under S.B. 484; (iii) ordering a congressional redistricting plan that includes two majority-minority congressional districts; and (iv) providing any such additional relief as is appropriate.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1357.

11.      This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 and 2202.

12.      Venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

13.      Plaintiff LaKeisha Chestnut is an African-American citizen of the United States

and of the State of Alabama. She is a resident and registered voter in Mobile County in CD 1. Ms. Chestnut has resided in CD 1 since 2016. In 2016, Ms. Chestnut, who votes Democratic, was given no opportunity to elect her candidate of choice because the Republican candidate was unopposed. An additional majority-minority district could be drawn incorporating all or some of Mobile County, including Ms. Chestnut's residence, to provide a remedy for the existing Section 2 violation. The apportionment of one majority-minority district to the sufficiently numerous and geographically compact minority population in Alabama, as opposed to the two majority-minority districts required by the Voting Rights Act, dilutes Ms. Chestnut's voting power and denies her the equal opportunity to vote for a candidate of her choice to the U.S. House of Representatives.

14.     Plaintiff Marlene Martin is an African-American citizen of the United States and of the State of Alabama. She is a resident and registered voter in Montgomery County in CD 7. Ms. Martin is denied an equal opportunity to vote for candidates for the U.S. House of Representatives because she is packed in CD 7, where her vote is of lesser value because African-American voters are concentrated there. An additional majority-minority district could be drawn incorporating all or some of Montgomery County, including Ms. Martin's residence, to provide a remedy for the existing Section 2 violation. The apportionment of one majority-minority district to the sufficiently numerous and geographically compact minority population in Alabama, as opposed to the two majority-minority districts required by the Voting Rights Act, dilutes Ms. Martin's voting power.

15.     Plaintiff Bobby DuBose is an African-American citizen of the United States and of the State of Alabama. He is a resident and registered voter in Jefferson County in CD 7. Mr. DuBose is denied an equal opportunity to vote for candidates for the U.S. House of

Representatives because he is packed in CD 7, where his vote is of lesser value because African-American voters are concentrated there. The apportionment of one majority-minority district to the sufficiently numerous and geographically compact minority population in Alabama, as opposed to the two majority-minority districts required by the Voting Rights Act, dilutes Mr. DuBose's voting power.

16.     Plaintiff Rodney Love is an African-American citizen of the United States and of the State of Alabama. He is a resident and registered voter in Jefferson County in CD 7. Mr. Love has been denied an equal opportunity to vote for candidates for the U.S. House of Representatives because he is packed in CD 7, where his vote is of lesser value because African-American voters are concentrated there. The apportionment of one majority-minority district to the sufficiently numerous and geographically compact minority population in Alabama, as opposed to the two majority-minority districts required by the Voting Rights Act, dilutes Mr. Love's voting power.

17.     Plaintiff Janice Williams is an African-American citizen of the United States and of the State of Alabama. She is a resident and registered voter in Jefferson County in CD 7. Ms. Williams has been denied an equal opportunity to vote for candidates for the U.S. House of Representatives because she is packed in CD 7, where her vote is of lesser value because African-American voters are concentrated there. The apportionment of one majority-minority district to the sufficiently numerous and geographically compact minority population in Alabama, as opposed to the two majority-minority districts required by the Voting Rights Act, dilutes Ms. William's voting power.

18.     Plaintiff Karen Jones is an African-American citizen of the United States and of the State of Alabama. She is a resident and registered voter in Montgomery County in CD 7. Ms.

Jones has been denied an equal opportunity to vote for candidates for the U.S. House of Representatives because she is packed in CD 7, where her vote is of lesser value because African-American voters are concentrated there. An additional majority-minority district could be drawn incorporating all or some of Montgomery County, including Ms. Jones' residence, to provide a remedy for the existing Section 2 violation.  The apportionment of one majority-minority district to the sufficiently numerous and geographically compact minority population in Alabama, as opposed to the two majority-minority districts required by the Voting Rights Act, dilutes Ms. Jones's voting power.

19.     Plaintiff Roderick Clark is an African-American citizen of the United States and of the State of Alabama. He is a resident and registered voter in Bullock County in CD 2. Mr. Clark has been unable to elect candidates of his choice to the U.S. House of Representatives despite strong electoral support for those candidates from other African-American voters in his community. An additional majority-minority district could be drawn incorporating all or some of Bullock County, including Mr. Clark's residence, to provide a remedy for the existing Section 2 violation. The apportionment of one majority-minority district to the sufficiently numerous and geographically compact minority population in Alabama, as opposed to the two majority-minority districts required by the Voting Rights Act, dilutes Mr. Clark's voting power and denies him the equal opportunity to vote for a candidate of his choice to the U.S. House of Representatives.

20.     Plaintiff John Harris is an African-American citizen of the United States and of the State of Alabama. He is a resident and registered voter in Lee County in CD 3. Mr. Harris has been unable to elect candidates of his choice to the U.S. House of Representatives despite strong electoral support for those candidates from other African-American voters in his community. An

additional majority-minority district could be drawn incorporating all or some of Lee County to provide a remedy for the existing Section 2 violation. The apportionment of one majority-minority district to the sufficiently numerous and geographically compact minority population in Alabama, as opposed to the two majority-minority districts required by the Voting Rights Act, dilutes Mr. Harris's voting power and denies him the equal opportunity to vote for a candidate of his choice to the U.S. House of Representatives.

21.      Ms. Minnie Austin is an African-American citizen of the United States and of the State of Alabama. She is a resident and registered voter in Macon County in CD 3. Ms. Austin has been unable to elect candidates of her choice to the U.S. House of Representatives despite strong electoral support for those candidates from other African-American voters in her community. An additional majority-minority district could be drawn incorporating all or some of Macon County, including Ms. Austin's residence, to provide a remedy for the existing Section 2 violation.  The apportionment of one majority-minority district to the sufficiently numerous and geographically compact minority population in Alabama, as opposed to the two majority-minority districts required by the Voting Rights Act, dilutes Ms. Austin's voting power and denies her the equal opportunity to vote for a candidate of her choice to the U.S. House of Representatives.

22.      Plaintiff Joseph Boykins is an African-American citizen of the United States and of the State of Alabama. He is a resident and registered voter in Clarke County in CD 7. Mr. Boykins has been denied an equal opportunity to vote for candidates for the U.S. House of Representatives because he is packed in CD 7, where his vote is of lesser value because African-American voters are concentrated there. An additional majority-minority district could be drawn incorporating all or some of Clarke County, including Mr. Boykins' residence, to provide a

remedy for the existing Section 2 violation. The apportionment of one majority-minority district to the sufficiently numerous and geographically compact minority population in Alabama, as opposed to the two majority-minority districts required by the Voting Rights Act, dilutes Mr. Boykins' voting power.

23.     Defendant John H. Merrill is sued in his official capacity as the Secretary of State of Alabama. The Secretary of State is the State's chief election officer. Ala. Code § 17-1-3(a). In that capacity, he is responsible for providing uniform guidance for election activities and implementing election laws and regulations. *See* Ala. Admin. Code r. 820-2-1 - 820-2-4.

### LEGAL BACKGROUND

24.     Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" Thus, in addition to prohibiting practices that deny outright the exercise of the right to vote, Section 2 of the Voting Rights Act prohibits vote dilution. A violation of Section 2 is established if it is shown that, "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

25.     The dilution of African-American voting strength "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

26.     The United States Supreme Court, in *Thornburg v. Gingles*, identified three

- 8 -

necessary preconditions ("the *Gingles* preconditions") for a claim of vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51.

27.     Once all three preconditions are established, the statute directs courts to consider whether, under the totality of the circumstances, members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Senate Report on the 1982 amendments to the Voting Rights Act identifies several non-exclusive factors that courts should consider when determining if, under the totality of the circumstances in a jurisdiction, the operation of the electoral device being challenged results in a violation of Section 2.

28.     These Senate factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet-voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

29.     The Senate Report itself and the cases interpreting it have made clear that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)); *see also id*. ("The statute explicitly calls for a 'totality-of-the circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim.").

## FACTUAL BACKGROUND

30.     In June 2011, the Alabama legislature passed legislation to redraw Alabama's seven congressional districts, as set forth at Ala. Code § 17-14-70.

31.     On May 26, 2011, S.B. 484 passed in the Alabama Senate on a 19-11 vote over the objection of all seven of the state's African-American senators. On June 1, 2011, S.B. 484 passed the House on a 65-37 vote.

32.     Prior to the passage of S.B. 484, Joe Reed, who was the Alabama Democratic Party's vice chairman for minority affairs at the time, asked leaders of the Alabama Legislative Committee on Reapportionment to explore the possibility of creating a second majority African-American congressional district in Alabama. Nonetheless, S.B. 484 included only the existing majority-minority district and failed to create an additional district in which African Americans would have the opportunity to elect their preferred candidates.

33.     Alabama Governor Bentley signed S.B. 484 into law on June 8, 2011.

34.     S.B. 484 was sponsored or co-sponsored by four white Republican state senators—Senators Gerald Dial, Jimmy Holley, Trip Pittman, and Clay Scofield. Senator Dial also helped draw the 2011 Alabama state legislative redistricting plan, which was declared unconstitutional because three state senate and nine state house districts were drawn as illegal

- 10 -

racial gerrymanders. *See Ala. Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1038 (M.D. Ala. 2017). The same political consultant, Randy Hinaman, drew both the state legislative and congressional districts following the 2010 Census. *Id*.

35.     CD 7 is the only majority-minority district in S.B. 484. It is heavily black and packs in almost one-third of Alabama's African-American population. CD 7 has been represented by an African American since 1992. It is currently represented by Representative Terri Sewell, who was first elected in 2010.

36.     CD 7 includes Choctaw, Dallas, Greene, Hale, Lowndes, Marengo, Pickens, Perry, Sumter, and Wilcox counties, as well as portions of Clarke, Jefferson, Montgomery, and Tuscaloosa counties.

37.     The prior version of CD 7 had a BVAP of 58.33%. Before Representative Sewell took office, Artur Davis, an African-American Democrat, held the office from 2002 until 2010. In each of his general elections, Davis either won handily or ran unopposed.

38.     In the 2011 redistricting process, the Alabama legislature increased the district's BVAP to 60.91% despite CD 7's strong history of African-American representation since its establishment as a majority-minority district.

39.     S.B. 484 moved African Americans from majority-white districts into CD 7, heavily concentrating African Americans in the district and diluting their influence in adjacent districts.

40.     Representative Sewell ran in 2010 and won in a landslide election with approximately 72% of the vote. After the enactment of S.B. 484, Representative Sewell won re-election in 2012 with approximately 75% of the vote. In both the 2014 and 2016 general elections she ran unopposed.

41.     S.B. 484 "packs" African-American voters into CD 7 and "cracks" African-American population centers among other districts, preventing the emergence of a second congressional district in which minorities would have an opportunity to elect their candidates of choice.

42.     By unpacking CD 7's African-American population and combining it with African-American populations in other districts such as CDs 1, 2, and 3, the Alabama legislature could have drawn two majority-minority districts in S.B. 484, as required by Section 2 of the Voting Rights Act.

43.     Each of the three districts among which the African-American population is significantly cracked—CDs 1, 2, and 3—includes at least one heavily African-American area in an otherwise majority-white district. For example, CD 3 contains Macon County, which is home to the historically African-American college Tuskegee University and has an African-American population of 82.6%. Similarly, CD 1 includes Mobile County, which has an African-American population of 34.6%, and Monroe County, which has an African-American population of 41.7%. Montgomery County, which has an African-American population of 54.7%, is split between CDs 2, 3, and 7. The African-American population in the eastern portion of Alabama is split neatly in two by the border between CDs 2 and 3.

44.     The Black Belt is located in the south-central region of Alabama. The region was originally named for its black soil, but over time the term has also been used to refer to counties with a large black population. A large African-American population resides in the Black Belt and its surrounding area because of the history of agriculture and slavery in that region. Booker T. Washington said in 1901 that the Black Belt was "the part of the South where the slaves were most profitable, and consequently they were taken there in the largest numbers." According to

the Center for Business and Economic Research at the University of Alabama, the "traditional counties" of the Alabama Black Belt include: Sumter, Choctaw, Greene, Hale, Marengo, Perry, Dallas, Wilcox, Lowndes, Butler, Crenshaw, Montgomery, Macon, Bullock, Pike, Barbour, and Russell. The traditional Black Belt is surrounded by counties that also have substantial African-American populations, including but not limited to, Washington, Mobile, Clarke, Escambia, and Monroe counties.

45.     In S.B. 484, the Black Belt and the surrounding area is split among four congressional districts—CDs 1, 2, 3, and 7.

### Racial Polarization

46.     African-American voters in Alabama are politically cohesive and overwhelmingly support Democratic candidates.

47.     The white majority, which overwhelmingly supports Republican candidates, votes as a bloc usually to defeat African-American voters' candidates of choice.

48.     For example, according to CNN exit polling in the 2017 special election for the U.S. Senate seat vacated by Attorney General Jeff Sessions, 96% of African-American voters supported Democratic candidate Doug Jones. Senator Jones won 15 of the 17 counties that comprise the "traditional counties" of the Black Belt listed in Paragraph 42 herein. When the election is viewed through the lens of the state's seven congressional districts, Senator Jones won only one—CD 7.

49.     In the 2016 presidential election, over 80% of African-American voters voted for the Democratic candidate, while fewer than 20% of white voters statewide (and fewer than 15% of white voters in the Black Belt) voted for the Democratic candidate. African-American voters' candidate of choice lost the statewide vote by a margin of 27.7 percentage points.

50.     The last time voters in CD 1 elected an African American to represent them in Congress was during Reconstruction. While more than a quarter of the voting age population in CD 1 is African-American, white Republicans have been continuously elected to represent CD 1 since 1965.

51.     African-American Democrat Burton LeFlore has sought election to the U.S. House to represent CD 1 twice. Both times LeFlore, the African-American voters' candidate of choice, was defeated by Bradley Byrne, a white Republican, in wide margins that reflect the strongly racially polarized voting in the state. First, in a special election in 2013, despite strong African-American support for LeFlore, Byrne won in a landslide victory, receiving approximately two-thirds of the vote. A publicly reported precinct-by-precinct analysis of the vote in Mobile and Baldwin counties showed that Byrne was the overwhelming favorite everywhere—except in areas of CD 1 with large concentrations of African Americans. In the 2014 general election, LeFlore was again soundly defeated.

52.     Without exception, federal courts have found that voting in Alabama is and remains severely racially polarized. In 1983, in *Buskey v. Oliver*, the U.S. District Court for the Middle District of Alabama found that the City of Montgomery, which is the county seat of Montgomery County and is located in the Black Belt, is "a city still polarized by race, with only white council members being elected from predominantly white council districts and with only black council members being elected from predominantly black council districts." *Buskey v. Oliver*, 565 F. Supp. 1473, 1482 (M.D. Ala. 1983).

53.     In *United States v. Dallas County Commission*, 739 F.2d 1529, 1536 (11th Cir. 1984), the Eleventh Circuit found that racially polarized voting existed in Dallas County elections for the period 1966 through 1978. On remand, the U.S. District Court for the Southern

- 14 -

District of Alabama found that based on evidence from election contests between 1978 and 1986, voting patterns in Dallas County remained polarized along racial lines to a sufficient degree to warrant the conclusion that, when combined with the use of a majority vote requirement in the primary and the use of numbered posts, the at-large system for electing county commissioners in Dallas County violated Section 2 of the Voting Rights Act. *United States v. Dallas Cty. Comm'n*, 636 F. Supp. 704, 710 (S.D. Ala.), *rev'd on other grounds*, 791 F.2d 831 (1986).

54.     In 2002, in *Dillard v. Baldwin County Commission*, the court found that, "[t]he plaintiffs have shown that black citizens of Baldwin County still suffer from the racially polarized voting and from historically depressed conditions, economically and socially." *Dillard v. Baldwin County Comm'n*, 222 F. Supp. 2d 1283, 1290 (M.D. Ala. 2002), *aff'd*, 376 F.3d 1260 (11th Cir. 2004).

55.     Federal courts in Alabama have acknowledged the causal connection between racial bloc voting and the history of *de jure* segregation: "Racial bloc voting by whites is attributable in part to past discrimination, and the past history of segregation and discrimination affects the choices of voters at the polls." *Brown v. Bd. of School Comm'rs of Mobile Cty.*, 542 F. Supp. 1078, 1094 (S.D. Ala. 1982), *aff'd*, 706 F.2d 1103 (11th Cir. 1983), *aff'd* 464 U.S. 1005 (1983).

### History of Official Voting-Related Discrimination

56.     In addition to the three *Gingles* preconditions noted above, the totality of the circumstances in this case supports Plaintiffs' claim that African-American voters in Alabama have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice to Congress, in violation of Section 2 of the Voting Rights Act.

57.     Few, if any, states rival Alabama's notorious history of state-sponsored racial discrimination against African Americans, particularly in the voting context. Historically, and continuing through today, Alabama has implemented voting practices that have hindered African Americans' ability to participate equally in the political process.

58.     The history goes as far back as the post-Civil War era. Despite the passage of the Reconstruction Amendments after the Civil War and the fact that African-American men were given the franchise under the Alabama Constitution of 1867—which allowed every male person 21 years of age or older who satisfied the citizenship and residence requirements to vote—the Alabama legislature moved swiftly to undo these gains.

59.     The Alabama legislature adopted a new state constitution in 1875 and subsequently passed a series of local laws eliminating elections for county commissioners, instead giving the governor the power to appoint the commissioners. These laws were designed to prevent the election of African-American county commissioners.

60.     During Reconstruction, black voters were frequently violently intimidated and even killed by white paramilitary groups, including the Ku Klux Klan and a notorious group called the "White League." In the lead-up to the 1870 gubernatorial election, for example, in Greene County, Ku Klux Klansmen verbally harassed and violently attacked black voters at a political rally at the county courthouse where approximately 2,000 African-American Republican voters were gathered. The Klan's violent tactics had their intended result: black voters stayed away from the polls in fear of more violence, and the results of the 1870 election reflected the absence of black Republican voting power. In the 1868 presidential election, Greene County voted for Republican Ulysses S. Grant by a margin of 2,000 votes; by contrast in the 1870 gubernatorial election, Greene County supported Democrat Robert B. Lindsay by a

margin of 43.

61.     On election day, November 3, 1874, an Alabama chapter of the White League formed a mob, invaded Barbour County and killed seven African-American Republican voters and injured at least 70 more. The White League subsequently refused to count any Republican votes cast in the election, declared the Democrats victorious, and seized every county office in Barbour County.

62.     In 1901, Alabama held a Constitutional Convention, the purpose of which was to enshrine in the state constitution the disenfranchisement of African Americans. The President of the Constitutional Convention, John B. Knox, stated in his inaugural address that the intention of the convention was "to establish white supremacy in this State." The Convention ratified changes to the constitution that required voters to pass literacy tests as a prerequisite to registering to vote. A grandfather clause exempted anyone who had served in the military or descended from veterans. The intent and effect of the grandfather clause was to ensure that illiterate white residents could still register to vote, as African Americans had been precluded from serving in the military.

63.     The ratified Constitution also required voters to pay a cumulative poll tax of $1.50 every year. Though color blind on its face, the poll tax was intended to and had the effect of disenfranchising African Americans. At the 1901 Constitutional Convention, Delegate Hood voiced his approval of the poll tax because of the detrimental effect it would have on African Americans: "Now in my judgment, this poll tax qualification is the most important provision in this entire article. We are told that in the Black Belt and that in many counties in the state, there is a large percentage of those young Negroes who are coming of age that will be able to read and write, therefore will be qualified under the provisions of this article. The only safety valve, Mr.

President, that is contained in this article after 1903 for a large proportion of the Negroes in this State is this Poll tax of $1.50." *United States v. Alabama*, 252 F. Supp. 95, 99 (M.D. Ala. 1966).

64.     After the passage of the 1901 constitution, segregation progressed rapidly, as public spaces were increasingly either separated or reserved for whites alone. By 1913, a black sociologist concluded that African Americans in Mobile lived in an isolated world, utterly separate from whites in most aspects of life and even death, with blacks and whites being buried in separate cemeteries.

65.     Because of low education rates, African Americans were forced to use their bodies to generate income by providing unskilled physical labor. Particularly in the Black Belt, African Americans became sharecroppers and tenant farmers in large numbers. The economic picture for African Americans was bleak. By the end of the 20th century, Black Belt counties contained more than 50 percent rates of child poverty, double-digit unemployment numbers, and median incomes half to three-fourths of the national average. These facts made the Black Belt, which was seen as some of America's richest land, its poorest.

66.     Like other southern states, Alabama passed Jim Crow laws that legalized segregation and ensured that African Americans would be treated as second-class citizens. For example, in 1942, the Alabama legislature passed a resolution commending its U.S. Senators for "their magnificent fight against the measure now pending in Congress which is calculated to destroy our Poll Tax Law," fearing that the United States Senate would soon pass anti-poll tax legislation. *Alabama*, 252 F. Supp. at 102. Alabama's poll tax remained in effect until it was declared unconstitutional by a federal district court in 1966. *See id*. at 104.

67.     In 1957, the Alabama legislature transformed the boundaries of the city of Tuskegee to a twenty-eight-sided figure designed to fence out African Americans from the city

limits so that only whites could elect city officials, an action the U.S. Supreme Court found unconstitutional in *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

68.     After the Supreme Court banned the use of white primaries in *Smith v. Allwright*, 321 U.S. 649 (1944), Alabama legislators were openly and unabashedly intent on finding new strategies to keep African Americans out of the electoral process. In the 1950s, the legislature passed a bill outlawing single-shot voting in municipal elections conducted at-large. Single-shot voting generally "enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates." *City of Rome v. United States*, 446 U.S. 156, 184 n.19 (1980) (citation omitted), *abrogated by Shelby County v. Holder*, 570 U.S. 529 (2013). A law banning single-shot voting generally requires that each elector cast votes for as many candidates as there are positions. Such a law disadvantages minority voters "because it may force them to vote for nonminority candidates, thus depreciating the relative position of minority candidates." *Nevett v. Sides*, 571 F.2d 209, 217 n.10 (5th Cir. 1978).

69.     The laws banning single-shot voting were repealed in 1961 and replaced with laws requiring candidates to run for numbered places in all state, county, and municipal at-large elections. *Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1357 (1986). The numbered place laws had the same dilutive effect on African-American voting strength in at-large elections as the laws banning single-shot voting.

70.     The gravity of Alabama's discrimination and brutality against African-American voters was on display in places like Selma, where in 1964 and 1965, Dallas County Sheriff Jim Clark infamously—and violently—resisted African-American voter registration efforts and peaceful protests to gain access to the franchise.

71.     In March 1965, police officers assaulted unarmed marchers crossing the Edmund

Pettus Bridge in Selma, where less than 5% of African Americans were registered to vote. The

event, televised across American television screens, became known as "Bloody Sunday." The

publicity the march received helped pave the way for the passage of the Voting Rights Act in

August 1965.

72.     Alabama was declared a "covered" state under Section 4(b) of the Voting Rights

Act based on the state's enforcement of unconstitutional devices or tests, including voucher

requirements, together with low minority voter registration and turnout rates. *See South Carolina

v. Katzenbach*, 383 U.S. 301, 312-13 (1966), *abrogated by Shelby County v. Holder*, 570 U.S.

529 (2013). As a covered jurisdiction, Alabama was required to have any changes to its election

practices or procedures "precleared" by either the U.S. Department of Justice or a federal court.

73.     Between 1965 and 2013, when the Supreme Court effectively barred enforcement

of the Section 5 preclearance requirement in *Shelby County v. Holder*, the federal government's

independent oversight helped protect Alabama's African-American voters against

disenfranchisement and arbitrary and disparate treatment by the state in its election practices and

procedures. While Section 5 was in effect, at least 100 voting changes proposed by the State of

Alabama were blocked or altered pursuant to Section 5 of the Voting Rights Act. *See* U.S. Dep't

of Justice, Civil Rights Division, Voting Section, Voting Determination Letters for Alabama,

http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=al (last updated Aug. 7,

2015) (listing all objections imposed against Alabama under Section 5 of the Voting Rights Act).

74.     In 2006, during the reauthorization of the Voting Rights Act, Congress was

provided with extensive evidence documenting the Alabama legislature's and other state actors'

sustained record of unconstitutional and illegal voting discrimination practices. *See*, *e.g.*,

*Renewing the Temporary Provisions of the Voting Rights Act: Legislative Options after LULAC v. Perry: Hearing Before the Subcommittee on the Constitution, Civil Rights and Property Rights of the Senate Committee on the Judiciary*, 109th Cong. 365-402 (July 13, 2006).

75.     Alabama's history of voter discrimination is far from ancient. The state continues to implement a series of voting practices that have hindered the ability of African Americans to participate equally in the political process.

76.     Within the last five decades, African-American plaintiffs, the civil rights community, and the federal government have sued Alabama on numerous occasions for racially discriminatory voting practices. *See, e.g.*, *Greater Birmingham Ministries et al. v. Alabama et al.*, 161 F. Supp. 3d 1104 (N.D. Ala. 2016) (photo identification law); *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015) (racial gerrymandering); *S. Christian Leadership Conference of Alabama v. Sessions*, 56 F.3d 1281 (11th Cir. 1995) (at-large system for electing trial judges); *City of Pleasant Grove v. United States*, 479 U.S. 462 (1987) (selective annexations); *Hunter v. Underwood*, 471 U.S. 222 (1985) (felon disenfranchisement); *Harris v. Graddick* (*Harris I*), 593 F. Supp. 128 (M.D. Ala. 1984) (appointment of disproportionately few black poll officials); *United States v. Alabama*, 252 F. Supp. 95 (M.D. Ala. 1966) (discriminatory administration of the poll tax); *United States v. Logue*, 344 F.2d 290 (5th Cir. 1965) (racial discrimination in voter registration); *Sims v. Baggett*, 247 F. Supp. 96 (M.D. Ala. 1965) (racial gerrymandering); *United States v. Atkins*, 323 F.2d 733 (5th Cir. 1963) (racial discrimination in voter registration).

77.     The Department of Justice has sent observers to Alabama more than 91 times to ensure that the right of African-American voters to participate in various elections was not denied in the face of repeated attempts by white election officials to restrict African-American

- 21 -

access to the franchise. For instance, in 1992, the federal government sent observers to Greensboro, Alabama in Hale County after white election officials attempted to prevent African-American voters from entering polling places following the election of the first African-American officials to local office.

78.     In January 2014, a federal court in the Southern District of Alabama "bailed-in" the City of Evergreen in Conecuh County for preclearance under Section 3(c) of the Voting Rights Act—effectively making the county subject to preclearance under the Voting Rights Act even after the *Shelby County v. Holder* decision—because voter registrars and election officials continued to unconstitutionally discriminate against African-American voters. *Allen v. City of Evergreen, Alabama*, No. 13-0107-CG-M, 2014 WL 12607819 (S.D. Ala. Jan. 13, 2014).

79.     In *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015), the Supreme Court remanded to the district court a case brought by African-American residents alleging that the Alabama legislative redistricting plans included racially gerrymandered districts in violation of the Fourteenth Amendment's Equal Protection Clause. On remand, the three-judge panel ruled that twelve Alabama legislative districts were unconstitutional racial gerrymanders. *Ala. Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1038 (M.D. Ala. 2017).

80.     Elected officials in Alabama continue to undermine voting opportunities in minority communities by enacting voter ID laws and resisting early voting and easier registration. The day after the *Shelby County* decision, Alabama announced that it would move forward with the implementation of a strict photo ID law that had been passed by the Alabama legislature in 2011. In other words, Alabama waited until it was no longer subject to preclearance review under Section 5 of the Voting Rights Act to implement the law.

81.     Subsequently, the state closed 31 driver's license offices, making it more difficult for individuals to obtain the identification necessary to vote. The offices that were closed were disproportionately located in poor, predominantly African-American communities. A federal investigation by the Department of Transportation found that "African Americans residing in the Black Belt region of Alabama were disproportionately underserved by [the state's] driver licensing services, causing a disparate and adverse impact on the basis of race." As a result, Alabama reopened many of the driver's license offices but for fewer hours.

82.     In late 2015, a group of plaintiffs challenged the photo ID law on the grounds that it was enacted with a discriminatory purpose and would have a discriminatory effect in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments. Specifically, plaintiffs alleged that the Alabama legislature passed the photo ID law to make it more burdensome for African Americans and other minorities to vote, and that the law would have this intended effect because minorities disproportionately lacked the ID necessary to vote and lacked the necessary means (for example, transportation and time off from work) to obtain the required ID. *See Greater Birmingham Ministries*, 161 F. Supp. 3d 1104. On February 17, 2016, the district court denied Plaintiffs' request for a preliminary injunction. *Id*. The court later granted motions to dismiss as to certain Defendants, and granted summary judgment for the Secretary of State on January 10, 2018. *Greater Birmingham Ministries*, 284 F.Supp.3d 1253. The case is currently on appeal.

83.     Alabama law disenfranchises individuals with certain felony convictions for "crimes of moral turpitude." The list of convictions "involving moral turpitude" includes a number of non-violent crimes, including almost all theft crimes. Citizens with these "disqualifying" convictions may petition to have their rights restored, but only after paying all

court-ordered fines, fees, and restitution. Describing this restriction as a modern-day poll tax, Alabama ex-felons have sued the state seeking removal of this economic barrier that limits their ability to exercise their constitutional rights. *See Thompson, et al. v. Alabama*, 293 F.Supp.3d 1313 (M.D. Ala. 2017). This law disenfranchises over 286,000 people in the state—7.6% of the entire statewide voting-age population, and 15.1% of the African-American male voting-age population.

84.     Alabama Secretary of State John Merrill opposes automatic voter registration—a reform civil rights leaders have advocated for years—arguing that such a policy would "cheapen the work" of voting rights activists, including John Lewis. In an interview, Merrill stated: "If you're too sorry or lazy to get up off of your rear to go register to vote, or to register electronically, and then to go vote, then you don't deserve that privilege. As long as I'm secretary of state of Alabama, you're going to have to show some initiative to become a registered voter in this state."

85.     What is briefly described here as Alabama's history and current reality of race discrimination in voting has been thoroughly documented by historians and scholars. The history is so extensive and well-established that several courts have taken judicial notice of it. *See, e.g.*, *United States v. McGregor*, 824 F. Supp. 2d 1339, 1346 (M.D. Ala. 2011) ("The intersection of political strategy and purposeful racial prejudice is nothing new. Alabama has a lengthy and infamous history of racial discrimination in voting."); *Hunter*, 471 U.S. at 229 ("[T]he Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks . . . . The delegates to the all-white convention were not secretive about their purpose."); *Dillard v. Crenshaw County*, 640 F. Supp. at 1360 ("As the late Judge Richard T. Rives states, 'from the Constitutional Convention of 1901 to the present, the State of

Alabama has consistently devoted its official resources to maintaining white supremacy and a segregated society.'") (quoting *United States v. Alabama*, 252 F. Supp. at 101).

### Use of Racial Appeals in Political Campaigns

86.    In addition to Alabama's history of discrimination against minorities in voting and elections, political campaigns in Alabama have often relied on both explicit and implicit racial appeals.

87.    Former Alabama Governor George Wallace was explicit in his appeal to white voters, running on a platform of "segregation now, segregation tomorrow, segregation forever."

88.    More recently, the 2010 elections were marked by explicit and implicit racial appeals. For example, certain Alabama state senators were recorded on tape deliberately strategizing about suppressing African-American voter turnout by keeping an issue important to African Americans—whether to legalize electronic bingo—off the ballot. In these conversations, then-State Senator Scott Beason, then-State Representative Benjamin Lewis (now an appointed county judge), and other influential members of the Alabama legislature are heard targeting African-American voters for "mockery and racist abuse." *McGregor*, 824 F. Supp. 2d at 1346. They referred to African Americans as "Aborigines" and "Indians" and predicted that if the ballot measure appeared on the ballot "every black in this state will be bused to the polls . . . [e]very black, every illiterate would be bused on HUD financed buses." *Id.* at 1345 (citation and internal quotation marks omitted).  A federal district court found that the state senators' efforts to depress African-American voter turnout constituted an intentionally discriminatory "scheme" to "maintain and strengthen white control of the political system," and that "political exclusion through racism remains a real and enduring problem in this State." *Id.* at 1347.

89.    In November 2015 at a rally for then-candidate Donald Trump in Birmingham, a

peaceful Black Lives Matter protester was punched and kicked by a group of men yelling, "Go home nigger." The next day, then-candidate Trump stated, "Maybe he should have been roughed up, because it was absolutely disgusting what he was doing."  The protestor had interrupted Trump's speech to shout "Black Lives Matter!"

90.     Roy Moore, candidate for U.S. Senate in the 2017 special election, stated at a revival in Jackson, Alabama, "They started [to] create new rights in 1965, and today we've got a problem," an apparent reference to the Voting Rights Act. When asked to speak about the last time America was great, Moore stated, "I think it was great at the time when families were united—even though we had slavery—they cared for one another. . . . Our families were strong, our country had a direction."

### Ongoing Effects of Alabama's History of Discrimination

91.     African-American residents of Alabama bear the effects of the state's history of discrimination in areas such as education, employment, income, and access to health care. In nearly every measure of every sphere of life, African Americans in Alabama lag behind whites. These socio-economic disadvantages hinder African Americans' ability to participate effectively in the political process. The effects of the history of de facto and de jure segregation in all realms of life—from transportation, to education, criminal justice, and business ownership—are still clearly visible in Alabama and continue to impact African Americans' access to the franchise. As late as the 1960s, Jim Crow was a grim reality in Alabama, as many African Americans attended separate and unequal schools, lived in dilapidated and deteriorating housing, and toiled as underpaid domestic and farm workers who were still completely shut out of the political process.

92.     In the present day, the disparities resulting from this state-sponsored discrimination remains. As of 2014, 43 school districts in Alabama were under some form of

federal oversight as a result of continued segregation, although the Supreme Court's landmark *Brown v. Board of Education* decision was issued 60 years earlier.

93.     African-American children still attend schools in racially segregated neighborhoods, and their families still disproportionately live in poverty. According to the 2012-2016 American Community Survey Five-Year Estimates, 30.1% of African Americans live below the poverty line, more than double the rate for white Alabamans. Similarly, 26.1% of African-American family households live below the poverty line, more than double the rate for white family households.

94.     Despite African Americans' ties to land and the agricultural industry in Alabama, they still lag behind economically, in large part because they have had limited access to land ownership historically. Following slavery, blacks worked as sharecroppers and labored under a highly exploitative system of tenant farming that preserved much of the power relations of slavery. This history is reflected in the economic status of African Americans as compared to whites in Alabama today.

95.      According to the 2012-2016 American Community Survey Five-Year Estimates, the median household income for white households is $51,684; the figure for African-American households is $30,180.

96.     African Americans in Alabama are unemployed at significantly higher rates than whites. The 2012-2016 American Community Survey Five-Year Estimates report that 7.5% of African Americans over age 16 are unemployed as compared to only 3.7% of whites over age 16.

97.     African Americans are significantly more likely to rent their home and to not have a vehicle available in their household as compared to whites.

98.     In 2010, the Alabama Department of Public Health reported that the infant

mortality rate for African Americans was 14.1%, nearly double the rate for white Alabamans.

99.     According to Alabama's Prison Policy Initiative, under 2010 Census numbers, African Americans represent only 26% of the total population but 54% of the total incarcerated population.

### Extent to Which African Americans Have Been Elected to Public Office

100.    African Americans are still woefully underrepresented in Alabama politics. Despite the fact that approximately 27% of Alabama's population is African American, none of the current statewide elected officials is African American. There has never been an African-American governor or senator. White majorities and severe racial bloc voting continue to cement these ongoing disparities.

101.    Because of white bloc voting against African-American candidates, only two African Americans have been elected to statewide office in the history of Alabama. Every other black statewide candidate has been defeated by a white candidate. The late Oscar Adams was appointed to a place on the Alabama Supreme Court in 1980; he won re-election in 1982 and 1988. When Justice Adams retired in 1993, the governor appointed another African American, Ralph Cook, to replace him. Justice Cook was re-elected in 1994.

### CAUSE OF ACTION

### S.B. 484 violates Section 2 of the Voting Rights Act

102.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

103.    Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any U.S. citizen to vote on account of race, color, or

membership in a language minority group. 52 U.S.C. § 10301(a).

104.    The current district boundaries of CDs 1, 2, 3, and 7 combine to "crack" and "pack" African Americans, resulting in the dilution of the electoral strength of the state's African-American residents, in violation of Section 2 of the Voting Rights Act.

105.    African Americans in Alabama are sufficiently numerous and geographically compact to constitute a majority of eligible voters in two congressional districts.

106.    Under Section 2 of the Voting Rights Act, the Alabama legislature was required to create a second majority-minority district in which African Americans have the opportunity to elect their candidates of choice.

107.    African-American voters in Alabama are politically cohesive, and elections in the state reveal a clear pattern of racially polarized voting that allows the bloc of white voters usually to defeat the African Americans' preferred candidates.

108.    The totality of the circumstances establishes that the current congressional map has the effect of denying African-American voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

109.    By engaging in the acts and omissions alleged herein, Defendant has acted and continues to act to deny Plaintiffs rights guaranteed to them by Section 2 of the Voting Rights Act. Defendant will continue to violate those rights absent relief granted by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.    Declare that S.B. 484 violates Section 2 of the Voting Rights Act.

B.    Order the adoption of a valid congressional redistricting plan that includes a

second majority-minority district in Alabama.

C.      Issue a permanent injunction enjoining Defendant, as well as his agents and successors in office, from enforcing or giving any effect to the boundaries of the congressional districts as drawn in S.B. 484, including an injunction barring Defendant from conducting any further congressional elections under the current map.

D.      Hold hearings, consider briefing and evidence, and otherwise take actions necessary to order a valid plan for new congressional districts in Alabama that comports with Section 2 of the Voting Rights Act.

E.      Grant such other or further relief the Court deems appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Dated:  July 23, 2018                  Respectfully submitted,

                                       By /s/ *Aria Branch*
                                       Marc Erik Elias (*admitted pro hac vice*)
                                       Bruce V. Spiva (*admitted pro hac vice*)
                                       Aria C. Branch (*admitted pro hac vice*)
                                       **Perkins Coie, LLP**
                                       700 13th St. N.W., Suite 600
                                       Washington, D.C. 20005-3960
                                       Phone: (202) 654-6338
                                       Fax: (202) 654-9106
                                       Email: MElias@perkinscoie.com
                                       Email: ABranch@perkinscoie.com

                                       Abha Khanna (*admitted pro hac vice*)
                                       **Perkins Coie, LLP**
                                       1201 Third Avenue, Ste. 4900
                                       Seattle, WA 98101-3099
                                       Phone: (206) 359-8000
                                       Fax: (206) 359-9000
                                       Email: AKhanna@perkinscoie.com

                                       *Richard P. Rouco* (AL Bar. No. 6182-R76R)
                                       **Quinn, Connor, Weaver, Davies & Rouco LLP**
                                       Two North Twentieth
                                       2-20th Street North, Suite 930
                                       Birmingham, AL 35203
                                       Phone: (205) 870-9989
                                       Fax: (205) 803-4143
                                       Email: rrouco@qcwdr.com

                                       *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on July 23, 2018, I filed the foregoing document electronically via the Court's CM/ECF system, which will send a copy to all counsel of record.

By /s/ *Aria Branch*
Aria C. Branch (*admitted pro hac vice*)
**Perkins Coie, LLP**
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
Email: ABranch@perkinscoie.com