FILED
2018 Aug-27  PM 04:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LAKEISHA CHESTNUT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CASE NO. 2:18-CV-00907-KOB |
| | ) | |
| JOHN H. MERRILL, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SEN. JIM MCCLENDON, | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |

## MOTION TO DISMISS THE AMENDED COMPLAINT

Comes now Alabama Senator Jim McClendon, as an Alabama Senator and member of the Alabama Legislature's Permanent Legislative Committee on Reapportionment, and pursuant to Rule 12, *Fed.R.Civ.P.* respectfully moves the Court to dismiss the amended complaint, *doc. 14*, and in support of this motion shows the following:

## THE COURT LACKS SUBJECT-MATTER JURISDICTION[1]

As the Court knows, 28 U.S.C § 2284(a) requires federal <u>constitutional</u> challenges to a state's congressional districts be heard by a three-judge court. To avoid a three-judge court, the plaintiffs (hereinafter collectively, "Chestnut") have brought their challenge under § 2 of the Voting Rights Act only – *i.e.*, they make a <u>statutory</u> challenge, not a constitutional one - and have uniquely eschewed claims under the 14th and 15th Amendments, which otherwise uniformly are made together with such § 2 claims. *See Page v. Bartels*, 248 F.3d 175, 190 (3rd. Cir. 2001) (observing that "statutory Voting Rights Act challenges to statewide legislative apportionment are generally" so "inextricably intertwined with constitutional challenges to such apportionment" that they "should be considered a single 'action' within the meaning of § 2284(a)"); *see also Johnson v. Ardoin*[2], No. 18-cv-625-SDD-EWD (M.D. La. July 31, 2018) (Memorandum in Support of

---

[1]     Sen. McClendon questions whether this case should be heard by a single-judge or a three-judge district court, but regardless of the ruling on that issue, this (single-judge) Court has jurisdiction to dismiss this case if it determines that the plaintiffs' claims are "wholly insubstantial or completely without merit." *United States v. St. Landry Parish School Board*, 601 F.2d 859, 863 (5th Cir. 1979) (re § 5 of the Voting Rights Act); *accord Kalson v. Paterson*, 542 F.3d 281, 287 (2nd Cir. 2008) ("Although 28 U.S.C § 2284 is jurisdictional, it has long been held that a single judge may dismiss a claim that must normally be heard by a three-judge court if it is insubstantial.").

[2]     The instant case, *Chestnut*, is one of three cases challenging congressional districts reportedly filed under the aegis of the National Democratic Redistricting Committee, dba the National Redistricting Foundation. *See* https://www.apnews.com/d30b289c43f543079555304f2be53b6a (last visited July 23, 2018). The other two are *Dwight v. Kemp*, No. 1:18-cv-2869 (N.D. Ga. June 13, 2018) and *Johnson v. Ardoin*, No. 3:13-cv-625-SDD-EWD (M.D. Ga. June 13, 2018). All three cases make the same basic legal argument under § 2 of the VRA, and make no parallel constitutional claims.

Defendant's Motion to Dismiss a parallel challenge to Louisiana's congressional districts, p. 3, n. 1 (pointing out the rarity of reapportionment challenges that do not include claims under the 14th and 15th Amendments as well as § 2 of the Voting Rights Act))(attached as Exhibit A).

The argument that this statutory challenge should be heard by a three-judge court comes down to the language of § 2284(a) and what Congress knew when it last amended that statute. The argument that Congress meant for all challenges to congressional reapportionment to be heard by three-judge courts is ably made by the Attorney General of Louisiana in its motion to dismiss in *Johnson v. Ardoin*, *Ex. A, pp. 2-6*, which Sen. McClendon adopts with the additional observation that Chestnut's argument ultimately rests on the sort of "magic language" that the Supreme Court disavowed in *Abbott v. Perez*, 138 S.Ct. 2305 (Jun. 25, 2018). In that case the Supreme Court was required to determine, for jurisdictional purposes, if a three-judge court's order was an injunction - and thus appealable - even though the three-judge court did not call it an injunction. Doing so required the Supreme Court to consider the wording of two statutes relating to interlocutory appeals, 28 U.S.C. § 1253 and § 1292(a)(1):

> The orders in these cases fall within § 1253 [allowing appeal of "an order granting ... an interlocutory ... injunction"]. To be sure, the District Court did not *call* its orders "injunctions" – in fact, it disclaimed the term ... but the label attached to an order is not dispositive. We have previously made clear that where an order has the 'practical effect' of granting or denying an injunction, it should be treated as such for purposes of appellate jurisdiction. ... We applied this test in Carson [*v. American Brands, Inc.*, 450 U.S. 79 (1981)], holding that an order that declined to enter a consent decree

prohibiting certain conduct could be appealed under § 1292(a)(1) because it was the practical equivalent of an order denying an injunction and threatened serious and perhaps irreparable harm if not immediately reviewed.

This 'practical effect' rule serves a valuable purpose. If an interlocutory injunction is improperly granted or denied, much harm can occur before the final decision in the district court. Lawful and important conduct may be barred, and unlawful and harmful conduct may be allowed to continue. Recognizing this, Congress authorized interlocutory appellate review for such orders. But if the availability of interlocutory review depended on the district court's use of the term 'injunction' or some other particular language, Congress's scheme would be frustrated. The harms that Congress wanted to avoid could occur so long as the district court was careful about its terminology. The 'practical effect' inquiry prevents such manipulation.

*Abbott*, 138 S.Ct. at 2319-2320. The Court then explained that although its "'practical effect' approach" was developed in cases dealing with § 1292(a)(1) [allowing appeals of "[i]nterlocutory orders ... granting injunctions"], the approach also applies to § 1253:

The provisions are also textually interlocked. Section 1292(a)(1) does not apply where "direct review may be had in the Supreme Court, *i.e.,* where § 1253 applies. If the "practical effects" test applied under § 1292(a)(1) but not § 1253, the consequences would be unfortunate and strange. We would have to identify the magic language needed for an order to qualify as an order granting or denying an injunction ....

*Abbott*, 138 S.Ct. at 2320.

Just as with the interlocutory appeal statutes the Supreme Court discussed in *Abbott*, challenges to congressional districts under the Constitution and the Voting Rights Act are interrelated. *Page*, 248 F.3d at 190 ("More significantly, it

is clear that questions regarding the legitimacy of an apportionment scheme, whether under the Constitution or the Voting Rights Act … are 'intimately related'…."). The amended complaint shows ignoring this interrelation frustrates Congress' reason in 1976 for continuing to require that challenges to congressional districts be heard by three-judge courts. As the relevant Senate Report said: "The bill preserves three-judge courts for cases involving congressional reapportionment … because it is the judgment of the committee that these issues are of such importance that they ought to be heard by a three-judge court …." S. REP. 94-204, at 1996 (1975).

The "practical effect" of a successful challenge to congressional districts is the same regardless of whether the claim is brought under §2 or under the 14th and 15th Amendments. To ignore this fact would grant Chestnut an end run around the procedure that Congress intended to be used when congressional districts are challenged: a three-judge court and quick direct appeal to the Supreme Court.[3] Because the practical effects of these challenges are the same, they should be treated the same. *Page*, 248 F.3d at 190 ("[W]e conclude that because statutory Voting Rights Act challenges to statewide legislative apportionment are generally inextricably intertwined with constitutional

---

[3] Given the importance of the interests at issue, it is probably inevitable that the decision of the district court will be appealed by one side or the other, and for this reason Chestnut's refusal to take advantage of the far speedier appeal available under § 2284(a) is a continuation by different means of her inexcusable delay in commencing this lawsuit, which is addressed below.

challenges to such apportionment, those claims should be considered a single 'action' within the meaning of § 2284(a)").

On a related point, in Chestnut's response to Secretary Merrill's motion to dismiss, Chestnut responds to the argument (not made by Secretary Merrill)  that when Congress narrowed the scope of § 2284 in 1976, it did so under the belief that all statewide reapportionment challenges would be constitutional, meaning that the language Congress used - "when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body" – did not reflect a choice that statutory claims would not be heard before three-judge courts.  Congress could have made no such choice because in 1976 no such choice existed: all such apportionment challenges were perforce constitutional until 1982, when Congress revised the Voting Rights Act to allow statutory vote dilutions claims. *See generally, Page*, 284 F.3d 189-190 (explaining the history of § 2284). Chestnut responds that Alabama's "claim that Section 2 was not available for reapportionment challenges prior to 1982 seems dubious at best," and cites to a 1980 Fifth Circuit decision in which Section 2 was used to challenge an at-large election scheme for a local school board. *Doc. 15, p. 8, n.3.* This argument misses the mark. Even assuming statutory vote dilution claims were possible before Congress amended the Voting Rights Act in 1982, the point remains that in 1976 when Congress narrowed the scope of § 2284, they were unheard of, and 1976, not 1982, is what matters in determining Congressional intent behind that

statute. The undersigned could not locate a vote dilution case brought under § 2 before 1976, when Congress amended the three-judge court statute. See Ex. B. These results indicate that in 1976 there was no vote dilution claim under § 2; all such challenges were constitutional. *E.g., Sims v. Baggett*, 247 F. Supp. 96 (M.D. Ala. 1965) (constitutional challenge Alabama legislative districts); *Kilgarlin v. Martin*, 252 F. Supp. 404 (S.D. Tex. 1966) (constitutional challenge to Texas legislative reapportionment plan); *Turner v. McKeithen*, 490 F.2d 191 (5th Cir. 1973) (constitutional vote dilution challenge to proposed multimember reapportionment plan). [4]

Congressional districting is important no matter how it is challenged, and a challenge under § 2 implicates delicate federal-state balances just as much as a constitutional challenge. This is precisely the kind of case that Congress intended to be heard by a three-judge court. *See Page*, 248 F.3d at 189 ("We do not believe

---

[4]     The Third Circuit avoided the issue of § 2284's applicability to statutory challenges by concocting a practical solution. In *Cavanaugh v. Brock*, 577 F. Supp. 176 (E.D.N.C. 1983), a challenge to North Carolina's General Assembly's districts, plaintiffs alleged violations of the <u>state</u> constitution– clearly not the sort of constitutional challenge envisioned for § 2284. In defense, North Carolina argued that the Voting Rights Act required it to split precincts (the alleged state constitutional violation), and a question for court was whether raising a federal statutory claim as a defense meant the case must be heard by a three-judge court. *Id.*, 577 F. Supp. at 180, n. 3 ("It is not clear to us that the invocation of a federal defense implicating the Voting Rights Act also generates three-judge court jurisdiction."). The Third Circuit sidestepped the issue: "Due to the substantial likelihood that this matter is beyond the purview of § 2284, Circuit Judge Philips, designated as a member of the statutory three-judge court, has also been designated pursuant to 28 U.S.C. § 291(b) [] to sit in the alternative as a district judge with other members of this court, with the court constituting in that mode a regular district court consisting of a panel of three district judges."). *See also* S. REP. 94-204, at 1994 (suggesting this alternative).

that Congress made a deliberate choice to distinguish between constitutional apportionment challenges and challenges brought under § 2 of the Voting Rights Act [as to the scope of§ 2284(a)]"). Consequently, the Court should dismiss the amended complaint for lack of subject-matter jurisdiction. If the Court denies this part of this motion, Sen. McClendon respectfully asks the Court to certify the question for interlocutory appeal under 26 U.S.C. § 1292(b). This issue meets the Eleventh Circuit's requirements for such interlocutory appeal: (1) the issue is a pure question of law, (2) and controls at least a substantial part of the case, (3) the issue would be specified by the district court in its order (if the Court agrees with this request), (4) there are substantial grounds for difference of opinion on the issue, and (5) resolution of the issue would reduce the amount of litigation necessary on remand. *See McFarlin v. Conseco Services, LLC*, 381 F.3d 1251, 1264 (11th Cir. 2004)(specifying five requirements for granting interlocutory appeal under § 2292(b)); *see also Johnson, Ex. A, doc. 16-1, p. 5-6.* Further, if the Court were to certify this issue for interlocutory appeal, Sen. McClendon would request the Court to enter an order staying proceedings before this Court pending the interlocutory appeal.

**THE AMENDED COMPLAINT FAILS TO DEMONSTRATE
THE EXISTENCE OF A PROPER REMEDY
AND SO IT FAILS TO ESTABLISH THAT PLAINTIFFS HAVE STANDING**

The "irreducible constitutional minimum of standing" has three components: an injury in fact, a causal connection between the injury and the

conduct complained of, and a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements," which "are not mere pleading requirements but rather an indispensable part of the plaintiff[s'] case ...." *Id.* In other words, a plaintiff's failure to establish an injury means that plaintiff lacks standing, which in turn means the plaintiff's case must be dismissed.

The initial test of a claim for vote dilution under § 2 of the Voting Rights Act is its ability to cross the threshold laid down by the Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30 (1986):

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. [] Second, the minority group must be able to show that it is politically cohesive. [] Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, [] —usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 50-51 (footnote and citations omitted). The first of these requirements has particular importance. "The reason that a minority group making such a challenge must show, <u>as a threshold matter</u>, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot

claim to have been injured by that structure or practice." *Id.* at 52 n.17 (underlining added).

Mindful of *Gingles*' threshold requirement, Chestnut has alleged that "[t]he African-American population in Alabama is sufficiently numerous and geographically compact to form a majority of eligible voters – meaning a majority of the voting age population - in two congressional districts." *Doc. 14, ¶ 6* (footnote omitted), *see also id.* ¶ 105 (same allegation). However, she pleaded no facts to support this conclusory allegation.

The modern standard for pleading a cause of action, set forth by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), is not onerous, and can be satisfied simply by alleging sufficient facts to show that a claim is more than speculative. As summarized by the Eleventh Circuit:

> To survive dismissal for failure to state a claim, the "factual allegations in the complaint, accepted as true, must be sufficient to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In other words, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Id.* at 570. The well-pled facts in the complaint must be sufficient to "permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).
>
> A complaint that offers "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement" will not be sufficient to withstand a motion to dismiss. (internal quotation marks omitted; alteration adopted). Likewise, we have stated that "conclusory allegations, unwarranted deductions of facts[,] or legal conclusions

masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

*Lopez v. United States*, 2016 WL 3771824 *5 (11th Cir. July 15, 2016) (parallel citations omitted); *see also, e.g., Mallory v. Biomet*, 2014 WL 6890740 *5 (M.D. Ala. Dec. 4, 2014)(same). As further summarized by this Court, "Pleadings that contain nothing more than a formulaic recitation of the elements of a cause of action do not meet Rule 8 standards." *Teitel v. Capell Howard, P.C.*, 2018 WL 525296, *3 (N.D. Ala. 2018)(internal quotation marks removed).

Chestnut's amended complaint does not meet this pleading standard. Merely asserting in ¶¶ 6 and 105 that the "African-American population in Alabama is sufficiently numerous and geographically compact to form a majority of eligible voters ... in two congressional districts" is an example of the sort of "formulaic recitation of the elements of a cause of action" and "naked assertion[] devoid of further factual enhancement" that is "not sufficient to withstand a motion to dismiss." *Broward Citizens for Fair Districts v. Broward County*, 2012 WL 1110053, *4-*5 (N.D. Fla. 2012)(granting motion to dismiss where plaintiffs alleged without necessary factual support that the "voting electorate ... in Commission Districts 1 and 7 .. have become sufficiently large and geographically compact to constitute a majority of those districts", and saying "Merely reciting the elements of a cause of action, as the Plaintiffs have done, does not meet this standard."). Rather than the conclusory allegations pleaded in ¶¶ 6 and 105 of the amended complaint, *Twombly* and *Iqbal*, and the Eleventh Circuit's and this

Court's cases construing them require Chestnut to have pleaded enough facts to move her complaint across the line from speculative to "plausible on its face."

To be specific, to meet the first *Gingles* requirement, which Chestnut had to do to establish an injury, and thus standing, Chestnut was required to include in her pleading a map[5] showing that *Gingles'* first requirement could, as a matter of fact, have been drawn by Alabama. *Wright v. Sumter County Bd. of Elections and Registrations*, 2014 WL 1347427, *2 (M.D. Ga. 2014) (denying motion for preliminary injunction, and saying: "Wright did not satisfy the first *Gingles* factor. The Eleventh Circuit has 'repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy.' ... Beyond his request that the Court 'order districts for the Sumter County, Georgia School Board to have nine districts only,' which the Court cannot command, Wright did not propose or identify any scheme or district division—a benchmark—that would provide black voters better access to the political process. '[A] court cannot determine whether the voting strength of a minority has been impermissibly diluted without having some alternative electoral structure in mind for comparison.' ... Wright's failure to identify an alternative scheme is fatal to his

---

[5]    Sen. McClendon does not foreclose the possibility of establishing *Gingles'* first requirement without a map – for example, Chestnut could designate all of the census blocks that would be included in a *Gingles*-compliant district, but that would be a very cumbersome thing to do. As a practical matter, a map, with the usual accompanying population reports, is the practical and obvious way to show compliance with *Gingles,* particularly given that at some point in the litigation Chestnut will have to produce an actual map, and it is difficult to believe that Chestnut commenced this expensive litigation without reason for believing that she could meet *Gingles'* first requirement.

dilution claim.")(underlining added; citations omitted); *Broward Citizens for Fair Districts v. Broward County*, 2012 WL 1110053, \*5, n. 6 (N.D. Fla. 2012)(granting motion to dismiss and saying: "In its Reply, Broward County also points out that Plaintiffs have failed to present alternative maps to the Court or 'offer any information about how they would create majority Black districts.' … The Court agrees that this represents an additional pleading deficiency in Plaintiffs' Amended Complaint. The Eleventh Circuit has 'repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy.' …. Plaintiffs mere allegation that '[s]everal alternate maps were presented to the County Commission which would potentially achieve the objectives of the County's redistricting mandate without violating the constitutional rights of the Black and other minority voting population' is conclusory and insufficient to meet Plaintiffs' pleading burden. *See Iqbal,* 129 S.Ct. at 1950 ('Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.').")); *see also Nipper v. Smith*, 39 F.3d 1494, 1530-31 (11th Cir 1994) ("The rationale of the *Gingles* decision demonstrates that, if a plaintiff's section 2 claim alleges vote dilution, then the plaintiff must meet *Gingles'* threshold criteria regardless of the nature of the office at stake. … The first *Gingles* precondition, informed by the second, dictates that the issue of remedy is part of the plaintiff's prima facie case in section 2 vote dilution cases. As the Supreme Court has explained, "[t]he

'geographically compact [minority]' and 'minority political cohesion' showings [in the *Gingles* threshold test] are needed to establish that the minority has the potential to elect a representative of its own choice from some single-member district." .... Accordingly, we read the first threshold factor of *Gingles* to require that there must be a remedy within the confines of the state's judicial model that does not undermine the administration of justice."); *Brooks v. Miller*, 158 F.3d 1230, 1239 (11th Cir. 1998); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999) ("We have repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy. *See Brooks v. Miller,* 158 F.3d 1230, 1239 (11th Cir.1998), *cert. denied,* 526 U.S. 1131[]; *Davis v. Chiles,* 139 F.3d 1414, 1419 (11th Cir.1998), *cert. denied,* 526 U.S. 1003 [] (1999); *Southern Christian Leadership Conference v. Sessions,* 56 F.3d 1281, 1289, 1294–97 (11th Cir.1995) (en banc); *Nipper v. Smith,* 39 F.3d 1494, 1530–31 (11th Cir.1994) (en banc). This requirement simply serves "'to establish that the minority has the potential to elect a representative of its own choice from some single-member district.' " *Nipper,* 39 F.3d at 1530 (quoting *Growe v. Emison,* 507 U.S. 25, 40, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993)). Thus, if a minority cannot establish that an alternate election scheme exists that would provide better access to the political process, then the challenged voting practice is not responsible for the claimed injury."); *Johnson v. DeSoto County Board of Commissioners*, 204 F.3d 1335, 1343 (11th Cir. 2000) ("On this record, the district court (considering all the evidence including the 1990 census) did not

clearly err in finding and in concluding that Plaintiffs failed to show the existence of the black-majority district needed to establish their prima facie case of vote dilution.").

Chestnut's failure to establish an injury is curious, given that the relevant data have been available since the 2010 Census was released February 2011 and it is fair to assume that before commencing this lawsuit Chestnut sought factual confirmation that Alabama's black voting-age population (BVAP) population were "sufficiently large and geographically compact to constitute a majority in a [second] single-member district". Nevertheless, Chestnut's failure to show in her complaint that the first *Gingles* prerequisite could be satisfied means that she lacks standing. Therefore the amended complaint should be dismissed. In the alternative, because this issue also meets *McFarlin*'s five requirements for interlocutory appeal, Sen. McClendon respectfully requests the Court to certify this issue for interlocutory appeal if the Court declines to dismiss, and to stay proceedings before this Court while the interlocutory appeal is pending.

### CHESTNUT'S AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE HER DELAY IN BRINGING IT WAS INEXCUSABLE AND PREJUDICIAL

The 2010 Census result for the State of Alabama was released in February 2011. Those data contained all of the information that Chestnut needed or could have used to bring the claim that instead she waited over seven years to bring in June 2018. In the intervening years, there have been four Congressional elections: 2012, 2014, 2016, and 2018 (pending). And while the census results

have not changed, their accuracy has, because of demographic changes over the past eight years since the 2010 Census. What's more, we now are on the threshold of the 2020 Census, which when released in 2021 will be used to draw new congressional districts for Alabama. In February 2021, the State of Alabama will receive the Alabama results from the 2020 Census and will start redistricting. At that time, the Legislature already will be in session, and will need to complete redistricting before it recesses in May (if not earlier) so that candidates for Congress and the Legislature can start campaigning in new districts for the 2022 election. If this case takes half as long as the recent 5-year long legislative redistricting case[6], then it will be concluded at about the time the Legislature takes up redistricting. And although plaintiff's counsel will argue that congressional redistricting is not as complicated as legislative redistricting, and will insist that this case can get to a final decision in fewer than 2.5 years, they

---

[6]     Redistricting cases are not simple and they are not quickly resolved; they almost always involve at least one appeal, and often a remand that the trial court must act upon. For example, *Abbott v. Perez*, the challenge to Texas' congressional and legislative districts mentioned above, was commended before a three-judge court in 2011, just after the challenged plans we enacted, and no final order is yet in sight. By this measure, the last redistricting challenge in Alabama, which consolidated separate claims brought by the Alabama Legislative Black Caucus and the Alabama Democratic Conference, was a model of judicial speed and took only five years to complete, running from October 10, 2012 (when a stay was lifted after the new legislative plans were precleared by Attorney General Holder) until October 23, 2017 (when final judgment approving the State's remedial legislative districts was entered). *See Alabama Legislative Black Caucus v. State of Alabama, No. 2:12-cv-691-WKW-MHT-WHP (docket sheet).* The case included a trial, 989 F. Supp. 2d 1227 (M.D. Ala. 2013), an appeal and oral argument to the Supreme Court, 135 S.Ct 1257 (2015), a remand, 231 F. Supp. 2d 1026 (2017), and passage of remedial districts by the Legislature.

also are insisting that this case not follow the most expeditious route to a final decision, *i.e.*, trial before a three judge court and direct appeal to the Supreme Court, instead of trial before a single judge with an appeal to the Eleventh Circuit and review by writ of certiorari by the Supreme Court.

To apply laches against Chestnut requires a showing that she delayed in bringing her vote dilution claim, that her delay was inexcusable, and that her inexcusable delay unduly prejudiced Secretary Merrill and Sen. McClendon – or more broadly and accurately, the State of Alabama. *In re Woide*, 730 Fed.Appx. 731, *736 (11th Cir. April 5, 2018); *E.E.O.C. v. Dressler Industries, Inc*., 668 F2d 1199, 1202 (11th Cir. 1982) ("To apply laches in a particular case, the court must find both that the plaintiff delayed inexcusably in bringing the suit and that this delay unduly prejudiced defendants."). These elements are easily established.

First, Chestnut's claim became available to her in June 2011 when Alabama's new congressional districts were enacted with only one majority-black district, despite the fact that the 2010 Census established – she alleges – that two majority-black districts could have been drawn, and that, she alleges, the Voting Rights Act required drawing two majority-black districts. Instead of challenging the new congressional districts, she waited seven years to bring the very same challenge she could have brought in 2011. Chestnut unquestionably delayed.

Two, Chestnut's delay was clearly inexcusable. The information on which her claim necessarily is based – the 2010 Census results - became available in February 2011. Since then there has been no change in those data, or in other

17

relevant facts, or in the law that was necessary for her to bring her lawsuit. There was no impediment to her bringing a § 2 vote dilution claim in 2011.[7]

Three, the State of Alabama would be unduly prejudiced by allowing Chestnut's claim to proceed. Assuming Chestnut were to prevail, and that a final decision could be reached in 2019 or 2020 (an unlikely assumption, *see supra* n.7), new districts would be drawn on the basis of the 2010 Census, which would be at least nine of ten years out-of-date. It unduly prejudice the State, office holders, candidates, and voters to require the drawing of new districts using data no one pretends portrays accurately the State's present demographics. Also, the Census Bureau estimates broad variances in how populations of Alabama counties have changed since 2010. According to the Bureau's most recent estimates, Mobile County's population has barely changed (+.2%)[8], neighboring Baldwin County's has increased by 16.7 %, Lee County's increased by 15.2%, and Conecuh County's decreased by 5.2%, and all of these counties would likely be included in or impacted by Chestnut's efforts to draw a second majority-black congressional district. As this example shows, using outdated Census data to

---

[7]   Chestnut may respond that she could not have commenced this claim until she moved to Congressional District 1. The amended complaint alleges she did that in 2016, *doc. 14, ¶ 13*, but it does not say where she lived before then, and it does not address where the other nine plaintiffs live or have lived. But even in the unlikely event that from 2011 until just recently no plaintiff lived in a location that plaintiffs claim would be a basis for standing to sue, the real party in interest in this case is a political entity that - this case itself shows - is able to recruit plaintiffs at will. *See supra* n. 4. There is no reason why this case could not have been brought in 2011.

[8]   These 2018 Census Bureau as from U.S. Bureau QuickFacts: Alabama, https://www.census.gov/quickfacts/al (last visited August 26, 2018).

draw new districts would violate one-person, one-vote and lay the basis for a separate counter-lawsuit under the Equal Protection Clause.

In addition, Alabamians would be prejudiced if the Legislature were required to spend time and resources with redistricting, taking attention away from other important Legislative activities, only months before the Legislature must take up that task again after the 2020 Census. It would be senseless to do as Chestnut asks, and require the Legislature to redistrict twice in such a short period of time. Following this reasoning, the court in *MacGovern v. Connolly*, refused to order a redistricting where plaintiffs inexcusably delayed until the last moment their challenge to Massachusetts legislative district:

> Equity demands that a federal court stay its hand when judicial relief makes no sense. This action, in which the remedy sought would come at great cost and yield results that are at best uncertain, and at worst, perverse, is plainly such a case. When the massive disruption to the political process of the Commonwealth is weighed against the harm to plaintiffs of suffering through one more election based on an allegedly invalid redistricting scheme, equity requires that we deny relief.

*Id.*, 637 F. Supp. 111, 116 (D. Mass. 1986).

Moreover, Alabama is projected to lose a Congressional seat based on the 2020 Census. Were that to happen, the boundaries of new districts would vary significantly from any remedial districts. For this reason, a demonstration by Chestnut of the possibility of drawing two majority-black districts with seven congressional seats would not establish a precedent that two majority-black

districts could be drawn using 2020 Census data, or when there are only six Congressional districts.

In *Fouts v. Harris*, the Court found that very similar facts were unduly prejudicial to the State of Florida. *Id.*, 88 F. Supp. 2d 1351 (S.D. Fla. 1999). Plaintiffs in *Fouts* brought a challenge to Florida's congressional districts in 1998. The State of Florida asserted laches:

> Defendants assert that they are prejudiced by the Plaintiff's delay in bringing this action because (1) over the six years [since the then-existing congressional districts went into effect] and three election cycles voters have come to know their districts and candidates, and will be confused by change; and (2) requiring redistricting now, before the 2000 census will result in two redistrictings within a two year period, with resulting in voter confusion, instability, dislocation, and [a] financial and logistical burden on the state.

*Id.*, 88 F. Supp. 2d at 1354. Relying on a Fourth Circuit decision, the District Court dismissed the case on the basis of laches:

> The dangers of such frequent redistrictings were the basis for the *White* court's decision to impose the defense of laches. The *White* court stated:
>
>> [i]f we affirm the district court's order, the Board will be required to reapportion itself this year and it will probably be required to do so again next year, when the results of the 1990 census are available. *We believe that two reapportionments within a short period of two years would greatly prejudice the County and its citizens by creating instability and dislocation in the electoral system and by imposing great financial and logistical burdens.*

> *White,* 909 F.2d at 104 (emphasis added).

> Moreover, if the Court were to impose redistricting before the 2000 census, such redistricting would necessarily be based on 1990 census

> figures. Such old census figures have been recognized as unduly prejudicial because they fail to provide a basis for "fair and accurate representation for the citizens."
>
> Therefore, the defendants have established each of the three elements necessary to assert the defense of laches. Accordingly, the motions to dismiss will be granted as to that issue.

*Fouts*, 88 F. Supp. 2d at 1354-1355 (*quoting and citing White v. Daniel*, 909 F.2d 99 (4th Cir. 1990))(emphasis added in *Fouts*).

*Fouts* was cited approvingly by the Eleventh Circuit in another redistricting case, *Sanders v. Dooly County, Ga*., 245 F.3d 1289 (11th Cir. 2001). The *Sanders* complaint attacked a joint county commission-board of education redistricting plan, but as in this case, the *Sanders* plaintiffs had waited until two years before the next census to file their complaint. On appeal, the Eleventh Circuit affirmed the District Court's dismissal for laches of plaintiff's claims for injunctive relief:

> The district court granted the defendants summary judgment on laches grounds. According to the court, the plaintiffs' waiting until November 1998 to file suit—over six years after the first use of the plan and five years after *Shaw v. Reno* issued—was an inexcusable delay. This delay prejudiced the defendants and citizens of Dooly County, the court concluded, in two principal ways: (1) redistricting late in the decade would lead to back-to-back redistrictings (the court-ordered one and the one using new census data) that would confuse voters and be unnecessarily costly to the County; and (2) the census data available to redistrict now are over ten years old and thus unreliable. The plaintiffs appeal.
> ....
>
> Turning to the merits, we conclude that the district court did not abuse its discretion in deeming the claims seeking injunctive relief to be laches-barred for the reasons that we described above. *Cf. Fouts v. Harris,* 88 F. Supp. 2d 1351, 1353 (S.D.Fla.1999) (relying on similar laches reasoning to dismiss *Shaw* claims), *aff'd sub nom.*

> *Chandler v. Harris,* 529 U.S. 1084, 120 S.Ct. 1716, 146 L.Ed.2d 639 (2000).

*Sanders*, 245 F.3d at 1290-1291.

However, the Eleventh Circuit reached a different conclusion on the plaintiffs' claim for declaratory relief:

> But we do think that the district court overstepped its discretion in judging the claims for declaratory relief to be similarly barred, because the third element of a laches defense—prejudice to the defendants from the unexcused delay—is missing. ... None of the grounds for prejudice that the district court relied on applies to the plaintiffs' claims for a declaration that the 1992 plan violates the Equal Protection Clause. There is no risk of confusion from a redistricting, obviously; no burden to the county to redistrict; and no use of out-of-date census data. An effect of a grant of such declaratory relief could be to prevent the Attorney General from using the 1993 consent-decree plan as a baseline for retrogression analysis in the post–2000 census round of preclearance proceedings under § 5 of the Voting Rights Act, but that effect is no more prejudicial to the defendants now than it would have been in 1993.

*Id.*, 245 F.3d at 1291-2192 (footnotes omitted). This part of *Sander*s is distinguishable. The specific benefit to plaintiffs that the Eleventh Circuit identified – resetting the benchmark for purposes of Section 5 review – is of no use to Chestnut. And whether two majority-black districts could have been drawn in 2011 is speculative as to whether two such districts will be drawable after the 2020 Census, particularly if Alabama loses a seat in Congress, leaving the state with only six Representatives.

Chestnut waited too late to bring her suit, and the defendants and State of Alabama would be unduly prejudiced if the Court were to overlook her inexcusable delay and allow her case to go forward.

## **CONCLUSION**

For the reasons shown above, Sen. McClendon respectfully moves the Court to:

> a. dismiss the amended complaint for lack of subject-matter jurisdiction, or in the alternative certify for interlocutory appeal the issue of whether Chestnut's § 2 challenge to the State's congressional districts must be heard by a three-judge court, and stay proceedings before this Court while the interlocutory appeal is pending;
>
> b. dismiss the amended complaint because Chestnut failed to state a claim of vote dilution, or in the alternative certify for interlocutory appeal the issue of whether Chestnut must satisfy *Gingles'* first threshold requirement in her complaint, and stay proceedings before this Court while the interlocutory appeal is pending, and
>
> c. dismiss the amended complaint because Chestnut inexcusably delayed in commencing this case, and allowing it to proceed would unduly prejudice defendants, the State of Alabama, members of the Legislature, candidates, and voters.

Respectfully submitted this the 27th day of August, 2018.


*/s/Dorman Walker*
Counsel for Intervenor

**OF COUNSEL:**

Dorman Walker (ASB-9154-R81J)
dwalker@balch.com
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115

## CERTIFICATE OF SERVICE

      I certify that on August 27, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a copy to the following:

    Aria C. Branch
    Marc E. Elias
    Bruce V. Spiva
    Perkins Coie LLP
    700 13th Street, NW, Suite 600
    Washington, DC 20005

    Abha Khanna
    Perkins Coie LLP
    1201 Third Avenue, Ste. 4900
    Seattle, WA  98101

    Richard P. Rouco
    Quinn Connor Weaver Davies & Rouco, LLP
    Two North Twentieth Street
    Suite 930
    Birmingham, AL 35203

    James W. Davis
    Brad A. Chynoweth
    Laura E. Howell
    Misty Fairbanks Messick
    Winfield J. Sinclair
    Office of Attorney General
    Post Office Box 300152
    Montgomery, AL  36130-0152

24

*s/Dorman Walker*
Of Counsel

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JAMILA JOHNSON, et al. | |
| Plaintiffs, | |
| v. | Case No. 3:18-cv-625-SDD-EWD |
| KYLE ARDOIN, in his official capacity as the Acting Secretary of State of Louisiana, | |
| Defendant. | |

## MEMORADUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Plaintiffs bring a claim under § 2 of the Voting Rights Act of 1965 ("VRA") alleging that the Louisiana Legislature intentionally "packed" and "cracked" African American voters to dilute their vote when it created a single majority-minority district in Louisiana following the 2010 census. As such, Plaintiffs seek declaratory and injunctive relief as well as a court-ordered re-drawing of at least some of Louisiana's Congressional Districts.

As a threshold matter, this Court lacks jurisdiction to hear this case because Plaintiffs have failed to request a three-judge court pursuant to 28 U.S.C. § 2284. Notwithstanding the three-judge court issue, this Court lacks subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) because the Plaintiffs lack standing to bring these claims. Furthermore, the Plaintiffs never sufficiently allege that a second *compact* congressional district can be created in Louisiana. Because of this, and other defects found on the face of the Complaint, Plaintiffs have failed to state a claim under 12(b)(6). Finally, this case should be dismissed on the equitable ground of laches since Plaintiffs waited until mere months before the fourth congressional elections held under the current Louisiana apportionment plan, and seek a new plan for only the fifth and last election cycle to be held under the current plan.

**I.    Plaintiffs Have Failed to Request a Three-Judge Panel and Therefore this Court Should Dismiss the Complaint.**

Section 2284 of Chapter 28 of the United States Code states, in relevant part, that "[a] district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the apportionment of congressional districts . . . ." 28 U.S.C. § 2284. Through artful pleading, Plaintiffs attempt to avoid the statutory trigger for a three-judge court under 28 U.S.C. § 2284 by not *expressly* raising claims under the Fourteenth and Fifteenth Amendments to the United States Constitution. However, an examination of the text reveals, as noted in *City of Mobile*, the underlying language of Section 2 of Voting Rights Act and the Fifteenth Amendment are essentially identical. *See City of Mobile v. Bolden,* 446 U.S. 55, 61 (1980). The Fifteenth Amendment provides, "[t]he *right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color*, or previous condition of servitude . . . . " (emphasis added). Section 2 of the Voting Rights Act provides, "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner *which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color,* or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b)." 52 U.S.C. § 10301 (emphasis added). Subsection (b) was added in 1982 in order to add the totality of the circumstances test.

The Plaintiffs' actions in this case create an issue of first impression for the federal judiciary: can a plaintiff skirt the provisions of 28 U.S.C. § 2284, therefore avoiding a three-judge panel, by not expressly mentioning constitutional claims when bringing a claim under

Section 2 of the Voting Rights Act of 1965? As will be shown, this attempted end-run around federal law is as ill-fated as it is unprecedented.[1]

As the United States Supreme Court noted in *City of Mobile v. Bolden*, "Section 2 was an uncontroversial provision in proposed legislation whose other provisions engendered protracted dispute. . . . The view that this section simply restated the prohibitions already contained in the Fifteenth Amendment was expressed without contradiction during the Senate hearings." 446 U.S. at 61. Both the legislative history of 28 U.S.C. § 2284 and purposes and effect of the Voting Rights Act lead inexorably to the conclusion that this action should be dismissed, or alternatively, referred to the Chief Justice for Fifth Circuit for the impaneling of a three-judge court. In fact, pursuant to 28 U.S.C. § 2284 this Court lacks power to do anything else.

   a. **The Purposes of the Voting Rights Act and the Legislative History of Section 2284 Make Clear that all Cases Brought Under the Voting Rights Act Are Required to Be Heard by a Panel of Three Judges.**

In *Page v. Bartels*, the Court of Appeals for the Third Circuit looked extensively at the history and purpose of both the Voting Rights Act and Section 2284. 248 F.3d 175 (3d Cir. 2001). The court in *Page* held that when constitutional and Voting Rights Act claims are brought together, a single district court judge could not separately reach claims brought under the Voting Rights Act without referring the case to a three judge panel under 28 U.S.C. § 2284.[2] *Id.* at 190.

---

[1] It is interesting to note that a review of the case law shows that singular claims under the Voting Rights Act are exceedingly rare. In fact, Counsel for Defendant is unaware of any instance such a claim made it past the Motion to Dismiss stage. *See Huertas v. City of Camden*, 245 Fed. Appx. 168 (3d Cir. 2007). However, Plaintiffs' counsel now brings three such claims, including this one, presumably in an effort to avoid a three-judge panel for reasons that are currently unclear. *See Chestnut v. Merrill*, No. 2:18-cv-907 (N.D. Ala. 2018); *Dwight v. Kemp*, No. 1:18-cv-2869 (N.D. Ga. 2018).

[2] While the holding and underlying facts in *Page* are not entirely on point, the same reasoning undergirding the court's holding, and its discussion of the history and purpose of the three-judge court statute, is wholly applicable here. Furthermore, there is a lack of precedent in this context simply because Voting Rights Act claims are universally brought in concert with claims under the Fourteenth or Fifteenth Amendments. Based on counsel's research, this instant action and two cases filed the same day as the complaint in this matter in federal courts in Georgia and Alabama by the same counsel appear to be the first time congressional districts have ever been challenged under Section 2 without an express invocation of a constitutional amendment in the complaint. *Compare*

As an initial matter, it is well accepted by the courts that the Voting Rights Act is simply Congress enforcing provisions of the Fourteenth and Fifteenth Amendments. *See e.g. City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) ("We have also concluded that . . . measures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments, despite the burdens those measures placed on the States."); *Lewis v. Governor of Ala.,* No. 17-11009, *17-18 (11th Cir. July 25, 2018) ("The Voting Rights Act, which is designed to implement the Fifteenth Amendment and, in some respects, the Fourteenth Amendment was enacted pursuant to an identical enforcement provision, U.S. Const. amend. XV, § 2, which the Supreme Court has referred to [in *City of Boerne*] as a parallel power to enforce the provisions of the Fifteenth Amendment." (internal quotations and citations omitted)); U.S. Const. amend. XV, § 2 ("The Congress shall have the power to enforce this article by appropriate legislation."); U.S. Const. amend. XIV, § 5 ("The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.").

In 1976, Congress revised 28 U.S.C. § 2284 to its current form "in response to complaints" that the statute as then written was "cumbersome, labyrinthine, and unnecessary." *Page*, 248 F.3d at 189. When enacting the change it is clear from the legislative history that "Congress was concerned less with the source of the law on which the apportionment challenge was based than on the *unique importance of apportionment cases generally*." *Id.* at 190 (emphasis added). This is further reinforced by the fact that when the 1976 amendments were made, the only possible claim to invalidate a congressional apportionment under the Voting Rights Act was under §5, which itself provides for a three-judge court. *Id.* at 189-90. In other words, when Congress amended § 2284 it appeared nearly impossible for "any case involving

---

Complaint (Doc. No. 1) (*filed* June 13, 2018) *with Chestnut*, No. 2:18-cv-907 (*filed* June 13, 2018); *and Dwight*, No. 1:18-cv-2869 (*filed* June 13, 2018).

congressional reapportionment," *see* 28 U.S.C. § 2284, to be brought in federal court and *not* be subject to a panel of three-judges. *See Page*, 248 F.3d at 189; *see also Allen v. State Bd. of Elections*, 393 U.S. 544, 569 (1969).

This properly captures Congress' understanding of the three-judge statute at the time it was written because "[t]he Senate Report . . . consistently states that 'three-judge courts would be retained . . . in any case involving congressional reapportionment or the reapportionment of any statewide legislative body. . . .'" *Page*, 248 F.3d at 190 (second alteration in original) (citing and quoting S. Rep. No. 94-204 (1976), reprinted in 1976 U.S.C.C.A.N. 1988, 1988). As such, "[c]hallenges to apportionment are the kinds of claims requiring what has been described as the 'special and extraordinary procedure' represented by the convening of a three-judge district court." *Page*, 248 F.3d at 190 (citing and quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 155 (1963)).

This Court, composed of a single judge, lacks subject matter jurisdiction over this matter. Defendant requests that if this portion of the Motion to Dismiss is denied, that the question be certified for immediate appeal pursuant to 26 USC 1292(b), because it is a significantly important question and it is vital to the judicial economy of this matter.[3] *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 914-15 (5th Cir. 2008) (accepting certified question of a denial of motion to dismiss for lack of subject matter jurisdiction); *Lemery v. Ford Motor Co.*, 244 F. Supp. 2d 720, 728-29 (S.D. Tex. 2002) (district court certifying question under § 1292(b) as there was an outstanding "controlling question of law concerning the Court's subject matter jurisdiction.") If a single judge does not have jurisdiction over this claim, it would be a

---

[3] 28 U.S.C. § 1292(b) states, in relevant part, that "[w]hen a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order."

significant waste of resources to proceed with this action for it to be vacated, only to have to rehear the entire matter before a fully composed three-judge panel. *See Lemery,* 244 F. Supp. 2d at 728 ("It would pain the Court to see both attorneys of this excellence and well-motivated Parties proceed to judgment after considerable expense and delay, only to discover that the judgment must be overturned on appeal because the federal judiciary lacks subject matter jurisdiction.").

II.     **This Court Is Without Jurisdiction as Plaintiffs Lack Standing to Bring Their Claims.**

   a.  **Legal Standard**

The determination of whether a case or controversy exists is jurisdictional. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-241 (1937). When a Motion to Dismiss is predicated on jurisdictional and other grounds, the court should first resolve the jurisdictional issue before an attack on the merits of the claim. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

When addressing a lack of subject matter jurisdiction, "[a] court may base its disposition of a motion to dismiss . . . on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Robinson v. TCI/US West Communs.*, 117 F.3d 900, 904 (5th Cir. 1997). The allegations in the Plaintiffs' complaint receive no presumption of the truthfulness when determining whether the court has jurisdiction. *Montez v. Dep't of the Navy*, 392 F.3d 147, 149 (5th Cir. 2004). Accordingly, the burden of proof for a Rule 12(b)(1) Motion to Dismiss is on the party asserting jurisdiction. *Ramming*, 281 F.3d. at 161. In this case, the Plaintiff constantly bears this burden. *See id.*

As this Court is no doubt aware, Article III of the U.S. Constitution limits the jurisdiction of federal courts to "cases" or "controversies." *See* U.S. Const. art. III, § 2; *Allen v. Wright*, 468

U.S. 737, 750 (1984); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). "The case-or-controversy doctrines state fundamental limits on federal judicial power in our system of government." *Allen*, 468 U.S. at 750. Standing "is perhaps the most important of these doctrines." *Id.* To invoke federal jurisdiction under Article III, a plaintiff must establish the following "irreducible constitutional minimum[s] of standing": (1) an injury-in-fact; (2) traceability; and (3) redressability. *Lujan*, 504 U.S. at 560-61.

Nowhere in their Complaint do Plaintiffs meet the "irreducible constitutional minimum[s]" of standing required by *Lujan* and its progeny. To meet the redressability requirement a plaintiff must "show[] that a favorable decision will relieve a discrete injury to himself." *James v. City of Dallas*, 254 F.3d 551, 556, n.14 (5th Cir. 2001). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). Without standing, Plaintiffs merely make a "generalized grievance against governmental conduct of which he or she does not approve." United States v. *Hays*, 515 U.S. 737, 745 (1995); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1921 (2018).

The Supreme Court in *Gingles* stated that to make a successful claim under § 2, "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). Therefore, any viable § 2 remedy *must be reasonably compact. League of Latin Am. Citizens v. Perry*, 548 U.S. 399, 430 (2006). Plaintiffs have failed to produce any proof that: (1) any of the Plaintiffs would actually live in either newly created majority-minority district; and (2) the newly formed districts containing Plaintiffs would be reasonably compact. The lack of a viable remedial plan is a pleading failure under Rule 8 and *Iqbal. See Broward Citizens for*

*Fair Dists. v. Broward County*, 2012 U.S. Dist. LEXIS 46828, *18, n. 6 (S.D. Fla. 2012) ("The first *Gingles* factor . . . requir[es] a plaintiff to demonstrate the existence of a proper remedy. Plaintiffs mere allegation that [a possible remedial maps exist] is conclusory and insufficient to meet Plaintiffs' pleading burden."). The Supreme Court has "set out the condition that a challenge to an existing set of single-member districts must show the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *League of Latin Am. Citizens*, 548 U.S. 399 (internal quotations omitted). The failure of Plaintiffs to allege with any specificity that they would, could, or will live within one of two reasonably compact majority-minority districts deprives them of standing.

In this case, Plaintiffs have alleged that their votes are diluted and as such have requested two majority-minority districts to remedy the alleged wrong. Doc. 1 ¶¶ 19-23, 91. However, Plaintiffs have failed to prove that they would reside in *any* congressional district created that provides a remedy to their complained of harms—let alone a district that was reasonably compact as is required by the Supreme Court. Therefore, Plaintiffs fail to maintain standing and this case should be dismissed.

### b. Plaintiffs Have Failed to Show that they Would Reside in any Reasonably Compact Remedial District

### i. Standing of Plaintiffs Living Specifically Within Louisiana's Congressional District 2.

Plaintiffs Johnson,[4] Henderson, Thomas, and Howard all currently reside in Congressional District 2 ("CD-2"). *See* Complaint at ¶¶ 15-18 (Doc. No. 1). CD-2 is currently

---

[4] Plaintiff Johnson has yet to suffer any harm at all as she is a new resident of the district and has yet to vote in any election in CD-2. Complaint ¶15 (Ms. Johnson "*will vote* for a candidate for the U.S. house of Representatives in CD 2 for the first time in the November 2018 general election."). Some future hypothetical harm, without more, is insufficient for standing purposes.

Louisiana's only majority-minority district. The Plaintiffs who reside in CD-2 do not specifically request that their own district be redrawn, but instead seek "the adoption of a valid congressional redistricting plan for Louisiana that includes two majority-minority districts." *Id.* at 26C. Federal courts in Louisiana have thrice rejected the Louisiana legislature's attempts to do just that. In *Hays v. Louisiana* (hereinafter, *Hays I*), the state of Louisiana, crafted a map with two majority-minority congressional districts in order to comply with the U.S. Attorney General's office's insistence that only a map with two such districts would be "precleared." 839 F. Supp. 1188, 1197-98, n. 21 (W.D. La. 1993). That map was found to be a racial gerrymander. *Id.* at 1215-16. Louisiana subsequently drafted yet another plan with two majority-minority districts, which was also found to be a racial gerrymander. *Hays v. Louisiana*, 862 F. Supp. 119, 125 (W.D. La. 1994) (hereinafter, *Hays II*). The district court drew its own plan and was only able to create one majority-minority district because the court "did not carve districts along race lines, except in District 2, where the Constitution and fairness requires us to consider it." *Id. Hays II* was subsequently vacated by the Supreme Court on standing grounds. *United States v. Hays*, 515 U.S. 737 (1995). *Hays* came back again to the district court "like the Australian who went bonkers trying to throw away his old boomerang" and the two majority-minority district plan was once again invalidated and once again a plan with a single majority-minority district was put in its place. *Hays v. Louisiana*, 936 F. Supp. 360 (W.D. La. 1996) (hereinafter, *Hays III*).

In the *racial gerrymandering context*, the Supreme Court has held that a plaintiff only has standing to challenge the district in which the plaintiff resides. *Hays,* 515 U.S. at 744-45; *Shaw v. Hunt*, 517 U.S. 899, 904 (1996). However, pursuant to Plaintiffs' Complaint, they have not brought a racial gerrymandering claim and have instead brought a claim solely under § 2 of the Voting Rights Act. *See* Doc. No. 1 ¶¶ 88-95. Vote-dilution, which Plaintiffs singularly allege,

cannot be remedied "by creating a safe majority-black district *somewhere else* in the State." *Shaw*, 517 U.S. at 917 (emphasis added). Instead, "for standing purposes, to the extent plaintiffs' alleged harm from gerrymandering is the dilution of their votes, that injury is district specific." *Gill*, 138 S. Ct. at 1930. Consequently, "plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury-in-fact.'" *Id.* (internal alterations in original) (citing and quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). There is no specific evidence in the Complaint that the creation of a second majority-minority district would remedy any injury specific to Plaintiffs residing in CD-2. Furthermore, since Plaintiffs do not bring a *Shaw* based intentional racial gerrymandering claim, and also fail to allege how a second congressional district somewhere in the state would remedy their harm, they are unable to maintain standing as there is nothing but an assertion that they are "packed." Therefore, the Plaintiffs residing in CD-2 currently lack standing to bring their claims.

      ii.     **Standing of Plaintiffs Living Specifically Within Louisiana's Congressional District's 5 and 6**.

Plaintiffs Rogers, Armstrong, Smith, Hart, and Lanus fail to allege that they would actually live in any majority-minority district that this Court may order. Plaintiffs each allege that "an additional majority-minority district could be drawn incorporating" the parish in which the Plaintiffs live. *See* Doc. No. 1 ¶¶ 19-23. No specific allegation is made that any of the Plaintiffs currently living in CD-5 or 6 (or CD-2 for that matter) would actually reside in any newly created district—should one be drawn. No specific map was provided nor were any facts alleged that would allow the Court to conclude Plaintiffs harm could be remedied. *Broward Citizens for Fair Dists.*, 2012 U.S. Dist. LEXIS 46828, *18, n. 6. As a practical matter, counties—or in the case of Louisiana, parishes—are often split to comply with various traditional districting criteria, chief of which is the equal population requirements found in *Baker*

*v. Carr* and its progeny. 369 U.S. 186 (1962); *see also Gray v. Sanders*, 372 U.S. 368 (1962). As a result, Defendant has no way to know what relief these Plaintiffs seek that would provide a remedy to their claimed harm.

### c. The Secretary of State Lacks the Power to Implement Any Remedy the Court May Order.

It is an "elemental fact that a state official cannot be enjoined to act in any way that is beyond his authority to act in the first place." *Okpalobi v. Foster*, 244 F. 3d 405, 427 (5th Cir. 2001). It is unquestionable that the Secretary of State cannot redress the Plaintiffs' alleged injury. The Secretary has no authority to draw congressional districts in the first instance, re-draw districts to, or change the composition of any district. *See* La. Const. art. IV, § 7. Finally, the Secretary of State has no ability to amend La. R.S. 18:1276.1, the statute that Plaintiffs challenge in their Complaint. *See* La. Const. art. III, § I (vesting the legislative power with the Louisiana Legislature). The Secretary of State does not have the authority to effectuate a cure for the injury about which the Plaintiffs sue. Therefore, this case should be dismissed because the plaintiffs' complaint is one that the Secretary simply cannot fix.

### d. The Actions Plaintiffs Complain of Are Not Traceable to the Louisiana Secretary of State.

The second element of the standing analysis is that there must be a causal connection which is "fairly traceable" to "the action of defendant." *Lujan*, 504 U.S. at 560-61. The State of Louisiana has legislative, executive, and judicial branches similar to those found in the federal government. These three branches, again nearly identical to their federal counterparts, are granted enumerated powers by the Louisiana Constitution. The Louisiana Constitution is clear that "no one . . . branch[], nor any person holding office in one of them, shall exercise power belonging to either of the others." La. Const. art. II, § 2. The Secretary of State is a member of

the executive branch. La. Const. art. IV, § 7. While the Secretary of State is the chief elections officer of the state, only the Louisiana Legislature is vested with the power to actually make laws. *See* La. Const. art. IV, § 7; La. Const. art. III, § 1. The Louisiana legislature codified the current congressional apportionment following the 2010 census via Acts 2011, 1st Extraordinary Session, No. 2, § 5(A), codified in the Louisiana statutes as La.R.S. 18:1276.1.[5]

As Plaintiffs admit, the Secretary of State "is responsible for preparing and certifying the ballots for all elections, promulgating all elections returns, and administering the election laws." Doc. No. 1 ¶ 24; *see also* La. Const. art. IV, § 7. Nowhere in their Complaint do Plaintiffs allege *any* wrongdoing attributable to the Secretary of State. *See e.g.,* Doc. No. 1 ¶ 31 (On April 13, 2011, the Legislature established Louisiana's six Congressional districts with the passage of Act 2, the 2011 Congressional Plan."); Doc. No. 1 ¶ 3 ("Even though Louisiana had maintained a substantial African-American population, the *Louisiana State Legislature* ('the Legislature') chose to limit minority voting strength" of African American voters); Doc. No. 1 ¶ 92 ("Under Section 2 of the Voting Rights Act, the Legislature was required to create a second majority-minority district in which African Americans have the opportunity to elect their candidates of choice."). In fact, nowhere in the complaint do Plaintiffs allege *any wrongdoing* by the Secretary of State. *See id.* at ¶¶ 50, 53-55, 57-61, 63, 68-69 (all allegations of wrongdoing by the Louisiana Legislature). The Plaintiffs' alleged injury, if any, owes to the conduct of other departments, agencies, or branches of the State governments, not to the Secretary of State. Plaintiffs therefore lack standing to bring this case against the Secretary of State.

### III.   Plaintiffs Have Failed to State a Claim Under 12(b)(1) and Therefore this Case Should Be Dismissed.

#### a.   Legal Standard

---

[5] In fact, with limited exceptions, it is impossible for a legislative body other than either the state legislature or Congress to apportion congressional districts. *See* U.S. Const. art. I, § 4, Cl. 1.

A pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). "The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing and quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). As such, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Id.* Although a district court must assume the veracity of well-pleaded facts, a complaint that "fail[s] to show more than mere conclusory allegations" is properly met with dismissal for failure to state a claim. *Smith v. Dep't of Health & Hosps. La.*, 581 Fed. Appx. 319 (5th Cir 2014) (citing *City of Clinton v. Pilgrim's Pride Corp.*, 632 F. 3d 148, 155 (5th Cir. 2010)). Plaintiffs' Complaint is rife with the exact sort of unadorned and conclusory allegations that *Iqbal*, *Twombly*, and their progeny sought to eliminate.

**b. Plaintiffs Request for a Majority-Minority District Created of "Eligible Voters" Without More Is Insufficient to Afford Relief.**

In their Complaint, Plaintiffs state that "African Americans in Louisiana" can "constitute a majority of eligible voters in two congressional districts." Doc. No. 1 ¶91. Furthermore, the balance of the Complaint is inconsistent in how it references African American voters. Occasionally the complaint refers to "Black Voting Age Population" or ""BVAP". Doc. No. 1 ¶¶

13

8, 34, 36. Other times the Complaint simply discusses "eligible voters." *Id.* at ¶¶ 9, 91. Race, however, is not binary. *See e.g., Pope v. County of Albany*, 2014 U.S. Dist. LEXIS 10023, *7, n.3 (N.D.N.Y. 2014). For this exact reason, demographers often use, "non-Hispanic Black", in addition to BVAP, and "Any Part Black" as part of their calculations. *See e.g., Pope v. County of Albany*, 2014 U.S. Dist. LEXIS 10023, *7, n.3 (N.D.N.Y. 2014) *Fairley v. Hattiesburg Miss.*, 662 Fed. Appx. 291 (5th Cir. 2016); *Fairley v. Hattiesburg*, 122 F. Supp. 3d 553, 559 (S.D. Miss. 2015). Furthermore, the first *Gingles* prong requires "citizens of voting age" who could form a majority. *See Reyes v. City of Farmers Branch Tex.*, 586 F.3d 1019, 1023 (5th Cir. 2009). Plaintiffs' naked assertion that "African Americans in Louisiana" can "constitute a majority of eligible voters in two congressional districts" is insufficient on its face to warrant relief and therefore this complaint should be dismissed.

### c. Plaintiffs Fail to Sufficiently Allege that African American Voters Can Constitute a Reasonably Compact Majority in Two Districts.

As discussed *supra*, the Supreme Court in *Gingles* stated that to make a successful claim under § 2, "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50-51. There are two operative parts to the first *Gingles* precondition: numerosity and compactness. Plaintiffs repeatedly allege that "African Americans in Louisiana are sufficiently numerous and geographically compact to constitute a majority of eligible voters in two congressional districts." *See* Doc. No. 1 ¶¶ 9, 91.

Assuming there is enough BVAP to constitute two majority-minority districts in Louisiana, there is no shred of "factual matter" anywhere in the Complaint, "taken as true" that two *compact* districts could be created. *See Twombly*, 550 U.S. at 555. "Satisfying the first *Gingles* precondition—compactness—normally requires submitting as evidence hypothetical

14

redistricting schemes in the form of illustrative plans." *Gonzalez v. Harris County*, 601 Fed. Appx. 255, 258 (5th Cir. 2015) (per curium); *see also Fairley v. Hattiesburg,* 584 F.3d 660, 669 (5th Cir. 2009) ("Requiring the district court to fish through the record for evidence that might conceivably support redistricting approaches that were never urged by the plaintiffs or presented as a developed plans would be downright perverse."). In fact, the Court of Appeals for the Eleventh Circuit requires the demonstration of a proper remedy through maps, a failure of which constitutes a pleading deficiency sufficient to warrant dismissal under Rule 8 and *Iqbal. Broward Citizens for Fair Dists. v. Broward County*, 2012 U.S. Dist. LEXIS 46828, *18, n. 6 (S.D. Fla. 2012); *see also Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999).

A remedial map has special importance when, as here, there is a history of litigation in the relevant jurisdiction which resulted in the utter failure to produce a legally compliant second majority-minority district. *See generally Hays I*, 839 F. Supp. 1188; *Hays II,* 862 F. Supp. 119; *Hays III,* 936 F. Supp. 360. As discussed *supra*, in each *Hays* case the Louisiana Legislature attempted to draw a second majority-minority district expressly for the purpose of gaining pre-clearance under § 5. *See e.g., Hays II*, 936 F. Supp. at 363 ("From the outset the legislators received unmistakable advisories from the Attorney General's office that only redistricting legislation containing two majority-minority district would be approved . . . , so the Legislature directed its energies toward crafting such a plan."[6]). In fact, "[t]he primary justification espoused by the State for the enactment of . . . a second majority-minority district was [that it] was <u>required</u> under the Voting Rights Act." *Hays III*, 936 F. Supp. at 369 (emphasis in original). However, like many cases since the Supreme Court's decision in *Shaw v. Reno*, the Voting

---

[6] It also should be noted that, likely as a result of *Hays I-III*, no such demand for a second majority-minority district was made by the Attorney General's office when applying for pre-clearance after the 2010 census. The Attorney General's office promptly pre-cleared the map with a single majority-minority district. *See* Letter of Assistant Attorney General Day, Aug. 01, 2011.

Rights Act justification was not enough to save the a second majority minority Congressional District in Louisiana from violating the Fourteenth Amendment. *Shaw v. Reno*, 509 U.S. 630 (1993); *see e.g., Miller v. Johnson*, 515 U.S. 900 (1995); *Copper v. Harris,* 137 S. Ct. 1455, 1464 (2017) ("When a State invokes the VRA to justify race-based districting, it must show (to meet the 'narrow tailoring' requirement) that is had a 'strong basis in evidence' for concluding that the statute required its action." (quoting *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1274 (2015)); *Bethune-Hill v. Virginia State Bd. of Elections,* 137 S. Ct. 788 (2017). Furthermore, taking the Plaintiffs' proposed BVAP at face value and comparing it with the population numbers found in *Hays III*, not much has changed in terms of population percentages.[7] *Compare* Doc. No. 1 ¶ 8 (alleging CD 2 has a BVAP of 59.7%, CD 5 has a BVAP of 33.7%, and CD 6 has a BVAP of 21.5%); *with Hays III*, 936 F. Supp. at 377 (showing similar population numbers as percentage of the district population as to what Plaintiffs allege).[8]

However, irrespective of whether a *map* is required at this stage, what cannot be doubted is that Plaintiffs were required to adduce *some* facts on compactness. In fact, without a plan or other facts showing that two majority-minority districts are plausible, Plaintiffs have given merely "a legal conclusion couched as a factual allegation" which amounts to nothing more than a "threadbare recital[] of the elements of a cause of action." *Iqbal*, 556 U.S. at 678; *compare* Doc. No. 1 ¶ 9 ("African Americans in Louisiana are sufficiently numerous and geographically compact to form a majority of eligible voters in a second congressional district . . . .) *with Gingles*, 478 U.S. at 50 ("First, the minority group must be able to demonstrate that it is

---

[7] What has changed is that Louisiana *lost* a congressional seat as of the 2010 census, which would make it even more difficult to draw two compact majority-minority districts.

[8] Given the difficulties Plaintiffs face in creating a compact map, made all the more evident as they have yet to produce one, is that Plaintiffs *may* be attempting to create a "minority opportunity district." This attempt, if one is being made at all, should be rejected by this court. *See Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) ("This Court has held that § 2 does not require the creation of influence districts.") (citing and quoting *League of Latin Am. Citizens*, 548 U.S. at 445).

sufficiently large and geographically compact to constitute a majority in a single-member district."). *Twombly, Iqbal,* and the Rule 8 pleading standards play an important role in the fairness of our judicial system because they require fair notice to the Defendant of the claims against him. *See Twombly*, 550 U.S. at 555. Plaintiffs have wholly failed to sufficiently plead their case and as such this claim should be dismissed.

## IV.   The Equitable Doctrine of Laches Bars Plaintiffs Requested Relief.

The equitable doctrine of laches applies when there is "an inexcusable delay that results in prejudice to the defendant." *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998). Laches has three elements: "(1) delay in asserting a right or claim; (2) that the delay was inexcusable; and (3) that undue prejudice resulted from the delay." *Id*. (internal quotations and alterations omitted).

Plaintiffs waited seven years and three congressional elections to bring their claim. The redistricting statute was enacted in 2011, soon after the completion of the decennial census. *See* Acts 2011, 1st Extraordinary Session, No. 2, § 5(A) (codified in the Louisiana statutes as La.R.S. 18:1276.1). There is no excuse for Plaintiffs' delay since records show that this same claim was previously filed in 2013 by a group of plaintiffs residing in CD-2. *Buckley v. Schedler*, No. 3:13-cv-00763, (M.D. La. 2013). The suit was subsequently dismissed without explanation and without prejudice upon motion of the plaintiffs. The five year delay in reviving the case is likewise unexplained. By waiting seven years to bring their claim, the Plaintiffs will prejudice the Secretary of State and people of Louisiana by throwing the election machinery into disarray for the benefit of a single election under the current apportionment plan. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (holding that, in the preliminary injunction context, waiting until five years into a redistricting cycle weighed against relief).

## CONCLUSION

For the aforementioned reasons this Court should either dismiss this case for lack of standing, or, in the alternative, dismiss this case for failure to state a claim.

Dated: July 30, 2018                    Respectfully Submitted,

Jason Torchinsky (VSB 47481)*               JEFF LANDRY
Phillip M. Gordon (TX 24096085)*            ATTORNEY GENERAL
HOLTZMAN VOGEL JOSEFIAK                      /s/ Angelique Duhon Freel
TORCHINSKY PLLC                             Angelique Duhon Freel (La. Bar Roll No. 28561)
45 N. Hill Drive, Suite 100                 Carey Tom Jones (La. Bar Roll No. 07474)
Warrenton, VA 20186                         David Jeddie Smith, Jr. (La Bar Roll No. 27089)
Telephone: (540) 341-8808                   Jeffrey M. Wale (La. Bar Roll No. 36070)
Facsimile: (540) 341-8809                   Assistant Attorneys General
Email: jtorchinsky@hvjt.law                 Louisiana Department of Justice
pgordon@hvjt.law                            Civil Division
*Admitted Pro Hac Vice*                     P. O. BOX 94005
                                            Baton Rouge, Louisiana 70804-9005
                                            Telephone: (225) 326-6060
                                            Facsimile: (225) 326-6098
Celia R. Cangelosi (La. Bar Roll No. 12140) Email: walej@ag.louisiana.gov
5551 Corporate Blvd. Suite 101              freela@ag.louisiana.gov
Baton Rouge, LA  70808                      jonescar@ag.louisiana.gov
Telephone: 225-231-1453                     smithda@ag.louisiana.gov
Facsimile: 225-231-1456
Email: celiacan@bellsouth.net
*Counsel for Defendant Louisiana Secretary of State*

## CERTIFICATE OF SERVICE

I do hereby certify that, on this 31st day of July 2018, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system which gives notice of filing to all counsel of record.

/s/ Angelique Duhon Freel

# EXHIBIT B

**1. Beer v. U.S.**
**United States District Court, District of Columbia. March 15, 1974 374 F.Supp. 363**

Action by city of New Orleans and city officials for a judgment declaring that its proposed plan of redistricting for councilmanic elections does not have the purpose and will not have the effect of denying or abridging the **right** to **vote** on account of race or color. The three-judge Court, Spottswood W. Robinson, III, Circuit Judge, held that the...

...with opinion. West Headnotes [1] 142T Election Law 142TVIII Discrimination; **Voting Rights Act** 142T 620 Federal Preclearance of Changes in Voting Procedure 142T...
...622 k. Acts requiring preclearance. (Formerly 144k12(1) 144k12 Elections) The **Voting Rights Act** must be given the broadest possible scope to reach any...

**2. Turner v. McKeithen**
**United States Court of Appeals, Fifth Circuit. December 28, 1973 490 F.2d 191**

Action for reapportionment of a school board and police jury in a Louisiana parish. The United States District Court for the Western District of Louisiana, Benjamin C. Dawkins, Jr., Chief Judge, determined that the police jury's proposed multimember reapportionment plan unconstitutionally **diluted** the potential for political participation by the...

...sufficient. Affirmed. West Headnotes [1] 142T Election Law 142TVIII Discrimination; **Voting Rights Act** 142T 599 k. Dilution of voting power in general. (Formerly...
...legislators of their choice. [2] 142T Election Law 142TVIII Discrimination; **Voting Rights Act** 142T 598 k. Discriminatory practices proscribed in general. (Formerly 144k15...

**3. Sims v. Baggett**

**United States District Court, M.D. Alabama, Northern Division. October 02, 1965 247 F.Supp. 96**

Reapportionment case. The Three-Judge District Court held that Alabama reapportionment bill relating to senatorial districts was valid and constitutional but that plan adopted by legislature for house reapportionment whereby predominantly Negro counties were aggregated with predominantly white counties for sole purpose of preventing election of...

...and gerrymandering. (Formerly 92k215.3 92k215 142T Election Law 142TVIII Discrimination; **Voting Rights Act** 142T 610 Apportionment and Reapportionment 142T 614 **Vote Dilution** 142T 614(4) k. Gerrymandering of equipopulous districts. (Formerly 144k12(6)...

...and gerrymandering. (Formerly 92k215.3 92k215 142T Election Law 142TVIII Discrimination; **Voting Rights Act** 142T 610 Apportionment and Reapportionment 142T 614 **Vote Dilution** 142T 614(1) k. In general. (Formerly 144k12(6) 144k12 Elections...

🚩 **4. Haakenson v. Parkhouse**
**United States District Court, E.D. Pennsylvania. April 20, 1970 312 F.Supp. 929**

Suit under Civil **Rights Act** by citizens of Pennsylvania seeking injunction restraining state election officials from issuing absentee ballots pursuant to state statute and seeking declaratory judgment that statute governing absentee ballots violated Pennsylvania Constitution and Fourteenth Amendment of the United States Constitution. On defendants'...

...representation; discrimination. (Formerly 92k225.3(4) 92k225(1) 142T Election Law 142TVIII Discrimination; **Voting Rights Act** 142T 610 Apportionment and Reapportionment 142T 614 **Vote Dilution** 142T 614(1) k. In general. (Formerly 144k11 Elections) Fourteenth...

🚩 **5. Kilgarlin v. Martin**
**United States District Court S.D. Texas, Houston Division. February 02, 1966 252 F.Supp. 404**

List of 5 results for adv: "vote dilution" and "Voting Rights Act"

Action attacking validity of 1965 Texas reapportionment statute. The United States District Court for the Southern District of Texas, Houston Division, sitting as a three-judge court, Noel, J., held that the **act** is unconstitutional as to provisions for flotorial districts, but otherwise valid. Decree in accordance with opinion. John R. Brown,...

...and political rights. (Formerly 92k215.3 142T Election Law 142TVIII Discrimination; **Voting Rights Act** 142T 610 Apportionment and Reapportionment 142T 614 **Vote Dilution** 142T 614(1) k. In general. (Formerly 144k12(6) 144k12 Elections...