

2018 Nov-02  PM 04:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **LAKEISHA CHESTNUT, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 2:18-CV-00907-KOB** |
| | ) | |
| **JOHN H. MERRILL,** | ) | |
| | ) | |
| **Defendant,** | ) | |

## MOTION FOR JUDGMENT ON THE PLEADINGS

Defendant John H. Merrill, Alabama Secretary of State, respectfully moves for a judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), on grounds that jurisdiction over this matter lies with a three-judge court, Plaintiffs have failed to plead sufficient facts to demonstrate that they have a proper remedy, and Plaintiffs' claims are barred by the doctrine of laches. In support of this motion, Secretary Merrill states as follows.

## I.  Jurisdiction over this matter lies with a three-judge court.[1]

It is clear that a constitutional challenge to a state's congressional districts must be heard by a three-judge court: "A district court of three judges shall be

---

[1] Secretary Merrill previously filed a Notice of Jurisdictional Issue, doc. 12, raising the issue of whether a three-judge court was required and explaining that there is authority both ways. Sen. McClendon's proposed motion to dismiss persuasively argued that a three-judge court is required, doc. 19-1, and as noted below, the State of Louisiana takes the same position in similar litigation. Secretary Merrill finds those arguments persuasive and adopts that position.

convened when otherwise required by Act of Congress, or *when an action is filed challenging the constitutionality of the apportionment of congressional districts* or the apportionment of any statewide legislative body." 28 U.S.C § 2284(a). To avoid a three-judge court, Plaintiffs bring their challenge solely under § 2 of the Voting Rights Act – *i.e.*, they make a <u>statutory</u> challenge, not a constitutional one – and have uniquely eschewed claims under the 14th and 15th Amendments, which otherwise uniformly are made together with such § 2 claims. *See Page v. Bartels*, 248 F.3d 175, 190 (3rd. Cir. 2001) (observing that "statutory Voting Rights Act challenges to statewide legislative apportionment are generally" so "inextricably intertwined with constitutional challenges to such apportionment" that they "should be considered a single 'action' within the meaning of § 2284(a)"); *see also Johnson v. Ardoin*[2], No. 18-cv-625-SDD-EWD (M.D. La. July 31, 2018) (Mem. in Supp. of Def.'s Mot. to Dismiss a parallel challenge to Louisiana's congressional districts, ECF No. 16-1, at 3 n.1 (pointing out the rarity of reapportionment challenges that do not include claims under the 14th and 15th Amendments as well as § 2 of the Voting Rights Act))(attached as Exhibit A).

---

[2]    The instant case, *Chestnut*, is one of three cases challenging congressional districts reportedly filed under the aegis of the National Democratic Redistricting Committee, styled as the National Redistricting Foundation. The other two are *Dwight v. Kemp*, No. 1:18-cv-2869 (N.D. Ga. June 13, 2018) and *Johnson v. Ardoin*, No. 3:13-cv-625-SDD-EWD (M.D. La. June 13, 2018). All three cases make the same basic legal argument under § 2 of the VRA and make no parallel constitutional claims.

2

As the State of Louisiana argued in *Johnson v. Ardoin*, in the memorandum cited above, § 2 claims are so like a constitutional challenge, and the claims are so intertwined, that this action must likewise be heard by a three-judge court. To be clear, Secretary Merrill does not prefer one forum over another. However, the issue is a jurisdictional one and, if the matter is heard by a single District Court Judge when jurisdiction lies elsewhere, the litigation would be a nullity. Better to decide the issue on the front-end.

There is good reason to consider a § 2 claim to be a form of constitutional challenge. The Voting Rights Act was enacted under Congress' "power to enforce the provisions of the Fifteenth Amendment." *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997). As the Supreme Court noted in *City of Mobile v.* Bolden, "Section 2 was an uncontroversial provision in proposed legislation whose other provisions engendered protracted dispute. … The view that this section simply restated the prohibitions already contained in the Fifteenth Amendment was expressed without contradiction during the Senate hearings." 446 U.S. 55, 61 (1980). The text of the Fifteenth Amendment ("[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude ….") is largely repeated in the text of Section 2 ("[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a

manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color …").  Plaintiffs' claim is thus in essence a constitutional one, and there is no practical difference in the way this claim will be litigated, or decided, under § 2 and how it would have been treated if brought under the Fourteenth or Fifteenth Amendment directly.

For these and other reasons, the Third Circuit held that 28 U.S.C. § 2284 should be construed to reach claims brought under the Voting Rights Act. *Page v. Bartels*, 248 F.3d 175 (3d Cir. 2001). In *Page*, challengers of New Jersey's legislative reapportionment scheme brought claims under both the Constitution and Section 2, and the District Court of New Jersey denied challengers' application for relief without convening a three-judge court. The Third Circuit vacated the district court's decision and remanded the case for consideration by a "district court of three judges" after deciding that a three-judge court *did* have jurisdiction to consider the Section 2 claims. *Page*, 248 F.3d at 189. The Third Circuit noted that claims brought under Section 5 of the Voting Rights Act (the preclearance regime that previously applied to some states) were expressly referred to a three-judge court, *see* 52 U.S.C. § 10304, and that there was no such express referral for Section 2 claims. *Page*, 248 F.3d at 189. Nonetheless, the Third Circuit in *Page* held that "[w]e do not believe that Congress made a deliberate choice to distinguish between constitutional

apportionment challenges and apportionment challenges brought under § 2 of the Voting Rights Act." *Id.*

The court reasoned that "when the three-judge court statutes were revised in 1976 to require that this specialized tribunal hear challenges to the 'constitutionality of … the apportionment of any statewide legislative body,' § 2 of the Voting Rights Act was not available to litigants seeking to challenge apportionment." *Page*, 248 F.3d at 189. Plaintiffs did not use Section 2 to challenge apportionment plans until after the Supreme Court determined that Section 2 provided a private right of action, *see City of Mobile v. Bolden*, 446 U.S. 55, 60 (1980), and recognized the legal framework for vote dilution claims, *see Thornburg v. Gingles*, 478 U.S. 30 (1986). That is, when Congress provided that three-judge courts were required for constitutional challenges to congressional districting plans, it could not have meant to exclude Section 2 claims because there were no Section 2 challenges to congressional plans.

The *Page* court emphasized that the legislative history of 28 U.S.C. § 2284 shows that "Congress was concerned less with the source of the law on which an apportionment challenge was based than on the unique importance of apportionment cases generally. The Senate Report, for example, consistently states that 'three-judge courts would be retained … *in any case involving congressional reapportionment*.'" 248 F.3d at 190 (emphasis added, citing S. Rep. No. 94-204 (1976)). Moreover, all

the reasons why Congress called for three judges to decide constitutional challenges to apportionment plans – the importance of the claim and the sensitivity of the matter – apply equally to a Section 2 challenge. *Id.*

*Page* obviously is not binding on this Court, and its specific holding – that a three-judge court should decide Section 2 claims that are brought in conjunction with constitutional claims – is not directly on point. Nonetheless, the Third Circuit's reasoning in *Page* suggests that 28 U.S.C. § 2284 should be applied to a Section 2 claim even when not accompanied by constitutional claims.[3]

In response to Secretary Merrill's initial motion to dismiss, Plaintiffs argued that Alabama's "claim that Section 2 was not available for reapportionment challenges prior to 1982 seems dubious at best," citing to a 1980 Fifth Circuit decision in which Section 2 was used to challenge an at-large election scheme for a local school board. Doc. 15 at 8 n.3. This argument misses the mark. Even assuming statutory vote dilution claims were possible before Congress amended the Voting Rights Act in 1982, the point remains that in 1976, when Congress narrowed the scope of § 2284, they were unheard of, and 1976, not 1982, is what matters in determining Congressional intent behind that statute. As of 1976 there was no vote

---

[3]     Given the importance of the interests at issue, it is probably inevitable that the decision of the district court will be appealed by one side or the other, and for this reason Chestnut's refusal to take advantage of the far speedier appeal available under § 2284(a) is a continuation by different means of her inexcusable delay in commencing this lawsuit, which is addressed below.

dilution claim under § 2; all such challenges were constitutional. *E.g., Sims v. Baggett*, 247 F. Supp. 96 (M.D. Ala. 1965) (constitutional challenge to Alabama's legislative districts); *Kilgarlin v. Martin*, 252 F. Supp. 404 (S.D. Tex. 1966) (constitutional challenge to Texas' legislative reapportionment plan); *Turner v. McKeithen*, 490 F.2d 191 (5th Cir. 1973) (constitutional vote dilution challenge to proposed multimember reapportionment plan).[4]

Congressional districting is important no matter how it is challenged, and a challenge under § 2 implicates delicate federal-state balances just as much as a constitutional challenge. This is precisely the kind of case that Congress intended to be heard by a three-judge court. *See Page*, 248 F.3d at 189 ("We do not believe that Congress made a deliberate choice to distinguish between constitutional apportionment challenges and challenges brought under § 2 of the Voting Rights Act

---

[4]     One court avoided the issue of § 2284's applicability to statutory challenges by using a practical solution that had been discussed in the Senate Report. In *Cavanaugh v. Brock*, 577 F. Supp. 176 (E.D.N.C. 1983), a challenge to the North Carolina General Assembly's districts, plaintiffs alleged violations of the <u>state</u> constitution – clearly not the sort of constitutional challenge envisioned for § 2284. In defense, North Carolina argued that the Voting Rights Act required it to split precincts (the alleged state constitutional violation), leading the court to consider whether raising a federal statutory claim as a defense meant the case must be heard by a three-judge court. *Id.*, 577 F. Supp. at 180 n.3 ("It is not clear to us that the invocation of a federal defense implicating the Voting Rights Act also generates three-judge court jurisdiction."). The court sidestepped the issue: "Due to the substantial likelihood that this matter is beyond the purview of § 2284, Circuit Judge Philips, designated as a member of the statutory three-judge court, has also been designated pursuant to 28 U.S.C. § 291(b) [] to sit in the alternative as a district judge with other members of this court, with the court constituting in that mode a regular district court consisting of a panel of three district judges."). *Id. See also* S. REP. 94-204, at 1994 (suggesting this alternative).

[as to the scope of § 2284(a)]"). Consequently, the Court should dismiss the amended complaint for lack of subject-matter jurisdiction.[5]

If the Court denies this part of this motion, Secretary Merrill respectfully asks the Court to certify the question for interlocutory appeal under 26 U.S.C. § 1292(b). This issue meets the Eleventh Circuit's requirements for such interlocutory appeal: (1) the issue is a pure question of law, (2) and controls at least a substantial part of

---

[5]    An argument that this claim is not "constitutional" simply because it is brought more immediately under a statute rests on the sort of "magic language" requirement that the Supreme Court disavowed in *Abbott v. Perez*, 138 S. Ct. 2305 (Jun. 25, 2018). In that case the Supreme Court was required to determine, for jurisdictional purposes, if a three-judge court's order was an injunction – and thus appealable – even though the three-judge court did not call it an injunction. Doing so required the Supreme Court to consider the wording of two statutes relating to interlocutory appeals, 28 U.S.C. § 1253 and § 1292(a)(1): "To be sure, the District Court did not *call* its orders "injunctions" – in fact, it disclaimed the term … but the label attached to an order is not dispositive. We have previously made clear that where an order has the 'practical effect' of granting or denying an injunction, it should be treated as such for purposes of appellate jurisdiction." *Abbott*, 138 S. Ct. at 2319-2320. The Court then explained that although its "'practical effect' approach" was developed in cases dealing with § 1292(a)(1) [allowing appeals of "[i]nterlocutory orders … granting injunctions"], the approach also applies to § 1253: "The provisions are also textually interlocked. Section 1292(a)(1) does not apply where direct review may be had in the Supreme Court, *i.e.,* where § 1253 applies. If the 'practical effects' test applied under § 1292(a)(1) but not § 1253, the consequences would be unfortunate and strange. We would have to identify the magic language needed for an order to qualify as an order granting or denying an injunction ...." *Abbott*, 138 S. Ct. at 2320. Just as with the interlocutory appeal statutes, challenges to congressional districts under the Constitution and the Voting Rights Act are interrelated. *Page*, 248 F.3d at 190 ("it is clear that questions regarding the legitimacy of an apportionment scheme, whether under the Constitution or the Voting Rights Act … are 'intimately related'…."). The relief sought in the amended complaint (doc. 14) plainly shows that ignoring this interrelation frustrates Congress' reason in 1976 for continuing to require that challenges to congressional districts be heard by three-judge courts. The "practical effect" of a successful challenge to a state's congressional districts is the same regardless of whether the claim is brought under § 2 or under the 14th and 15th Amendments, and the claims should be treated the same. *Page*, 248 F.3d at 190 ("[W]e conclude that because statutory Voting Rights Act challenges to statewide legislative apportionment are generally inextricably intertwined with constitutional challenges to such apportionment, those claims should be considered a single 'action' within the meaning of § 2284(a)").

the case, (3) the issue would be specified by the District Court in its order (if the Court agrees with this request), (4) there are substantial grounds for difference of opinion on the issue, and (5) resolution of the issue would reduce the amount of litigation necessary if the case is remanded. *See McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1264 (11th Cir. 2004) (specifying five requirements for granting interlocutory appeal under § 2292(b)); *see also* Ex. A, Def.'s Mem. in Supp. of Mot. to Dismiss in *Johnson*, doc. 16-1, at 5-6.

## II.   The Amended Complaint Fails to Demonstrate the Existence of a Proper Remedy

The Amended Complaint fails to demonstrate the existence of a proper remedy, and that is fatal to the case on either of two theories.  It is fatal as a matter of standing and as a matter of establishing a *prima facie* case.

The "irreducible constitutional minimum of standing" has three components: an injury in fact, a causal connection between the injury and the conduct complained of, and a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements," which "are not mere pleading requirements but rather an indispensable part of the plaintiff[s'] case ...." *Id.* In other words, a plaintiff's failure to establish an injury redressable in the litigation means that plaintiff lacks standing.

Moreover, the Eleventh Circuit has held that to satisfy the *Thornburg v. Gingles* prerequisites, Plaintiffs must demonstrate that they have a viable remedy:

> The first *Gingles* precondition, informed by the second, dictates that the issue of remedy is part of the plaintiff's prima facie case in section 2 vote dilution cases. As the Supreme Court has explained, "[t]he 'geographically compact [minority]' and 'minority political cohesion' showings [in the *Gingles* threshold test] are needed to establish that the minority has the potential to elect a representative of its own choice from some single-member district." *Growe v. Emison*, 507 U.S. 25 (1993) (citing *Gingles*, 478 U.S. at 50, n. 17). The inquiries into remedy and liability, therefore, cannot be separated: A district court must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system.

*Nipper v. Smith*, 39 F.3d 1494, 1530-31 (11th Cir. 1994).[6] "The reason that a minority group making such a challenge must show, <u>as a threshold matter</u>, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect

---

[6] The *Gingles* threshold test is:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. [] Second, the minority group must be able to show that it is politically cohesive. [] Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, [] —usually to defeat the minority's preferred candidate.

*Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986) (footnote and citations omitted).

representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Gingles*, 478 U.S. at 52 n.17 (underlining added).

Thus, a plaintiff who does not plead sufficient facts to establish a proper remedy has failed to plead sufficient facts to establish an injury that will likely be redressed by a decision in her favor, and thus standing, as well as that she meets the *Gingles* prerequisites to a § 2 claim. Under either theory, the claim must be dismissed.

Mindful of *Gingles*' threshold requirement, Chestnut has alleged that "[t]he African-American population in Alabama is sufficiently numerous and geographically compact to form a majority of eligible voters – meaning a majority of the voting age population – in two congressional districts." Doc. 14 ¶ 6 (footnote omitted), *see also id.* ¶ 105 (same allegation). However, she has pleaded no facts to support this conclusory allegation.

The modern standard for pleading a cause of action, set forth by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), is not onerous, and can be satisfied simply by alleging sufficient facts to show that a claim is more than speculative. As summarized by the Eleventh Circuit:

> To survive dismissal for failure to state a claim, the "factual allegations in the complaint, accepted as true, must be sufficient to raise a right to

relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In other words, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Id.* at 570. The well-pled facts in the complaint must be sufficient to "permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

A complaint that offers "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement" will not be sufficient to withstand a motion to dismiss. (internal quotation marks omitted; alteration adopted). Likewise, we have stated that "conclusory allegations, unwarranted deductions of facts[,] or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

*Lopez v. United States*, 656 F. App'x 957, 963 (11th Cir. July 15, 2016) (parallel citations omitted); *see also, e.g., Mallory v. Biomet*, 2014 WL 6890740, at *5 (M.D. Ala. Dec. 4, 2014) (same). As further summarized by this Court, "Pleadings that contain nothing more than a formulaic recitation of the elements of a cause of action do not meet Rule 8 standards." *Teitel v. Capell Howard, P.C.*, 2018 WL 525296, at *3 (N.D. Ala. 2018) (internal quotation marks removed).

Chestnut's amended complaint does not meet this pleading standard. Merely asserting in ¶¶ 6 and 105 that the "African-American population in Alabama is sufficiently numerous and geographically compact to form a majority of eligible voters … in two congressional districts" is an example of the sort of "formulaic recitation of the elements of a cause of action" and "naked assertion[] devoid of further factual enhancement" that warrants dismissal. *See Broward Citizens for Fair*

12

*Districts v. Broward County*, 2012 WL 1110053, at \*4-\*5 (N.D. Fla. 2012) (granting motion to dismiss where plaintiffs alleged without necessary factual support that the "voting electorate ... in Commission Districts 1 and 7 ... have become sufficiently large and geographically compact to constitute a majority of those districts"). *Twombly* and *Iqbal*, along with the Eleventh Circuit's and this Court's cases construing them, require more than the conclusory allegations pleaded in ¶¶ 6 and 105 of the amended complaint. They require Chestnut to have pleaded enough facts to move her complaint across the line from speculative to "plausible on its face."

To be specific, to meet the first *Gingles* requirement, Chestnut was required to include in her pleading a map[7] showing that the district she proposes could, as a matter of fact, have been drawn by Alabama. In *Wright v. Sumter County Bd. of Elections and Registrations*, 2014 WL 1347427 (M.D. Ga. 2014), the court denied a motion for preliminary injunction for similar pleading defects:

> Wright did not satisfy the first *Gingles* factor. The Eleventh Circuit has 'repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy.' ... Beyond his request that the Court 'order districts for the Sumter County, Georgia School Board to have nine districts only,' which the Court cannot command, Wright did not propose or identify any scheme or district division—a

---

[7]     Secretary Merrill does not foreclose the possibility of establishing *Gingles*' first requirement without a map – for example, Chestnut could designate all of the census blocks that would be included in a *Gingles*-compliant district, but that would be a very cumbersome thing to do. As a practical matter, a map, with the usual accompanying population reports, is the most obvious way to show compliance with *Gingles,* particularly given that at some point in the litigation Chestnut will have to produce an actual map, and it is difficult to believe that Chestnut commenced this expensive litigation without a concrete reason for believing that she could meet *Gingles*' first requirement.

benchmark—that would provide black voters better access to the political process. '[A] court cannot determine whether the voting strength of a minority has been impermissibly diluted without having some alternative electoral structure in mind for comparison.' ... *Wright's failure to identify an alternative scheme is fatal to his dilution claim.*"

*Id.* at *2 (emphasis added; citations omitted).[8]

Chestnut's failure to establish an injury is curious, given that the relevant data have been available since the 2010 Census was released February 2011 and it is fair to assume that before commencing this lawsuit Chestnut sought factual confirmation that Alabama's black voting-age population (BVAP) population was "sufficiently large and geographically compact to constitute a majority in a [second] single-

---

[8] *See also Broward Citizens for Fair Districts v. Broward County*, 2012 WL 1110053 at *5 n.6 (N.D. Fla. 2012) (granting motion to dismiss and saying: "In its Reply, Broward County also points out that Plaintiffs have failed to present alternative maps to the Court or 'offer any information about how they would create majority Black districts.' … The Court agrees that this represents an additional pleading deficiency in Plaintiffs' Amended Complaint. The Eleventh Circuit has 'repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy.' .… Plaintiffs mere allegation that '[s]everal alternate maps were presented to the County Commission which would potentially achieve the objectives of the County's redistricting mandate without violating the constitutional rights of the Black and other minority voting population' is conclusory and insufficient to meet Plaintiffs' pleading burden. *See Iqbal,* 129 S. Ct. at 1950 ('Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.').");  *Brooks v. Miller*, 158 F.3d 1230, 1239 (11th Cir. 1998); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999) ("We have repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy."); *Brooks v. Miller,* 158 F.3d 1230, 1239 (11th Cir.1998); *Davis v. Chiles,* 139 F.3d 1414, 1419 (11th Cir. 1998); *Southern Christian Leadership Conference v. Sessions,* 56 F.3d 1281, 1289, 1294–97 (11th Cir. 1995) (en banc); *Johnson v. DeSoto County Board of Commissioners*, 204 F.3d 1335, 1343 (11th Cir. 2000) ("On this record, the district court (considering all the evidence including the 1990 census) did not clearly err in finding and in concluding that Plaintiffs failed to show the existence of the black-majority district needed to establish their prima facie case of vote dilution.").

member district". Nevertheless, Chestnut's failure to demonstrate a viable remedy means that she lacks standing and that she fails to satisfy the *Gingles* prerequisites, and the amended complaint should therefore be dismissed. If this Court disagrees, because this issue also meets *McFarlin*'s five requirements for interlocutory appeal, Secretary Merrill respectfully requests the Court to certify this issue for interlocutory appeal, and to stay proceedings while the interlocutory appeal is pending.

### III.   Plaintiffs' Claims are Barred by Laches

The 2010 Census results for the State of Alabama were released in February 2011. Those data contained all of the information that Chestnut needed or could have used to bring the claim that she instead waited more than seven years to bring in June 2018. In the intervening years, there have been four Congressional elections: 2012, 2014, 2016, and 2018 (happening now). And while the Census results have not changed, their accuracy has lessened as people moved and died and were born over the past eight years.

What's more, we now are on the threshold of the 2020 Census, which when released in 2021 will be used to draw new congressional districts for Alabama. the State of Alabama expects to receive the Alabama results from the 2020 Census in February 2021 and to start redistricting. At that time, the Legislature already will be in session, and will need to complete redistricting before it recesses in May (if not earlier) so that candidates for Congress and the Legislature can start campaigning in

new districts for the 2022 election. If this case takes half as long as the recent 5-year long legislative redistricting case[9], then it will be concluded at about the time the Legislature takes up the 2021 redistricting. And although Plaintiffs' counsel will argue that congressional redistricting is not as complicated as legislative redistricting, and will insist that this case can get to a final decision in fewer than 2.5 years, they also are insisting that this case not follow the most expeditious route to a final decision, *i.e*., trial before a three judge court and direct appeal to the Supreme Court, instead of trial before a single judge with an appeal to the Eleventh Circuit and review by writ of certiorari by the Supreme Court.

To apply laches against Chestnut requires a showing that she delayed in bringing her vote dilution claim, that her delay was inexcusable, and that her inexcusable delay unduly prejudiced Secretary Merrill (or more broadly and accurately, the State of Alabama). *In re Woide*, 730 F. App'x 731, 736 (11th Cir.

---

[9]     Redistricting cases are neither simple nor quickly resolved; they almost always involve at least one appeal, and often a remand that the trial court must act upon. For example, *Abbott v. Perez*, the challenge to Texas' congressional and legislative districts mentioned above, was commenced before a three-judge court in 2011, just after the challenged plans were enacted, and no final order is yet in sight. By this measure, the last redistricting challenge in Alabama, which consolidated separate claims brought by the Alabama Legislative Black Caucus and the Alabama Democratic Conference, was a model of judicial speed and took only five years to complete, running from October 10, 2012 (when a stay was lifted after the new legislative plans were precleared by Attorney General Holder) until October 23, 2017 (when final judgment approving the State's remedial legislative districts was entered). *See Ala. Legislative Black Caucus v. Alabama,* No. 2:12-cv-691-WKW-MHT-WHP (docket sheet)*.* The case included a trial, 989 F. Supp. 2d 1227 (M.D. Ala. 2013), an appeal before the Supreme Court, 135 S. Ct 1257 (2015), a remand, 231 F. Supp. 2d 1026 (M.D. Ala. 2017), and passage of remedial districts by the Legislature.

April 5, 2018); *E.E.O.C. v. Dressler Industries, Inc.*, 668 F.2d 1199, 1202 (11th Cir. 1982) ("To apply laches in a particular case, the court must find both that the plaintiff delayed inexcusably in bringing the suit and that this delay unduly prejudiced defendants."). These elements are easily established.

First, Chestnut's claim became available to her in June 2011 when Alabama's new congressional districts were enacted with only one majority-black district, despite the fact that the 2010 Census established – she alleges – that two majority-black districts could have been drawn, and that, she alleges, the Voting Rights Act required drawing two majority-black districts. Instead of challenging the new congressional districts, she waited seven years to bring the very same challenge she could have brought in 2011. Chestnut unquestionably delayed.

Second, Chestnut's delay was clearly inexcusable. The information on which her claim necessarily is based – the 2010 Census results – became available in February 2011. Since then there has been no change in those data, or in other relevant facts, or in the law that was necessary for her to bring her lawsuit. There was no impediment to her bringing a § 2 vote dilution claim in 2011.

Third, the State of Alabama would be unduly prejudiced by allowing Chestnut's claim to proceed. Assuming Chestnut were to prevail, and that a final decision after appeals could be reached in 2019 or 2020 (an unlikely assumption), new districts would be drawn on the basis of the 2010 Census, which would be at

least nine or ten years out-of-date. It unduly prejudices the State, office-holders, candidates, and voters to require the drawing of new districts using data no one pretends portrays accurately the State's present demographics. Also, the Census Bureau estimates broad variances in how populations of Alabama counties have changed since 2010. According to the Bureau's most recent estimates, Mobile County's population has barely changed (+0.2%)[10], while neighboring Baldwin County's increased by 16.7%, Lee County's increased by 15.2%, and Conecuh County's decreased by 5.2%, and all of these counties would likely be included in or impacted by Chestnut's efforts to draw a second majority-black congressional district. As this example shows, using outdated Census data to draw new districts would violate one-person, one-vote and lay the basis for a separate counter-lawsuit under the Equal Protection Clause.

In addition, Alabamians would be prejudiced if the Legislature were required to spend time and resources redistricting its Congressional seats for 2020, taking attention away from other important Legislative activities, only months before the Legislature must take up that task again after the 2020 Census. It would be senseless to do as Chestnut asks and require the Legislature to redistrict twice in such a short period of time. Following this reasoning, the court in *MacGovern v. Connolly*

---

[10]     These 2018 Census Bureau figures are taken from U.S. Bureau QuickFacts: Alabama, *available at* https://www.census.gov/quickfacts/al (last visited October 30, 2018).

refused to order a redistricting where plaintiffs inexcusably delayed until the last

moment their challenge to Massachusetts' legislative districts:

> Equity demands that a federal court stay its hand when judicial relief
> makes no sense. This action, in which the remedy sought would come
> at great cost and yield results that are at best uncertain, and at worst,
> perverse, is plainly such a case. When the massive disruption to the
> political process of the Commonwealth is weighed against the harm to
> plaintiffs of suffering through one more election based on an allegedly
> invalid redistricting scheme, equity requires that we deny relief.

*Id.*, 637 F. Supp. 111, 116 (D. Mass. 1986).

In addition to population shifts within the State since 2010, Alabama is

projected to lose a Congressional seat based on the 2020 Census based on population

changes within and without the State.[11] Were that to happen, the boundaries of new

districts would vary significantly from any remedial districts that might result from

this litigation. A demonstration by Chestnut of the possibility of drawing two

majority-black districts with seven congressional seats using 2010 data would not

establish a precedent that two majority-black districts could be drawn using 2020

Census data, especially given the potential that there will only be six Congressional

districts.

---

[11] *See* Brian Lyman, "Ivey establishes Census committee; federal funds, congressional seats on the line," Montgomery Advertiser (August 20, 2018), available at https://www.montgomeryadvertiser.com/story/news/politics/2018/08/20/federal-funds-congressional-seat-line-2020-census/1023841002/ (last visited October 30, 2018).

In *Fouts v. Harris*, the court held that very similar facts were unduly prejudicial to the State of Florida. *See* 88 F. Supp. 2d 1351 (S.D. Fla. 1999). Plaintiffs in *Fouts* brought a challenge to Florida's congressional districts in 1998. The State of Florida asserted laches:

> Defendants assert that they are prejudiced by the Plaintiff's delay in bringing this action because (1) over the six years [since the then-existing congressional districts went into effect] and three election cycles voters have come to know their districts and candidates, and will be confused by change; and (2) requiring redistricting now, before the 2000 census will result in two redistrictings within a two year period, with resulting in voter confusion, instability, dislocation, and [a] financial and logistical burden on the state.

*Id*., 88 F. Supp. 2d at 1354. Relying on a Fourth Circuit decision, the District Court dismissed the case on the basis of laches:

> The dangers of such frequent redistrictings were the basis for the *White* court's decision to impose the defense of laches. The *White* court stated:
>
> > [i]f we affirm the district court's order, the Board will be required to reapportion itself this year and it will probably be required to do so again next year, when the results of the 1990 census are available. *We believe that two reapportionments within a short period of two years would greatly prejudice the County and its citizens by creating instability and dislocation in the electoral system and by imposing great financial and logistical burdens.*
>
> *White,* 909 F.2d at 104 (emphasis added).

Moreover, if the Court were to impose redistricting before the 2000 census, such redistricting would necessarily be based on 1990 census figures. Such old census figures have been recognized as unduly prejudicial because they fail to provide a basis for "fair and accurate

representation for the citizens." *White,* 909 F.2d at 104.

Therefore, the defendants have established each of the three elements necessary to assert the defense of laches. Accordingly, the motions to dismiss will be granted as to that issue.

*Fouts*, 88 F. Supp. 2d at 1354-1355 (*quoting White v. Daniel*, 909 F.2d 99 (4th Cir. 1990)).

*Fouts* was cited approvingly by the Eleventh Circuit in another redistricting case, *Sanders v. Dooly County, Ga.*, 245 F.3d 1289 (11th Cir. 2001). The *Sanders* complaint attacked a joint county commission-board of education redistricting plan, but as in this case, the *Sanders* plaintiffs had waited until two years before the next Census to file their complaint. On appeal, the Eleventh Circuit affirmed the District Court's dismissal for laches of plaintiff's claims for injunctive relief:

> The district court granted the defendants summary judgment on laches grounds. According to the court, the plaintiffs' waiting until November 1998 to file suit—over six years after the first use of the plan and five years after *Shaw v. Reno* issued—was an inexcusable delay. This delay prejudiced the defendants and citizens of Dooly County, the court concluded, in two principal ways: (1) redistricting late in the decade would lead to back-to-back redistrictings (the court-ordered one and the one using new census data) that would confuse voters and be unnecessarily costly to the County; and (2) the census data available to redistrict now are over ten years old and thus unreliable. The plaintiffs appeal.
> ….
>
> Turning to the merits, we conclude that the district court did not abuse its discretion in deeming the claims seeking injunctive relief to be laches-barred for the reasons that we described above. *Cf. Fouts v. Harris,* 88 F. Supp. 2d 1351, 1353 (S.D.Fla.1999) (relying on similar

laches reasoning to dismiss *Shaw* claims), *aff'd sub nom. Chandler v. Harris,* 529 U.S. 1084, 120 S.Ct. 1716, 146 L.Ed.2d 639 (2000).

*Sanders*, 245 F.3d at 1290-1291.

However, the Eleventh Circuit reached a different conclusion on the plaintiffs'

claim for declaratory relief:

> But we do think that the district court overstepped its discretion in judging the claims for declaratory relief to be similarly barred, because the third element of a laches defense—prejudice to the defendants from the unexcused delay—is missing. ... None of the grounds for prejudice that the district court relied on applies to the plaintiffs' claims for a declaration that the 1992 plan violates the Equal Protection Clause. There is no risk of confusion from a redistricting, obviously; no burden to the county to redistrict; and no use of out-of-date census data. An effect of a grant of such declaratory relief could be to prevent the Attorney General from using the 1993 consent-decree plan as a baseline for retrogression analysis in the post–2000 census round of preclearance proceedings under § 5 of the Voting Rights Act, but that effect is no more prejudicial to the defendants now than it would have been in 1993.

*Id*., 245 F.3d at 1291-2192 (footnotes omitted). This part of *Sander*s is

distinguishable. The specific benefit to plaintiffs that the Eleventh Circuit identified

– resetting the benchmark for purposes of Section 5 review – is inapplicable to

Chestnut. And whether two majority-black districts could have been drawn in 2011

simply does not speak to whether two such districts will be drawable after the 2020

Census, particularly if Alabama loses a seat in Congress, leaving the state with only

six Representatives.

Chestnut waited too late to bring her suit, and the State of Alabama would be unduly prejudiced if the Court were to overlook her inexcusable delay and allow her case to go forward.

<u>CONCLUSION</u>

For the reasons shown above, Secretary Merrill respectfully moves the Court to:

a. dismiss the amended complaint for lack of subject-matter jurisdiction, or, if the Court declines to do so, then certify for interlocutory appeal the issue of whether Chestnut's § 2 challenge to the State's congressional districts must be heard by a three-judge court, and stay proceedings before this Court while the interlocutory appeal is pending;

b. dismiss the amended complaint because Chestnut failed to state a claim of vote dilution, or if the Court declines to do so, then certify for interlocutory appeal the issue of whether Chestnut must satisfy *Gingles*' first threshold requirement in her complaint, and stay proceedings before this Court while the interlocutory appeal is pending, and

c. dismiss the amended complaint because Chestnut inexcusably delayed in commencing this case, and allowing it to proceed would unduly prejudice Defendant Secretary Merrill, the State of Alabama, members of the Legislature, candidates, and voters.

Respectfully submitted this the 2nd day of November, 2018.

Steve  Marshall
  *Attorney General*

<u>s/ James W. Davis</u>
James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

23

Winfield J. Sinclair (ASB-1750-S81W)
Misty S. Fairbanks Messick (ASB-1813-T71F)
Laura E. Howell (ASB-0551-A41H)
Brad A. Chynoweth (ASB-0030-S63K)
  *Assistant Attorneys General*

Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
jimdavis@ago.state.al.us
wsinclair@ago.state.al.us
mmessick@ago.state.al.us
lhowell@ago.state.al.us
bchynoweth@ago.state.al.us

Dorman Walker (ASB-9154-R81J)
dwalker@balch.com
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115

***Counsel for Secretary of State John H. Merrill***

## CERTIFICATE OF SERVICE

I certify that on November 2, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a copy to all counsel of record.

<u>*s/* James W. Davis</u>
Of Counsel