FILED
2018 Nov-30  PM 06:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| LAKEISHA CHESTNUT, *et al.*,<br><br>             Plaintiffs,<br><br>     v.<br><br>JOHN H. MERRILL, in his official capacity as Alabama Secretary of State,<br><br>           Defendant. | Civil Action No. 2:18-cv-907-KOB |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

## **<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION.........................................................................................2

II.   LEGAL STANDARD................................................................................3

III.  ARGUMENT ...............................................................................................4

  A. This Case is Properly Before a Single District Judge ......................................4

  B. Plaintiffs' Amended Complaint Sufficiently Alleges that African-American
      Voters in Alabama Meet the First *Gingles* Requirement ..............................134

  C. Plaintiffs' Claim is Not Barred by Laches.....................................................189

     1.  Laches Does Not Bar Claims for Prospective Relief.................................189

     2.  Defendant Fails to Establish the Essential Elements of Laches ................20

        i.  Plaintiffs did not "inexcusably delay"....................................................20

        ii. Defendant Has Not Identified Any Prejudice Attributable to the Alleged
           Delay in Filing this Lawsuit....................................................................23

     3.  Defendant's Authorities Are Inapt and Distinguishable............................27

     4.  Plaintiffs' Claims for Declaratory Relief are Not Barred by Laches........330

IV.  CONCLUSION ...............................................................................................32

## I.   INTRODUCTION

Plaintiffs brought the instant suit under § 2 of the Voting Rights Act to challenge the Alabama congressional map on the ground that it illegally dilutes African-American voting power. After Defendant filed an initial motion to dismiss, Doc. 11, along with a "Notice of Jurisdictional Issue" regarding this Court's ability to hear the case, Doc. 12, Plaintiffs filed an Amended Complaint, Doc. 14, which this Court ruled mooted Defendant's motion, Doc. 16. Defendant subsequently answered Plaintiffs' Amended Complaint. Doc. 17. Nearly three months later, Defendant filed the present motion seeking dismissal of the suit on a myriad of baseless grounds, all of which should be rejected. Defendant's contention—for the second time—that this claim is improperly before a single district judge ignores the plain language of 28 U.S.C. § 2284, which limits the jurisdiction of three-judge panels to constitutional claims, not vote dilution claims brought under the VRA. Defendant's challenge to the sufficiency of Plaintiffs' allegations, moreover, imposes a higher pleading burden than permitted by Rule 8 and ignores numerous factual allegations in the Amended Complaint that support Plaintiffs' claims. Finally, laches does not apply to bar Plaintiffs' claim, which seeks prospective relief for future elections, and even if it did, Defendant falls far short of his burden to establish this affirmative defense. Accordingly, for the reasons set forth below as well as in Plaintiffs' opposition to Defendant's Motion to Dismiss, Doc. 15, which

1

is incorporated fully herein, Plaintiffs respectfully request that this Court deny Defendant's Motion for Judgment on the Pleadings.

## II.    LEGAL STANDARD

Judgment on the pleadings is only appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. *See Ortega v. Christian*, 85 F.3d 1521, 1524 (11th Cir. 1996). A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards as a motion to dismiss under Rule 12(b)(6). *Ala. Teachers Credit Union v. Design Build Concepts, Inc.*, No. 4:16-CV-2027-KOB, 2017 WL 1331019, at *1 (N.D. Ala. Apr. 11, 2017). In determining whether a party is entitled to judgment on the pleadings, the court must accept as true all material facts alleged in the non-moving party's pleading and view those facts in the light most favorable to the non-moving party, drawing all reasonable inferences in favor of the nonmovant. *Raines v. Caldwell*, No. 2:17-CV-00974-RDP-JEO, 2018 WL 3368962, at *1 (N.D. Ala. July 10, 2018) (quoting *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014)). "The complaint may not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998) (quoting *Slagle v. ITT Hartford*, 102 F.3d 494, 497 (11th Cir. 1996)).

## III.   ARGUMENT

### A.   This Case is Properly Before a Single District Judge

Defendant's assertion that 28 U.S.C. § 2284 mandates the convening of a three-judge panel in this case is, just as it was the first time Defendant raised the issue in his Notice of Jurisdictional Issue, wholly without merit. Defendant asserts that he has been newly inspired on this point by Senator McClendon's proposed motion to dismiss and the State of Louisiana's (pending) motion to dismiss in *Johnson v. Ardoin*, No. 3:18-cv-00625 (M.D. La.). Mot. at 1 n.1.[1] Defendant fails to acknowledge, however, that, in a similar § 2 case challenging a statewide congressional plan, the State of Georgia has agreed that the case "is properly before a single district judge" and that "there is no question regarding th[e] Court's jurisdiction." Joint Statement Regarding Assignment of Three-Judge Panel, *Dwight v. Kemp*, No. 1:18-cv-2869-RWS (N.D. Ga. Sept. 12, 2018), ECF No. 25 at 1-2; *see also id.* at 5 ("Because the § 2 claim at issue here is functionally and substantively distinct from the constitutional claims referenced in 28 U.S.C. § 2284, the parties submit that a three-judge court is not appropriate in this case."). The court in that case has since issued a scheduling order to allow the case to proceed before a single district judge. *Dwight v. Kemp*, ECF No. 27; *see Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d

---

[1] Senator McClendon's proposed Motion to Dismiss is not before this Court as Senator McClendon was denied intervention. Doc. No. 24. Counsel for Senator McClendon has since appeared on behalf of the State. Doc. 26.

1267, 1280 (11th Cir. 2005) (citing *Rembert v. Apfel*, 213 F.3d 1331, 1333 (11th Cir. 2000)) (courts must always consider the question of whether they have subject matter jurisdiction, even if no party has raised it).

Defendant's argument on this score is no more persuasive now than it was when he raised it four months ago. It ignores not only the statute's plain language but also standard principles of statutory interpretation and constitutional avoidance, as well as long-standing jurisprudence mandating strict statutory construction for statutes permitting three-judge courts.

The plain language of 28 U.S.C. § 2284(a) provides that "[a] district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed *challenging the constitutionality* of the apportionment of congressional districts or the apportionment of any statewide legislative body" (emphasis added). The text of the statute leaves no room for ambiguity: three-judge courts are convened only where plaintiffs raise constitutional claims. *See, e.g.*, *United States v. Ron Pair Enters, Inc.*, 489 U.S. 235, 241 (1989) ("The task of resolving the dispute over the meaning of [the statute] begins where all such inquiries must begin: with the language of the statute itself. In this case it is also where the inquiry should end, for where, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms.") (citation omitted). Plaintiffs' Amended Complaint alleges a violation of § 2 of the Voting Rights Act—a statutory, not a

constitutional claim. Doc. 14 ("Am. Compl.") ¶¶ 102-109. Thus, not only should this case not be referred to a three-judge court, the plain language of the statute dictates that it *cannot* be. Defendant's insistence that the Court ignore the plain language of the statute has not become more persuasive upon repetition.

Indeed, the United States Supreme Court has "long held that congressional enactments providing for the convening of three-judge courts must be strictly construed." *Allen v. State Bd. of Elections*, 393 U.S. 544, 561–62 (1969) (citing *Phillips v. United States*, 312 U.S. 246 (1941)); *see also, e.g.*, *Morales v. Turman*, 430 U.S. 322, 324 (1977) ("The ruling [] merely reflected the consistent recognition that the three-judge court procedure is not a measure of broad social policy to be construed with great liberality, but . . . an enactment technical in the strict sense of the term and to be applied as such." (quotation marks omitted)). This is because "[c]onvening a three-judge court places a burden on our federal court system, and may often result in a delay in a matter needing swift initial adjudication." *Allen*, 393 U.S. at 561. Consistent with this principle of strict construction, courts have dissolved three-judge panels in § 2 cases that, like this one, did not assert any constitutional claims in challenging statewide redistricting plans. *See, e.g.*, *Rural W. Tenn. African-Am. Affairs Council, Inc. v. Sundquist*, 209 F. 3d 835, 838 (6th Cir. 2000) (noting that a three-judge panel, which convened after plaintiffs asserted a § 2 *and* a constitutional claim, disbanded itself after plaintiffs filed a second amended complaint solely under

§ 2 of the Voting Rights Act). Thus, not only is a referral for a three-judge panel unwarranted here, this Court is not at liberty to expand the scope of 28 U.S.C. § 2284 to include the § 2 statutory claim as any panel would lack jurisdiction to resolve it.

Defendant's effort to suggest that Plaintiffs' § 2 claim should be considered "a form of constitutional challenge," Mot. at 3, is similarly misguided. As an initial matter, Defendant provides no support for the proposition that the Court can read a constitutional claim into a plaintiff's complaint where none has been alleged. On the contrary, it is a well-settled rule that "the plaintiff [is] the master of the claim," and "'[j]urisdiction may not be sustained on a theory that the plaintiff has not advanced.'" *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 12 (2003) (quoting *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 809, n.6 (1986)). In fact, this rule is so deeply rooted that even if Plaintiffs in this case were engaging in artful pleading "to avoid a three-judge court," Mot. at 2, (which they are not), such action would be entirely permissible, as the rule specifically recognizes that a plaintiff may draft his claims to avoid an exercise of jurisdiction. *Id.* (explaining that the well-pleaded complaint rule allows plaintiffs to "avoid federal jurisdiction by exclusive reliance on state law"); *see also The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) ("Of course, the party who brings a suit is master to decide what law he will rely upon.").

Moreover, Defendant's reliance on the *City of Mobile v. Bolden*, 446 U.S. 55 (1980), a case that pre-dated the 1982 amendments to the Voting Rights Act, to contend that § 2 and the Fifteenth Amendment are "in essence" identical, Mot. at 4, ignores the critical distinction between the two:

> The Senate Report which accompanied the 1982 amendments elaborates on the nature of § 2 violations and on the proof required to establish these violations. First and foremost, the Report dispositively rejects the position of the plurality in *Mobile v. Bolden*, . . . which required proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters. *See, e.g.*, S.Rep., at 2, 15–16, 27. The intent test was repudiated for three principal reasons—it is "unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities," it places an "inordinately difficult" burden of proof on plaintiffs, and it "asks the wrong question." *Id.*, at 36, U.S. Code Cong. & Admin. News 1982, p. 214. The "right" question, as the Report emphasizes repeatedly, is whether "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Id.*, at 28, U.S. Code Cong. & Admin. News 1982, p. 206.

*Thornburg v. Gingles*, 478 U.S. 30, 43–44 (1986) (citation omitted). Defendant, therefore, is plain wrong to assert that "there is no practical difference in the way this claim will be litigated[] or decided" under § 2 than it would had it been brought under the Fourteenth or Fifteenth Amendments. Mot. at 4. As explained at length in Plaintiffs' opposition to Defendant's motion to dismiss, vote dilution claims and constitutional claims are analytically and practically distinct. *See Miller v. Johnson*, 515 U.S. 900, 911 (1995) (a claim of racial gerrymandering is "analytically distinct"

7

from a vote dilution claim); *see also Bethune-Hill v. Va. State Bd. of Elections*, 141 F.Supp.3d 505, 512 (E.D. Va. 2015) (same), *aff'd in part and vacated in part*,137 S. Ct. 788 (2017); *Ala. Legislative Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1290 (M.D. Ala. 2013) (same); *LULAC v. Perry*, 548 U.S. 399, 432-33 (2006) (district court's analysis of compactness "for equal protection purposes" is "inapposite" "[u]nder § 2," which "embraces different considerations"). These claims require proof of different elements, call for different remedies, are adjudicated under different legal standards, and address different legal harms. *See* Pls.' Opp. to Mot. to Dismiss, Doc. 15, pg. 1, 3-4. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47. Notably, § 2 does not require proof of intentional discrimination or race-based motive (or any intent at all); rather, "[u]nlike discrimination claims brought pursuant to the Fourteenth Amendment, Congress has clarified that violations of Section 2(a) can 'be proved by showing discriminatory effect alone.'" *Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (quoting *Gingles*, 478 U.S. at 35), *cert. denied*, 137 S. Ct. 612 (2017). Construing Plaintiffs' § 2 claim as an intentional discrimination claim under the Fifteenth Amendment or a racial gerrymandering claim under the Fourteenth Amendment, therefore, would essentially force Plaintiffs to satisfy an "'inordinately difficult'

burden of proof," *Gingles*, 478 U.S. at 43-44; *see also Miller*, 515 U.S. at 928 (O'Connor, J., concurring) (racial gerrymandering plaintiffs must satisfy a "demanding" standard to establish racial motivation), in support of a claim they are not even making. Defendant cannot strongarm Plaintiffs into asserting a constitutional claim.

Defendant's continued reliance on *Page v. Bartels*, 248 F.3d 175 (3d Cir. 2001), moreover, fails to provide support for his novel theory that § 2 claims are the equivalent of constitutional claims for jurisdictional purposes. Defendant begins his discussion of *Page* by mischaracterizing its holding. *See* Mot. at 4 ("[T]he Third Circuit held that 28 U.S.C. § 2284 should be construed to reach claims brought under the Voting Rights Act."). Three pages later, Defendant admits that *Page* in fact held only that "a three-judge court should decide Section 2 claims that are brought *in conjunction with constitutional claims*," and accordingly *Page* "is not directly on point." Mot. at 6 (emphasis added). That is an understatement. Plaintiffs have already explained at length the multiple reasons *Page* is entirely uninformative here, where Plaintiffs have asserted only a statutory claim. *See* Pls. Op. to Mot. to Dismiss, Doc. 15, pg. 6-8. By referring to a three-judge panel the "action" before it "challenging the constitutionality" of a statewide redistricting plan, the *Page* ruling falls squarely within the plain language of 28 U.S.C. § 2284(a). *See also Rural W. Tenn. African Am. Affairs Council, Inc*, 209 F. 3d at 838 (disbanding a three-judge panel in

9

challenge to reapportionment of state House districts after plaintiffs filed a second amended complaint dropping their constitutional claim and advancing solely a claim under § 2 of the Voting Rights Act). The *Page* holding thus has no bearing on this case.

Defendant again contends that when 28 U.S.C. § 2284 was narrowed in 1976 to require that three-judge courts hear challenges to the "constitutionality" of apportionment plans, there was no cause of action for apportionment plans under § 2 because the 1982 amendments to the Voting Rights Act had not yet been passed. But even if apportionment plans were not commonly challenged under § 2 until after the 1982 amendments to the Voting Rights Act, Congress has had more than *three decades* to amend either § 2 or 28 U.S.C. § 2284 to mandate that § 2 claims (or more generally, Voting Rights Act claims) be decided by a three-judge court. It has not done so. Indeed, in *Allen v. State Board of Elections*, the Court found that the three-judge court statute applies to claims brought under § 5 of the Voting Rights Act specifically because "[t]he final sentence of s 5 provides that '(a)ny action under this section shall be heard and determined by a court of three judges.'" *Allen*, 393 U.S. at 561 (citing 42 U.S.C. s 1973c (1964 ed., Supp. I)). The Court further noted that, with respect to the Voting Rights Act, where Congress wanted to, it expressly allowed for three-judge courts in other sections. *See id.* at 563 (discussing similar language in §10 of the Voting Rights Act). No such language, however, exists in §

2. Had it been Congress's intent for three-judge courts to hear § 2 cases, *Allen* demonstrates that Congress certainly knew how to expressly provide as much either in the text of § 2 or in 28 U.S.C. § 2284.[2]

Finally, Defendant requests an immediate certification of interlocutory appeal of this issue under 28 U.S.C. § 1292(b). Certification under § 1292(b) "is by a wide margin the exception, not the rule." *Drummond Co., Inc. v. Collingsworth*, No. 2:15-cv-506-RDP, 2017 WL 4783549, at *2 (N.D. Ala. Sept. 14, 2017); *see also McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1264 (11th Cir. 2004); *OFS Fitel, LLC v. Epstein, Becker, and Green, P.C.*, 549 F.3d 1344, 1359 (11th Cir. 2008). Defendant asserts that the question of whether a three-judge panel is required meets the five-part test for certification of interlocutory appeal under *McFarlin*, 381 F.3d at 1264. Mot. at 8-9. But although Defendant bears the burden of demonstrating these grounds, he has made no argument whatsoever to establish any of them. *See McFarlin*, 381 F.3d at 1264 (holding that the petitioning party failed to carry its burden of persuading the

---

[2] *Cavanagh v. Brock*, 577 F. Supp. 176 (E.D.N.C. 1983), does not apply to this case. The plaintiffs in *Cavanagh* did not allege any statutory violation; they alleged that the map violated the North Carolina Constitution. Because 28 U.S.C. § 2284 requires the convening of a three-judge court only for *federal* constitutional challenges, the three-judge statute did not apply. 577 F. Supp. at 180 n.3. The fact that Defendant raised a defense under the VRA was not sufficient to mandate a three-judge court under 28 U.S.C. § 2284 either. *Id*. (finding a "substantial likelihood that this matter is beyond the purview of § 2284"). When the *Cavanagh* case was removed to federal court, it was consolidated with two other pending redistricting cases that were designated for determination by a three-judge court pursuant to 28 U.S.C. § 2284. *Id*. at 179. Because a three-judge court was not mandated by 28 U.S.C. § 2284 in *Cavanagh*, the Court essentially dismantled the three-judge panel that had been previously designated by designating the circuit judge to sit as a district judge. *Id*. at 180 n.3.

court that a question of law meeting the requirements of § 1292(b) was clearly presented). This omission is fatal to Defendant's request.

Indeed, it is plain there are no grounds for certification here. To determine if a "substantial ground for difference of opinion" exists under 28 U.S.C. § 1292(b), courts must examine to what extent the controlling law is unclear. "[A] court faced with a motion for certification must analyze the strength of the arguments in opposition to the challenged ruling to decide whether the issue is truly one on which there is a substantial ground for dispute." *Williams v. Saxon Mortg. Co.*, Civ. Act. No. 06-0799-WS-B, 2007 WL 4105126, at *2 (S.D. Ala. Nov. 15, 2007). Courts have rejected a finding of a substantial ground for difference of opinion in a multitude of scenarios, including where there is a mere absence of binding authority on the issue, *see id.*; where there is a disputed issue that is a question of first impression, *see In re Flor*, 79 F.3d 281, 284 (2nd Cir. 1996); and, most applicable here, where the statutory language is clear, *see Singh v. Daimler-Benz, AG*, 800 F. Supp. 260, 263 (E.D. Pa. 1992), *aff'd*, 9 F.3d 303 (3d Cir. 1993). Here, there is simply no ground supporting a purported difference of opinion, much less a substantial one. As demonstrated, there can be no genuine dispute as to the meaning of 28 U.S.C. § 2284. Indeed, Defendant has not identified a single case in which a three-judge court considered an action in which Plaintiffs brought only a § 2 claim. Undoubtedly, the reason why this issue has not come up before is because the language of the statute is clear: § 2 claims are

statutory, and thus 28 U.S.C. § 2284 does not apply. This question should not be certified for appeal.

**B.     Plaintiffs' Amended Complaint Sufficiently Alleges that African-American Voters in Alabama Meet the First *Gingles* Requirement**

Defendant's argument that Plaintiffs fail to sufficiently allege (and lack standing to allege) the first *Gingles* precondition (i.e., that African-American voters can constitute a reasonably compact majority in two congressional districts) improperly seeks to impose upon § 2 plaintiffs a heightened standard of pleading than required by the Federal Rules or legal precedent. Read as a whole and with a proper understanding of the law, Plaintiffs' Amended Complaint provides more than sufficient facts to demonstrate that the African-American population in Alabama is sufficiently numerous and geographically compact to form a majority of eligible voters in two congressional districts.

Defendant contends that Plaintiffs' allegations with respect to the first *Gingles* precondition amount to nothing more than "naked assertion[s] devoid of further factual enhancement," Mot. at 12, pointing only to paragraphs 6 and 105 (in the introduction and cause of action) of Plaintiffs' Amended Complaint, Mot. at 11, 12, 13. In so doing, he overlooks the actual allegations set forth in the Amended Complaint. For example, the Amended Complaint sets forth the substantial Black Voting Age Population residing in CD 7, Am. Compl. ¶ 38, and alleges that the

current redistricting plan "'packs' African-American voters into CD 7 and 'cracks' African-American voters among three other congressional districts—CDs 1, 2, and 3—despite the fact that African-American population in these areas could have been united to form an additional majority-minority congressional district. *Id.* ¶¶ 3, 31. As specific evidence of "cracking," the Amended Complaint points to CDs 1, 2, and 3, which each contain at least one heavily African-American area in an otherwise majority-white district. *Id.* ¶ 43 (CD 3 contains Macon County, which has an African-American population of 82.6%, CD 1 includes Mobile County (34.6% African-American population) and Monroe County (41.7% African American population, while Montgomery County, with an African-American population of 54.7%, is split between CDs 2, 3, and 7); *see also id.* ¶ 45 ("[T]he Black Belt and the surrounding area is split among four congressional districts -- CDs 1, 2, 3, and 7."). The Amended Complaint specifies that "[b]y unpacking CD 7's African-American population and combining it with African-American population in other districts such as CDs 1, 2, and 3, the Alabama legislature could have drawn two majority-minority districts in S.B. 484." *Id.* ¶ 42.

The Amended Complaint also alleges that several of the plaintiffs reside in areas that could be drawn into an additional majority-minority congressional district. *Id.* at ¶¶ 13 (Mobile County), 14 and 18 (Montgomery County), 19 (Bullock County), 20 (Lee County), 21 (Macon County), 22 (Clarke County). Taken together, these

facts are more than sufficient to infer that African Americans residing in a relatively compact area are sufficiently numerous to form a second majority-minority district.

Ultimately, Defendant asks for far more than plausible allegations, insisting instead on a copy of the proposed map (or, alternatively a comprehensive list of census blocks that would comprise the new district) Plaintiffs will eventually provide in an expert report to prove their claim. *See* Mot. at 13 (arguing Plaintiffs were "required to include in [their] pleading a map showing that the district [they] propose[] could, as a matter of fact, have been drawn by Alabama"). This is simply not required. The cases Defendant relies on for this do not evaluate the requirements for *pleading* a § 2 claim, but rather discuss the requirements for *proving* a § 2 claim— after a trial or hearing on the merits and a complete evidentiary record. *See Johnson v. DeSoto Cty. Bd. of Comm'rs*, 204 F.3d 1335, 1343 (11th Cir. 2000) (evaluating sufficiency of plaintiffs' showing after trial on the merits); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999) (addressing the proof requirement at the summary judgment stage); *Brooks v. Miller*, 158 F.3d 1230, 1233 (11th Cir. 1998) (district court considered evidence presented at five-day hearing on motion for preliminary injunction and four-day bench trial as well as exhibits and reports submitted by the parties); *Davis v. Chiles*, 139 F.3d 1414, 1419 (11th Cir. 1998) (evaluating plaintiffs' claim after a bench trial); *S. Christian Leadership Conference of Ala. v. Sessions*, 56 F.3d 1281, 1289, 1294–97 (11th Cir. 1995) (en banc) (district

15

court rejected plaintiffs' claims after bench trial); *Wright v. Sumter Cty. Bd. of Elections and Registration*, No. 1:14-cv-42 (WLS) 2014 WL 1347427, at *3 (M.D. Ga. Apr. 3, 2014) (denying motion for preliminary injunction after evidentiary hearing).[3] To hold that an illustrative plan is required to sufficiently plead the first *Gingles* precondition would necessarily conflate the pleading standard for § 2 with an evidentiary standard. This is out of line with both the liberal pleading standards of Rule 8, the case law on Article III standing, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (no substantive evidence required at pleading stage for plaintiffs to demonstrate standing, "for on a motion to dismiss [the court] 'presum[es] that general allegations embrace those specific facts that are necessary to support the claim'") (citation omitted), and the Supreme Court's interpretation of the Voting Rights Act, *see, e.g.*, *Chisom v. Roemer*, 501 U.S. at 380, 403–04 (1991) ("The VRA should be interpreted in a manner that provides the broadest possible scope in combating racial discrimination." (internal quotation marks and citations omitted)).

Defendant cites only one district court case that demanded an illustrative map at the pleading stage—*Broward Citizens for Fair Dists. v. Broward Cty.*, No. 12-60317-CIV, 2012 WL 1110053 (S.D. Fla. Apr. 3, 2012)—and it is an outlier. To

---

[3] Defendant complains that Plaintiffs have failed to establish a *prima facie* case. Mot. at 9. But Plaintiffs do not have the burden of establishing a *prima facie* case at the pleading stage. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569-70 (2007) (explaining that *prima facie* is a "heightened pleading requirement," inappropriate at the pleading stage, which requires "only enough facts to state a claim to relief that is plausible on its face").

Plaintiffs' knowledge, no other court has required an illustrative map at the pleading stage or cited *Broward* for this proposition. In fact, one court specifically rejected the *Broward* holding, finding that "requiring the submission of a proposed map with the complaint [extends] what is an evidentiary requirement for purposes of summary judgment to the pleading stage of litigation." *Luna v. Cty. of Kern*, No. 1:16-cv-00568-DAD-JLT, 2016 WL 4679723, at *5 (E.D. Ca. Sept. 2, 2016); *see also Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004) ("It is no accident that most cases under section 2 have been decided on summary judgment or after a verdict, and not on a motion to dismiss."). The court explained that such a requirement would necessarily force factual disputes and require expert analysis, effectively requiring plaintiffs "to develop an unobjectionable map, before discovery even begins." *Luna*, 2016 WL 4679723, at *5.[4] Neither the letter nor the spirit of Rule 8 requires as much.

Defendant once again asserts without argument that "this issue also meets *McFarlin*'s five requirements for interlocutory appeal." Mot. at 15. On the contrary, Defendant's argument on this question rests entirely on a single, discredited district court case and defies the well-established pleading standard under Rule 8.

---

[4] In addition, the *Luna* court noted that the Eleventh Circuit case relied on in *Broward* for the proposition that a map is required at the pleading stage, *Burton*, 178 F.3d at 1199, was not, in fact, addressing a motion to dismiss. Rather, it was addressing the proof requirement at the summary judgment stage. *Luna*, 2016 WL 4679723, at *5.

Defendant's failure to muster any basis whatsoever to certify the issue for interlocutory appeal demonstrates the utter baselessness of that request.

## C.   Plaintiffs' Claim is Not Barred by Laches

Defendant argues that Plaintiffs' claim is barred by laches. This argument fails on multiple grounds. Not only does laches not apply to this prospective claim, but even if it did, Defendant fails to establish the essential elements of laches.

### 1.   Laches Does Not Bar Claims for Prospective Relief

Defendant's argument that Plaintiffs' § 2 claim is barred by laches fails because Plaintiffs seek prospective injunctive relief to protect their rights in future elections, and therefore laches does not apply. *See Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1321 (11th Cir. 2008) ("[L]aches serves as a bar only to the recovery of retrospective damages, not to prospective relief."); *see also Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 1005, n.32 (5th Cir. 1981) ("[L]aches may not be used as a shield for future, independent violations of the law. The concept of undue prejudice, an essential element in a defense of laches, is normally inapplicable when the relief is prospective."). Thus, courts generally refuse to apply laches in voting rights cases, like this one, where plaintiffs seek prospective relief to address "ongoing" injury. *See, e.g.*, *Garza v. Cty. of L.A.*, 918 F.2d 763, 772 (9th Cir. 1990); *Smith v. Clinton*, 687 F. Supp. 1310, 1312-13 (E.D. Ark. 1988) (action not barred by laches because "the injury alleged by the plaintiffs

is continuing, suffered anew each time a State Representative election is held"). Here, Plaintiffs seek entirely prospective relief. *See* Am. Compl. ¶ 109 (Defendant's actions represent ongoing violations under the VRA and Defendant "will continue to violate [Plaintiffs' Section 2] rights absent relief granted by this Court"). Thus, laches does not bar their claims.

### 2.    Defendant Fails to Establish the Essential Elements of Laches

Even if laches could apply, it should not apply here. Laches is only available when the party seeking to avoid liability establishes three essential elements: (1) a delay in asserting a right or claim, which (2) was not excusable, and (3) caused undue prejudice to the party against whom the claim is asserted. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1545 (11th Cir. 1986). Defendant bears the burden of establishing each element, *see Keefe v. Bah. Cruise Lines, Inc.*, 867 F.2d 1318, 1324 (11th Cir. 1989), and he fails to carry it.

### i.    Plaintiffs did not "inexcusably delay"

The first and second elements of laches require the court to assess the length of Plaintiffs' delay, "measured from the time at which the plaintiff knows or should know she has a provable claim," and to assess whether such delay was reasonable or inexcusable. *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1206 (11th Cir. 1997). Furthermore, the Court must assess, separately, the extent and reasonableness of each plaintiff's purported delay in bringing suit, and may not

simply impute knowledge of voting rights violations from once citizen to another. *See Nader 2000 Primary Comm., Inc. v. Hechler*, 112 F. Supp. 2d 575, 579 n.2 (S.D.W.Va. 2000) (holding that a political candidate and political party plaintiff's delay in asserting First Amendment challenge to ballot access laws did not apply to registered-voter co-plaintiffs); *see also Garden City Boxing Club, Inc. v. Johnson*, 552 F. Supp. 2d 611, 618 (N.D. Tex. 2008) ("The Court is unaware of any case that imputes the delay of a plaintiff in one case to a different plaintiff in another case simply because the plaintiffs shared the same attorneys.").

Defendant misinterprets this threshold element in suggesting that Plaintiffs should have known they had a provable claim as early as February 2011. Mot. at 17.[5] He does not point to a single authority that would require Plaintiffs to predict that their votes will be diluted immediately upon the passage of redistricting plan (or, in the case of Ms. Chestnut, before she ever resided in Alabama). *But see Nader 2000 Primary Comm.*, 112 F. Supp. 2d at 579 n.2 ("Ordinary citizens should not be forced to anticipate and predict possible constitutional violations . . ."). Indeed, the Eleventh Circuit has repeatedly rejected this broad interpretation of laches that would require plaintiffs to forego any investigation of potential voting rights violations, or to "sue first and ask questions later." *Kason Indus.*, 120 F.3d at 1206 (quoting J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR

---

[5] The congressional plan challenged here was not enacted until June 8, 2011.

COMPETITION § 31.19 (4th ed. 1997)). The Court recognized that "a plaintiff's reasonable need to fully investigate its claims" may excuse a delay in filing suit, and that to hold otherwise "would create a powerful and perverse incentive for plaintiffs to file premature and even frivolous suits to avoid the invocation of laches." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1285 (11th Cir. 2015).

Defendant also ignores the fact that Ms. Chestnut did not become a resident of Alabama until 2016, Am. Compl. ⁋ 13, and, thus, cannot be charged with delay in asserting claims that did not even exist. *Cf. Correll v. Herring*, 212 F. Supp. 3d 584, 617 n. 29 (E.D. Va. 2016) ("[Plaintiff] could not have challenged a statute that allegedly impinges on the First Amendment rights of delegates when he was not a delegate."). Like all other litigants, Ms. Chestnut was entitled to investigate and prepare her claims, rather than pursuing legal action immediately upon moving to Alabama. *Black Warrior*, 78 F.3d at 1285. This is especially true for claims asserted under § 2 of the Voting Rights Act, which require evidence that bloc voting by a white majority is usually sufficient to defeat the minority group's preferred candidate. *See Smith*, 687 F. Supp. at 1313 (denying laches defense based on time needed to develop evidence of Voting Rights Act violation). In some instances, such evidence may require multiple elections to establish, and may be "unavailable unless the [challenged] structure ha[s] been in place for some time." *Id.*

21

In short, Defendant has not pointed to any evidence that suggests Plaintiffs unreasonably delayed the filing of this suit.

### ii.    Defendant Has Not Identified Any Prejudice Attributable to the Alleged Delay in Filing this Lawsuit.

Compounding the absence of any unreasonable delay is Defendant's failure to identify any prejudice caused by the *timing* of this lawsuit. To establish this element, Defendant must demonstrate harm that is attributable specifically to Plaintiffs' alleged delay. *See Black Warrior*, 781 F.3d at 1286. Courts applying laches have drawn a clear distinction between prejudice caused by the delay in asserting one's rights, and the harm that results merely from losing a case on the merits. *See id.* (explaining that prejudice must stem from the delay, "rather than from the consequences of an adverse decision on the merits . . . ."); *see also Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1058 (5th Cir. 1985) (rejecting laches defense because defendant's alleged "prejudice would arise essentially from a decision on the merits . . . rather than from the [plaintiff's] delay in bringing suit"); *Matter of Bohart*, 743 F.2d 313, 327 (5th Cir. 1984) ("Nor is there prejudicial harm merely because one loses what otherwise he would have kept; there must be a delay which causes a disadvantage in asserting and establishing a claimed right or defense."); *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n*, 366 F. Supp. 2d 887, 908 (D. Ariz. 2005) (acknowledging two forms of prejudice relevant to laches: "evidentiary and expectations-based [prejudice]") (quoting

*Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955 (9th Cir. 2001)). In other words, the party invoking laches must establish that he or she was "[was] made significantly worse off because [Plaintiffs] did not bring suit as soon as [they] had the opportunity to do so." *Black Warrior*, 781 F.3d at 1286.

What Defendant describes as prejudice are simply consequences of an adverse ruling on the merits, which are plainly insufficient to demonstrate laches. Defendant contends, for instance, that Plaintiffs' action may result in multiple redistrictings within a short period of time and more use of the legislature's resources. But that would be true of any successful claim challenging a districting plan, whether filed immediately or several years after its enactment. *See Shuford v. Ala. State Bd. of Educ.* 920 F. Supp. 1233, 1239-40 (M.D. Ala. 1996) (rejecting laches defense, finding no "reason why it would be more difficult to litigate a § 5 claim" at the time plaintiffs filed suit "than it would have been if the claim had been raised at the time the [change in election practice or procedure occurred]"); *Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 996 F. Supp. 2d 1353, 1357-58 (recognizing that a §2 violation is remedied by a court or legislatively-drawn redistricting plan). In *Larios v. Cox*, for instance, a three-judge panel's ruling striking Georgia's 2002 state legislative reapportionment plan—in a case filed less than a year after the plan was enacted—resulted in multiple redistrictings (in 2002 and 2004) within a two-year span. 300 F. Supp. 2d 1320 (N.D. Ga. 2004), *aff'd*, 542 U.S. 947 (2004). In other

words, "back-to-back" redistricting—even without the benefit of up-to-date census data—is an inevitable consequence of protecting the right to vote when the legislature fails to get it right the first time.

These cases also demonstrate that the absence of up-to-date Census data should not preclude a court from affording relief to African-American voters who have been denied the right to participate equally in the political process. It would make little sense to reject a remedial map as "prejudicial," while permitting the continued use of an unlawful districting plan that relies on the same 2010 Census data. If the State is going to hold elections in 2020 based on 2010 data (which it will regardless of the outcome of this case), it should do so in a way that does not dilute African-American voting strength.

Defendant's argument is even less compelling when considering that prior Census figures are "the relevant data for assessing a claim under Section [2]." *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991). Following Defendant's approach, the Court would be required to rely on 2010 Census data in determining whether the redistricting plan complies with the law, yet declare such data unreliable in crafting a remedy, which is nonsensical and would eliminate all avenues for relief in almost all mid-decade vote dilution and gerrymandering claims. In short, mid-cycle redistricting based on decennial census data is commonplace and is not a form of prejudice. Indeed, while Defendant chooses to discount the voting

24

rights injury Plaintiffs will face in the 2020 election based on its proximity to the next decennial redistricting process, that election is no less important than the four others that have taken place under an unlawful plan. *See Smith*, 687 F. Supp. at 1312-13 (action not barred by laches because "the injury alleged by the plaintiffs is continuing, suffered anew each time a State Representative election is held").

Defendant, meanwhile, views it as a foregone conclusion that this case cannot possibly be concluded in time for the 2020 elections. To be sure, Defendant's litigation tactics thus far—refusing to exchange initial disclosures, Doc. 29, pg. 1-2, calling for an unnecessarily protracted case schedule, *id.* at 3, seeking a stay of all discovery until the Court rules on the present motion, Doc. 28, and demanding multiple piecemeal interlocutory appeals, Mot. at 8, 15—seem directed at ensuring just that. Defendant's complaints about an extended litigation ring hollow where he is actively working to ensure further delay. Plaintiffs filed their Amended Complaint more than two years before the 2020 election and have requested a trial date eight months before the 2020 primary and 16 months before the 2020 general election. *See* Doc. 29, pg. 4. Defendant has identified no reason why this (primarily expert-driven) case cannot proceed on that schedule.[6]

---

[6] Defendant further faults Plaintiffs for "insisting that this case not follow the most expeditious route to a final decision" by pursuing a three-judge panel, Mot. at 16, failing to recognize that a three-judge panel would not have jurisdiction over this § 2 claim. *See supra* at 3-13. Nor does a three-judge panel ensure a speedy resolution. On the contrary, "[c]onvening a three-judge court . . . may often result in a delay in a matter needing swift initial adjudication." *Allen*, 393 U.S. at 561–62.

Defendant points to *Abbott v. Perez* and *Alabama Legislative Black Caucus v. Alabama* to suggest that this case may take years to resolve on appeal. Mot. at 16 n.9. But those cases involved constitutional claims heard by three-judge panels with mandatory review by the U.S. Supreme Court.[7] Defendant's suggestion here that he might choose to appeal a ruling in Plaintiffs' favor hardly means that the Court should not allow Plaintiffs to pursue their claim. Courts do not shrug at legal violations just because a losing party may try to appeal. Defendant's argument implies he is entitled to some sort of automatic stay of any ruling in Plaintiffs' favor, contrary to the legal standard. *See Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986) (a stay pending appeal is "an exceptional response granted only upon a showing of four factors," including a "likelihood of success on the merits on appeal").

### 3.   Defendant's Authorities Are Inapt and Distinguishable

Defendant incorrectly relies on four primary authorities, *Sanders v. Dooly County, GA*, *Fouts v. Harris*, *White v. Daniel*, and *MacGovern v. Connolly*, to support his flawed theory of prejudice. All are clearly distinguishable and fail to support Defendant's laches defense.

---

[7] *Abbott v. Perez*, 138 S.Ct. 2305 (2018), was stalled by the need for federal preclearance of the originally-challenged map under § 5 of the Voting Rights Act and the Texas Legislature's decision to adopt a new legislative map before the court issued a final judgment, prompting multiple trials.

In *Sanders v. Dooly County, GA*, the Eleventh Circuit affirmed a district court order dismissing, based on laches, a lawsuit to enjoin a county commission and board of education districting plan. 245 F.3d 1289, 1291 (11th Cir. 2001) (holding that the district court did not abuse its discretion). The Eleventh Circuit's opinion did not include any analysis of the alleged forms of prejudice to defendants, but simply held that the district court had not abused its discretion. *Id*. Nothing in the Eleventh Circuit's opinion requires this Court to accept Defendant's claims of prejudice, as even the court in *Sanders* recognized that laches is not available as a defense where the alleged harm resulting from plaintiffs' delay "is no more prejudicial to the defendants now than it would have been [earlier in the decennial cycle]." *Id*. at 1291-92 (holding that the district court "overstepped its discretion" in applying laches to dismiss claims for declaratory relief); *see also Black Warrior*, 781 F.3d at 1286. As explained above, the "cost" of redistricting to remedy vote dilution in this case is no more prejudicial in 2018 than it would have been in 2013. Defendant does not argue otherwise, nor does he point to any evidence to support his implied theory that redistricting is somehow costlier for the State later in the decade. Because the burden of complying with the law, by itself, is not a form of prejudice under the doctrine of laches, Defendant has not established the required elements of this defense, notwithstanding the ruling in *Sanders*.[8]

---

[8] Furthermore, obvious factual distinctions between the school board elections in *Sanders* and the

For the same reason, Defendant's reliance on *Fouts v. Harris*—and the District of Florida's focus on voter confusion as a form of prejudice—is misplaced here. 88 F. Supp. 2d 1351, 1354 (S.D. Fla. 1999). Putting aside the fact that *Fouts* is not binding on this court, redistricting to remedy a § 2 violation will always require the reallocation of some voters to different districts. Defendant does not explain why voter confusion from re-drawn districts, if any, would be greater now than it would have been earlier in the decade. The purported harm that Defendant asserts is not the result of any delay in filing the lawsuit, but rather the inevitable result of a court's determination that the current Congressional district boundaries have unlawfully diluted African-American votes in those districts.

Finally, the Fourth Circuit's ruling in *White v. Daniel* is inapposite because the plaintiffs in that case filed suit *seventeen years* after the alleged unlawful redistricting, and *after* the County had already held its last election of the decade under the operative plan. *See White v. Daniel*, 909 F.2d 99, 101 (4th Cir. 1990). Notably, the Fourth Circuit's ruling in that case relied in part on "principles of equity" which "require a federal court to stay its hand when judicial relief makes no sense." *Id*. at 104. The court also acknowledged that "court-ordered reapportionment

---

Congressional races here counsel against applying that ruling blindly to all forms of redistricting as the State appears to suggest. For instance, unlike the school board and county commission elections at issue in *Sanders*, voter confusion over district boundaries is far less likely in Congressional races, which are typically better funded and highly publicized.

. . . would be completely gratuitous[] because there are no elections scheduled before November 1991 . . . ." *Id.* Similarly, in *MacGovern v. Connolly*, the District Court of Massachusetts relied on principles of equity to reject plaintiffs' request for relief. There, plaintiffs did not file their complaint challenging a redistricting plan that was drawn based on the previous census until *after* the new census had already been conducted and the population numbers were in the process of being finalized. 637 F. Supp. 111, 113 (D. Mass. 1986). They also filed their complaint less than a month before nominations in the next election were due, roughly three months before the primary, and less than eight months before the general election. *Id.* at 115. While these equitable considerations counseled against judicial relief in *White* and *MacGovern*, they stand in stark contrast to this lawsuit, which Plaintiffs have filed only six years after the first election following the 2011 redistricting and two years before the next congressional election, and which seeks relief that will have a direct impact on the 2020 elections. Under the standards announced by the Eleventh Circuit in applying the doctrine of laches, neither the facts nor the court's reasoning in *White* or *MacGovern* supports Defendant's argument.[9]

---

[9] Plaintiffs maintain that the applicable case law and particular allegations here support a finding that this case, and specifically Plaintiffs' claim for injunctive relief, is *not* barred by laches. But even if the Court does not agree that laches fails here *as a legal matter*, it should reserve any decision on Defendant's affirmative defense until after the facts have been developed. District courts have generally found that challenges to an action based on the doctrine of laches are "not amenable to dismissal at the pleadings stage" precisely because they are inherently fact-specific. *Am. Nat'l Prop. & Cas. Co. v. Tosh*, No. 5:12-CV-00051, 2013 WL 1311399, at *3 (W.D. Ky. Mar. 27, 2013); *see also Williamson v. Recovery Ltd. P'ship*, No. C2-06-292, 2009 WL 3172648,

4.    **Plaintiffs' Claims for Declaratory Relief are Not Barred by Laches.**

Even if the Court agreed that laches bars any relief in the form of court-ordered redistricting before the 2020 election, Defendant's laches defense does not apply to Plaintiffs' claim for declaratory judgment. *See Sanders*, 245 F.3d at 1291. Defendant's argument that the *Sanders* reasoning does not apply here is incorrect. As the Eleventh Circuit acknowledged in *Sanders*, none of the purported grounds for prejudice associated with late-decade redistricting would apply to a claim for a declaration that the current redistricting map is unlawful. *See id*. Furthermore, Defendant's attempt to portray declaratory relief as a mere academic exercise ignores the realities of the legislative redistricting process. The Legislature does not "wipe the slate clean from one decade to the next, and . . . a plan whose [legal] defects are left unidentified and unremedied could leave its own [unlawful] mark on the next plan." *Kelley v. Bennett*, 96 F. Supp. 2d 1301, 1306-07 (M.D. Ala. 2000), *vacated on other grounds*, 531 U.S. 28 (2000); *see also Dickinson*, 933 F.2d  at 503 (holding that district court judge "misconstrued the function of declaratory relief" in applying laches to dismiss declaratory judgment claim, and that "declaratory judgment provides relief when legal or equitable remedies are too intrusive or are otherwise inappropriate"). In this case, declaratory relief serves the important

---

at \*4 (S.D. Ohio. Sept. 30, 2009) (same); *Ultra-Images, LLC v. Franclemont*, No. 05-60538-CIV, 2005 WL 8154576, at \*2 (S.D. Fla. Nov. 8, 2005) (same).

function of ensuring that the next congressional districting map does not build upon and exacerbate the voting rights violations that pervade the current plan. This is true regardless of whether the speculation that Alabama may lose a congressional seat following the 2020 Census comes to pass. Therefore, notwithstanding Defendant's laches defense, Plaintiffs' claim for declaratory judgment precludes the dismissal of this action.

## IV.   CONCLUSION

For the foregoing reasons, and the reasons set forth in Plaintiffs' opposition brief to Defendant's Motion to Dismiss, Plaintiffs respectfully request that the Court deny Defendant's Motion for Judgment on the Pleadings.

Dated:  November 30, 2018                Respectfully submitted,

By /s/ *Aria Branch*
Marc Erik Elias (*admitted pro hac vice*)
Bruce V. Spiva (*admitted pro hac vice*)
Aria C. Branch (*admitted pro hac vice*)
**Perkins Coie, LLP**
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
Email: MElias@perkinscoie.com
Email: ABranch@perkinscoie.com

Abha Khanna (*admitted pro hac vice*)
**Perkins Coie, LLP**
1201 Third Avenue, Ste. 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
Email: AKhanna@perkinscoie.com

*Richard P. Rouco* (AL Bar. No. 6182-R76R)
**Quinn, Connor, Weaver, Davies & Rouco
LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
Email: rrouco@qcwdr.com

*Attorneys for Plaintiffs*

32

## CERTIFICATE OF SERVICE

I certify that on November 30, 2018, I filed the foregoing document electronically via the Court's CM/ECF system, which will send a copy to all counsel of record.

By /s/ *Aria Branch*
Aria C. Branch (*admitted pro hac vice*)
**Perkins Coie, LLP**
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
Email: ABranch@perkinscoie.com