FILED
2019 Mar-27  PM 01:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **LAKEISHA CHESTNUT, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 2:18-CV-00907-KOB** |
| ) | |
| **JOHN H. MERRILL, in his official capacity** ) | |
| **as Alabama Secretary of State** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION**

This matter comes before the court on Defendant John Merrill's "Motion for Judgment on the Pleadings" pursuant to Federal Rule of Civil Procedure 12(c), filed on November 2, 2018. (Doc. 27). In this motion, Defendant raised three grounds for judgment on the pleadings: (1) jurisdiction lies with a three-judge court, (2) the complaint fails to demonstrate that a remedy exists, and (3) the claims are barred by the doctrine of laches.

On November 7, 2018, the court ordered the parties to brief all three issues raised in the motion. (Doc. 30). Plaintiffs filed "Plaintiffs' Brief in Opposition to Defendant's Motion for Judgment on the Pleadings" on November 30, 2018. (Doc. 31). On December 21, 2018, Defendant filed "Secretary of State John Merrill's Reply in Support of His Motion for Judgment on the Pleadings (Doc. 27)." (Doc. 37).

On January 16, 2019, the court held a hearing solely on the issue of whether jurisdiction of this case lay with this court or with a three-judge panel. On January 28, 2019, the court entered an Order denying Defendant's motion for judgment on the pleadings as to the jurisdictional issue. (Doc. 41). Because the court has jurisdiction, the case remains before this

court. So, the remaining two grounds raised by Defendant in his motion for judgment on the pleadings are now ripe for review.

**I. Background**

Plaintiffs are eight African-American citizens of Alabama. One Plaintiff resides in Congressional District ("CD") 1, one resides in CD 2, one resides in CD 3, and five reside in CD 7. The redistricting plan currently used in Alabama, Senate Bill 484, allegedly "packs" African-American voters into CD 7. *See* S.B. 484, 2011 Reg. Sess. (Ala. 2011). The Alabama legislature established CD 7 as a majority-minority district following the 1982 Amendments of the Voting Rights Act. Nearly one-third of Alabama's African-American population falls into CD 7.[1] Prior to the passage of S.B. 484, the black voting age population (BVAP) of CD 7 under the 2002 redistricting plan was 58.33%. Now, the CD 7 BVAP is 60.91%.

Plaintiffs argue that S.B. 484 redrew district lines to "move" African-American voters from predominantly white districts into CD 7 to "pack" the district designated as a majority-minority district with African-American voters. But the plan also allegedly "cracks" African-American voters in CDs 1, 2, and 3 by splitting among three districts those African-American voters who could be grouped together in a second majority-minority district. Plaintiffs contend that the African-American population in these districts should be united to form a second majority-minority CD.

Plaintiffs raise a Section 2 violation of the Voting Rights Act, alleging vote dilution. The Supreme Court identified three preconditions necessary to establish a vote dilution claim: (1) the minority group "is sufficiently large and geographically compact to constitute a majority in the single-member district," (2) the minority group is "politically cohesive," and (3) "the white

---

[1] Based on the facts provided, the court cannot determine whether the CD 7 under the 2011 redistricting plan is the same CD 7 as drawn following the 1982 Amendments.

majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986) (internal citations omitted).

## II. Standard of Review

Rule 12(c) of the Federal Rules of Civil Procedure allows a party to move for judgment on the pleadings after the pleadings are closed, but early enough to not delay trial. *See* Fed. R. Civ. P. 12(c). A judgment on the pleadings is appropriate "when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." *Horsley v. Rivera*, 292 F.3d 695, 700 (11th Cir. 2002). To determine whether the movant is entitled to a judgment on the pleadings, the court should "accept as true all material facts alleged in the non-moving party's pleading, and . . . view those facts in the light most favorable to the non-moving party." *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014).

The court analyzes a Rule 12(c) motion for judgment on the pleadings the same way as a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. *See Dial v. City of Bessemer*, No. 2:14-cv-01297-RDP, 2016 WL 3054728, at *3 (N.D. Ala. May 31, 2016). ("A Rule 12(c) motion for judgment on the pleadings is analyzed the same as a Rule 12(b)(6) motion to dismiss."). "A motion to dismiss and a motion for judgment on the pleadings should not be granted unless 'the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Losey v. Warden*, 521 F. App'x 717, 719 (11th Cir. 2013) (quoting *Horsley v. Feldt*, 304 F.3d 1225, 1131 (11th Cir. 2002)). So, "to survive a motion for judgment on the pleadings, 'a complaint must contain sufficient factual matter, accepted as true, to state a

claim to relief that it plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

To be plausible on its face, the claim must contain enough facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

The Supreme Court has identified "two working principles" for the district court to use in applying the facial plausibility standard. The first principle is that, in evaluating motions to dismiss, the court must assume the veracity of well-pleaded factual allegations; however, the court does not have to accept as true legal conclusions even when "couched as . . . factual allegation[s]" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. The second principle is that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679.

Thus, under prong one, the court determines the factual allegations that are well-pleaded and assumes their veracity, and then proceeds, under prong two, to determine the claim's plausibility given the well-pleaded facts. That task is "context-specific" and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claim must be dismissed. *Id.*

### III. Discussion

Defendant raises two grounds why he is entitled to a judgment on the pleadings: first, Plaintiffs failed to demonstrate the existence of a proper remedy; and second, Plaintiffs' claims are barred by the doctrine of laches. The court will discuss each argument in turn.

### a. Existence of a proper remedy

Defendant argues that Plaintiffs fail to seek a proper remedy, which causes Plaintiffs to lack standing. If a party cannot show that the injury can be redressed by the litigation, then the party lacks standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (identifying the three elements of standing: injury-in-fact, causality, and redressability).

The Eleventh Circuit has held that a plaintiff must demonstrate a viable remedy to properly allege a Section 2 violation of the Voting Rights Act. *See Nipper v. Smith*, 39 F.3d 1494, 1530–31 (11th Cir. 1994) ("A district court must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system."). Specifically, where a plaintiff seeks redistricting to create a new majority-minority district, the plaintiff must demonstrate that the "minority voters possess the potential to elect representatives in the absence of the challenged structure or practice." *Thornburg*, 478 U.S. at 57 n.17.

Plaintiffs alleged in the complaint that "[t]he African-American population in Alabama is sufficiently numerous and geographically compact to form a majority of eligible voters—meaning a majority of the voting age population—in two congressional districts." (Doc. 14 at 2). Specifically, they seek the adoption of a new congressional redistricting plan that adds a second majority-minority district in Alabama. (*Id.* at 29–30).

Defendant argues that Plaintiffs offered these conclusory allegations without factual support. But Plaintiffs support each assertion with statistical and anecdotal evidence. Plaintiffs point out that CDs 1, 2, and 3 each have a heavily African-American area within a majority-white district. (Doc. 14 at 12). Plaintiffs explain in their complaint how "African-American voters in Alabama are politically cohesive and overwhelmingly support[] Democratic candidates," with several statistical examples from Alabama elections in the CDs at issue. (*Id.* at 13). In contrast, "[t]he white majority . . . overwhelmingly supports Republican candidates." (*Id.*). Defendant's argument attacking the complaint as "conclusory" seems as though he has not read past the first page of the complaint because the complaint as a whole contains the support and explanation for the initial conclusory statements.

Plaintiffs argue that Defendant conflates the requirements for *pleading* with the requirements for *proving*. While Defendant is correct that Plaintiffs must eventually prove that a new redistricting plan would resolve the alleged Section 2 violation, such proof is not necessary at the pleading stage. Courts hesitate to require a plaintiff to prove the elements of a claim at the motion to dismiss stage. "Asking for plausible grounds to infer [an element of a claim] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556. And "[i]t is no accident that most cases under section 2 have been decided on summary judgment or after a verdict, and not on a motion to dismiss." *Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004) (holding that the district court was too quick to dismiss the case because "the plaintiffs are entitled to an opportunity to develop evidence before the merits are resolved").

Defendant further argues that one unreported district court case indicates that a plaintiff must submit a map presenting an alternative redistricting plan to satisfy the potential remedy

requirement. *See Broward Citizens for Fair Districts v. Broward Cty.*, No. 12-60317-CIV, 2012 WL 1110053, at *5 n.6 (N.D. Fla. Apr. 3, 2012) ("The Court agrees that this [failure to present alternative maps] represents an additional pleading deficiency in Plaintiffs' Amended Complaint."). But another district court specifically refused to follow *Broward Citizens*, noting that in *Broward Citizens* "that court extended what is an evidentiary requirement for purposes of summary judgment to the pleading stage of litigation." *Luna v. Cty. of Kern*, No. 1:16-cv-00568-DAD-JLT, 2016 WL 4679723, at *5 (E.D. Cal. Sept. 2, 2016). The District Court for the Eastern District of California noted that "[f]orcing plaintiffs to develop an unobjectionable map, before discovery even begins, would be putting the cart before the horse." *Id.* This court agrees.

To satisfy the pleading requirements, Plaintiffs only must allege with "enough fact to raise a reasonable expectation that discovery will reveal evidence" that a second majority-minority district exists. *Twombly*, 550 U.S. at 556. In *Luna*, the court found that such a district plausibly existed when the plaintiffs alleged that the Latino population in Kern County grew from 25% to 34%. *Luna*, 2016 WL 4679723, at *4. The court inferred from those statistics that "a minority group compromising nearly one-third of the county's total voting population could comprise majorities in each of at least two county supervisorial districts." *Id.*

Likewise in our case, Plaintiffs allege that the three allegedly "cracked" CDs contain four counties with large minority populations: Macon County in CD 3, 82.6% African-American population; Mobile County in CD 1, 34.6% African-American population; Monroe County in CD 1, 34.6% African-American population; and Montgomery County in CDs 2,3, and 7, 54.7% African-American population. (Doc. 31 at 16). Plaintiffs also explain how the area known as the

"Black Belt"[2] was specifically divided between the four CDs at issue in the complaint, packing minorities into CD 7 and cracking CDs 1, 2, and 3. (*Id.*). From this division of the Black Belt, the court can infer that a second majority-minority district could plausibly be formed.

So, while Plaintiffs have not yet *proven* by presenting an alternative district map that an alternative redistricting plan that resolves the alleged Section 2 violations definitely exists, they have met the burden to *plead* Section 2 violations by showing that such a plan plausibly could exist. Because such a plan plausibly exists, the court must deny Defendant's motion for judgment on the pleadings on the grounds of standing.

### b. Doctrine of laches

Defendant also argues that Plaintiffs' claim is barred by the doctrine of laches. Specifically, Defendant contends that Plaintiffs' claims first became available in June 2011 when the redistricting plan was passed; that Plaintiffs had no excuse for delay because the 2010 Census data upon which their claim is based was available since February 2011; and that the state of Alabama would be prejudiced because a final decision (after appeal) would not be reached until 2019 or 2020, requiring a new redistricting plan to be drawn based on outdated census information from 2010—and shortly before statewide redistricting using the 2020 Census—if Plaintiffs succeed.

Preliminarily, Plaintiffs contend that the doctrine of laches only applies in cases seeking retrospective damages. *See Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*,

---

[2] The "Black Belt" is so named "because the soil in that region of the state is dark in color. Additionally, during the period immediately following the Civil War, the majority population in that area of the state was black." *Knight v. Alabama*, 787 F. Supp. 1030, 1067 n.13 (N.D. Ala. 1991); *see also* Zachary L. Guyse, Note, *Alabama's Original Sin: Property Taxes, Racism, and Constitutional Reform in Alabama*, 65 Ala. L. Rev. 519, 532 (2013) ("The name 'Black Belt' is primarily derived from the dark, rich layer of topsoil that runs across the width of roughly twelve counties in central Alabama, which made the region extremely fertile for cotton farming.").

533 F.3d 1287, 1321 (11th Cir. 2008) ("[L]aches serves as a bar only to the recovery of retrospective damages, not to prospective relief."). Here Plaintiffs seek no retrospective damages, solely prospective relief. But, as Defendant points out, redistricting challenges are subject to the doctrine of laches because of the ten-year expiration date of electoral districts. *See Sanders v. Dooly Cty.*, 245 F.3d 1289, 1290–91 (11th Cir. 2001) (per curiam) (applying the doctrine of laches to a voting rights case). Electoral districts expire every ten years because the federal government conducts a new census every ten years, which the state then uses to create an updated redistricting plan. *See 2020 Census: What is the Census?*, U.S. Census Bureau, https://www.census.gov/programs-surveys/decennial-census/2020-census/about.html (last visited Mar. 11, 2019).

So, because the doctrine of laches can apply to redistricting cases, the court will address the elements of the doctrine. The doctrine of laches requires three elements: "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Venus Lines Agency Inc. v. CVG Int'l Am., Inc.*, 234 F.3d 1225, 1230 (11th Cir. 2000) (quoting *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997)). Each element will be discussed in turn.

> ### i.   Delay in asserting a right or claim

Defendant asserts that Plaintiffs delayed in challenging the redistricting plan because the claim became available in June 2011, when Alabama's redistricting plan went into effect, and because the 2010 Census, which Plaintiffs use to support their arguments for redistricting, was already available to Plaintiffs in June 2011. Further, Defendant contends that Plaintiffs did not

challenge the past four elections in 2012, 2014, 2016, and 2016, but instead waited until just before the government conducts the 2020 Census.

Defendant suggests that, because Plaintiffs could have filed suit seven years prior, the claim is inexcusably delayed. One court has found inexcusable delay when the challenged redistricting plan was no longer the plan used. *See White v. Daniel*, 909 F.2d 99, 102–03 (4th Cir. 1990) (finding that the plaintiffs delayed by challenging the 1981 plan—which was just a continuation of the 1971 plan with no changes—when plaintiffs never challenged the 1971 plan and waited until after the last election under the 1981 plan to file suit). A different court found inexcusable delay when only one election under the challenged plan remained, and four elections based on that plan had passed. *See Fouts v. Harris*, 88 F. Supp. 2d 1351, 1354 (S.D. Fla. 1999), *aff'd sub nom. Chandler v. Harris*, 529 U.S. 1084 (2000).

Nine of the Plaintiffs were registered voters in Alabama in June 2011.[3] Those nine citizens delayed in bringing their case, but was the delay excusable? And Ms. Chestnut, the one Plaintiff not residing in Alabama in June 2011, has been a registered voter in Alabama since 2016. (Doc. 31 at 23). Even though she did not live in Alabama when the redistricting plan first came into effect, she has had two years to bring such a claim.

But Plaintiffs also argue that the claim did not necessarily arise in 2011, which leads to the second element of the doctrine of laches.

### ii. Delay was not excusable

Delay is "measured from the time at which the plaintiff knows or should know she has a provable claim." *Kason Indus., Inc.*, 120 F.3d at 1206. Plaintiffs argue that, at the time the 2011

---

[3] While Plaintiffs do not allege that all nine of them were in fact registered to vote in June 2011, the court presumes this to be true because Plaintiffs only argue that Ms. Chestnut could not have brought her case any sooner because she did not live in Alabama until 2016. (Doc. 31 at 22).

redistricting plan was passed, they were not immediately aware that their votes would be diluted. Additionally, Ms. Chestnut, did not reside is Alabama until 2016, so she could not have sued earlier.

The Eleventh Circuit has recognized that "a plaintiff's reasonable need to fully investigate its claims" may excuse delay. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1285 (11th Cir. 2015). But even if the nine Plaintiffs who were citizens in 2011 did not realize their claim arose in June 2011, they were registered voters in Alabama for the next three election cycles before bringing a claim. Plaintiffs suggest that Ms. Chestnut could have reasonably taken until 2018 to investigate her claims, although they do not explain why the other plaintiffs would be justified in a seven-year delay from the 2011 redistricting. And Plaintiffs provide no demonstration of the steps taken to investigate the claim that would justify the delay.

As to Ms. Chestnut, one plaintiff's delay does not necessarily prejudice others. For example, a political party's sophisticated knowledge of a state's election laws and awareness of a claim is not imputed to ordinary citizens *Nader 2000 Primary Comm., Inc. v. Hechler*, 112 F. Supp. 2d, 575, 579 n.2 (S.D. W. Va. 2000). But our case does not involve one sophisticated plaintiff's greater knowledge being imputed to ordinary citizens. Instead, our case involves nine citizens—who supposedly had been investigating their claims since they arose in June 2011— joined by a new citizen, who then needed an additional two years after moving into the state to join the other nine in bringing this claim. The court finds these excuses for the delay unpersuasive.

### iii. Defendant was prejudiced

Defendant argues that the state of Alabama would be prejudiced because, if Plaintiffs win, a new redistricting plan must be drawn using 2010 Census data merely a year or two before the new 2020 Census; Defendant points to demographic shifts in Alabama since the 2010 Census, implying that the redistricting plan will have to change in 2021. (Doc. 27 at 18). Defendant also contends that redistricting now would spend valuable state resources that could otherwise be allocated to the 2021 redistricting plan, while noting that Alabama may lose a congressional seat following the 2020 Census.

In support, Defendant cites the U.S. District Court for the District of Massachusetts, which held that forcing the state to redistrict when one election remained under the challenged plan "would come at great cost and yield results that are at best uncertain, and at worst, perverse." *MacGovern v. Connolly*, 637 F. Supp. 111, 116 (D. Mass. 1986). But at the time of that case, the 1985 Census was not yet complete, and the state was already in the process of redistricting. The court noted, "Since the 1985 census may not be complete, an injunction at this point could have the ironic effect of forcing a hasty reapportionment based on the already-superseded 1975 state census . . . ." *Id.* In our case, redistricting will certainly be costly. But the 2010 Census still remains the most current data available as of today.

Defendant also cites *Fouts*, in which the U.S. District Court for the Southern District of Florida found that forcing the state to redistrict two years before the mandatory redistricting would "result[] in voter confusion, instability, dislocation, and [a] financial and logistical burden on the state." *Fouts*, 88 F. Supp. 2d at 1354. But as noted by Plaintiffs, "redistricting to remedy a § 2 violation will always require the allocation of some voters to different districts." (Doc. 31 at 30). Plaintiffs also point out that a court has previously ordered redistricting within two years of

another redistricting. *See Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004), *aff'd*, 542 U.S. 947 (2004) (finding that the 2002 reapportionment plan was unconstitutional, and ordering redistricting in 2004). But the court notes that the plaintiffs in this case seek a new reapportionment plan two years *before* the next scheduled reapportionment plan, while the plaintiffs in *Larios* sought a new reapportionment plan two years *after* the last reapportionment plan. So *Larios* does not provide support for Plaintiffs' position.

Further, Defendant cites *Sanders* in support of his argument that Plaintiffs' delay prejudiced him. In *Sanders*, voters in Dooly County, Georgia sued county officials, alleging that the county commission and board of education districting plan contained racially gerrymandered districts in violation of equal protection. 245 F.3d at 1290. The plaintiffs waited five years after the plan was released to sue. *Id.* The Eleventh Circuit ruled that the U.S. District Court did not abuse its discretion by ruling that the plaintiffs' claims for injunctive relief were barred by laches. *Id.* at 1291. But the Eleventh Circuit did not independently evaluate whether the delay actually prejudiced the defendants. The district court concluded that the delay prejudiced the defendants because (1) the back-to-back redistrictings would cause confusion and expense, and (2) the census data available was "over 10 years old and thus unreliable." *Id.* at 1290–91.

But this case differs from *Sanders*. As Plaintiffs point out, the congressional redistricting here would likely be less confusing than the localized county redistricting in *Sanders*. Congressional races are better funded and highly publicized, so voters would be more aware of which district they belong. (Doc. 31 at 30). And the 2010 Census data available here, while nine years old, is more reliable than the 10 year old data in *Sanders* because the government has not yet taken a new census. *See 2020 Census: What is the Census?*, U.S. Census Bureau, https://www.census.gov/programs-surveys/decennial-census/2020-census/about.html (last visited

Mar. 11, 2019) (explaining that the federal government took the first census in 1790 "and our country has every 10 years since").

While the data available in this case is nine years old, it remains the most up-to-date information available—until the government completes the 2020 Census. The U.S. District Court for the Southern District of Florida held that ordering a state to redistrict in 1999 forced the state to use the 1990 Census data, and "[s]uch old census figures have been recognized as unduly prejudicial because they fail to provide a basis for 'fair and accurate representation to the citizens.'" *Fouts*, 88 F. Supp. 2d at 1354 (quoting *White*, 909 F.2d at 104). And while congressional races are better funded and more highly publicized, the court remains unconvinced that a more publicized election will necessarily educate voters on where the newly drawn district lines lay. As noted by the Fourth Circuit, "two reapportionments within a short period of two years would greatly prejudice the [state] and its citizens by creating instability and dislocation in the electoral system and by imposing great financial and logistical burdens." *White*, 909 F.2d at 104.

The court finds that to force the state of Alabama to redistrict twice in two years—once based on nine-year-old census data—would result in prejudice. This prejudice was caused by Plaintiffs' inexcusable delay in waiting until 2018 to file suit. So, the doctrine of laches bars Plaintiffs' claim to the extent Plaintiffs seek injunctive relief.

But, in addition to injunctive relief, Plaintiffs seek declaratory relief. Redistricting committees sometimes base new redistricting plans on existing plans. The Eleventh Circuit has held that, while the defendant may be prejudiced by the plaintiff's delay in bringing a voting rights claim for injunctive relief, the same prejudice does not apply to a claim for declaratory relief. *See Sanders*, 245 F.3d at 1291–92. Finding the current plan unconstitutional—if it is—

14

would prevent the committee from reusing the plan as the basis for the 2021 redistricting plan. *See id.* at 1291 (noting that declaratory relief in a voting rights case may "prevent the Attorney General from using the [challenged] plan as a baseline for retrogression analysis in the [new] census round of preclearance proceedings"). Even if the court were to find that Defendant would be prejudiced as to injunctive relief, declaratory relief would still be available to Plaintiffs.

Because Defendant cannot demonstrate prejudice as to Plaintiffs' claim for declaratory relief, the doctrine of laches will not bar declaratory relief. So, Plaintiffs' claim will remain as to declaratory relief.

## IV. Conclusion

For the reasons discussed above, the court will GRANT IN PART and DENY IN PART Defendant John Merrill's motion for judgment on the pleadings. The court will DENY Defendant's motion as to the standing issue. The court will GRANT Defendant's motion as to the doctrine of laches issue for injunctive relief. The court will DENY Defendant's motion as to the doctrine of laches issue for declaratory relief. The court will enter a separate Order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this 27th day of March, 2019.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE