

FILED
2019 Oct-28  PM 04:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| **LAKEISHA CHESTNUT, et al.,** | ) |
| | ) |
|     **Plaintiffs,** | ) |
| | ) |
| **vs.** | ) **CASE NO. 2:18-CV-00907-KOB** |
| | ) |
| **JOHN H. MERRILL,** | ) |
| | ) |
|     **Defendant,** | ) |

### SECRETARY OF STATE MERRILL'S PRE-TRIAL BRIEF

James W. Davis (ASB-4063-I58J)
*Deputy Attorney General*
Laura E. Howell (ASB-0551-A41H)
*Assistant Attorney General*

Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
jimdavis@ago.state.al.us
lhowell@ago.state.al.us

Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
dwalker@balch.com

October 28, 2019

# Table of Contents

Table of Authorities ................................................................................... ii

I.     Plaintiffs' illustrative plans do not satisfy the *Gingles 1* compactness
       prerequisite because they split historical communities of interest in order
       to connect distant voters with nothing in common except for race.................2

II.    Plaintiffs' illustrative plans are racial gerrymanders and do not
       demonstrate that Plaintiffs have a lawful remedy ...........................................5

III.   Plaintiffs' claims are moot because entirely different conditions will exist
       after the 2020 census .....................................................................................12

IV.    Plaintiffs' plans would not have been precleared in 2011 ............................17

V.     Plaintiffs cannot demonstrate that any alleged vote dilution is "on account
       of race or color."............................................................................................20

VI.    Plaintiffs DuBose, Love, Williams and Harris lack standing ........................23

VII.   Any-part-Black and single-race-Black ...........................................................27

VIII.  Conclusion......................................................................................................28

Certificate of Service ...........................................................................................29

i

# Table of Authorities

## Cases

*Abbott v. Perez*,
  138 S. Ct. 2305 (2018) ............................................................................................9

*Abrams v. Johnson*,
  521 U.S. 74 (1997) .............................................................................................4, 5

*Alabama Legislative Black Caucus v. Alabama*,
  231 F. Supp. 3d 1026 (M.D. Ala. 2017) ..............................................................18

*Alabama Legislative Black Caucus v. Alabama*,
  135 S. Ct. 1257 (2015) ................................................................................ 6, 9, 11

*Beer v. United States*,
  425 U.S. 130 (1976) ..............................................................................................18

*Bethune-Hill v. Virginia State Bd. of Elections*,
  137 S. Ct. 788 (2017) ..............................................................................................6

*Bush v. Vera*,
  517 U.S. 952 (1996) .............................................................................................4, 8

*Cooper v. Harris*,
  137 S.Ct. 1455 (2017) .............................................................................................8

*Davis v. Chiles*,
  139 F.3d 1414 (11th Cir. 1998). .............................................................................6

*Flanigan's Enters., Inc. of Georgia v. City of Sandy Springs, Georgia*,
  868 F.3d 1248 (11th Cir. 2017) ............................................................................13

*Gagliardi v. TJCV Land Trust*,
  889 F.3d 728 (11th Cir. 2018) ...................................................................... 14, 16

*Georgia v. Ashcroft*,
  539 U.S. 461 (2003) ..............................................................................................18

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ..........................................................................................24

*Johnson v. Miller*,
    864 F. Supp. 1354 (S.D. Ga. 1994)........................................................................11

*Kawa Orthodontics, LLP v. Sec'y, U.S. Dep't of the Treasury*,
    773 F.3d 243 (11th Cir. 2014) ........................................................................ 24, 25

*League of United Latin American Citizens v. Clements*,
    999 F.2d 831 (5th Cir. 1993) ................................................................................22

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................................................... 24, 25, 26

*LULAC v. Perry*,
    548 U.S. 399 (2006).............................................................................................5

*Luna v. County. of Kern*,
    291 F. Supp. 3d 1088 (E.D. Cal. 2018) ..............................................................25

*Miller v. Johnson*,
    515 U.S. 900 (1995)................................................................................. 3, 8, 11

*Nipper v. Smith*,
    39 F.3d 1494 (11th Cir.1994) ..............................................................................20

*Penn Tank Lines, Inc. v. Jackson*,
    2018 WL 465977 (N.D. Ala. January 18, 2018) ..................................................16

*Preiser v. Newkirk*,
    422 U.S. 395 (1975)............................................................................................17

*Reno v. Bossier Parish School Bd.*,
    528 U.S. 320 (2000)............................................................................................15

*Sanders v. Dooly County, Ga.*,
    245 F.3d 1289 (11th Cir. 2001) ..........................................................................15

*Shaw v. Hunt*,
    517 U.S. 899 (1996)..............................................................................................6

*Shaw v. Reno*,
    509 U.S. 630 (1993)............................................................................................12

*Shelby County v. Holder*,
   570 U.S. 529 (2013) ........................................................................ 14, 16

*Solomon v. Liberty Cty. Comm'rs*,
   221 F.3d 1218 (11th Cir. 2000) .................................................... 20, 23

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ........................................................................24

*Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*,
   524 F.3d 1229 (11th Cir. 2008) ..........................................................24

*Thornburg v. Gingles*,
   478 U.S. 30 (1986).................................................................. *passim*

## Statutes

52 U.S.C. § 10301 .................................................................. *passim*

52 U.S.C. § 10304 .................................................................17

iv

## SECRETARY OF STATE MERRILL'S PRE-TRIAL BRIEF

Section 2 of the Voting Rights Act did not require Alabama to draw as many majority-minority districts as it possibly could in its 2011 Congressional plan. The Fourteenth Amendment's prohibition against racial sorting and the duty to respect communities of interest limit both the requirement and the ability of a State to divide voters into black and white districts. The evidence in this case will show that Plaintiffs' illustrative plans are unconstitutional racial gerrymanders that break up longstanding communities of interest in order to connect distant voters who have nothing in common except for race.

Moreover, because the only relief Plaintiffs can receive is a declaratory judgment of whether Alabama should have drawn two majority-black districts in 2011, this case is moot. A judgment declaring what Alabama should have done based on 2011 conditions will not determine what Alabama can or should do after a new census and after those conditions radically change with population shifts and, perhaps, even losing a Congressional seat. For these and other reasons discussed below, Defendant will ask for a judgment in his favor.

1

**I.** **Plaintiffs' illustrative plans do not satisfy the *Gingles 1* compactness prerequisite because they split historical communities of interest in order to connect distant voters with nothing in common except for race.**

Plaintiffs cannot meet the first *Gingles* requirement that the African-American population is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). Plaintiffs' plans do not satisfy this condition because they break up longstanding communities of interest to connect pockets of African-American voters in Mobile with pockets of African-American voters in Montgomery, Macon, and Bullock Counties, hundreds of miles away.

Defendant will present evidence that Alabama's current geographically-compact First Congressional District has centered around Mobile Bay for 50 years, and the State has long considered the Gulf Coast counties to be a strong community of interest. Voters in the First District, black and white, are bound together socially, culturally, and economically. Likewise, the Wiregrass counties in the current Second



*Alabama 2011 Congressional Plan*

District represent a strong community of interest that is culturally and economically distinct from the Gulf Counties. Yet Plaintiffs would break up these

historical districts and communities of interest in order to draw a new majority-black Second District based on nothing more than race and the unsavory assumption that black voters in Mobile and black voters in distant Montgomery, Macon, and Bullock Counties think alike and share the same interests simply because they are black.

Plaintiffs' First and Second districts are not geographically compact and encompass so many distinct interests (shipping, airline manufacturing, tourism, and fishing in Mobile, versus agriculture and military bases in the Wiregrass), that each would be impossible to effectively represent, to the detriment of citizens of all races in both districts. The Court will hear testimony from Rep. Bradley Byrne and former Rep. Jo Bonner that a Representative's attention and political capital would be diluted if he or she were asked to pursue so many different political goals.



*Plaintiffs' Illustrative Plan 4*

Thus, "the social, political, and economic makeup of [Plaintiffs' proposed districts] tells a tale of disparity, not community." *Miller v. Johnson*, 515 U.S. 900, 908 (1995). Section 2 does not require Alabama to draw such districts. A district that "reaches out to grab small and apparently isolated minority communities" is

3

not reasonably compact. *Bush v. Vera*, 517 U.S. 952, 979 (1996). And part of the *Gingles 1* "compactness" inquiry requires a court to consider whether Plaintiffs are ignoring existing communities of interest: "[T]he § 2 compactness inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." *Abrams v. Johnson*, 521 U.S. 74, 91-92 (1997).

The Court asked the parties to address the standards for compactness. Different mathematical scores are used by demographers to measure compactness, such as the ratio of a district's area to its perimeter, but such tests alone do not usually end the analysis. Defendant is not aware of any bright-line rules in the case law, and in fact, courts often appear to use a simple "eye" test.

In this case, Defendant contends that Districts 1 and 2 in Plaintiffs' illustrative plans are not reasonably compact because they break up communities of interest to divide voters along racial lines, selectively choosing counties, precincts, and parts thereof because of race, not political interests. Defendant will show, for example, that when Plaintiffs split Mobile County, they do not simply add the northernmost areas of Mobile County to adjacent District 2, but instead swoop around as necessary to target black voters for District 2 and white voters for District 1. The result is a plan with districts that are far less compact than they would be if Plaintiffs had respected these longstanding communities of interest.

"[T]here is no basis to believe a district that combines two far-flung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first *Gingles* condition contemplates." *LULAC v. Perry*, 548 U.S. 399, 433-34 (2006). The Supreme Court therefore mandates that

> *[l]egitimate yet differing communities of interest should not be disregarded in the interest of race.* The practical consequence of drawing a district to cover two distant, disparate communities is that one or both groups will be unable to achieve their political goals. Compactness is, therefore, about more than 'style points;' it is critical to advancing the ultimate purposes of § 2, ensuring minority groups equal opportunity to participate in the political process and to elect representatives of their choice."

*Id.* at 434 (emphasis added).

## II.   Plaintiffs' illustrative plans are racial gerrymanders and do not demonstrate that Plaintiffs have a lawful remedy.

Plaintiffs' demonstrative plans do not show that Alabama could have drawn two constitutional majority-minority districts; they show only that it is possible to draw two such districts through racial gerrymandering. *See Abrams v. Johnson*, 521 U.S. 74, 88, 90 (1997) (affirming a District Court decision that Georgia could not draw an additional majority-minority district without subordinating Georgia's traditional districting policies and allowing race to predominate). In this Circuit, it is clear that Plaintiffs satisfy the first *Gingles* prerequisite only if they show that they have a legal remedy: "As part of any prima facie case under Section Two, a

plaintiff must demonstrate the existence of a proper remedy." *Davis v. Chiles*, 139 F.3d 1414, 1419 (11th Cir. 1998). If the only way Alabama could draw a second majority-black district is by elevating race over traditional districting principles, Plaintiffs have not satisfied this requirement.

"[E]lectoral districting violates the Equal Protection Clause when (1) race is the 'dominant and controlling' or 'predominant' consideration in deciding to place a significant number of voters within or without a particular district, and (2) the use of race is not narrowly tailored to serve a compelling state interest." *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1264 (2015) (cleaned up). Defendant will present evidence that race predominates in Plaintiffs' Illustrative Plans. For example, Illustrative Plan 4 divides Mobile County, with part of it going into District 1 (the majority-white district) and part going into District 2 (the majority-black district). Plaintiffs' expert did not simply divide the population, but intentionally did so along racial lines.[1]

Defendant will seek to introduce charts attached to Donna Overton's declaration, the particular charts to which Plaintiffs have objected, that show the

---

[1] The fact that Plaintiffs' map-drawer observed some of the traditional criteria, such as avoiding splitting some precincts and counties, does not mean that their map is not a racial gerrymander. "Race may predominate even when a reapportionment plan respects traditional principles … if '[r]ace was the criterion that … could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made.'" *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 798 (2017), quoting *Shaw v. Hunt*, 517 U.S. 899, 907 (1996).

racial nature of the splits (those disputed charts are discussed in this paragraph and the accompanying footnote). The part of Mobile County that Plaintiffs' expert drew into District 2 has 61.42% of Mobile County's population, but a disproportionate 83.41% of its African-American population. And the two segments of Mobile County have very different demographics. The segment that is part of District 2 is 47.02% black, while the segment that goes into District 1 is only 14.89% black.[2] That can't be an accident, and Plaintiffs achieved this racial goal by separating the races in Mobile County. Each of Plaintiffs' illustrative plans demonstrates similar racial sorting.

---

[2] Simple math demonstrates the manner of the splits in Plaintiffs' illustrative plans. Defendant will propose to admit the declaration of Donna Overton (as Exhibit D-17). That Declaration has an Exhibit D, which are reports concerning the illustrative plans (and to which Plaintiffs have objected). For each plan, Exhibit D includes reports titled "Assigned District Splits," one for county splits and one for precinct splits. The county Assigned District Splits report for Illustrative Plan 4 shows that District 1 includes part of Mobile County, and District 2 includes the remainder of Mobile County. The part of Mobile County that is in District 1 includes 159,347 persons, 125,873 of whom are white and 23,729 of whom are black. The part of Mobile County that is in District 2 includes 253,645 people, 122,774 of whom are white and 119,263 of whom are black. It is easy to see that Mobile County has 412,992 total residents (159,347+253,645), a total of 248,647 white residents (125,873 +122,774), and a total of 142,992 black residents (23,729+119,263).

Proposed Defense Exhibits D-18 through D-21 present percentages, based on these numbers, of how the races are split in Plaintiffs' plans. For example, Exhibit D-21 shows that Illustrative Plan 4 puts 38.58% of the total population of Mobile County into District 1 (159,347/412,922), but includes 50.62% of the white residents of Mobile County (125,873/248,647) and only 16.59% of the black residents of Mobile County (23,729/142,992). The plan puts the other 61.42% of Mobile County's population into District 2 (253,645/412,922), which includes 49.38% of Mobile County's white residents (122,774/248,647) and 83.41% of its black residents (119/263/142,992). We can also calculate the different demographics of the two "halves" of Mobile County as split by the Plaintiffs. The part of Mobile County that is in District 1 is 78.99% white (125,873/159,347) and 14.89% black (23,729/159,347). However, the part of Mobile County that is in District 2 is 48.40% white (122,774/253,645) and 47.02% black (119,263/253,645).

Plaintiffs' proposed racial gerrymandering would violate the constitutional rights of voters and harm them in two ways: The voters would be "personally … subjected to [a] racial classification," *Vera*, 517 U.S. at 957, and they would be represented by a Representative who believes her or his "primary obligation is to represent only the members" of a particular racial group, *Shaw v. Reno*, 509 U.S. 630, 648 (1993). "When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls." *Miller*, 515 U.S. at 911-912 (internal quotation marks and citations omitted).

The racial discrimination that Plaintiffs' plans require would thus violate the Constitution unless the districts are "narrowly tailored to achieve a compelling interest." *Miller*, 515 U.S. at 920. The Supreme Court has not expressly held that compliance with the Voting Rights Act can provide a compelling interest that justifies racial discrimination but has "long assumed" it to be so. *Cooper v. Harris*, 137 S.Ct. 1455, 1464 (2017)). Defendant challenges that assumption. The Fourteenth Amendment trumps a statute, and it is not okay to violate a voter's Constitutional rights through racial sorting even if Congress purports to require it.

Even if Section 2 compliance could provide an excuse for trampling voters' Equal Protection rights, Plaintiffs' proposed districts could not survive strict

scrutiny. The Alabama Legislature had no good reason to believe in 2011 (or any time thereafter) that two constitutional majority-minority districts could be drawn.[3] That is true for three reasons: (1) As discussed above, the Alabama Legislature was on notice that it could not break up strong communities of interest to draw non-compact districts connecting disparate pockets of African-American population; (2) no one believed in 2011 that a plan that reduced the African-American population in District 7 to barely over 50% would be precleared by the Department of Justice (more on that point below);[4] and (3) no Legislator introduced a viable plan that drew two majority-minority districts. One would think that if drawing two majority-minority districts were easy and permissible, and stood a chance of preclearance, a member of the Alabama Legislative Black Caucus would have introduced such a plan, or at least would have filed suit before 2018.[5]

---

[3] Assuming compliance with a statute can provide a compelling interest for discriminating on the basis of race (a premise that Defendant rejects), a State can meet strict scrutiny by showing that it has a "strong basis in evidence" that segregating voters was necessary to comply with the Voting Rights Act. *Alabama*, 135 S. Ct. at 1274. "The good faith of the state legislature must be presumed." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (cleaned up).

[4] The Legislature's judgment was validated several months after the congressional districts became law, when Attorney General Eric Holder precleared them.

[5] The evidence will show that the only plan with two majority-black districts introduced at the time the Legislature passed a Congressional districting plan in 2011 was a wildly gerrymandered plan introduced by Representative Thad McClammy, an African-American member of the Alabama Legislature. *See* Exhibit C-11 to Alabama's 2011 preclearance submission, proposed in this case as Exhibit D-3. That plan included one district that connected Birmingham with parts of the Black Belt, and then snaked up along the Mississippi border up the length of the State, and then turned right to follow the Tennessee River to grab black voters in Huntsville. The second majority-black district was equally discriminatory, connecting black voters in Mobile to black voters in far-away Anniston. McClammy produced another plan, one closer to Plaintiffs' illustrative plans, but *after* the Governor had already signed the existing plan.

That brings us to a question that the Court asked the parties to address: Is racial gerrymandering permissible if done in an effort to comply with the Voting Rights Act, and if so, how much? Defendant contends that no racial gerrymandering is permissible and that Section 2 cannot provide a justification for it, for reasons stated above. A map-drawer cannot point to Section 2 as the compelling interest that justifies racial gerrymandering because "[Section] 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" *Abrams*, 521 U.S. at 91-92).

That doesn't mean that a State can never draw a majority-black district. If the State has two alternative ways to draw a Congressional plan and each observes traditional districting criteria and longstanding communities of interest, but one plan has a majority-black district and the other has none, then Section 2 requires the plan with a majority-black district (or, at least, compactness and racial gerrymandering do not present an obstacle to the plan.) For example, if the Legislature draws a plan where race does not predominate and then notes that a district is 40 or 45% black, it may be constitutional to bump the district up to over 50% black if that can be done in a way that continues to observe traditional districting principles, and the State otherwise has a strong basis in evidence to conclude that changes on the margins of the districts are required by law. But in this case, for all the reasons discussed above, the State would never have split

10

Mobile and Baldwin County simply to connect voters in Mobile and Dothan, or Mobile and Bullock County, because no community of interest connects those voters. Alabama could not draw such a district unless the Legislature put race above all other criteria. The Voting Rights Act does not require Alabama to draw such a district and thus cannot be used to justify a constitutional violation. The answer to the question of how much racial gerrymandering is okay is "zero."

If Defendant is correct, what about District 7? As the Court pointed out at a pretrial conference, District 7 appears to be racially gerrymandered, with a finger sticking up from the black belt for the sole purpose of grabbing the black population of Jefferson County. Defendant does not believe that the law would permit Alabama to draw that district today if the finger into Jefferson County was for the predominate purpose of drawing African American voters into the district. Alabama did so in the early 1990s as part of a consent decree, at a time when the Department of Justice was enforcing a "max-black" policy that required States to draw as many majority-black districts as possible, no matter what, or else DOJ would not preclear the plan under Section 5. *See Johnson v. Miller*, 864 F. Supp. 1354, 1360-61 (S.D. Ga. 1994); *Alabama*, 135 S. Ct. at 1284-85 (Thomas, J., dissenting). The max-black policy was appropriately rejected in *Miller*, 515 U.S. at 924-927, and no longer applies, but once the district existed, Alabama had to continue to draw the district in order to comply with Section 5's anti-retrogression

requirement. Today, with Section 5 effectively tabled, Alabama has more liberty to draw its districts differently. In 2021 there may be permissible, non-racial reasons for which Alabama might preserve a link between Jefferson County and Black Belt counties in the same congressional district, but that does not mean that the district was legal when drawn, or that Alabama could draw it so race-consciously today. The DOJ-required discrimination of 1992 cannot excuse new discrimination in 2021.

Racial gerrymandering is therefore never permissible. Dividing the State into separate-but-equal districts is not only bad policy,[6] it is illegal, and Plaintiffs do not meet their *Gingles* requirements with an unconstitutional plan.

### III. Plaintiffs' claims are moot because entirely different conditions will exist after the 2020 census.

Plaintiffs' claim for declaratory relief was made moot by the Court's March 27 decision on laches, doc. 52, which denied them the only relief that would have had a practical effect on the relationship between the parties: an injunction requiring the State to redraw its congressional districts before the 2020 election (or before the 2021 census that will reveal new population distributions). True enough,

---

[6] "Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire." *Shaw v. Reno*, 509 U.S. 630, 657 (1993).

Plaintiffs' have also asked for declaratory relief, but a declaratory judgment would have no effect on the relationship between the parties: A judgment declaring what the Legislature should or should not have done in 2011, based on the conditions that existed at that time, does not tell us what the Legislature can or cannot do in 2021 when those conditions will have changed with new census numbers. For this reason, the declaratory judgment claim became moot when injunctive relief was denied. *Flanigan's Enters., Inc. of Georgia v. City of Sandy Springs*, 868 F.3d 1248, 1264 (11th Cir. 2017) (F]ederal courts are without power to decide questions that cannot affect the rights of litigants in the case before them. … [A] previously justiciable case is moot when the requested relief, if granted, would no longer have any practical effect on the rights or obligations of the litigants.") (internal citations, quotation marks and footnotes omitted).

Alabama's new congressional districts will not be drawn until after the 2020 Census is released in early 2021. We can only guess at their boundaries, which will be shaped by new population data, the need to compensate for population shifts over the last 10 years,[7] the number of congressional districts that Alabama will have (7 or 6),[8] and the political interests of the Legislators and members of

---

[7] See, e.g., Defense Exhibit 5 which shows the adjustments Alabama's congressional districts needed after 2010 Census to equalize their populations; 225,177 people had to be moved into or out of all districts, and almost 80,000 people had to be moved into District 7.

[8] Plaintiffs' expert submitted a six-district plan in an effort to show that Alabama could draw two majority-black districts even if it loses a Congressional seat. That plan is absurd. The evidence will show that it is gerrymandered along racial lines to an even greater extent than

Congress who draw the districts – all presently unknowable. We cannot even know in which new districts each of the Plaintiffs will reside. The important point is that the number of majority-black districts Alabama can draw in 2021 will depend upon these presently unknown conditions, not a declaration of what the 2010 conditions required. How those districts can and will be shaped is speculation at this time, and federal courts "do not have the power to 'advise' potential parties about the lawfulness of potential actions that have not and may never occur." *Gagliardi v. TJCV Land Trust*, 889 F.3d 728, 735 (11th Cir. 2018).

Plaintiffs disagree. They say that "declaratory relief [would serve] the function of ensuring that the next congressional districting map does not build upon and exacerbate the voting rights violations that pervade the current plan." Doc 31 at 32-33.[9] But this argument is rooted in Section 5 law that no longer applies after *Shelby County v. Holder*, 570 U.S. 529 (2013) (holding that Section 5 could not be enforced using Section 4's coverage formula that was based on prior discrimination occurring in the 1960's and before).

---

Plaintiffs' seven-district plans, and it is based on wild guesses of how Alabama's population will shift after the next census. Mr. Cooper assumes that counties will gain or lose a certain amount of population and then meanders around the state, reaching into areas as necessary to find African-American voters to sort. Even with all that speculation and gerrymandering, he still is barely able to get to 50% BVAP. If he is off by a hair in his assumptions of how populations will move, the districts will be nowhere close to equal population, will fail to have African-American majorities, or both.

[9] Citations are to ECF-generated numbers.

14

Plaintiffs took their "benchmark" argument from *Sanders v. Dooly County, Ga.*, 245 F.3d 1289 (11th Cir. 2001) (per curiam),[10] which involved a racial gerrymandering challenge to board of education districts. The District Court held that the plaintiffs' claim for injunctive relief was barred by their delay in filing suit. *Sanders*, 245 F.3d at 1290. The Eleventh Circuit sustained the District Court on this point, but parted ways with the District Court's decision that plaintiffs' claims for declaratory judgment likewise were barred. *Id.*, 245 F.3d at 1291. A declaratory judgment would not prejudice the defendant board of education, the Eleventh Circuit said, and "[a]n effect of a grant of such declaratory relief could be to prevent the [U.S.] Attorney General from using the 1993 consent-decree plan as a baseline for retrogression analysis in the post-2000 census round of preclearance proceedings under §5 of the Voting Rights Act…" *Id.* at 1291-92 (footnotes omitted). *See also Reno v. Bossier Parish School Bd.,* 528 U.S. 320, 327-28 (2000) (rejecting argument that if school board's 1992 district plan "will never again be used for any purpose" voting rights challenge was moot, because it would "serve as the baseline against which appellee's next voting plan will be evaluated for the purposes of preclearance.")).

*Sanders* and *Reno* therefore hold that a declaratory judgment about districts that will not be used again may still have value if the judgment determines which

---

[10] *See* doc. 31 at 32-33.

plan will serve as the Section 5 benchmark. However, Section 5 no longer is enforceable because the Supreme Court held that the conditions of the 1960s cannot serve as a basis for requiring preclearance today. *Shelby County v. Holder*, 570 U.S. 529, 557 (2013). With §5 no longer available to serve as the statutory anvil to a declaratory hammer, a declaratory judgment that the 2011 districts violate §2 would not change the relationship between the parties. Accordingly, this case is moot. *Gagliardi*, 889 F.3d at 734 ("But before a federal court may issue relief under the [Declaratory Judgment] Act, there must still be a case or controversy that is live, is 'definite and concrete,' and is susceptible to 'specific relief through decree of conclusive character….'").

Populations shift between census cycles, with some communities growing, some stagnant, and some losing population. The evidence will show that the Black Belt and inner-city Birmingham typically shrink in population compared to the rest of the State, which means it will likely be harder after the next census for Alabama to draw even one majority-black district without racially gerrymandering, much less two. Because a declaratory judgment would not affect a change in the relationship between the parties in this case, it would be advisory and therefore would be beyond the Court's jurisdiction. *Penn Tank Lines, Inc. v. Jackson*, 2018 WL 465977, *3 (N.D. Ala. January 18, 2018) ("[A] federal court has neither the power to render advisory opinions or 'to decide questions that cannot affect the

16

rights of litigants in the case before them.' Its judgments must resolve 'a real and substantial controversy admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.") (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)).

With injunctive relief off the table, a declaratory judgment that the 2011 districts violated §2 has no value to Plaintiffs except as a defense to be asserted if the Legislature draws districts they do not like in 2021. Yet Plaintiffs have neither a right to nor a need for such a declaratory judgment now, before the Legislature draws new congressional districts. In 2021, if Plaintiffs don't like the new districts, they can bring a §2 action and "the court hearing that case, with all the facts available to it, will determine the merits" of their claim. *Id.* at *3.

## IV.    Plaintiffs' plans would not have been precleared in 2011.

Furthermore, if Alabama had drawn the State's congressional districts in the way Plaintiffs' Illustrative Plans suggest is required by Section 2, it would not have been able to obtain preclearance to implement such plans. *See* 52 U.S.C. § 10304. To receive preclearance under §5 of the Voting Rights Act, either the Attorney General or the U.S. District Court for the District of Columbia must find that the change "neither has the purpose nor will have the effect of denying or abridging

the right to vote on account of race or color." *Id.* Section 5 also specifies that any change that "will have the effect of diminishing the ability of any citizens of the United States on account of race or color … to elect their preferred candidates of choice denies or abridges the right to vote." *Id.* More specifically, "[w]hether a voting procedure change should be precleared depends on whether the change 'would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.'" *Georgia v. Ashcroft*, 539 U.S. 461, 466 (2003) (quoting *Beer v. United States*, 425 U.S. 130, 141 (1976)).

At the time Alabama's 2011 Congressional map was drawn, state legislators operated under the entirely reasonable assumption that no map that reduced the BVAP for a majority-minority district to the levels Plaintiffs propose (i.e., right at 50% BVAP) would receive preclearance, because there was a risk such a district would actually diminish, rather than extend, black voters' ability to elect their candidates of choice. Indeed, this understanding was echoed by prominent black state legislators, who indicated that a district where the black population was reduced to less than 62% might fail to perform in elections, and so would be unable to obtain preclearance. *See generally Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1040-1041 (M.D. Ala. 2017) (citing Sen. Hank Sanders asking for 62% black as the minimum for an African-American district and Representative Thomas Jackson arguing for 62-65% black).

Indeed, if Plaintiffs' own assertions about the average percentage difference between black and white voter turnout are correct, *see* doc. 95 ¶ 154, taken in conjunction with their own experts' conclusions about racially polarized voting in Alabama, *see* doc. 95 ¶¶ 99-114, it would be easy to draw the conclusion that Mr. Cooper's hypothetical districts containing barely 50% BVAP could "have the effect of diminishing the ability of any citizens of the United States on account of race or color . . . to elect their preferred candidates of choice." At the very least, the data on voter turnout and polarized voting would raise serious concerns about whether Plaintiffs' proposed majority-minority districts might in the end take away African-Americans' undisputed ability to elect candidates of their choice in one district, and create a situation where there would be no assurance of black voters' ability to elect the candidates of their choice in *either* of the two "majority" black districts.

The evidence will show that the 2011 Congressional delegation hired a consultant to draw a plan to propose to the Legislature, and that the plan they proposed is the one that was passed with no material changes. The evidence will further show that Congresswoman Sewell approved her district. She, perhaps more than anyone, knows what is needed for minority voters in her district to have a realistic opportunity to elect their candidate of choice, and there will be no evidence that suggests that she would have approved of packing minority voters in

19

her district or harming them in any way. Her stamp of approval on the plan, and Senator Sander's statement that more than 60% BVAP was needed to provide minority voters with electoral opportunity, show that a plan of around 50% BVAP would have been retrogressive and would not have been precleared.

### V.     Plaintiffs cannot demonstrate that any alleged vote dilution is "on account of race or color."

The text of Section 2 makes clear that vote dilution is illegal only if it is "on account of race or color." 52 U.S.C. § 10301(a). And the Eleventh Circuit has emphasized this fact: "[T]o be actionable, a deprivation of the minority group's right to equal participation in the political process must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause." *Solomon v. Liberty Cty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc), quoting *Nipper v. Smith*, 39 F.3d 1494, 1515 (11th Cir.1994) (en banc) (Tjoflat, C.J., plurality opinion).

If some black voters are unable usually to elect their candidate of choice under the current district lines, it must therefore be "on account of race or color" for plaintiffs to prevail, not some other cause such as party affiliation. Plaintiffs argue that they can make this showing by demonstrating that voting is polarized in Alabama, but that tells us nothing of the reason behind the votes. Defendant will present evidence that African-American voters overwhelmingly prefer Democratic

candidates *everywhere*, not just in Alabama.[11] That means that voting is polarized wherever a majority of white voters tend to support Republican candidates. A showing of polarized voting therefore does not show that that the system is broken; it shows that Alabama is a conservative state, which is news to no one. To say that polarized voting is, by itself, evidence of racial bias is to say that voting Republican is evidence of racial bias.

As the Fifth Circuit noted, a proper interpretation of the *Gingles* requirements involves consideration of whether the candidates of choice of black voters lose elections because of race or for a more benign reason, such as party politics:

> The scope of the Voting Rights Act is indeed quite broad, but its rigorous protections, as the text of § 2 suggests, extend only to defeats experienced by voters "on account of race or color." Without an inquiry into the circumstances underlying unfavorable election returns, courts lack the tools to discern results that are in any sense "discriminatory," and any distinction between deprivation and mere losses at the polls becomes untenable. In holding that the failure of minority-preferred candidates to receive support from a majority of whites on a regular basis, without more, sufficed to prove legally significant racial bloc voting, the district court loosed § 2 from its racial tether and fused illegal vote dilution and political defeat.

---

[11] Defendants will also show that Plaintiffs' evidence regarding certain "Senate Factors" does nothing to single Alabama out or to demonstrate the existence of racial bias. For example, Plaintiffs argue that the fact that African-Americans lag behind whites in Alabama in certain socio-economic factors is caused by Alabama's discriminatory past and is a reason to be suspicious that Alabama is guilty of illegal vote dilution, but in fact those socio-economic gaps unfortunately exist in every single State studied, including such northern States as New York, Delaware, Pennsylvania, Michigan, Ohio, Illinois, New Jersey, and Connecticut.

*League of United Latin American Citizens v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993). Citing to the text of § 2, legislative history, and *Gingles* itself, the Fifth Circuit held that legally significant racial bloc voting is not shown if people vote the way they do because of party preferences: "The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates. *Rather, § 2 is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats*." *Id.* at 854 (citation and internal quotation marks omitted; emphasis added).

The Eleventh Circuit has similarly held that voter motivations are relevant to the question of vote dilution. It is not clear if the Eleventh Circuit views voter motivation as part of the definition of racial bloc voting, as does the Fifth Circuit, or whether the Eleventh Circuit views it as part of the "totality of the circumstances" analysis, or if the Court has even decided that question. What *is* clear is that voter motivation is part of the analysis, and a simple difference in voter preferences is not enough to establish a § 2 violation:

> [I]t is entirely possible that bloc voting (as defined by *Gingles*) could exist, but that such bloc voting would not result in a diminution of minority opportunity to participate in the political process and elect representatives of the minority group's choice. Other circumstances may indicate that both the degree and nature of the bloc voting weigh against an ultimate finding of minority exclusion from the political process. The degree of racial polarization may not be sufficiently intense, for example; ***or what appears to be bloc voting on account of***

> *race may, instead, be the result of political or personal affiliation of different racial groups with different candidates*.

*Solomon v. Liberty Cty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (emphasis added) (en banc).

Thus, showing that black and white voters prefer different candidates is not enough to establish a § 2 violation. Otherwise, the Voting Rights Act becomes a partisan tool, stepping in to give a leg up to the party black voters prefer even if a majority of Alabamians support the other party for non-racial reasons.[12] The record will not show that racial bias is the reason that a majority of present-day Alabamians usually vote Republican, and therefore any alleged vote dilution is not on account of race or color.

## VI.   Plaintiffs DuBose, Love, Williams and Harris lack standing

Plaintiffs Bobby Dubose, Rodney Love, and Janice Williams live in Jefferson County and are represented by Congresswoman Terri Sewell in District 7. The evidence will show that they are presently able to elect their candidate of choice. In all four of Plaintiffs' illustrative plans, these three Plaintiffs would remain in District 7 and would continue to be able to elect their candidate of choice. Plaintiffs have disavowed a racial gerrymandering claim where a voter might claim an injury of being subject to a racial classification; here, with only a

---

[12] Turning §2 into a partisan tool, instead of a protection against racial discrimination outlawed by the Fourteenth and Fifteenth Amendments, would raise serious questions about the constitutionality of the statute.

Section 2 claim, the question is whether the plaintiff is able to elect his or her candidate of choice. A judgment in these Plaintiffs' favor would not change their ability to elect their candidate of choice in the least or redress any alleged injury, and these Plaintiffs therefore lack standing.

"Article III of the Constitution limits the jurisdiction of federal courts to the consideration of 'Cases' and 'Controversies.'" *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (quoting U.S. Const. art. III, § 2). Therefore, a plaintiff must show Article III standing to vest a federal court with subject matter jurisdiction. *Id.*

Standing consists of three elements: (1) an injury in fact; (2) that is traceable to defendant's conduct; and (3) that can be redressed with a favorable decision from the court. *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). Together these elements serve as the "irreducible constitutional minimum" required to establish Article III standing. *Spokeo, Inc.*, 136 S. Ct. at 1547 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). A plaintiff fails to show redressability, and therefore standing, when the relief the plaintiff seeks would not "put [the plaintiff] in any different position than [plaintiff] is currently in now." *Kawa Orthodontics, LLP v. Sec'y, U.S. Dep't of the Treasury*, 773 F.3d 243, 247–48 (11th Cir. 2014).

Section 2 of the Voting Rights Act protects the ability of racial minorities to "participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301. Courts have split on whether an injury sufficient to support standing in a Section Two vote dilution claim may arise from an entire redistricting scheme or instead must arise from the plaintiff's own district. *See generally Luna v. County of Kern*, 291 F. Supp. 3d 1088, 1122 n.14 (E.D. Cal. 2018) (discussing this split and collecting cases). However, independent of any showing of injury, "it must be likely, as opposed to merely speculative," that a favorable decision will result in a favorable change of position. *Lujan*, 504 U.S. at 561 (1992).

These three Plaintiffs lack standing because a favorable decision of this Court would not "put [them] in any different position than [they are] currently in now." *Kawa Orthodontics, LLP*, 773 at 247–48. Congressional District 7 "has been represented by an African American since 1992" and "is currently represented by Representative Terri Sewell, who was first elected in 2010." Doc. 14 ¶ 35. These Plaintiffs concede that Representative Sewell is their candidate of choice (they just want new districts so that *other* voters can be in a majority-minority district too).

Therefore, these Plaintiffs will continue to have the same opportunity to "participate in the political process and to elect representatives of their choice" regardless of whether this Court rules for them. 52 U.S.C. § 10301. With either a

favorable or an unfavorable decision, the Jefferson County Plaintiffs will be able to elect their candidate of choice.

Ultimately, these Plaintiffs will not experience any practical changes in their lives even if this Court rules in their favor. They will continue to be able to participate in the political process and will continue to be able to elect the representative of their choice. They will be represented by the same person in the same district, and they have no standing to argue that other voters in other parts of the State should be part of a different sort of district. Even assuming, *arguendo*, that Plaintiffs Dubose, Love and Williams have an injury sufficient to support standing, the "irreducible constitutional minimum" demands an independent showing of redressability. *Lujan*, 504 U.S. at 560. Accordingly, Plaintiffs must show that a favorable decision of this Court is likely to put them "in any different position" than they are in now to establish standing. These plaintiffs cannot do so.

For a similar reason, Plaintiff John Harris lacks standing. He currently lives in Opelika, part of District 3. He would continue to live in District 3, a majority-white district, in all four of the Plaintiffs' illustrative plans. There is therefore no evidence that a judgment in his favor would alter his situation at all, and he has no standing to argue that other voters in other parts of Alabama should be part of a particular sort of district.

### VII.   Any-part-Black and single-race-Black

The experts disagree over the proper measurement of minority voting strength. Plaintiff expert Bill Cooper lumps those who identify as any-part Black on the census with those who identify as single-race Black on the census. Defense experts note that the Alabama Reapportionment Office (and therefore the Alabama Legislature) has historically used single-race Black to determine whether a district is a majority-minority district.

Defendant is not aware of any authority requiring the use of one category to the exclusion of the other, but he maintains the single-race Black is the appropriate category in this case. First of all, there is no evidence that those who identify as mixed-race vote cohesively with those who identify as single-race Black. That matters when determining whether a district will in fact provide an opportunity for minority voters to elect their candidate of choice. Second, Alabama's voter registration database does not have categories for voters to identify with more than one race, and therefore the single-race census category is a better comparator when assessing Dr. Palmer's reports. When he discusses how many African-American voters make up the electorate in state-wide elections in the "focus area," or how African-Americans tend to vote, he is referring to those who identified as African-American on a voter registration form, not all persons who identify as African-

American plus some other race (which is not an option on the voter registration form).

The difference is admittedly small, because very few people identify as mixed-race Black on the census, but Plaintiffs' illustrative plans have such razor-thin margins, it is enough to knock two of their districts below 50% BVAP. Because it allows for more of an apples-to-apples comparison, and because it is consistent with the practice of the Alabama Legislature, Defendant argues that single-race black is the appropriate measure for BVAP.

## VIII. Conclusion

Plaintiffs essentially want to put Alabama back under the failed "max-black" policies of the 1990s, requiring Alabama to draw a second majority-black district even if it requires racial gerrymandering and a disregard of communities of interest. That is not the law. Moreover, the declaratory judgment that they week will alter the legal relationship between the parties, because Alabama's ability to draw a second majority-minority district in 2021 will depend on the new census numbers and new conditions, not a judgment concerning what Alabama should have done under the very different conditions that existed in 2011. For these and other reasons discussed above, Defendant will ask the Court to enter judgment in his favor at the conclusion of this case.

Respectfully submitted,

Steve Marshall
 *Attorney General*

*s/* James W. Davis
James W. Davis (ASB-4063-I58J)
 *Deputy Attorney General*
Laura E. Howell (ASB-0551-A41H)
 *Assistant Attorney General*

Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
jimdavis@ago.state.al.us
lhowell@ago.state.al.us

Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
dwalker@balch.com

**Counsel for Secretary of State John H. Merrill**


### Certificate of Service

I hereby certify that on the 28th day of October, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a copy to all counsel of record.

*s/* James W. Davis

29