FILED

2019 Oct-28  PM 09:26
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LAKEISHA CHESTNUT, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 2:18-cv-00907-KOB |
| v. | ) | |
| | ) | |
| JOHN H. MERRILL, in his official | ) | |
| Capacity as Alabama Secretary of State | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' PRETRIAL BRIEF

# TABLE OF CONTENTS

**Page**

I.    Introduction.................................................................................1

II.   Legal Framework of a Vote Dilution Claim Under Section 2 ........................3

III.  Expected Trial Evidence and Argument...............................................7

    A.    *Gingles* Preconditions ......................................................... 7

        1.    *Gingles* 1: The African-American Community in
Alabama Is Sufficiently Large and Geographically
Compact to Constitute A Majority in Two Congressional
Districts................................................................................. 7

            a.    Numerousness: The Illustrative Plans Each Include
Two Majority-Minority Districts......................................8

            b.    Compactness: The African-American
Communities Within Illustrative Districts 2 and 7
Are Geographically Compact .........................................10

        2.    *Gingles* 2 and 3: African Americans in Central and
Southern Alabama Are Politically Cohesive and the
White Majority Votes as a Bloc Usually to Defeat
African-American Candidates of Choice..................................15

    B.    The Totality of the Circumstances Shows That the 2011 Plan
Dilutes African-American Voting Strength............................................... 18

        Senate Factor 1: Alabama's History of Official Discrimination ........19

        Senate Factor 2: Racially Polarized Voting ........................................24

        Senate Factor 3: Use of Voting Practices or Procedures That
Enhance the Opportunity for Discrimination............................25

        Senate Factor 4: Exclusion from Slating Process ...............................25

        Senate Factor 5: Effects of Discrimination .......................................25

## TABLE OF CONTENTS

**Page**

Senate Factor 6: Racial Appeals in Campaigns ..................................27

Senate Factor 7: Extent to Which African Americans Have
Been Elected to Office ..............................................29

IV.    Responses to Anticipated Arguments by Defendant .....................30

    A.    Racial Gerrymandering............................................................ 30

    B.    Functionality of Illustrative Districts ........................................ 33

    C.    Race-Neutral Causes of Vote Dilution ...................................... 34

    D.    Section 5 of the Voting Rights Act............................................ 36

V.    Conclusion ....................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ala. Legislative Black Caucus v. Alabama,*
  135 S. Ct. 1257 (2015) ........................................................................37

*Ala. Legislative Black Caucus v. Alabama,*
  231 F. Supp. 3d 1026 (M.D. Ala. 2017) ...........................................13

*Allen v. City of Evergreen, Ala.,*
  2014 WL 12607819 (S.D. Ala. Jan. 13, 2014) ................................24

*Askew v. City of Rome,*
  127 F.3d 1355 (11th Cir. 1997) ........................................................35

*Bartlett v. Strickland,*
  556 U.S. 1 (2009) ..................................................................................8

*Benavidez v. City of Irving, Tex.,*
  638 F. Supp. 2d 709 (N.D. Tex. 2009) .............................................16

*Bone Shirt v. Hazeltine,*
  336 F. Supp. 2d 976 (D.S.D. 2004) ..................................................16

*Brown v. Bd. of Sch. Comm'rs of Mobile Cty., Ala.,*
  706 F.2d 1103 (11th Cir. 1983) ........................................................22

*Bush v. Vera,*
  517 U.S. 952 (1996) ............................................................................38

*Buskey v. Oliver,*
  565 F. Supp. 1473 (M.D. Ala. 1983) ...............................................22

*Chen v. City of Houston,*
  206 F.3d 502 (5th Cir. 2000) ...........................................................14

*City of Carrollton Branch of N.A.A.C.P. v. Stallings,*
  829 F.2d 1547 (11th Cir. 1987) ........................................................34

# TABLE OF AUTHORITIES

**Page(s)**

*City of Rome v. United States*,
    446 U.S. 156 (1980) ................................................................21

*Clark v. Calhoun Cty., Miss.*,
    21 F.3d 92 (5th Cir. 1994) ......................................................32

*Davis v. Chiles*,
    139 F.3d 1414 (11th Cir. 1998) ...................................10, 31, 32, 33

*Dillard v. Baldwin Cty. Bd. of Educ.*,
    686 F. Supp. 1459 (M.D. Ala. 1988) ....................................14

*Dillard v. Crenshaw Cty.*,
    640 F. Supp. 1347 (M.D. Ala. 1986) ..............................19, 22

*Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*,
    118 F. Supp. 3d 1338 (N.D. Ga. 2015) ................................31

*Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*,
    775 F.3d 1336 (11th Cir. 2015) .................................*passim*

*Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*,
    950 F. Supp. 2d 1294 (N.D. Ga. 2013) .......................*passim*

*Georgia v. Ashcroft*,
    539 U.S. 461 (2003) ..................................................................9

*Gomillion v. Lightfoot*,
    364 U.S. 339 (1960) ..............................................................21

*Goosby v. Town Bd. of Town of Hempstead, N.Y.*,
    956 F. Supp. 326 (E.D.N.Y. 1997) .....................................27

*Hale Cty., Ala. v. United States*,
    496 F. Supp. 1206 (D.D.C. 1980) ........................................22

*Harris v. Graddick*,
    593 F. Supp. 128 (M.D. Ala. 1984) .....................................22

# TABLE OF AUTHORITIES

**Page(s)**

*Houston v. Lafayette Cty., Miss.,*
    56 F.3d 606 (5th Cir. 1995) ........................................................................12, 14

*Hunter v. Underwood,*
    471 U.S. 222 (1985)....................................................................................20, 21

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.,*
    4 F.3d 1103 (3d Cir. 1993) ..............................................................................18

*Johnson v. Hamrick,*
    196 F.3d 1216 (11th Cir. 1999) ......................................................................35

*Jordan v. Winter,*
    604 F. Supp. 807 (N.D. Miss. 1984)...............................................................29

*League of United Latin Am. Citizens v. Perry,*
    548 U.S. 399 (2006)....................................................................................10, 17

*Lynch ex rel. Lynch v. Alabama,*
    2011 WL 13186739 (N.D. Ala. Nov. 7, 2011).................................................13

*McMillan v. Escambia Cty., Fla.,*
    748 F.2d 1037 (Former 5th Cir. 1984) .......................................................25, 27

*Mobile v. Bolden,*
    446 U.S. 55 (1980)............................................................................................3

*Montes v. City of Yakima,*
    40 F. Supp. 3d 1377 (E.D. Wash. 2014).......................................................32, 33

*N.C. State Conf. of NAACP v. McCrory,*
    831 F.3d 204 (4th Cir. 2016) ..........................................................................24

*Nipper v. Smith,*
    39 F.3d 1494 (11th Cir. 1994) ....................................................................35, 36

*Patino v. City of Pasadena,*
    230 F. Supp. 3d 667 (S.D. Tex. 2017).............................................................16

# TABLE OF AUTHORITIES

**Page(s)**

*Sanchez v. Colorado,*
   97 F.3d 1303 (10th Cir. 1996) ...........................................................32

*Terrebonne Parish Branch NAACP v. Jindal,*
   274 F. Supp. 3d 395 (M.D. La. 2017) ...........................................11, 12

*Thornburg v. Gingles,*
   478 U.S. 30 (1986) ................................................................*passim*

*United States v. Alamosa Cty. Colo.,*
   306 F. Supp. 2d 1016 (D. Colo. 2004) ................................................27

*United States v. Marengo Cty. Comm'n,*
   731 F.2d 1546 (11th Cir. 1984) ......................................6, 18, 19, 36

*United States v. McGregor,*
   824 F. Supp. 2d 1339 (M.D. Ala. 2011) ...............................19, 23, 24

*Voinovich v. Quilter,*
   507 U.S. 146 (1993) .............................................................................4

*Wright v. Sumter Cty. Bd. of Elections & Registration,*
   301 F. Supp. 3d 1297 (M.D. Ga. 2018) ..............................................27

## STATUTES

52 U.S.C. § 10301(a) ...........................................................................3

52 U.S.C. § 10301(b) ...........................................................................4

52 U.S.C. § 10302(c) .........................................................................24

52 U.S.C. § 10304(b) .........................................................................36

## OTHER AUTHORITIES

ALA. CONST. art. VIII, § 177 ................................................................10

## I.    Introduction

This lawsuit challenges Alabama's 2011 congressional districting plan (the "2011 Plan") for failing to provide African Americans an equal opportunity to participate in the political process and elect their preferred candidates. Though African Americans comprise more than a quarter of Alabama's voting age population, their voting strength is confined to just one of the State's seven congressional districts.

At trial, Plaintiffs will prove that the African-American community in central and southern Alabama is sufficiently numerous and geographically compact to constitute a majority of the voting age population in two congressional districts. Despite this, the 2011 Plan packs most African Americans in this region into the State's single pre-existing majority-minority district and divides the remaining African-American population among three districts in which they comprise an ineffectual political minority.

African-American voters in Congressional District ("CD") 7, the State's sole majority-minority district, have consistently enjoyed overwhelming electoral success in congressional elections. From 2002 through 2010, African-American-preferred candidates won CD 7 by margins of more than 45 percentage points. Despite this fact, the 2011 Plan *increased* the African-American population in CD 7 by almost an additional percentage point and further splintered the remaining

African-American communities—located predominantly in the State's Black Belt region—among CDs 1, 2, and 3. Indeed, the African-American population alone in CDs 1, 2, and 3 constitutes over 90% of the population of a full congressional district. Instead of concentrating African-American voters in CD 7 and dispersing others across the surrounding districts, the 2011 Plan could—and should—include a second majority-minority congressional district in the Black Belt region.

Plaintiffs challenge the 2011 Plan under Section 2 of the Voting Rights Act ("VRA"), which prohibits district plans that dilute a minority group's voting strength. Section 2 calls for a two-step inquiry to determine whether Plaintiffs lack "an equal opportunity to participate in the political processes and to elect candidates of their choice." *Thornburg v. Gingles*, 478 U.S. 30, 46 (1986). The first phase, the "*Gingles* preconditions," examines whether it is possible to create an additional majority-minority district and whether voting in the region is racially polarized. As the facts above suggest, the evidence at trial will easily satisfy these requirements.

The second phase of the analysis examines the past and present realities of Alabama politics through a series of factors, which together show that Alabama's failure to create a second majority-African-American congressional district denies African Americans equal footing in congressional elections. The facts and evidence relevant to these considerations—including Alabama's sordid history of voting-

related discrimination, the effects borne of discrimination across sectors, and the absence of African-American elected officials in statewide office—are largely beyond dispute. As a result, the evidence at trial will confirm that Alabama's congressional map violates the VRA.

## II.    Legal Framework of a Vote Dilution Claim Under Section 2

The VRA is one of this nation's seminal pieces of civil rights legislation. Section 2 of the VRA, under which Plaintiffs bring this suit, makes unlawful any law that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). In 1982, Congress amended Section 2 to reject the Supreme Court's "plurality opinion in *Mobile v. Bolden*, 446 U.S. 55 (1980), which had declared that, in order to establish a violation[,] . . . minority voters must prove that a contested electoral mechanism was intentionally adopted or maintained by state officials for a discriminatory purpose." *Gingles*, 478 U.S. at 35. Today, "[a] discriminatory *result* is all that is required" to establish a Section 2 claim; "discriminatory intent is not necessary." *Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015).

A voting law dilutes minority voting strength in violation of Section 2 if, under the totality of the circumstances, the "political processes leading to nomination or election in the State . . . are not equally open to participation by members of [a racial

minority group] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). The "essence" of this claim is that the challenged law "interacts with social conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred candidates." *Gingles*, 478 U.S. at 47. In the context of a single-member districting plan, "'[d]ilution of racial minority group voting strength may be caused' either 'by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority.'" *Voinovich v. Quilter*, 507 U.S. 146, 154 (1993) (quoting *Gingles*, 478 U.S. at 46 n.11). Alabama's current congressional map commits both forms of dilution: it packs African-American voters into CD 7, and it divides the remaining African-American population in the area between CDs 1, 2, and 3.

The legal analysis under Section 2 follows two steps. First, to make a *prima facie* case under Section 2 a plaintiff must establish three preconditions: (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group is "politically cohesive," and (3) the majority votes "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51. If the

preconditions are met, the Court then engages in a "totality of the circumstances" analysis to confirm what the *Gingles* preconditions suggest: that the challenged practice impermissibly impairs minority voting strength. *Fayette Cty.*, 775 F.3d at 1342. "[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances." *Id.* (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)).

In conducting the totality-of-the-circumstances inquiry, the Court engages in "a searching practical evaluation of the past and present reality." *Gingles*, 478 U.S. at 45. In particular, the Court considers seven principal factors set forth in the Senate Judiciary Committee Report accompanying the 1982 amendments to Section 2, known as the "Senate Factors." *Id.* at 44–45 (citing S. Rep. No. 97-417 at 28–29 (1982) ("S. Rep.")). Those factors are: (1) "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process"; (2) "the extent to which voting in the elections of the state or political subdivision is racially polarized"; (3) "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that

may enhance the opportunity for discrimination against the minority group"; (4) "if there is a candidate slating process, whether the members of the minority group have been denied access to that process"; (5) "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process"; (6) "whether political campaigns have been characterized by overt or subtle racial appeals"; and (7) "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Id.* at 36–37 (quoting S. Rep. at 28–29).[1]

The Senate Factors are "neither comprehensive nor exclusive," *Gingles*, 478 U.S. at 45, and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. at 29). In other words, they are not a "mechanical 'point counting' device"; a failure

_____

[1] The Senate Report also explicates two additional considerations that may have probative value if they weigh in favor of a finding of dilution: "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group," and "whether the policy underlying the state['s] . . . use of such voting . . . standard . . . is tenuous." *Id.* at 37 (quoting S. Rep. at 29); *see also United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1572 (11th Cir. 1984) ("[U]nresponsiveness [is] relevant only if the plaintiff chose to make it so, and [] although a showing of unresponsiveness might have some probative value a showing of responsiveness would have very little.").

"to establish any particular factor is not rebuttal evidence of non-dilution." S. Rep.

at 29 n.118.

## III.  Expected Trial Evidence and Argument

### A.  *Gingles* Preconditions

**1.  *Gingles* 1: The African-American Community in Alabama Is Sufficiently Large and Geographically Compact to Constitute A Majority in Two Congressional Districts**

The first *Gingles* precondition asks whether Plaintiffs have identified a minority group that is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. Plaintiffs will satisfy this precondition at trial by offering four "Illustrative Plans" drawn by expert demographer William Cooper. The Illustrative Plans show four different ways in which Alabama's congressional map could have two majority-minority districts, each containing a geographically compact African-American community.[2]

_____

[2] Mr. Cooper's initial report offered four plans: Illustrative Plans 1, 2, 3, and 4. Plaintiffs' Exhibit ("PX") 001 ¶¶ 54–73. At that time, Mr. Cooper lacked access to the addresses of Alabama's congressional incumbents. After he discovered that Representative Sewell lived outside of CD 7 in three of the four illustrative plans, Mr. Cooper replaced Illustrative Plans 1, 2, and 3 with new Revised Plans 1, 2, and 3, respectively. PX059 ¶¶ 59–68. These revisions "are minor and have no impact outside of Jefferson County." *Id.* ¶ 50. Plaintiffs' references to the "Illustrative Plans" in this brief and at trial refer to the currently operative plans: Revised Plans 1, 2, and 3, and Illustrative Plan 4.

a.   **Numerousness: The Illustrative Plans Each Include Two Majority-Minority Districts**

The numerousness requirement under *Gingles* involves a "straightforward," "objective numeric test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009). The answer here is unequivocally yes. In each of the Illustrative Plans, more than 50% of voting-age residents of CDs 2 and 7 are African American. PX059 figs. 5, 7, 9; PX001 fig. 18. The black voting-age population ("BVAP") of CDs 2 and 7 in each Illustrative Plan is as follows:

| Plan | CD 2 BVAP | CD 7 BVAP |
|---|---|---|
| 2011 Plan | 27.90% | 60.91% |
| Revised Plan 1 | 51.32% | 50.65% |
| Revised Plan 2 | 51.37% | 51.95% |
| Revised Plan 3 | 50.99% | 50.34% |
| Illustrative Plan 4 | 50.33% | 50.74% |

PX001 figs. 11, 18; PX059 figs. 5, 7, 9. To the extent Defendant claims a candidate of choice of African Americans in CDs 2 or 7 might lose a particular election because the BVAP percentages are not high enough—an assertion his own expert has essentially abandoned, *see infra* Section IV.B—this argument is irrelevant to the first precondition. *See Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1303–04 (N.D. Ga. 2013) (rejecting as irrelevant the assertion that a proposed district with 50.22% BVAP was too low because "*Bartlett* holds that a bright-line 50% rule applies to" the first *Gingles* precondition), *aff'd in part, vacated*

*in part, and rev'd in part on other grounds by Fayette Cty.*, 775 F.3d 1336.[3]

Defendant also will likely argue, erroneously, that Revised Plan 3 and Illustrative Plan 4 do not contain two majority-minority districts because, according to him, individuals who self-identify on the Census as both African American and another race, or as African American and Hispanic, should not be considered African American. This argument directly conflicts with the Supreme Court's clear instruction that in a case "involv[ing] an examination of only one minority group's effective exercise of the electoral franchise," a court should "look at *all* individuals who identify themselves as black" when determining the BVAP of a given district. *Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003). And in any event, Defendant has stipulated that even when excluding multi-racial and Hispanic African Americans from the BVAP calculation, at least two of the Illustrative Plans contain two majority-African-American districts. Joint List of Agreed & Disputed Principal Facts ("Stipulated Facts" or "SF"), ECF No. 95, ¶ 86. Indeed, when one considers only *citizen* residents of Alabama, *see* ALA. CONST. art. VIII, § 177 (requiring all

---

[3] In *Fayette County*, the district court granted plaintiffs summary judgment on their Section 2 claim. 950 F. Supp. 2d 1294. On appeal, the Eleventh Circuit explained that while the existence of genuine issues of material fact in the case made summary judgment inappropriate, "[w]e cannot say that the district court misconstrued our precedent or reached its conclusions based on a misunderstanding of the applicable law." *Fayette Cty.*, 775 F.3d at 1343–44.

electors to be "citizen[s] of the United States"), all four of the Illustrative Plans have two districts with a voting-age population that is majority single-race, non-Hispanic Black. PX059 fig. 1.

> **b.** **Compactness: The African-American Communities Within Illustrative Districts 2 and 7 Are Geographically Compact**

The minority communities in CDs 2 and 7 of each Illustrative Plan are geographically compact because they exist within districts that adhere to traditional districting principles. This "compactness" aspect of "[t]he first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested districts." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) ("*LULAC*"). "While no precise rule has emerged governing § 2 compactness," *id.*, a plaintiff satisfies this requirement when she proposes a majority-minority district that is "consistent with traditional districting principles." *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998). These principles include population equality, contiguity, geographical compactness, maintaining traditional boundaries, protection of incumbents, and maintaining communities of interest. *See, e.g.*, *Fayette Cty.*, 950 F. Supp. 2d at 1307. They also include avoiding dilution of a minority group's voting strength. *See* PX084 § IV.2.

Here, the districts in the Illustrative Plans are equal in population. SF ¶ 87; PX059 figs. 5, 7, 9; PX001 fig. 18. None of the Illustrative Plans pair congressional

incumbents. SF ¶ 88. And the Illustrative Plans are contiguous, meaning that each district is "connected in one piece." *Terrebonne Parish Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 424 (M.D. La. 2017).

The Illustrative Plans also maintain as many, and in many cases more, traditional boundaries than the 2011 Plan. Defendant stipulates that: (1) each plan splits the same number of, or fewer, counties than the 2011 Plan, SF ¶ 89; PX059 fig. 12; (2) the number of discrete county splits in each plan is lower than under the 2011 Plan, SF ¶ 90; PX059 fig. 12; (3) each plan resolves the 2011 Plan's three-district split of Montgomery County by placing Montgomery County entirely into a single district, SF ¶ 92; PX001 ¶ 53, fig. 18; PX059 figs. 4, 6, 8; and (4) each plan splits the same number of, or fewer, populated voter tabulation districts ("VTDs") than the 2011 Plan, SF ¶ 91; PX059 fig. 12.[4]

Districts 2 and 7 in each plan are also reasonably compact. *See Fayette Cty.*, 950 F. Supp. 2d at 1307 ("[W]hile Plaintiffs' evidence regarding the geographical compactness of their proposed district does not alone establish compactness under § 2, that evidence, combined with their evidence that the district complies with other traditional redistricting principles, is directly relevant to determining whether the

---

[4] The Census Bureau's VTDs generally correspond to the State's voting precincts as they exist at the time of the Census. PX001 at 19 n.11. A VTD split is "populated" when residents live on both sides of the split.

district is compact under § 2."). To objectively analyze the compactness of these districts, Mr. Cooper utilized two commonly-used tests in redistricting cases, "Reock" and "Polsby-Popper."[5] *See, e.g.*, *Fayette Cty.*, 950 F. Supp. 2d at 1308 (utilizing both tests in determining that plaintiffs met *Gingles*' compactness requirement). Based on these measurements, "compared to other statewide plan[s], the illustrative plans are clearly within the norm." PX001 ¶ 85. And while a proposed majority-minority district need not be as compact as the districts in an existing plan, *Fayette Cty.*, 950 F. Supp. 3d at 1308, the Reock and Polsby-Popper scores of Districts 2 and 7 in each plan are the same as or higher than the least compact district in the 2011 Plan. *See* PX059 fig. 11; *Houston v. Lafayette Cty., Miss.*, 56 F.3d 606, 611 (5th Cir. 1995) (reversing a district court's conclusion that plaintiffs' illustrative majority-minority district was not compact because, among other reasons, "the district in the plaintiff residents' proposed plan [wa]s not substantially less compact" than the districts in the existing and previous plans); *Terrebonne Parish*, 274 F. Supp. 3d at 424 (finding that the compactness of a proposed district "compares favorably both in terms of its shape and its geographical compactness to other surrounding electoral districts").

---

[5] Both tests provide a ratio comparing the size of each district with a circle, the ideally compact shape. PX001 at 33 nn.16, 17. For both, the measure is always between 0 and 1, with 1 being the most compact. *Id.*

Finally, the Illustrative Plans unite communities of interest that the 2011 Plan currently divides. The African-American communities in the Black Belt region share well-recognized historical, social, and economic ties. *See, e.g.*, *Ala. Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1036 (M.D. Ala. 2017) (referencing the Black Belt's "history of agriculture and slavery"); *see also Lynch ex rel. Lynch v. Alabama*, No. 08-S-450-NE, 2011 WL 13186739, at *30–43 (N.D. Ala. Nov. 7, 2011) (outlining the Black Belt's history); PX001 at 10 n.8. Indeed, the State has recognized these shared interests by placing the Black Belt counties in the same Alabama State Board of Education ("SBOE") district. *See* PX084 § IV.7.b (requiring both congressional and SBOE district plans to respect "[t]he integrity of communities of interest"); PX001 fig. 1. But under the 2011 Plan, that region is carved among three, or even four congressional districts, depending on one's selection among competing understandings of the region's contours. PX001 figs. 4, 10. The Illustrative Plans, by contrast, largely unite the Black Belt region within District 2, a district which would provide—for the first time—African-American voters in the Black Belt region the opportunity to elect their preferred candidates.

Defendant will offer little to combat Plaintiffs' showing under the first precondition's compactness criterion. Attempting to pull threads, Defendant and his experts pick and choose the criteria on which they allege Plaintiffs' plans fare worse

than the 2011 Plan. "But districting is hardly a science," and "there is more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles, even if not to the same extent or degree as some other hypothetical district." *Chen v. City of Houston*, 206 F.3d 502, 519 (5th Cir. 2000). For instance, Defendant's expert criticizes Plaintiffs' Illustrative Plans based exclusively on visual inspection of the districts' shapes—exactly the sort of analysis courts have long rejected in the context of a Section 2 claim. *Dillard v. Baldwin Cty. Bd. of Educ.*, 686 F. Supp. 1459, 1465–66 (M.D. Ala. 1988) ("An aesthetic norm, by itself, would be not only unrelated to the legal and social issues presented under § 2, it would be an unworkable concept, resulting in arbitrary and capricious results, because it offers no guidance as to when it is met."). Moreover, Defendant's contention that Plaintiffs' plans retain less of the "core" of the current districts is a red herring: where Plaintiffs are specifically tasked with drawing a *new* majority-minority district under the first precondition, they can hardly be faulted for failing to retain prior unlawful districts. *See* PX059 ¶¶ 21–22.

Contrary to Defendant's likely suggestion, "[t]he first *Gingles* precondition does not require some aesthetic ideal of compactness." *Houston*, 56 F.3d at 611 (quoting *Clark v. Calhoun Cty., Miss.*, 21 F.3d 92, 95 (5th Cir. 1994)). Instead, because Plaintiffs' illustrative majority-minority districts are consistent with

traditional districting principles, they satisfy the first *Gingles* precondition.

2.    ***Gingles* 2 and 3: African Americans in Central and Southern Alabama Are Politically Cohesive and the White Majority Votes as a Bloc Usually to Defeat African-American Candidates of Choice**

The second and third *Gingles* preconditions together ask whether racial bloc voting in the region usually results in the defeat of minority-preferred candidates. Here, it most certainly does.

Plaintiffs will establish the second *Gingles* precondition by showing that "a significant number of minority group members usually vote for the same candidates," and the third *Gingles* precondition by showing "a white bloc vote that normally [] defeat[s] the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Gingles*, 478 U.S. at 56. Because "[t]he amount of white bloc voting that can generally 'minimize or cancel' black voters' ability to elect representatives of their choice . . . will vary from district to district," no specific threshold percentage is required to demonstrate bloc voting. *Id.* (citation omitted).

Plaintiffs' expert, Dr. Maxwell Palmer, will testify that African Americans in central and southern Alabama vote cohesively in support of the same candidates, and that the white majority votes as a bloc usually to defeat their candidates of choice. Comparing results for congressional and statewide races in general elections

- 15 -

between 2012 and 2018 with voter registration data and voter files, Dr. Palmer applied a statistical procedure known as ecological inference to estimate the percentage of each racial group that voted for each candidate in each election examined in the counties either wholly or partially within CDs 1, 2, 3, and 7, which he refers to as the "Focus Area." PX079 ¶¶ 8, 10–13, 25.[6]

With respect to the second precondition, as Defendant concedes, "African Americans in the Focus Area vote cohesively for their candidates of choice." SF ¶ 104. Dr. Palmer's county-level analysis shows that between 2012 and 2018 African-American voters in the Focus Area supported the same candidates at an average rate of 94.1%. SF ¶ 102; PX079 ¶ 20. Under his precinct-level analysis, the rate was 98.3%. SF ¶ 103; PX079 ¶ 35. Dr. Palmer's analysis establishes that a "significant number" of African Americans in the Focus Area "usually vote for the same candidates," satisfying the second precondition. *Gingles*, 478 U.S. at 56; *see id.* at 59 (second precondition satisfied where 71% to 92% of African Americans voted for the same candidates); *LULAC*, 548 U.S. at 427 (92% cohesion).

---

[6] Courts have recognized ecological inference as an appropriate analysis for determining whether a plaintiff has satisfied the second and third *Gingles* preconditions. *See, e.g.*, *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 691 (S.D. Tex. 2017); *Benavidez v. City of Irving, Tex.*, 638 F. Supp. 2d 709, 723–24 (N.D. Tex. 2009); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1003 (D.S.D. 2004), *aff'd* 461 F.3d 1011 (8th Cir. 2006).

As for the third precondition, and as Defendant also concedes, in every election Dr. Palmer analyzed, African-American and white voters cohesively supported opposing candidates. SF ¶ 106. Dr. Palmer found that white voters supported the African-American-preferred candidate at an average rate of just 16.7% (county-level) and 17.4% (precinct-level). SF ¶¶ 107–08; PX079 ¶¶ 20, 35. Indeed, the average difference in support for the African-American-preferred candidate in the Focus Area was 80.9 percentage points, with comparable disparities in each of the examined districts. SF ¶¶ 109–113; PX079 ¶ 36. The outcome produced by this racially polarized voting was stark. In every single congressional election examined—except for those in CD 7, the State's only majority-African-American district—the white majority voted "as a bloc . . . to defeat the minority's preferred candidate," *Gingles*, 478 U.S. at 51. *See* PX079 ¶ 38. In statewide races, the white-preferred candidate defeated the African-American-preferred candidate in the Focus Area 16 of 18 times. SF ¶ 114; PX079 ¶ 23.[7] And in every congressional and statewide election, the white-preferred candidate defeated the African-American-preferred candidate in CDs 1, 2, and 3. PX079 ¶ 38.

In sum, African-American and white voters in central and southern Alabama

---

[7] In the two statewide contests in which the African-American-preferred candidate won in the Focus Area, the white-preferred candidate was Roy Moore. PX079 ¶ 24.

"consistently prefer different candidates," and outside CD 7, white voters "regularly defeat the choices of minority voters." *Gingles*, 478 U.S. at 48.

### B. The Totality of the Circumstances Shows That the 2011 Plan Dilutes African-American Voting Strength

Once the preconditions are met, the Court examines whether the "totality of circumstances" demonstrates vote dilution. *Fayette Cty.*, 775 F.3d at 1342. "[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of Section 2 under the totality of the circumstances." *Id.* at 1342 (quoting *Jenkins*, 4 F.3d at 1135). In fact, in a case where the *Gingles* preconditions are met but the court determines the totality of the circumstances does not show vote dilution, "the district court must explain with particularity why it has concluded, under the particular facts of that case, that an electoral system that routinely results in white voters voting as a bloc to defeat the candidate of choice of a politically cohesive minority group is not violative of § 2 of the Voting Rights Act." *Jenkins*, 4 F.3d at 1135.

While "[n]o formula for aggregating the [Senate F]actors applies in every case," *Marengo Cty.*, 731 F.2d at 1574, courts have set forth guidance regarding their comparative weight. "[T]he most important Senate Report factors . . . are the 'extent to which minority group members have been elected to public office in the jurisdiction' and the 'extent to which voting in the elections of the state or political

subdivision is racially polarized.'" *Gingles*, 478 U.S. at 48 n.15 (citation omitted). "Indeed, courts have found vote dilution based solely on the existence of these two factors." *Fayette Cty.*, 950 F. Supp. 2d at 1325. And while the presence of the other Senate factors might be supportive of a vote dilution challenge, they are "not essential to" such a claim. *Gingles*, 478 U.S. at 48 n.15.

This is not a "very unusual case." The trial evidence will show that the most important factors (2 and 7) are clearly met, and all other relevant factors also weigh in Plaintiffs' favor. *Marengo Cty.*, 731 F.3d at 1574 (reversing finding of no dilution where none of the factors "substantial[ly] weigh[ed] in favor of the defendants").

### Senate Factor 1: Alabama's History of Official Discrimination

"Alabama has a lengthy and infamous history of racial discrimination in voting." *United States v. McGregor*, 824 F. Supp. 2d 1339, 1346 (M.D. Ala. 2011). "[F]rom . . . 1901 to the present, the State of Alabama has consistently devoted its official resources to maintaining white supremacy and a segregated society." *Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1360 (M.D. Ala. 1986) (quoting *United States v. Alabama*, 252 F. Supp. 95, 101 (M.D. Ala. 1966)). This centuries-long pattern of discrimination, which persists through present day, continues to deny African Americans equal participation in the political process. Plaintiffs' expert, Dr. Peyton McCrary, will testify regarding Alabama's history of voting-related racial discrimination. Defendant has not disclosed any expert prepared to rebut Dr.

McCrary's testimony or opinions.

Dr. McCrary will testify about persistent efforts by Alabama politicians to prevent African Americans from participating equally—if at all—in the political process, and the brutal violence that has accompanied these efforts. For example, the drafters of Alabama's current Constitution were guided primarily by an intent "to establish white supremacy in this State." *Hunter v. Underwood*, 471 U.S. 222, 229 (1985); *see* PX081 ¶ 13. The founders of the Constitution crafted devices designed to prevent African Americans from voting: a literacy test, employment requirements, property qualifications, a cumulative poll tax, and a ban on voting by those convicted of minor crimes. PX081 ¶¶ 14, 15. These devices had a devastating impact on the African-American electorate: between 1900 and 1903, the number of black residents registered to vote in this State dropped from 181,000 to 3,000. *Id.* ¶ 16.

Against this backdrop, the past century has seen the State consistently warp its electoral procedures in response to court rulings in order to maintain white control of its political system. For example, after the Supreme Court invalidated white-only primaries, Alabama amended its Constitution to add an "understanding requirement" giving registrars broad discretion to reject African Americans' attempts to register to vote. *Id.* ¶ 18. After that provision was invalidated, the State re-imposed a literacy test to achieve the same goal. *Id.* ¶¶ 20, 21. Simultaneously, counties began holding

at-large elections, preventing African Americans—outnumbered by white voters—from electing their candidates of choice. *Id.* Recognizing that African-American voters could nonetheless consolidate their support behind a single candidate, the State enacted in 1951 a law prohibiting "single shot voting" in municipal elections. *Id.* ¶ 23; *City of Rome v. United States*, 446 U.S. 156, 184 n.19 (1980) ("Single-shot voting enables a minority group to win some at large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates."). In 1961, Alabama required all at-large elections in the State to utilize "numbered places," similarly preventing African Americans from consolidating their voting power behind one candidate. PX081 ¶¶ 24, 27; *see City of Rome*, 446 U.S. at 185 n.21 (numbered-post systems "separate[] one contest into a number of individual contests" to the detriment of minority voters). Officials also often engaged in more targeted discrimination: in 1957, for example, the State redrew the City of Tuskegee's boundaries to exclude African-American voters, giving only white residents the ability to vote in municipal elections. *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

In 1965, after national coverage of Dallas County officials' violent attacks against voting-rights advocates on "Bloody Sunday" gave the country a glimpse of the State's fierce resistance to minority voting rights, President Johnson introduced

and ultimately signed the VRA. Despite that law's protections, Alabama continued to engage in practices meant to deny African Americans political equality. Between 1965 and 1982, the United States Department of Justice ("DOJ") objected 58 times to proposed changes to election practices or procedures in Alabama on the basis that they infringed upon minority voting rights, and it sent election observers to the State on 107 occasions. PX081 ¶ 31. Between 1982 and 2006, DOJ objected to 46 such changes and sent federal observers 91 times. *Id.* ¶ 33. Federal courts during this time also repeatedly found that Alabama jurisdictions had intentionally diluted African-American voting strength. *See Brown v. Bd. of Sch. Comm'rs of Mobile Cty., Ala.*, 706 F.2d 1103 (11th Cir. 1983) (holding the City of Mobile's at-large elections were the result of intentional discrimination); *Buskey v. Oliver*, 565 F. Supp. 1473 (M.D. Ala. 1983) (finding the City of Montgomery's districts intentionally discriminatory); *see also Hale Cty., Ala. v. United States*, 496 F. Supp. 1206 (D.D.C. 1980); *Harris v. Graddick*, 593 F. Supp. 128, 133 (M.D. Ala. 1984); *Dillard*, 640 F. Supp. 1347.

After both the 1980 and 1990 Censuses, DOJ objected to districting plans proposed by the State because they diluted African-American voting strength. PX081 ¶¶ 37–38. Notably, after litigation forced the State to create its first majority-minority congressional district in 1992, DOJ objected to a resulting plan because it packed African-American voters into one district and "fragmented" others among

the rest. PX104 at 1–2. To ameliorate that fragmentation, DOJ suggested that the State adopt a plan strikingly similar to what Plaintiffs' propose here: "one district based on the black communities of Montgomery and Mobile Counties, and the other based upon the black population of Jefferson County and southern Tuscaloosa County, together with black-populated areas to the south and west." *Id.* at 2.

In the last decade, Alabama officials have continued to block equal access to the political process. In 2010, Alabama state senators schemed to depress black turnout by keeping a referendum issue off an upcoming ballot. *McGregor*, 824 F. Supp. 2d at 1345. The officials referred to African Americans as "Aborigines" and joked that if the issue were on the ballot, "[e]very black, every illiterate would be bused on HUD financed buses" to vote. *Id.* This prompted a federal judge to despair:

> In an era when the degree of racially polarized voting in the South is increasing, not decreasing, Alabama remains vulnerable to politicians setting an agenda that exploits racial differences. The[se statements] represent compelling evidence that political exclusion through racism remains a real and enduring problem in this State. Today, . . . it is still clear that such [racist] sentiments remain regrettably entrenched in the high echelons of state government.

*Id.* at 1347.

Even more recently, the Supreme Court's invalidation of the VRA's preclearance formula catalyzed the State's discriminatory tactics. Immediately after *Shelby County, Ala. v. Holder* was issued, for example, Defendant Merrill began enforcing a voter-ID law that disproportionately burdens African-American voters.

PX081 ¶ 36. Soon after, the State closed 31 driver's license offices in African-American communities, making it more difficult for American Americans to acquire the identification necessary to vote. *Id.* And less than six months after *Shelby County*, the City of Evergreen consented to being "bailed-in" for preclearance under Section 3(c) of the VRA because its voter registrars and election officials unconstitutionally discriminated against African-American voters. *Allen v. City of Evergreen, Ala.*, No. 13-cv-107-CG-M, 2014 WL 12607819 (S.D. Ala. Jan. 13, 2014).[8]

In short, "[t]he intersection of political strategy and purposeful racial prejudice" in Alabama "is nothing new." *McGregor*, 284 F. Supp. 2d at 1347. This history has, and will continue to have, a lasting effect on African Americans' ability to participate in the political process on an equal basis. Thus, the evidence on this factor will weigh heavily in favor of Plaintiffs' vote dilution claim.

### Senate Factor 2: Racially Polarized Voting

"Although no factor is indispensable, . . . racially polarized voting will ordinarily be the keystone of a dilution case." *McMillan v. Escambia Cty., Fla.*, 748 F.2d 1037, 1043 (Former 5th Cir. 1984). With respect to Senate Factor 2, Plaintiffs

---

[8] Section 3(c) is a "rarely used" and powerful form of relief, *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016), allowing a court to mandate that a jurisdiction obtain preclearance from federal authorities before implementing any change in voting practice or procedure. 52 U.S.C. § 10302(c).

incorporate by reference Section III.A.2, *supra*, regarding the second and third *Gingles* preconditions.

### Senate Factor 3: Use of Voting Practices or Procedures That Enhance the Opportunity for Discrimination

As discussed in Section III.B.1, *supra*, Alabama has utilized various practices and procedures specifically intended to dilute African-American voting strength. These include at-large elections, anti-single shot voting laws, numbered-place requirements, and majority-vote requirements. Even today, Alabama runs statewide at-large elections for seats on its Supreme Court, Court of Criminal Appeals, and Court of Civil Appeals. SF ¶ 136. And the State continues to impose a majority-vote requirement in its primary elections. SF ¶ 137. The undisputed evidence on this factor therefore weighs heavily in favor of vote dilution.

### Senate Factor 4: Exclusion from Slating Process

Because there is no slating process involved in Alabama's congressional elections, SF ¶ 138, this factor has no relevance to Plaintiffs' claim.

### Senate Factor 5: Effects of Discrimination

The pervasive discrimination African Americans in Alabama have experienced—which, for most of the State's history "manifested . . . in practically every area of political, social and economic life"—has caused persistent disparities between the day-to-day lives of African Americans and white residents in the State.

PX081 ¶¶ 11, 55. Defendant has conceded that there are severe disparities between African-American and white Alabamians in the areas of income and poverty, SF ¶¶ 139–143; educational attainment, SF ¶¶ 144–45; employment, SF ¶¶ 146–47; housing, SF ¶¶ 148, 150; access to a vehicle, SF ¶ 149; and health insurance coverage, SF ¶ 151; *see also* PX001 ¶ 102.[9]

These disparities have diminished political participation among African Americans in Alabama. Indeed, Defendant's own expert has found that since 2010, the statewide turnout rate among African-American voters has been, on average, 4.8% lower than that of white voters. Def.'s Exh. 11 tbl. 7; *see* SF ¶ 154. Where "disproportionate educational, employment, income level and living conditions . . . are shown and where the level of black participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation." *Wright v. Sumter Cty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1320 (M.D. Ga. 2018) (internal quotation marks omitted); *McMillan*, 748 F.2d at 1044 (same). And even though Defendant has disclosed no evidence that could make such a showing,

---

[9] Defendant's only response to this evidence is to suggest that similar disparities exist in other states. Even if true, that fact is completely irrelevant to the analysis before the Court. *Gingles*, 478 U.S. at 79 (requiring "an intensely *local appraisal* of the design and impact *of the contested electoral mechanism*[]" (emphases added) (internal quotation marks omitted)).

Dr. McCrary will explain that those with lower household income or lower educational achievement are less likely to vote or engage politically because the burdens of doing so are much higher for them compared to those with greater wealth and educational achievement. PX081 ¶ 56. In fact, "it is well established that an individual's education level is the single best indicator of whether that individual will vote." *Id.*

### Senate Factor 6: Racial Appeals in Campaigns

The sixth Senate Factor examines whether Alabama's elections have been characterized by "overt or subtle racial appeals." *Gingles*, 478 U.S. at 37 (quoting S. Rep. at 28–29). Racial appeals can take a variety of forms, from candidates' identification of their own ethnicity, *see United States v. Alamosa Cty. Colo.*, 306 F. Supp. 2d 1016, 1025-26 (D. Colo. 2004), to the use of racially charged campaign issues, *see Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 956 F. Supp. 326, 342 (E.D.N.Y. 1997) (finding Senate Factor 6 established where campaign literature preyed on fears that African-American students would be bused to town schools and warned of urban encroachment from New York City).

Racial appeals are all too common in Alabama. Plaintiffs' witnesses will testify about such appeals and the effect they have on Alabama's politics. For instance, in 2011, Alabama Congressman Mo Brooks told residents at a town hall meeting that he would do anything short of shooting undocumented immigrants in

order to remove them from the United States. Just a few years later, Brooks again resorted to racial appeals by asserting on national television that President Barack Obama was leading a "war on whites." He repeated a similar assertion in 2017 on a local Alabama radio show. The campaign preceding the 2017 special election for Alabama's U.S. Senate seat also included explicit racial appeals. Candidate Roy Moore complained about civil rights protections implemented in this country in 1965, the year the VRA was enacted. When asked to name a time that he believed America was great, Moore pointed to this country's pre-civil war era, stating that even though African Americans were enslaved, he thought that families were united.

The candidates who ultimately won the highest positions in the State's judicial and executive branches in 2018 also engaged in racial appeals. Alabama Supreme Court Justice Tom Parker's campaign for Chief Justice ran a television ad warning of "an invasion" of the State coupled with videos of what appear to be dark-skinned immigrants and a statement that Parker stood up for what "we" believe, and stood for "us." PX085. He also ran an ad touting the fact that he had "taken on and beaten" the ACLU and the Southern Poverty Law Center, organizations whose mission is to protect the civil rights of racial and ethnic minorities. PX086. At the same time, Kay Ivey made the preservation of confederate monuments a centerpiece of her gubernatorial campaign. *See Jordan v. Winter*, 604 F. Supp. 807, 813 n.8 (N.D. Miss.

1984) (describing as a racial appeal a white candidate's campaign ad with the slogan "He's one of us" and showing videos of Confederate monuments).

As Plaintiffs' witnesses will testify, such racial appeals divide the electorate along racial lines, spark animosity, and capitalize upon unfounded fears based on racial stereotypes.

### Senate Factor 7: Extent to Which African Americans Have Been Elected to Office

This factor considers "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37 (quoting S. Rep. at 28–29). As Defendant concedes, Alabama has never had more than one African-American congressional representative—and no African American since Reconstruction has been elected to the U.S. House of Representatives outside of CD 7. SF ¶ 156. No African American has ever been elected to the U.S. Senate from Alabama, and there are currently no African-American statewide officials. SF ¶¶ 157, 158. In fact, just two African Americans have *ever* been elected to statewide office in Alabama, both of whom won as incumbents running for reelection after first being appointed. SF ¶ 159. Finally, the "overwhelming majority" of African-American representatives in the Alabama Legislature come from majority-minority districts. SF ¶ 160. In short, Senate Factor 7 weighs strongly in favor of vote dilution.

\*     \*     \*

The evidence cited above with respect to the Senate Factors are matters of objective, historical fact, that vast majority of which Defendant does not dispute. At trial, Plaintiffs' fact witnesses will illuminate these cold hard facts by sharing their own experiences regarding race relations and voting discrimination. Together, the evidence will demonstrate that the 2011 Plan "interacts with social conditions" in Alabama "to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred candidates." *Gingles*, 478 U.S. at 47.

## IV. Responses to Anticipated Arguments by Defendant

Rather than present evidence rebutting Plaintiffs' showing under the applicable legal standard for Section 2 claims, Defendant will attempt to foist additional legal burdens on Plaintiffs, suggesting Plaintiffs must prove something *in addition* to the *Gingles* preconditions and the totality of the circumstances test set forth above. Any such argument fails on both the law and the facts.

### A. Racial Gerrymandering

Defendant will likely contend that Plaintiffs' plans fail *Gingles* 1 because they constitute "racial gerrymanders." This argument squarely contradicts governing Section 2 case law. As the Eleventh Circuit has explained, racial gerrymandering cases and Section 2 cases "address very different contexts." *Davis*, 139 F.3d at 1425. "The question under the first prong of *Gingles* in a § 2 case of whether the district was created 'consistent with traditional districting principles' is distinct from" the

- 30 -

question posed in racial gerrymandering cases "of whether in drawing district lines traditional districting principles were 'subordinated to racial objectives.'" *Fayette Cty.*, 950 F. Supp. 2d at 1307 (quoting *Davis*, 139 F.3d at 1425). Thus, "based on the directives of the Supreme Court and the Eleventh Circuit," a district court adjudicating a State's Section 2 liability "considers only the first question." *Id.*

Defendant's conflation of the Section 2 and racial gerrymandering doctrines ignores that "the Supreme Court and Eleventh Circuit's 'precedents *require* plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate.'" *Id.* at 1306 (quoting *Davis*, 139 F.3d at 1425). In other words, "[t]he intentional creation of a majority-minority district *necessarily requires consideration of race*." *Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1345 (N.D. Ga. 2015) (emphasis added). "To penalize [Plaintiffs] . . . for attempting to make the very showing that *Gingles* . . . demand[s] would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two claim." *Davis*, 139 F.3d at 1425. As a result, courts adjudicating a Section 2 claim should "not determine as part of the first *Gingles* inquiry whether Plaintiffs' Illustrative Plan[s] subordinate[] traditional redistricting principles to race." *Fayette Cty.*, 950 F. Supp. 2d at 1306.

- 31 -

Whether any particular district is a racial gerrymander becomes relevant only *after* liability has been established, when the Court determines the proper remedial plan. *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1401 (E.D. Wash. 2014) ("If Defendants believe that the present proposal cannot pass muster under the Equal Protection Clause, they may raise that issue during the remedial phase of the proceedings."). Of course, the Court is under no obligation to use a plaintiff's proposed plan when choosing a remedy. *Clark*, 21 F.3d at 95 ("[P]laintiffs' proposed district is not cast in stone. It was simply presented to demonstrate that a majority-black district is feasible in [the jurisdiction].").[10] Accordingly, any assertion by Defendant at *this* stage in this litigation that a particular illustrative plan is a racial gerrymander is not ripe for review because liability has not yet been established.[11] And notwithstanding the fundamental flaws in Defendant's legal theory, Mr. Cooper will testify that race did not predominate in his drawing of the Illustrative Plans. Rather, race was one of a host of considerations he applied when drawing plans to satisfy *Gingles* 1 consistent with traditional districting principles. PX001 ¶¶ 51–52.

---

[10] At the remedial stage, so long as the new majority-minority district does not "override all other traditional districting principles any more than reasonably necessary to remedy the violation," that remedy district is permissible. *Sanchez v. Colorado*, 97 F.3d 1303, 1327 (10th Cir. 1996).

[11] Notably, this Court has already denied Plaintiffs' claim for injunctive relief and the adoption of a remedial plan. *See* ECF No. 52.

In any event, even if one assumed "for the sake of argument that [a] proposed redistricting plan must survive strict scrutiny under an equal protection analysis because it favors race over all other traditional districting criteria, that does not preclude a finding of liability for a § 2 violation" because "it is possible that a district created to comply with § 2 that uses race as the predominant factor in drawing district lines may survive strict scrutiny." *Montes*, 40 F. Supp. 3d at 1400–01 (quoting *Fayette Cty.*, 950 F. Supp. 2d at 1306). After all, "a majority of the Supreme Court has assumed that the need to remedy a Section Two violation itself constitutes a compelling state interest" sufficient to justify race-based redistricting. *Davis*, 139 F.3d at 1425 n.23. In other words, even if racial predominance were relevant to the Section 2 inquiry (it is not), and even if race did predominate in the drawing of the Illustrative Plans (it did not), the Equal Protection Clause imposes no bar on race-based redistricting *where it is done pursuant to the compelling state interest of complying with Section 2. See Fayette Cty.*, 950 F. Supp. 2d at 1305–06.

## B.    Functionality of Illustrative Districts

As explained above, *Gingles* 1 does not require Plaintiffs to establish that their illustrative majority-minority districts will in fact elect minority-preferred candidates; they need only show an *opportunity* to elect. *See supra* Section III.A.1.a. In any event, here it is beyond dispute that Districts 2 and 7 under the Illustrative Plans would provide an opportunity for African Americans to elect their candidates

of their choice. After analyzing seven contested statewide races in the most recent general election, Dr. Palmer found that African Americans' candidates of choice received *at least 58% of the vote* in Districts 2 and 7 under each of the Illustrative Plans, with African Americans comprising a majority of actual voters in each of these districts. PX080 ¶¶ 8, 11. Defendant's experts have offered no evidence that would call these findings into question. *See* SF ¶¶ 162–64.

## C.  Race-Neutral Causes of Vote Dilution

Nor can Defendant import additional requirements for Plaintiffs' showing under *Gingles* 2 and 3. "[T]he legal concept of racially polarized voting, as it relates to claims of vote dilution, refers only to the existence of a correlation between the race of voters and the selection of certain candidates," and "[p]laintiffs need not prove causation or intent in order to prove a prima facie case of racial bloc voting and defendants may not rebut that case with evidence of causation or intent." *City of Carrollton Branch of N.A.A.C.P. v. Stallings*, 829 F.2d 1547, 1557–58 (11th Cir. 1987) (quoting *Gingles*, 478 U.S. at 74 (plurality opinion)). In other words, the reasons *why* voters in the jurisdiction exhibit racially polarized voting is irrelevant to Plaintiffs' Section 2 claim. *Gingles*, 478 U.S. at 63 (plurality opinion). It thus goes without saying that Plaintiffs are not required "to prove racism determines the voting choices of the white electorate in order to succeed in a voting rights case." *Askew v. City of Rome*, 127 F.3d 1355, 1382 (11th Cir. 1997); *Fayette Cty.*, 950 F. Supp. 2d

at 1321 n.29 (plaintiffs "are not required to prove[] racial animus" within the electorate). While "two judges of th[e Eleventh Circuit] consider racial bias in the voting community to be a relevant factor," *Johnson v. Hamrick*, 196 F.3d 1216, 1220 (11th Cir. 1999) (citing *Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994) (en banc) (plurality opinion of Tjoflat, C.J.)), no majority of the court has endorsed this view. And even those two judges have not suggested that a plaintiff must show that racial bias is the source of racially polarized voting. *Nipper*, 39 F.3d at 1525 n.64 (explaining that a plaintiff "would be under no obligation to search [race-neutral explanations for racially polarized voting] out and disprove them preemptively").

Even if racial bias in the electorate was relevant here, Defendant would have "the obligation to introduce evidence" and "affirmatively prove, under the totality of the circumstances, that racial bias does *not* play a major role in the political community." *Id.* at 1524–26 & nn.60, 64 (emphasis added); *Fayette Cty.*, 950 F. Supp. 2d at 1321 (when "Plaintiffs have proved the *Gingles* factors, it is up to the . . . Defendant[] to rebut Plaintiffs' proof of vote dilution"). That is no small feat, as "proof of the second and third *Gingles* factors will ordinarily create a sufficient inference that racial bias is at work." *Nipper*, 39 F.3d at 1525. In fact, the Eleventh Circuit has stated that "[t]he surest indication of race-conscious politics is a pattern of racially polarized voting." *Marengo Cty.*, 731 F.2d at 1567.

D.     **Section 5 of the Voting Rights Act**

Defendant will erroneously seek refuge in Section 5 of the VRA by arguing that in adopting the 2011 Plan, Alabama legislators were concerned that a congressional plan with two majority-minority districts would not have been precleared. At the time the 2011 Plan was adopted, Alabama was subject to Section 5's preclearance regime, which would have prohibited the State from enacting a congressional plan with "the effect of diminishing the ability of [African Americans] to elect their preferred candidates of choice." 52 U.S.C. § 10304(b).

As an initial matter, Section 5's anti-retrogression principle cannot serve as a defense to Plaintiffs' claim. Because Plaintiffs are asserting an effects-based Section 2 claim, the intent of those who drew the 2011 Plan is completely irrelevant. *Fayette Cty.*, 775 F.3d at 1342. Thus, it makes no difference whether those who drew the 2011 Plan were concerned—correctly or incorrectly—that a plan with two majority-minority districts might not have passed preclearance. The good faith intent of the mapdrawers does not inoculate a claim under Section 2's results test.

But even if Section 5 could serve as a defense to a Section 2 claim, the evidence at trial will demonstrate that Section 5 posed no obstacle to Alabama enacting a congressional plan with two majority-minority districts. As Dr. Palmer's functionality analysis demonstrates, the creation of an additional majority-minority district would have *expanded*—not diminished—African Americans' opportunities

- 36 -

to elect their preferred candidates. SF ¶ 164; PX080 ¶¶ 8, 11.

For the same reason, Alabama's choice to *increase* CD 7's BVAP in the 2011 Plan from what it was in the 2001 Plan cannot be explained as an attempt to avoid retrogression. Between 2002 and 2010, African-American-preferred candidates won CD 7 by over *45 percentage points*. PX087–091. Alabama did not need to maintain, let alone increase, the BVAP in CD 7 to ensure that African Americans in that district would continue to elect their candidates of choice. *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1272 (2015) ("Section 5 . . . does not require a covered jurisdiction to maintain a particular numerical minority percentage."); *id.* at 1273 (criticizing Alabama's "mechanically numerical view as to what counts as forbidden retrogression"). "Nonretrogression is not a license for the State to do whatever it deems necessary to ensure continued electoral success; it merely mandates that the minority's opportunity to elect representatives of its choice not be diminished, directly or indirectly, by the State's actions." *Bush v. Vera*, 517 U.S. 952, 982–83 (1996). Alabama's choice in 2011 to increase the concentration of African-American voters in CD 7 thus had no connection to Section 5's anti-retrogression requirement.

## V.    Conclusion

The evidence at trial will demonstrate that the 2011 Plan dilutes the voting strength of African-American Alabamians in violation of Section 2 of the VRA.

Dated:  October 28, 2019

Richard P. Rouco (AL Bar. No.
6182-R76R)
**Quinn, Connor, Weaver, Davies
& Rouco LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
Email: rrouco@qcwdr.com

Respectfully submitted,

By /s/ *Bruce V. Spiva*
Marc E. Elias (admitted *pro hac vice*)
Bruce V. Spiva (admitted *pro hac vice*)
Uzoma N. Nkwonta (admitted *pro hac vice*)
Aria C. Branch (admitted *pro hac vice*)
Lalitha D. Madduri (admitted *pro hac vice*)
Daniel C. Osher (admitted *pro hac vice*)
**Perkins Coie LLP**
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6200
Fax: (202) 654-9106
Email: MElias@perkinscoie.com
Email: BSpiva@perkinscoie.com
Email: UNkwonta@perkinscoie.com
Email: ABranch@perkinscoie.com
Email: LMadduri@perkinscoie.com
Email: DOsher@perkinscoie.com

Abha Khanna (admitted *pro hac vice*)
**Perkins Coie LLP**
1201 Third Avenue, Ste. 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
Email: AKhanna@perkinscoie.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 28, 2019, I filed a copy of the foregoing

Plaintiffs' Pretrial Brief with the Clerk of the Court using the CM/ECF system,

which will send notification of such filing to all counsel of record.

/s/ Bruce V. Spiva
Bruce V. Spiva
**Perkins Coie LLP**
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
Email: BSpiva@perkinscoie.com