UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| LAKEISHA CHESTNUT, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 2:18-cv-00907-KOB |
| v. ) | |
| ) | |
| JOHN H. MERRILL, in his official ) | |
| Capacity as Alabama Secretary of State ) | |
| ) | |
| Defendant. ) | |

## PLAINTIFFS' RESPONSE TO
## DEFENDANT'S ASSERTION OF MOOTNESS

Defendant's claim that the Court's laches decision rendered this case moot ignores the significant effect a declaratory judgment in this case would have on the State's redistricting process following the 2020 Census. "A case becomes moot only when it is impossible for a court to grant *any effectual relief whatever* to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (emphasis added) (internal quotation marks omitted). That is not the case here, where Plaintiffs seek a declaratory judgment that Alabama's current congressional plan does not provide African Americans an equal opportunity to participate in the political process and elect their preferred candidates in violation of Section 2 of the Voting Rights Act, which can prevent future dilution of Plaintiffs'

voting strength. Because Plaintiffs still "have a concrete interest, however small, in the outcome of th[is] litigation, the case is not moot." *Id.* at 307–08 (quoting *Ellis v. Bhd. of Ry., Airline and S.S. Clerks*, 466 U.S. 435, 442 (1984)).

As an initial matter, Defendant bears the burden to demonstrate that this case has become moot. *World Wide Supply OU v. Quail Cruises Ship Mgmt.*, 802 F.3d 1255, 1259 (11th Cir. 2015) ("The burden of establishing mootness rests with the party seeking dismissal."); *see also* 15 James Wm. Moore et al., Moore's Federal Practice Civil ¶ 101.101 (explaining that "[t]he burden of establishing mootness rests on the party raising the issue"). And "[a]s the Supreme Court has made clear, the 'burden of demonstrating mootness is a heavy one.'" *Dupree v. Palmer*, 284 F.3d 1234, 1237 (11th Cir. 2002) (per curiam) (quoting *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). Here, Defendant has not proven that, under the facts of this case, a declaratory judgment that the current congressional plan violates the Voting Rights Act would give no "effectual relief whatever" to Plaintiffs. *Knox*, 567 U.S. at 307.

Even without the possibility of injunctive relief, this dispute "is still unresolved and hotly contested by clearly adverse parties," and a resolution of this dispute will affect the State's behavior in the near future. *Powell v. McCormack*, 395 U.S. 486, 498 (1969); *see also id.* at 499 ("A court may grant declaratory relief even though it chooses not to issue an injunction . . ."). A declaratory judgment in

Plaintiffs' favor would significantly impact the 2021 redistricting process: if the Court declares that Alabama's current congressional map dilutes African-American voting strength in central and southern Alabama in violation of the Voting Rights Act, the State will remedy that dilution when it redraws the congressional map following the 2020 Census. After all, the State's redistricting guidelines have consistently required that any congressional plan adhere to the Voting Rights Act. *See* Pls.' Trial Ex. 83 at 263 (Bates Stamp Chestnut Defense 0263); Pls.' Trial Ex. 84 at 2. Similarly, if the Court determines that the current congressional plan is unlawful, the Alabama Legislature will have no legitimate basis to use the current congressional map as a starting point when it redraws the districts in 2021. Thus, "[e]ven if an injunction is unwarranted, an adjudication as to whether the events at issue in this litigation establish" a violation of the Voting Rights Act would "aid the parties in understanding" the State's obligations as this dispute continues beyond the 2010 redistricting cycle. *Verizon New England, Inc. v. Int'l Broth. of Elec. Workers, Local No. 2322*, 651 F.3d 176, 190 (1st Cir. 2011) (quoting *Bituminous Coal Operators' Ass'n, Inc. v. Int'l Union, United Mine Workers of Am.*, 585 F.2d 586, 595 (3d Cir. 1978)); *see also Int'l Ass'n of Machinists & Aerospace Workers, Local Lodge 964 v. BF Goodrich Aerospace Aerostructures Grp.*, 387 F.3d 1046, 1050 (9th Cir. 2004) (explaining that when challenged provisions of a collective bargaining agreement are "renew[ed] without material modification" such that the

"provisions in question otherwise continue to impact the parties' ongoing relationship, an action seeking a declaratory judgment concerning the legality of such provisions is appropriately subject to continued federal jurisdiction").

Defendant's argument to the contrary, which is based on the assertion that one cannot know whether Alabama's post-2020 congressional map will resemble the current one, squarely contradicts his position on the merits of this case. While Defendant is correct that, as a legal matter, in the wake of *Shelby County v. Holder*, 570 U.S. 529 (2013), the State need not redistrict by reference to the "benchmark" plan, as a practical matter the current plan will be the starting point for the 2021 redistricting process, particularly in light of Defendant's repeated assertions that "core retention" is a primary criterion according to which Alabama draws its congressional districts. At trial, former Senator Gerald Dial claimed that despite the State's removal of the only mention of core retention from its list of redistricting guidelines in 2011, it nonetheless remains an important redistricting principle. 3 Trial Tr. 633:17–634:8. Defendants' experts have criticized Plaintiffs' illustrative plans for failing to "preserve" enough of the current districts' cores, despite the fact that Section 2 *requires* a plaintiff to alter significantly the existing map by creating a new hypothetical district. 5 Trial Tr. 877:6–878:5; 991:13–992:22; Def.'s Trial Ex. 11 at 5–6; Def.'s Trial Ex. 13 at ¶¶ 25–32. And Defendant has pointed to the relative stability of the State's congressional district configurations in the last 50 years as a

reason the Court should overlook the vote dilution that results from the current map. *See, e.g.*, Def.'s Pre-Trial Br., ECF No. 101, at 2; 3 Trial Tr. 641:16–642:20. In asserting mootness, however, Defendant suddenly disavows any State interest in core retention by arguing that "[w]e can only guess" at how the State might draw its congressional districts after the 2020 Census. Def.'s Pre-Trial Br. at 13. Alabama's post-2020 congressional map, Defendant claims, depends on "presently unknown conditions," and "[h]ow those districts can and will be shaped is speculation at this time." *Id.* at 14. But if core retention is as important to the State as Defendant and his witnesses have claimed it to be, we know that Alabama's post-2020 congressional map will look very much like the current configuration. Core retention either is an important redistricting principle in Alabama, or it is not—Defendant cannot have it both ways.

While Defendant attempts to resolve this contradiction by asserting that population shifts since 2010 will require a material alteration of the current district configuration, *see* Def.'s Pre-Trial Br. at 13–14, 16–17, it is Defendant's burden to prove, with actual evidence, that such shifts are so dramatic that the State will abandon its purported interest in core retention come 2021. *World Wide Supply OU*, 802 F.3d at 1259. Yet, at trial, Defendant took the position that evidence relating to post-2010 population shifts was irrelevant, even though Plaintiffs' counsel argued

that such evidence was relevant to the mootness issue. *See* 1 Trial Tr. 36:11–38:14.[1] It would be quite unfair to credit the bald assertions in Defendant's brief regarding post-2010 population shifts after Plaintiffs were precluded at trial from offering actual evidence in response.

In any event, what evidence there is in the trial record relevant to this issue weighs heavily against Defendant's argument, as it indicates that two majority-minority congressional districts could be drawn after 2020 in a manner similar to what Plaintiffs propose in their illustrative plans. Defendant does not dispute that between 2010 and 2017, the African-American population in Alabama increased—accounting for well more than half of the State's total population growth—while during the same period the non-Hispanic White population decreased. *See* Joint List of Agreed and Disputed Principal Facts, ECF No. 95, at ¶¶ 47–48. In fact, Defendant's expert Dr. Hood states that the "notable BVAP growth" in Alabama during this time occurred in Jefferson, Mobile, Montgomery, and Tuscaloosa Counties, all of which are included in the majority-minority districts in Plaintiffs' illustrative plans. Def.'s Trial Ex. 11 at 12. And as Mr. Cooper's report explains, this population growth among African Americans "more than offsets" any population

---

[1] When Defendant later attempted to offer his own evidence in support of this argument, *see* 5 Trial Tr. 889:8–17, he was prevented from doing so because his counsel had already argued that Plaintiffs should not be permitted to offer their evidence on this issue, 5 Trial Tr. 890:1–3.

loss in the Black Belt counties. Pls.' Trial Ex. 1 at ¶ 97. These undisputed facts, at a minimum, preclude a conclusion that Defendant has *proven* that a declaratory judgment in Plaintiffs' favor would have absolutely no effect on the State's post-2020 redistricting process.[2]

In sum, Defendant has failed to demonstrate that a declaratory judgment finding that Alabama's current congressional plan violates the Voting Rights Act would have no impact on the outcome of the post-2020 redistricting process. Alabama has consistently required that the Legislature devise congressional plans that comply with the Voting Rights Act. A judgment in Plaintiffs' favor in this case would thus cause the State to remedy the vote dilution Plaintiffs currently experience when it redraws its congressional lines following the 2020 Census. Because Plaintiffs retain this "concrete interest . . . in the outcome of th[is] litigation, the case is not moot." *Knox*, 567 U.S. at 307–08.

---

[2] To the extent Defendant claims that Alabama is likely to lose a congressional seat after the 2020 Census, he offered no evidence at trial supporting that assertion other than conclusory, unsupported statements by his experts that this is a "possibility" or that it is "predicted" to occur. Def.'s Trial Ex. 11 at 12; Def.'s Trial Ex. 13 at ¶ 35.

Dated:  November 22, 2019

Richard P. Rouco (AL Bar. No. 6182-R76R)
**Quinn, Connor, Weaver, Davies & Rouco LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
Email: rrouco@qcwdr.com

Respectfully submitted,

By /s/ *Bruce V. Spiva*
Marc E. Elias (admitted *pro hac vice*)
Bruce V. Spiva (admitted *pro hac vice*)
Uzoma N. Nkwonta (admitted *pro hac vice*)
Aria C. Branch (admitted *pro hac vice*)
Lalitha D. Madduri (admitted *pro hac vice*)
Daniel C. Osher (admitted *pro hac vice*)
**Perkins Coie LLP**
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6200
Fax: (202) 654-9106
Email: MElias@perkinscoie.com
Email: BSpiva@perkinscoie.com
Email: UNkwonta@perkinscoie.com
Email: ABranch@perkinscoie.com
Email: LMadduri@perkinscoie.com
Email: DOsher@perkinscoie.com

Abha Khanna (admitted *pro hac vice*)
**Perkins Coie LLP**
1201 Third Avenue, Ste. 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
Email: AKhanna@perkinscoie.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2019, I filed a copy of the foregoing Plaintiffs' Response to Defendant's Assertion of Mootness with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

>*/s/ Bruce V. Spiva*
>Bruce V. Spiva
>**Perkins Coie LLP**
>700 13th St. N.W., Suite 600
>Washington, D.C. 20005-3960
>Phone: (202) 654-6338
>Fax: (202) 654-9106
>Email: BSpiva@perkinscoie.com