FILED
2019 Dec-13  PM 03:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| LAKEISHA CHESTNUT, et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| vs. | ) CASE NO. 2:18-CV-00907-KOB |
| | ) |
| JOHN H. MERRILL, | ) |
| | ) |
|     Defendant, | ) |

## DEFENDANT'S POST-TRIAL BRIEF

James W. Davis (ASB-4063-I58J)
*Deputy Attorney General*
Laura E. Howell (ASB-0551-A41H)
*Assistant Attorney General*

Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
jimdavis@ago.state.al.us
lhowell@ago.state.al.us

Dorman Walker (ASB-9154-R81J)
Balch & Bingham LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
dwalker@balch.com

December 13, 2019

8070509.2

## Table of Contents

Table of Authorities ................................................................................... ii

I.      Introduction.................................................................................1

II.     This case is moot .........................................................................2

III.    Plaintiffs failed to satisfy the *Gingles* prerequisites .........................................5

    A.      Plaintiffs' illustrative plans fail to observe communities of interest ....6

    B.      Plaintiffs' plans are unconstitutional racial gerrymanders.................11

    C.      A plan with two majority-minority Congressional districts would not have been precleared because it would have diminished the opportunity of minority voters to elect their candidate of choice...........................14

    D.      A note on the Gingles prerequisites 2 and 3 (polarized voting) .........18

IV.     Totality of the Circumstances .......................................................19

V.      Conclusion ...............................................................................26

Certificate of Service ...............................................................................28

# Table of Authorities

## Cases

*Abrams v. Johnson*,
521 U.S. 74 (1997).......................................................................................6, 13

*Bethune-Hill v. Virginia State Bd. of Elections*,
137 S. Ct. 788 (2017) ...................................................................................12

*Bush v. Vera*,
517 U.S. 952 (1996).................................................................................11, 13

*City of Mobile, Ala. v. Bolden*,
446 U.S. 55 (1980).........................................................................................21

*Davis v. Chiles*,
139 F.3d 1414 (11th Cir. 1998) ....................................................................13

*Flanigan's Enters., Inc. v. City of Sandy Springs*,
868 F.3d 1248 (11th Cir. 2017) ......................................................................3

*Greater Birmingham Ministries v. Merrill*,
284 F. Supp. 3d 1253 (N.D. Ala. 2018) ........................................................21

*Johnson v. De Grandy*,
512 U.S. 997 (1994)................................................................................11, 20

*League of United Latin American Citizens v. Clements*,
999 F.2d 831 (5th Cir. 1993) ...................................................................24, 26

*League of United Latin Am. Citizens v. Perry*,
548 U.S. 399 (2006)........................................................................1, 6, 9, 13

*Miller v. Johnson*,
5d15 U.S. 900 (1995)....................................................................................13

*Nipper v. Smith*,
39 F.3d 1494 (11th Cir.1994) .......................................................................24

8070509.2

*Parents Involved in Cmty. Schools v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007)................................................................................27

*Parker v. Judicial Inquiry Comm'n of Ala.*,
    295 F. Supp. 3d 1292 (M.D. Ala. 2018)......................................................23

*Penn Tank Lines, Inc. v. Jackson*,
    2018 WL 465977 ......................................................................................3

*Preiser v. Newkirk*,
    422 U.S. 395 (1975)..................................................................................3

*Shaw v. Hunt*,
    517 U.S. 899 (1996)................................................................................12

*Shaw v. Reno*,
    509 U.S. 630 (1993)..........................................................................13, 14

*Shelby Cty., Ala. v. Holder*,
    570 U.S. 529 (2013)................................................................................21

*Solomon v. Liberty Cty. Comm'rs*,
    221 F.3d 1218 (11th Cir. 2000) ................................................................24

*Thompson v. Alabama*,
    Civil Action No. 2:16-cv-783-ECM (M.D. Ala.)..........................................21

*Thornburg v. Gingles*,
    478 U.S. 30 (1986).........................................................................*passim*

*United States v. Jones*,
    29 F.3d 1549 (11th Cir. 1994) ..................................................................23

## Statutes

Ala. Code § 41-9-231.................................................................................23

Ala. Code § 41-9-232.................................................................................24

52 U.S.C. § 10301.....................................................................................20

iii

**DEFENDANT'S POST-TRIAL BRIEF**

## I.    Introduction

The Supreme Court could not have been clearer: "Legitimate yet differing communities of interest should not be disregarded in the interest of race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 434 (2006) ("LULAC").

And it told us why: "The recognition of nonracial communities of interest reflects the principle that a State may not assum[e] from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls." *Id.* at 433.

Defendant proved that the Alabama Legislature honored the requirement to respect communities of interest when drawing Congressional districts in 2011. The present First and Second Districts include people and communities bound together by real social, economic, and cultural interests. Plaintiffs, on the other hand, argue that the Legislature should have ignored communities of interest and focused exclusively on race.

Of course, Plaintiffs couch their arguments in terms of communities of interest, arguing that both the City of Mobile and Montgomery are urban areas, and that western Mobile County and distant Houston County are both rural. That's the best they can do, but they might as well claim that voters in Opp and distant Muscle Shoals are part of the same community of interest because they are all human. The

8070509.2

evidence showed that Plaintiffs' districts are not based on communities of interest at all, but solely on race. Their districts are non-compact racial gerrymanders that fail to show that the African-American population is sufficiently compact to form a majority in two Congressional districts. Having failed to meet their *Gingles* burden, Plaintiffs' Section 2 claim fails.

Before we even get to the merits, though, the Court must satisfy itself of its jurisdiction. There is none, because this case is moot. Plaintiffs seek a judgment declaring that Alabama should have drawn two majority-minority Congressional districts in 2011 based on 2011 conditions, but it is undisputed that those conditions will not exist after the 2020 Census when it will become clear how Alabama's population has shifted. *See* doc. 95 ¶ 51. Alabama's districting obligations after the next census will depend upon the results of the census, not upon an advisory opinion of what Alabama should have done under conditions that no longer exist.

The case should therefore be resolved for the Defendant on grounds of mootness. In the event the Court disagrees, it should hold that Plaintiffs failed to satisfy the *Gingles* prerequisites because their illustrative plans fail to respect communities of interest, are unlawful racial gerrymanders, and would not have been precleared.

## II.     This case is moot

"Federal courts are without power to decide questions that cannot affect the

8070509.2

rights of litigants in the case before them. … A previously justiciable case is moot when the requested relief, if granted, would no longer have a practical effect on the rights or obligations of the litigants." *Flanigan's Enters., Inc. v. City of Sandy Springs*, 868 F.3d 1248, 1264 (11th Cir. 2017) (internal citations, marks, and footnotes omitted). A declaration by the Court that Alabama's 2011 congressional districts violate Section 2 of the Voting Rights Act would not have a practical effect on the rights or obligations of the litigants. It would not grant Plaintiffs a right to have new districts drawn now, nor would it obligate the State to redistrict or to draw new districts in a particular manner in 2021, and Plaintiffs do not say otherwise.

That is the end of the matter. A judgment that has no effect on the rights of the parties would be advisory and thus beyond the Court's jurisdiction. *Penn Tank Lines, Inc. v. Jackson*, 2018 WL 465977, *3 (N.D. Ala. January 18, 2018) ("In short, as the Supreme Court explained, this court cannot address a hypothetical situation: [A] federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them. Its judgments must resolve a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." (citing *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)) (internal marks omitted).).

In their mootness brief, doc. 112, Plaintiffs talk a lot about the Congressional

3

districts that will be drawn in 2021. Drawing those new districts would not be in any way controlled by a declaration that the 2011 districts violated the Voting Rights Act. Legislators will be drawing *new* districts in 2021 based on *new* Census data, the number of Congressional districts apportioned to Alabama as a result of the 2020 Census, and an obligation to comply with Section 2 that is independent of any declaration by the Court, as Plaintiffs themselves acknowledge. *See* doc. 112 at 3 ("After all, the State's redistricting guidelines have consistently required that any congressional plan adhere to the Voting Rights Act."). And drawing the 2021 Congressional districts in compliance with Section 2 would in no way remedy the vote dilution allegedly suffered by Plaintiffs at the hands of the 2011 Congressional districts.

Moreover, assuming for the sake of argument that the Court were to declare that the 2011 districts violate Section 2, what would that actually mean to Legislators when they draw new districts in 2021? Plaintiffs argue that "if the Court declares that Alabama's current congressional map dilutes African American voting strength in central and southern Alabama in violation of the Voting Rights Act, the State will remedy that dilution when it draws the congressional map following the 2020 Census." Doc. 112 at 3.[1] Do Plaintiffs contend that the State must draw two majority-

---

[1] Plaintiffs also try to create an argument out of the State's interest in preserving the cores of existing districts. *Doc. 112, p. 5-6*. This is a red herring. The State's interest in applying

black congressional districts, even though no one knows what data would drive the shapes of new congressional districts? How would Legislators, given new data and possibly a different number of districts, know how to apply such a declaration? Asking these questions both underscores the absurdity of Plaintiffs' argument and the conclusion that it is moot.

Plaintiffs suggest that a declaratory judgment about past districts will aid the parties' understanding of their Section 2 obligations, doc. 112 at 3, but that is true only in an advisory sense. Any statements in a declaratory judgment about Section 2's requirements as applied to the 2011 districts would have to be applied to wholly new facts after the 2020 census. A declaratory judgment about the 2011 districts will be no more helpful after the new census than a declaratory judgment about Alabama's 1990 districts. In fact, it would be no more helpful than a declaratory judgment about Kentucky's congressional districts.

This case is therefore moot, and as a consequence, the Court lacks jurisdiction and should enter judgment for the Defendant.

## III.    Plaintiffs failed to satisfy the *Gingles* prerequisites

To establish their Section 2 claim, Plaintiffs must first show that they meet the three "*Gingles* prerequisites": (1) the minority group must be sufficiently large

---

traditional districting criteria always must yield to its duty to comply with the federal Constitution and the Voting Rights Act.

and geographically compact to constitute a majority in a single-member district; (2) the minority group must be politically cohesive and vote as a bloc; and (3) the white majority must vote sufficiently as a bloc to enable it to defeat the minority's preferred candidate. *Thornburg v. Gingles*, 478 U.S. 30, 49–51 (1986).[2] Plaintiffs cannot meet the first *Gingles* requirement because their illustrative plans ignore actual communities of interest and are racial gerrymanders where Plaintiffs repeatedly passed over one race of voters to reach another.

### A.    Plaintiffs' illustrative plans fail to observe communities of interest

While there are few bright-line rules on compactness, "the § 2 compactness inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." *Abrams v. Johnson*, 521 U.S. 74, 91-92 (1997). And States are not allowed to ignore the things that bind voters together economically, socially and culturally in order to draw districts primarily on the basis of race: "Legitimate yet differing communities of interest should not be disregarded in the interest of race." *LULAC*, 548 U.S. at 434.

The State proved that the Legislature respected strong communities of interest when it drew the First and Second Districts in 2011. Congressman Byrne and former

---

[2] "The reason that a minority group making such a challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Gingles*, 478 U.S. at 50 n.17

Congressman Bonner explained that the First District is bound together by the highway and river system, Mobile Bay and the Gulf of Mexico, and employers that center around the Port of Mobile. Tr. 667-674, 677-681, 765-775. Mobile and Baldwin Counties are closely tied together, much more so today than in the 1960s, before the tourism industry developed in Baldwin County and before the development of highways that made commuting feasible. Tr. 679, 744-748, 771. It is an area in Alabama with a unique history, such as Spanish and French influence, the origination of Mardi Gras, and all the attributes that come from being Alabama's only coastal region. Tr. 671, 674, 677, 778. As Mr. Bonner testified, "There is definitely a chemistry … that exists in this [the First] district that is unique." Tr. 765.

District 2 in the 2011 plan also respects a community of interest, but a different one. District 2, centered on the Wiregrass region and including portions of Montgomery, has a military and agrarian focus. Tr. 683, 780-81. While District 1 has military interests (a Navy shipyard), the military interests in District 1 are different from those in District 2. Tr. 683. And while District 1 also has agriculture, it is a different kind of agriculture than that found in District 2. Tr. 687-688, 768-69. Mobile and Montgomery are two separate economies, Tr. 688, 690, and Mobile and the Wiregrass share no communities of interest, Tr. 686. People from the Wiregrass do not come in to Mobile to work, Tr. 687, 766, and the industries in the Wiregrass do not use the port, Tr. 687. The two regions have no common interests and someone

from Mobile who was called to represent the Wiregrass would have to learn their "culture, way of life, [and] economic engine." Tr. 782.

Yet Plaintiffs would overlook these existing communities of interest to connect urban Mobile County (or at least the parts that are heavily African-American) with Montgomery, for a new District 2, and to connect rural Mobile County (or at least the parts that are heavily white) with the Wiregrass for a new District 1, both drawn on the basis of race. The resulting districts would be practically impossible to represent effectively. Travel throughout the districts would be quite difficult, limiting a Representative's ability to hold town hall meetings and connect with constituents. Tr. 684, 686, 775-776. It would be difficult to find the budget for sufficient offices and staff to serve such a broad area. Tr. 689. Moreover, by combining the diverse interests of two separate communities, a Congressman would have too many different areas of focus to address any of them effectively. Tr. 685, 782-83. It would be very difficult to focus on the seafood industry *and* the port *and* the shipyard *and* peanut subsidies *and* cattle ranching *and* Army/Airforce aviation *and* timber and give any of these diverse issues the attention they need.

Plaintiffs' districts would therefore be harmful to all voters, of all races, in their proposed districts. Plaintiffs' districts would be so difficult to represent, they would impede the ability of a Representative to address the very issues Plaintiffs care about, such as health care, education and criminal justice. Tr. 754-55. As the

Supreme Court noted, districts like Plaintiffs' that ignore communities of interest would in fact *diminish* the ability of African-American voters to participate in the electoral process:

> The practical consequence of drawing a district to cover two distant, disparate communities is that one or both groups will be unable to achieve their political goals. Compactness is, therefore, about more than 'style points;' it is critical to advancing the ultimate purposes of § 2, ensuring minority groups equal opportunity to participate in the political process and to elect representatives of their choice."

*LULAC*, 548 U.S. at 434 (emphasis added).

It is no answer that Alabama drew Board of Education Districts that are at least somewhat similar to Plaintiffs' proposals. The job of a Board of Education member is far different from the job of a member of Congress. Tr. 697-99, 825. Moreover, the existing Board of Education districts are difficult to represent, and a Board member from Montgomery cannot do an effective job of representing Southwest Alabama, despite the best of intentions. Tr. 740, 749.

Nor can Plaintiffs point to communities of interest that their proposed districts serve. Mr. Cooper did not even talk to anyone in Alabama about communities of interest when drawing the illustrative plans, Tr. 112, and it shows. Plaintiffs say, for their District 1, that rural Mobile County and Houston County are both "rural," Tr. 135, but so what? Double Springs is rural, too, but that doesn't mean it shares any real interests with Bayou La Batre. Plaintiffs say, for their District 2, that Mobile and Montgomery are both urban areas, Tr. 388-389, but so what? Huntsville is urban too,

but that doesn't mean that people's livelihood in Huntsville depends on the Airbus plant, or that people in Mobile care much about rockets.

And then Mr. Cooper testified about the Black Belt region being a community of interest that he wanted to put back together. Tr. 65. That sounds nice, but the fact is that Mr. Cooper never once, in four plans, includes the entire Black Belt region in a single district (he divides it each time between Districts 2 and 7).

There is no legitimate argument that Black voters in Mobile are part of the same community of interest as Black voters in Montgomery, unless one is defining the community of interest solely in terms of race. While race can be a permissible *consideration* in districting – and is one of many factors defining community of interest in Alabama's districting guidelines – defining a community of interest on the sole factor of race makes the impermissible assumption that voters of the same race all think alike and have the same needs from a Congressional representative, no matter where they live, their education, their profession, or anything else.

Historically, at least since the 1970s when Alabama first was allocated seven Congressional districts, Districts 1 and 2 have been remarkably stable, encompassing the same areas of the State after each redistricting cycle, except for changes on the margins as necessary to equalize population among the districts. Exhibits P-101, P0102; Tr. 642, 765, 952-952, 987; Doc. 95 ¶¶ 53, 67-68. *See also* Tr. 633-634 (Gerald Dial testifying that current guidelines make preserving the core of district a

priority even without express language). This stability shows that the Alabama Legislature has long recognized the communities of interest in Districts 1 and 2. Tr. 642, 765.

Plaintiffs' plans do not recognize communities of interest, but instead connect geographically distant voters for no reason other than race. *See Bush v. Vera*, 517 U.S. 952, 979 (1996) (holding that a district that "reaches out to grab small and apparently isolated minority communities" is not reasonably compact.). For all these reasons, Section 2 did not require Alabama to draw two majority-minority Congressional districts in 2011, when doing so would have required ignoring legitimate communities of interest.[3]

## B.    Plaintiffs' plans are unconstitutional racial gerrymanders

Not only does Section 2 not require Alabama to draw districts that elevate race above traditional districting criteria, the Constitution prohibits it.

Instead of districts based on the communities of interest that the Supreme Court says we should care about, Plaintiffs ask for districts drawn along racial lines. In their illustrative plans, Plaintiffs repeatedly skip over some voters to get to others,

---

[3] It has long been established that § 2 does not require maximization of majority-minority districts: "[R]eading the first *Gingles* condition in effect to define dilution as a failure to maximize in the face of bloc voting (plus some other incidents of societal bias to be expected where bloc voting occurs) causes its own dangers, and they are not to be courted. … One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast. … Failure to maximize cannot be the measure of § 2." *Johnson v. De Grandy*, 512 U.S. 997, 1016-17 (1994).

and they do so along racial lines. Tr. 972, 977-984. In drawing District 1, Plaintiffs skipped over minority voters to make a whiter district, and in drawing District 2, Plaintiffs skipped over white voters to make a majority-minority district. Dr. Doug Johnson's color-coded maps demonstrate how, especially in the City of Mobile, Mr. Cooper divided voters along racial lines. Tr. 985-87 and Ex. D-13.[4]

This is related to the compactness analysis. Dr. Johnson testified that Plaintiffs' districts 1 and 2 are not compact *because* of Plaintiffs' racial sorting. Tr. 981, 984. The racial gerrymandering therefore defeats Plaintiffs' Section 2 claim (Plaintiffs have not satisfied the *Gingles* prerequisites because their districts are not compact). It also shows that Alabama could not have drawn such districts in 2011 because doing so would have violated the Constitution. No traditional districting principle explains the decisions to sort voters by race. Tr. 993-997. Race is the only explanation for the decision to split Mobile County, to separate Mobile from Baldwin Counties, and to connect Mobile with unrelated Dothan and Montgomery. Plaintiffs' plans are therefore racial gerrymanders that would violate the Equal Protection rights of Alabama voters, and consequently, Plaintiffs have not shown

---

[4] The fact that Plaintiffs' map-drawer observed some of the traditional criteria, such as avoiding splitting some precincts and counties, does not mean that their map is not a racial gerrymander. "Race may predominate even when a reapportionment plan respects traditional principles … if '[r]ace was the criterion that … could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made.'" *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 798 (2017) (quoting *Shaw v. Hunt*, 517 U.S. 899, 907 (1996)).

that they have a proper remedy. *Davis v. Chiles*, 139 F.3d 1414, 1419 (11th Cir. 1998).

Plaintiffs' proposed racial gerrymandering would violate the constitutional rights of voters and harm them in two ways: The voters would be "personally … subjected to [a] racial classification," *Bush v. Vera*, 517 U.S. 952, 957 (1996), and they would be represented by a Representative who believes her or his "primary obligation is to represent only the members" of a particular racial group, *Shaw v. Reno*, 509 U.S. 630, 648 (1993). "When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls." *Miller v. Johnson*, 515 U.S. 900, 911-912 (1995) (internal quotation marks and citations omitted).

If the Alabama Legislature had passed any of Plaintiffs' illustrative plans, they would have been subject to strict scrutiny, and they would have failed. The Legislature could not have argued that it had a compelling interest to comply with Section 2, because Section 2 does not require States to ignore communities of interest to draw districts based on race. *LULAC*, 548 U.S. at 433; *see also Abrams*, 521 U.S. at 91-92 ("[Section] 2 does not require a State to create, on predominantly

racial lines, a district that is not 'reasonably compact.'").[5]

There are good reasons why the Supreme Court has repeatedly rejected the type of race-based districting that Plaintiffs propose. "Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire." *Shaw v. Reno*, 509 U.S. 630, 657 (1993).[6]

No one claims that any State is free of all private racism, but Alabama has come a long way from the days of Us and Them. Drawing districts that are Theirs and Ours would set us back. It would also be illegal, meaning the Alabama Legislature could not have drawn those districts in 2011. Plaintiffs' racially-gerrymandered districts therefore do not satisfy their *Gingles* burden.

### C. A plan with two majority-minority Congressional districts would not have been precleared because it would have diminished the opportunity of minority voters to elect their candidate of choice

In 2011, Alabama was a covered jurisdiction under Section 5 of the Voting Rights Act, and Alabama's congressional plans therefore had to be precleared by the U.S. Department of Justice. Doc. 95 ¶ 66. A plan that could not have been precleared

---

[5] As discussed in pretrial briefing, the State rejects any assumption that compliance with a federal statute can serve as a compelling interest to justify violating a voter's Constitutional rights.

[6] Congressman Byrne testified that dividing Mobile along racial lines would not only be morally wrong, but it would also harm economic development in the region. Tr. 693-94.

does not satisfy Plaintiffs' burden because such a plan could not have been put in place in 2011.

Plaintiffs' illustrative plans would drop the African-American voting age majority in District 7 to barely over 50%. It has been performing in the low to mid-60s range, but if a 50% district would not have provided African-American voters with the opportunity to elect their candidate of choice in 2012, it would have diminished that opportunity and would not have been precleared.

Plaintiffs rely on Dr. Palmer's analysis that showed that in the 2018 elections, African-Americans were a majority of the actual electorate in Plaintiffs' majority-black districts. That is irrelevant, though. How the districts performed in 2018 does not tell us how they performed in any earlier election, and the relevant question is whether DOJ would have precleared the plans in 2011. DOJ obviously could not review the results of a future election. Plaintiffs therefore have no evidence that their districts would in fact have provided a real opportunity to elect for minority voters in 2011.

On the other hand, there is ample evidence that the illustrative plans would *not* have been precleared:

(1) No one in 2011 was asking that two majority-black districts be drawn. Tr. 627, 807-808, 816. As active as Joe Reed and the Alabama Legislative Black Caucus have been in redistricting over the years, *see* Tr. 584, 626-627, it is not plausible that

15

they would have failed to make such a request if anyone thought that DOJ would approve such a plan.

(2) It was well known that Senator Hank Sanders believed that an opportunity district should be around 62-65% black voting age population (BVAP), and he was an experienced politician who faced elections every four years in part of the area included in Plaintiffs' proposed districts. Tr. 643. He says now that his opinion was for State Legislative districts only, but there is no evidence that in 2011 he was arguing that a lower percentage would suffice in Congressional districts.

(3) The Alabama Congressional delegation in 2011 proposed a plan to the Legislature that they supported, including Rep. Terry Sewell. Tr. 622-24, 807-808. Rep. Sewell is a Harvard-educated attorney who has served her district with distinction and who is a credit to the State of Alabama. There is simply no way that she would have designed and supported a plan that diluted the rights of minority voters. Tr. 810. It was reasonable for the Legislature to rely on Rep. Sewell's view that the district she drew and supported was legal and fair to minority voters, as well as her view of what was necessary for her African-American constituents to have an equal opportunity to participate in the electoral process. Tr. 658.

(4) Rep. Sewell had close relationships with President and First Lady Obama, as well as Attorney General Eric Holder. Tr. 811. When the delegation met to develop a plan to propose to the Alabama Legislature, Rep. Sewell offered to help

ensure that the plan was precleared by the Holder Department of Justice. Tr. 811. It was reasonable for the Legislature to rely on Rep. Sewell's knowledge of what was necessary to achieve preclearance in this particular case, particularly in light of her character and the inconceivability that she would intentionally harm her own voters.

(5) It is also telling that, even though there was a challenge to the State's legislative districts by the Alabama Legislative Black Caucus, no one sued about the Congressional districts until this case was filed in 2018, and no Legislators or local politicians are parties to this suit. That suggests that nobody seriously believed in 2011 that a 50% BVAP district had a chance of being precleared.

(6) There were many other reasons to believe that a barely 50% BVAP district would not have performed in 2011: The white population in Alabama tends to be older, as Mr. Cooper acknowledged, and therefore white voters are over-represented in the voting age population. Tr. 34. In most elections, African-American voters turn out at slightly lower rates than white voters. Tr. 881-883. The census isn't perfect, and Plaintiffs' margins are so thin, they are within the margin of error for the census results, leading Dr. Johnson to testify that it is at best a "coin toss" of whether in reality the districts reach 50% BVAP. Tr. 969-971. And finally, some 50% districts result in the election of white Republicans. An example of this is the Mississippi Senate district that is involved in litigation where Plaintiffs' expert Max Palmer is an expert witness, and in that district, Plaintiffs are suing to increase the black voting

17

age population from 50% to 62% because it hasn't been performing. Tr. 184-85.

While Plaintiffs point to Rep. Sewell's "landslide" victories, Senator Sanders correctly testified that landslides should not be a consideration when deciding the Black voting age percentage necessary to provide an opportunity to elect to minority voters. Tr. 593-94. Rep. Sewell is a special politician, and it would not be reasonable to assume that she will serve for all time.

The evidence thus shows that Plaintiffs' plans would have stood little chance of being precleared. To submit them would have been foolish, because the Legislature knew that if preclearance was denied, it would have required an expensive special session to rush through an alternative plan that itself might not be precleared. Tr. 620. Thus, Plaintiffs' illustrative plans do not satisfy the first *Gingles* prerequisite.[7]

### D.    A note on the *Gingles* prerequisites 2 and 3 (polarized voting)

The State does not dispute that, at least in most elections, black voters and

---

[7] By arguing that the law neither requires nor allows the State to draw the race-centric districts Plaintiffs propose, Alabama is by no means saying that there is a quota or a limit on majority-minority districts. The number of such districts Alabama will have depends on traditional districting criteria and the distribution of the population. Alabama would not be against drawing more majority-minority districts if it could do so while observing communities of interest and without violating the constitutional rights of Alabama voters. Plaintiffs may attempt to argue that Senator Dial testified that additional districts were against the principles and philosophies of the State, *see* Tr. 653-654, but he testified that it would be perfectly fine if all seven Congressional Districts sent African-Americans to Congress. Tr. 658. It is clear that he meant that additional majority-minority districts would be against the principles and philosophies of Alabama if, like Plaintiffs' districts, they broke up communities of interest in order to sort voters by race.

white voters tend to prefer different candidates. Specifically, black voters tend to support Democrats in most elections, and most white voters in Alabama usually support Republicans. Tr. 341, 885-888; Ex. D11 at 14-16. What the State disputes is that polarized voting necessarily means that the system is broken, or that the Court should infer that Republican votes are evidence of racial bias.

As Defense expert Trey Hood showed, African-Americans overwhelmingly support the Democratic party *everywhere*. He studied elections in all 21 States where African-Americans are at least 10% of the population, and in each State – North, South, East, and West – African-American support for the Democratic party neared or exceeded 90%. Tr. 885-888; Ex. D11 at 14-16. Consequently, voting is polarized anywhere that most white voters tend to support Republican candidates. Polarized voting alone tells us only that a majority of white voters in the jurisdiction are conservative. As discussed further below, Alabama does not agree with Plaintiffs' argument that conservatism or support for Republican candidates is by definition a sign of racism.

## IV.    Totality of the Circumstances

If the Court agrees that the case is moot or that Plaintiffs have failed to satisfy the *Gingles* prerequisites, it need not address the "totality of the circumstances." Should the Court decide otherwise, the question is whether, under the totality of the circumstances, and as a result of Alabama's Congressional districts, "the political

8070509.2

processes leading to nomination or election in the State or political subdivision are not equally open to participation by" the members of the minority group, on account of race. 52 U.S.C. § 10301(b).[8] (Section (a) of the Act notes that any denial or abridgement of the right to vote must be "on account of race or color." 52 U.S.C. § 10301(a)). Such an inquiry necessitates a "comprehensive, not limited, canvassing of relevant facts." *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994).[9]

Here, the totality of the circumstances weighs against a finding of vote dilution on account of race or color. Plaintiffs center their argument around the various "Senate factors" (which are not part of the text of Section 2). They raise Alabama's history of discrimination, and Alabama neither denies nor attempts to excuse that shameful history. But it's just that: *history*. As Dr. McCrary

---

[8] Section 2(b), 52 U.S.C. § 10301(b), provides:

> A violation of [Section 2(a)] is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

[9] While the *Gingles* Court held that satisfying the three prerequisites is necessary to prove a § 2 claim, "it just as clearly declined to hold them sufficient" by themselves to establish a claim. *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994). That is, to prevail on a Section 2 claim, Plaintiffs must satisfy the *Gingles* prerequisites *and* show that, under the totality of the circumstances, they have less opportunity to participate in the political process on account of race or color.

acknowledged, it has been a very long time since Alabama had a literacy test or a poll tax or anything of the sort. Tr. 314. The Supreme Court admonishes that "history did not end in 1965" and that the purpose of the Fifteenth Amendment is "not to punish the past." *Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 552-53 (2013). Moreover, "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 74 (1980).

In terms of more recent history, Plaintiffs talk about Alabama's photo ID law, but as this Court held in a challenge to that law, Alabama's photo ID law does not discriminate against anyone. *See* Tr. 319-21.[10] In the case of photo ID, which passed court scrutiny, or felon voting, which is presently being challenged in federal court,[11] Plaintiffs merely allege that the voting practices are discriminatory when no court has found that to be true.

A more accurate picture of Twenty-first Century Alabama comes from the testimony about Mobile. The city is becoming more racially integrated over time, with more African American families moving to the suburbs and more white voters moving downtown. Tr. 715. The City of Mobile elected an African-American mayor

---

[10] Judge Coogler's decision granting summary judgment for the State can be found at *Greater Birmingham Ministries v. Merrill*, 284 F. Supp. 3d 1253 (N.D. Ala. 2018). That decision is presently on appeal to the Eleventh Circuit.

[11] Alabama's felon voting laws are presently being challenged in *Thompson v. Alabama*, Civil Action No. 2:16-cv-783-ECM (M.D. Ala.).

when it was a majority-white city, and it elected a white mayor when it was a majority-black city. Tr. 779. The same is true for the nearby city of Prichard, which likewise elected a black mayor with a majority-white populace and a white mayor with a majority-black populace. Tr. 779. And while Plaintiffs attempted to paint the mayoral elections in Mobile as racially polarized, we believe the Court should credit Plaintiff Lakeisha Chestnut over internet news sites (*see* Tr. 843): Chestnut testified at deposition that Mobile Mayor Sandy Stimpson, a white Republican, received overwhelming support from black voters. Tr. 752, 851-852.

Plaintiffs also argue that African-American voters lag behind white Alabamians in various socio-economic factors. That is regrettably true, but it is true everywhere, not just in Alabama. Tr. 891-94. It does not occur only in Southern States, or former slave States, or States that once had Jim Crow laws. It is just as true in New York and New Jersey as it is in Alabama, and this socio-economic gap is therefore not tied to discrimination in Alabama, nor does this fact alone show that a political system is broken. Admittedly, there is evidence that a voter's participation in elections can be tied to economic and education levels, but that is as true for white voters of lower economic and education levels as it is for African-American voters.

Plaintiffs also point to alleged racial appeals in elections, such as ads run by Chief Justice Tom Parker. They complain about the ad's references to "mob rule" (but the ads came right after mobs disrupted Justice Kavanaugh's confirmation

hearings, which were referenced in the ads) and Chief Justice Parker's statement that

he had taken on Southern Poverty Law Center. Parker's dispute with the SPLC was

about traditional marriage, not race; Parker publicly commented on marriage

litigation while a judge and the SPLC filed an ethics complaint that led to an inquiry

by the Alabama Judicial Inquiry Commission. *See Parker v. Judicial Inquiry*

*Comm'n of Ala.*, 295 F. Supp. 3d 1292, 1295-96 (M.D. Ala. 2018) (noting the facts

leading to the complaint against Chief Justice Parker).[12]

Plaintiffs also point to an ad by Governor Ivey discussing the Alabama

Memorial Preservation Act, Ala. Code § 41-9-231 *et seq.* But that statute does not

single out "Civil War" memorials; it protects *all* memorials of a certain age,

including civil rights memorials.[13] And Plaintiffs talk about statements Rep. Mo

---

[12] No reasonable person would dispute the genesis of Chief Justice Parker's dispute with SPLC, as reported in Judge Watkins' opinion, and this Court can take judicial notice thereof. *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).

[13] The Memorial Preservation Act protects the following:

> (a) No architecturally significant building, memorial building, memorial street, or monument which is located on public property and has been so situated for 40 or more years may be relocated, removed, altered, renamed, or otherwise disturbed.

> (b) No architecturally significant building, memorial building, memorial street, or monument which is located on public property and has been so situated for at least 20 years, and less than 40 years, may be relocated, removed, altered, renamed, or otherwise disturbed except as provided in Section 41-9-235.

23

Brooks supposedly made on the radio in Huntsville, which is hardly relevant to anything in the First, Second, or Seventh Districts that this case is about. And in any event, Plaintiffs do not explain how any of these ads differ from Senator Sanders' robocall racial appeal in the 2010 elections. *See* Tr. 598-99.

Then there is the question of whether any vote dilution is "on account of race or color." The Eleventh Circuit has held that "to be actionable, a deprivation of the minority group's right to equal participation in the political process must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause." *Solomon v. Liberty Cty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc) (quoting *Nipper v. Smith*, 39 F.3d 1494, 1515 (11th Cir.1994) (en banc) (Tjoflat, C.J., plurality opinion)).[14]

Plaintiffs' response is to argue that one of our two major political parties is racially biased *per se*. One Plaintiff (Jones) testified, "Being a Republican for me,

---

(c) No memorial school which is located on public property and has been so situated for 20 or more years may be renamed except as provided in Section 41-9-235.

Ala. Code § 41-9-232.

[14] The State of Alabama preserves its position that part of a plaintiff's required showing under the polarized voting analysis includes demonstrating that race, and not partisan politics, explains the voting patterns of the body politic, as the Fifth Circuit held in *League of United Latin American Citizens v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993). To resolve this case, it is not necessary for this Court to decide whether the "on account of race or color" requirement applies in the *Gingles* prerequisites or in the "totality of the circumstances" analysis. *Solomon* makes clear that in the Eleventh Circuit, it is a requirement at some point in the Court's analysis; *where* it applies is not important in this particular case.

seeing somebody who is a Republican right now tells me that they're racist." Tr. 233. When asked, "Does voting for Republican candidates render the voter racist," Plaintiff Jones responded with a simple "Yes." Tr. 245. Another witness for the Plaintiffs (Knight) testified that the Republican Party "seems to be kind of one-sided when it comes to racial justice." Tr. 343. Commissioner Tyson testified that a member of Congress has to support the initiatives of the Democratic party "to represent everyone in his constituency." Tr. 526.

These witnesses are of course free to support any party they choose, but so are other Alabamians, and it would be a dangerous use of the Voting Rights Act to interpret it to allow Federal courts to step in and "fix" a State's electoral system simply because some voters prefer Republicans. It is hardly a secret that Alabama is generally a conservative State, or that the Republican party is the home for conservative voters. Tr. 203, 955. There are many reasons a voter might tend to support candidates of a particular party, including their positions on issues such as abortion, gun rights, and national defense. Dr. Hood noted that there was a realignment of Southern voters in the 1970s and 1980s based on religious beliefs. Tr. 952-953. As Congressman Byrne testified, he is a Republican because the Party's philosophy of a smaller, less-intrusive government is more consistent with his personal beliefs. Tr. 708-709. In short, Plaintiffs have not proven that voting Republican violates the Voting Rights Act, and an attempt to use it to put a thumb

on the scale in favor of one political party would put the Voting Rights Act on shaky constitutional ground.

In the end, "The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates. Rather, § 2 is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats." *Clements*, 999 F.2d at 854 (citation and internal quotation marks omitted).

For these reasons, even if Plaintiffs had met their burden under the *Gingles* prerequisites, their Section 2 claim still fails under the "totality of the circumstances" analysis. That said, Defendant believes that the Court need not reach this issue, because it is clear, as discussed above, that Plaintiffs' non-compact, racially-gerrymandered illustrative plans do not satisfy their burden under the *Gingles* prerequisites.

## V.    Conclusion

Defendant asks that this Court enter judgment in his favor because this case is moot and the Court consequently lacks jurisdiction. The next census will change the facts on the ground and will determine Alabama's future districting obligations; a declaratory judgment about what Alabama should have done ten years ago would be nothing more than an advisory opinion.

The Court need not reach any other issue, but in the event the Court disagrees,

26

it should hold that Plaintiffs have failed to carry their burden. The record shows that Plaintiffs did not meet their *Gingles 1* burden of showing that the minority population is sufficiently compact to form a voting age majority in two Congressional districts. They proved only that Alabama could have drawn a second district if it ignored Supreme Court precedent, disregarded communities of interest, and sorted voters by race in violation of their Equal Protection rights. Plaintiffs' Section 2 claim therefore fails.

* * * * *

Plaintiff Chestnut, testifying passionately about her love for the State, said, "We need to stop all this division." Tr. 450. We agree. But we do not believe that sorting voters by race into separate-but-equal districts will accomplish Ms. Chestnut's goal. It would instead make it worse, furthering the division. "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Schools v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (Roberts, C.J.) (plurality opinion).

Respectfully submitted,
Steve Marshall
*Attorney General*

*s/* James W. Davis
James W. Davis (ASB-4063-I58J)
Laura E. Howell (ASB-0551-A41H)
*Assistant Attorneys General*

Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
jimdavis@ago.state.al.us
lhowell@ago.state.al.us

Dorman Walker (ASB-9154-R81J)
Balch & Bingham LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
dwalker@balch.com

**Counsel for Secretary of State John H. Merrill**

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of December, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a copy to all counsel of record.

*s/* James W. Davis

28

8070509.2