FILED

2019 Dec-13 PM 07:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LAKEISHA CHESTNUT, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 2:18-cv-00907-KOB |
| v. | ) | |
| | ) | |
| JOHN H. MERRILL, in his official | ) | |
| Capacity as Alabama Secretary of State | ) | |
| | ) | |
| Defendant. | ) | |

## **PLAINTIFFS' POST-TRIAL BRIEF**

# TABLE OF CONTENTS

**Page**

I.    Introduction.......................................................................................1

II.   Defendant's arguments, if adopted, would fundamentally alter
      Section 2. .......................................................................................2

      A.    The legislative history behind the current congressional plan is
            irrelevant to whether it currently results in unlawful vote
            dilution...................................................................................2

      B.    Defendant's racial gerrymandering defense defies Eleventh
            Circuit law and would render Section 2 inoperative............................5

      C.    The cause of racially polarized voting is legally irrelevant, and,
            in any event, the undisputed evidence established a strong
            connection between partisanship and race in Alabama. ......................9

III.  Plaintiffs proved a violation of Section 2 of the VRA. .................................12

      A.    *Gingles* 1....................................................................................12

      B.    *Gingles* 2 and 3..........................................................................19

      C.    Totality of the Circumstances ...........................................................20

IV.   Conclusion ........................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bartlett v. Strickland*,
  556 U.S. 1 (2009) ............................................................................... 12

*Common Cause v. Lewis*,
  2019 WL 4569584 (N.C. Sup. Ct. Sept. 3, 2019) ................................. 7

*Covington v. North Carolina*,
  283 F. Supp. 3d 410 (M.D.N.C. 2018) ................................................. 7

*Davis v. Chiles*,
  139 F.3d 1414 (11th Cir. 1998) ............................................ 6, 7, 8, 14

*Democratic Nat'l Comm. v. Reagan*,
  329 F. Supp. 3d 824 (D. Ariz. 2018) ................................................... 7

*Dickinson v. Ind. State Election Bd.*,
  933 F.2d 497 (7th Cir. 1991) ............................................................... 5

*Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*,
  775 F.3d 1336 (11th Cir. 2015) ........................................................... 3

*Georgia v. Ashcroft*,
  539 U.S. 461 (2003) ..................................................................... 12, 13

*Hall v. Louisiana*,
  108 F. Supp. 3d 419 (M.D. La. 2015) .................................................. 3

*Johnson v. DeSoto Cty. Bd. of Comm'rs*,
  204 F.3d 1335 (11th Cir. 2000) ........................................................... 5

*Luna v. Kent*,
  291 F. Supp. 3d 1088 (E.D. Cal. 2018) ............................................... 7

*Mobile v. Bolden*,
  446 U.S. 55 (1980) ............................................................................... 3

# TABLE OF AUTHORITIES

**Page(s)**

*Nipper v. Smith*,
   39 F.3d 1494 (11th Cir. 1994) ...........................................................2, 9

*Shaw v. Reno*,
   509 U.S. 630 (1993)...................................................................................3

*Solomon v. Liberty Cty., Fl.*,
   899 F.2d 1012 (11th Cir. 1990) ............................................................3

*Terrebonne Parish Branch NAACP v. Jindal*,
   274 F. Supp. 3d 395 (M.D. La. 2017)........................................5, 18, 19

*United States v. Town of Lake Park, Fla.*,
   2009 WL 3667071 (S.D. Fla. Oct. 23, 2009) .......................................5

## I.    Introduction

The vast majority of the evidence that Plaintiffs offered at trial in this case went unanswered. Instead of defending this case on the merits, Defendant offered irrelevant and legally unsupported arguments that, if adopted, would radically transform the well-settled framework governing Section 2 of the Voting Rights Act ("VRA"). First, Defendant's position that the Court should consider the legislative history behind the 2011 congressional plan ("2011 Plan") when determining whether it currently dilutes minority voting strength fundamentally misunderstands how an effects-based claim operates under Section 2. Second, Defendant's attempt to import the racial gerrymandering doctrine into the context of a Section 2 claim has been thoroughly rejected by the Eleventh Circuit. Third, Defendant's assertion that the vote dilution that results from the 2011 Plan can be dismissed as "politics as usual" ignores both the legal standard and the role that race plays in Alabama's politics.

The evidence presented at trial that was actually relevant to Section 2 made a clear case of unlawful vote dilution. With respect to the *Gingles* preconditions, Plaintiffs proved that (1) two majority-African-American congressional districts can be drawn in central and southern Alabama, each containing a reasonably compact African-American population, (2) African-American voters in that area vote cohesively, and (3) white voters in the area vote as a bloc usually to defeat the

- 1 -

candidate preferred by African Americans. The totality of the circumstances of Alabama's politics—and the undersized role African Americans play within it—confirms that African Americans do not enjoy an equal opportunity to elect candidates of their choice in Alabama's congressional elections.[1]

## II.   Defendant's arguments, if adopted, would fundamentally alter Section 2.

### A.   The legislative history behind the current congressional plan is irrelevant to whether it currently results in unlawful vote dilution.

The question before this Court, and any court addressing a Section 2 effects claim, is not what the State could have or should have done when the challenged plan was passed. Rather, it is whether the plan "operates *today* to exclude [a minority group] from a fair chance to participate" in the relevant political system. *Nipper v. Smith*, 39 F.3d 1494, 1521-22 (11th Cir. 1994) (en banc) (plurality opinion of Tjoflat, C.J.) (emphasis added) (quoting S. Rep. No. 97-417 at 36 (1982)). As Plaintiffs maintained at trial, 1 Tr. 174:9-18; 3 Tr. 621:12-23; 4 Tr. 806:22, the process of enacting the plan—i.e., the plans that were submitted to and considered by the Legislature, hearsay statements from congressional representatives, or the intent of the legislators who passed the plan—is irrelevant.

---

[1] This brief highlights evidence and arguments not already discussed in Plaintiffs' Pre-Trial Brief. Plaintiffs thus incorporate their Pre-Trial Brief by reference. ECF No. 102 ("Pls.' Br.").

In 1982, Congress created an effects-based claim within Section 2 as a response to *Mobile v. Bolden*, 446 U.S. 55 (1980), which "required proof of what was in the minds of legislators who enacted or retained a voting law alleged to be discriminatory." *Solomon v. Liberty Cty., Fl.*, 899 F.2d 1012, 1026-27 (11th Cir. 1990). Unlike the claim envisioned in *Bolden*, this effects-based claim asks only "whether[,] as a result of the challenged" map, Plaintiffs currently lack "an equal opportunity to participate in the political processes and to elect candidates of their choice." *Gingles*, 478 U.S. at 44. The reasons the plan was adopted are irrelevant. *Shaw v. Reno*, 509 U.S. 630, 641 (1993) (explaining that Section 2 "prohibit[s] legislation that results in the dilution of a minority group's voting strength, regardless of the legislature's intent"); *Hall v. Louisiana*, 108 F. Supp. 3d 419, 425 (M.D. La. 2015) ("[The] 'results test' of Section 2 . . . focuses on objective facets of the local political context instead of probing the minds of legislators.").

Defendant's assertion that Plaintiffs' claim should fail because, among other reasons, Representative Sewell allegedly supported passage of the 2011 Plan or because only certain plans were proposed to the Committee, thus ignores that "a discriminatory result is all that is required" to prevail under Section 2. *Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir.

2015).[2] Under Defendant's novel standard, a state's compliance with Section 2 would hinge on whether, at the time a given map is drawn, minority legislators propose the right maps and provide the right analysis in support of an additional majority-minority district—notwithstanding their own desires as incumbents. *See* 3 Tr. 604:25-605:3 ("[E]very elected official wants the best district for their election. They're not thinking about what's the best district for all black people . . .") (Sanders). Nothing in Section 2 indicates Congress intended to foist upon any individual legislator, regardless of their race, the singular responsibility for determining what the VRA does and does not require whenever a new map is drawn.

Thus, contrary to Defendant's unsupported assertions, Section 2 neither asks why the Alabama Legislature failed to create a second majority-minority congressional district in 2011, nor provides a defense based on the assertion that it would have been politically difficult to pass a plan with two such districts.[3] Instead, it simply asks whether the map dilutes African Americans' voting strength, even if

_____

[2] To be sure, Representative Sewell supports Plaintiffs' claim in this case. PX129.

[3] Similarly, Defendant's argument that Plaintiffs' Illustrative Plans would not have been precleared is a red herring. Legislators' concerns about preclearance, well-founded or not, offer no information about whether a given districting plan has a dilutive effect.

- 4 -

that dilution is entirely inadvertent. The information considered by the Legislature

at the time it drew the 2011 Plan therefore has no bearing on Plaintiffs' claim.[4]

### B. Defendant's racial gerrymandering defense defies Eleventh Circuit law and would render Section 2 inoperative.

Defendant further attempts to distract from the actual Section 2 standard by

alleging the Illustrative Plans are racial gerrymanders. ECF No. 101 ("Def.'s Br."),

at 5-12. But Defendant fails to identify a single case in which a court rejected a

Section 2 claim because the plaintiff's illustrative plan was drawn with too much

focus on race. Instead, "various courts," including the Eleventh Circuit, "have held

that Section 2 plaintiffs in vote dilution cases are not required to show that their

proposed plans comply with *Miller v. Johnson* to satisfy *Gingles* One." *Terrebonne

Parish Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 428-29 (M.D. La. 2017)

(citing *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998)).

---

[4] Contrary to Defendant's suggestion, 1 Tr. 97:15-17, the Court considers 2010 Census data under *Gingles* 1 not because it informs what "could have" been drawn in 2011 but because decennial Census data are presumptively reliable throughout the decade. *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991) (census figures are "the relevant data for assessing a claim under Section [2]"); *United States v. Town of Lake Park, Fla.*, No. 09-cv-80507-CIV, 2009 WL 3667071, at *3-4 (S.D. Fla. Oct. 23, 2009); *compare Johnson v. DeSoto Cty. Bd. of Comm'rs*, 204 F.3d 1335, 1341-43 (11th Cir. 2000) (holding district court did not err in considering data post-dating challenged plan where defendant provided "competent evidence" to overcome the presumption of the "continuing accuracy of census figures").

Defendant's entire argument relies on the assertion that Plaintiffs "must demonstrate the existence of a proper remedy," for which Defendant quotes *Davis*. Def.'s Br. at 5. But not only does Defendant take that quotation out of context, the *Davis* court expressly rejected Defendant's exact argument. In *Davis*, the plaintiffs challenged at-large judicial election systems and offered a *Gingles* illustrative plan containing a majority-minority district. 139 F.3d at 1416, 1418. The district court rejected the claim on two independent grounds. First, the defendants' interests in maintaining at-large judicial election systems outweighed the plaintiffs' interest in a district-based scheme. *Id.* at 1419. Second, plaintiffs' proposed districts were racial gerrymanders. *Id.* The Eleventh Circuit affirmed only the first ground after considering "Florida's interest in maintaining its Constitution's judicial selection system in determining whether Davis has proposed a permissible remedy." *Id.* at 1421. As a result, the plaintiffs had not shown "the existence of a proper remedy." *Id.* at 1419. That is the statement that Defendant quotes. *See* Def.'s Br. at 5-6.

With regard to the second ground, the Eleventh Circuit found it "necessary and appropriate" to clarify that the district court had "misread the applicable law" by "attempt[ing] to apply [racial gerrymandering] authorities such as *Miller* to this Section Two case*.*" Davis, 139 F.3d at 1425. The racial gerrymandering doctrine does not apply to the first *Gingles* precondition, the court explained, because they

"address very different contexts": while the former involves a challenge to excessive focus on race, the latter *requires* a plaintiff to create a new district with a minimum minority population of 50%. *Id.* Applying the racial gerrymandering doctrine to Section 2 would "penalize [a plaintiff] . . . for attempting to make the very showing that *Gingles*" demands, and "would . . . make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action." *Id.* Thus, applying the racial gerrymandering doctrine to the first *Gingles* precondition "misinterpret[s] the law regarding the role of race in assessing permissible remedies for violations of Section Two." *Id.* at 1426.[5]

_____

[5] For this reason, the vast majority of the analyses performed by Defendant's experts are irrelevant to this case. And in any event, the sheer number of courts that have rejected both experts' opinions should give the Court pause before crediting their testimony on any aspect of the case. *See, e.g., Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 837 (D. Ariz. 2018) (finding Dr. Hood's analysis was "not useful" and "reflected an incomplete understanding" and noting that "Dr. Hood's testimony has been rejected or given little weight in numerous other cases due to concerns over its reliability"). In fact, every court before which Dr. Johnson has testified has rejected some or all of his opinions. *Common Cause v. Lewis*, No. 18 CVS 014001, 2019 WL 4569584, at *95-96 (N.C. Sup. Ct. Sept. 3, 2019) (rejecting Dr. Johnson's "methodologies, analyses, and conclusions" because he had made "a series of significant errors" and noting courts in all four of the previous cases in which he had testified "have rejected his analysis"); *see also Luna v. Kent*, 291 F. Supp. 3d 1088, 1109 (E.D. Cal. 2018) (rejecting his communities-of-interest analysis in the only other Section 2 case in which Dr. Johnson has testified); *Covington v. North Carolina*, 283 F. Supp. 3d 410, 449 (M.D.N.C. 2018) (finding his racial gerrymandering analysis "unreliable and not persuasive"). Indeed, when asked about

Defendant's reasoning illuminates the Eleventh Circuit's concerns. Under Defendant's wholly unsupported theory, the only scenario in which Section 2 applies is when a plan contains a district that is nearly majority-minority. Def.'s Br. at 10. According to Defendant, a new majority-minority district is permissible only when it entails tinkering "on the margins of the [existing] districts." *Id.* But if that were the standard, Section 2 would apply only when it is needed the least; a plan that severely cracks a minority population among several districts—like the one challenged here—would be insulated from Section 2 review. As *Davis* makes clear, that is not, and cannot be, the law. Thus, "[n]otwithstanding the polemics regarding race-based redistricting that pervade [Defendant's] brief to this [C]ourt," the racial gerrymandering doctrine has no role in the *Gingles* preconditions. *Davis*, 139 F.3d at 1424-25.[6]

---

the *Common Cause* court's rejection of his opinions, Dr. Johnson responded untruthfully. 5 Trial Tr. 1038:16-24.

[6] As explained in Plaintiffs' Pre-Trial Brief, even if this Court were to ignore Eleventh Circuit law and apply the racial gerrymandering doctrine in this case, Defendant's argument would still fail. Pls.' Br. at 33. Race did not predominate in the Illustrative Plans because, as explained in Section III.A, each complies with traditional redistricting principles. And even if race did predominate, it was justified by the compelling interest of complying with Section 2. *Davis*, 139 F.3d at 1425 n.23. Contrary to the Reapportionment Committee's Guidelines referring to the VRA as a "compelling state interest," PX084 § IV.7.d, Defendant appears to assert

**C.** **The cause of racially polarized voting is legally irrelevant, and, in any event, the undisputed evidence established a strong connection between partisanship and race in Alabama.**

Plaintiffs are not required to prove that the undisputed racially polarized voting in the State results from particular racial attitudes. *See* Pls.' Br. at 34-35. The *Gingles* plurality explicitly held that the motivations of voters are irrelevant to determining whether racially polarized voting exists, and no majority of the Eleventh Circuit has ever imposed such a requirement. *Id.* Defendant asks this Court to create a new legal standard requiring Section 2 plaintiffs to affirmatively demonstrate that individual voters are driven by race. Def.'s Br. at 20-21. But this would be a near impossible showing. This was a primary reason why Congress created the effects-based claim under which Plaintiffs bring this suit: any required showing of intent on the part of legislators or the public "is unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities, [] places an inordinately difficult burden of proof on plaintiffs, and [] asks the wrong question." *Gingles*, 478 U.S. at 43-44 (internal quotation marks and citations omitted). Instead, whether vote dilution is "on account of race or color" is determined by the objective Senate Factors. *Nipper*, 39 F.3d at 1524, 1526.

--------

that Section 2 compliance is not a compelling state interest, Def.'s Br. at 8. No court has ever taken that position; this Court should not be the first.

Even if the motivations behind racially polarized voting were a relevant consideration, it is Defendant's burden to prove that race is not a factor. *Nipper*, 39 F.3d at 1524-26 & nn.60, 64. Here, Defendant's own expert testified he could not support that position; when asked whether, based on his research, he could say race is not a factor in voters' choice of political parties, he answered, "No, certainly not." 5 Tr. 957:9-11 (Hood). Dr. Hood further testified that white southerners transitioned to the Republican party after passage of the VRA "primarily [as] a function of racial and political dynamics." 5 Tr. 939:2-25; 940:7-10. In fact, the VRA was a "milestone in the development of the Republican Party in the south," as the "increasingly liberal orientation of the National Democratic Party on the issue of [c]ivil [r]ights affected white southerners." 5 Tr. 940:11-18 (Hood); *see also* 2 Tr. 294:12-22; 295:2-8 (McCrary). It was "black mobilization [that] led directly to the transition of whites in[to] the Republican party," which was "increasingly viewed as the party of racial conservatism." 5 Tr. 940:25-941:6 (Hood); *see also* 3 Tr. 542:23-543:8 (Sanders) ("[T]he more active African-Americans became in the Democratic party, the more whites began to go to the Republican party."). And this is by no means a trend of the past. Dr. Hood testified that the partisan divide in recent elections was caused in part by race, as demonstrated by the "association between resentment of minority races and voting for President Trump." 5 Tr. 936:1-4. According to Dr. Hood's 2012 book

on the topic, "a complete understanding of southern party politics requires a full appreciation for the role that race has played and continues to play in the region." 5 Tr. 957:12-17.

Plaintiffs' witnesses confirmed the significant role race plays in Alabama's modern partisan politics. Senator Sanders testified that he became a Democrat in part because "the Republican party seemed . . . adverse to the interests of black people," and that the same holds true today, though it may be expressed differently than in the past. 3 Tr. 540:19-23, 541:12-20. Likewise, Rep. Knight feels "comfortable within the Democratic party"—despite not agreeing with all of its views—because the party is "as fair as it possibly can be when it comes to racial issues"; by contrast, he "ha[s] never felt welcome in the Republican party in the state of Alabama" because it seems "one-sided when it comes to racial justice." 2 Tr. 341:24-343:15. Ms. Chestnut put it even more plainly: as a black woman, she does not feel welcome in the Republican party in Alabama because it is "hospitable to hate." 2 Tr. 448:17-449:24.

In sum, the reasons Alabamians vote in a racially polarized manner are irrelevant to a Section 2 claim. But even if they were, Defendant utterly failed to meet his burden to prove that race is not one of those reasons.

### III.    Plaintiffs proved a violation of Section 2 of the VRA.

### A.    *Gingles* 1

**Numerousness.** Plaintiffs' Illustrative Plans satisfy the Supreme Court's bright line rule governing the numerousness prong of the first *Gingles* precondition: in each, African Americans constitute more than 50% of the voting-age populations of CDs 2 and 7. *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) ("Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?"); *see* 1 Tr. 81-86 (Cooper); PX001 fig. 18; PX059 figs. 5, 7, 9.

Defendant's assertion that Plaintiffs use an incorrect metric to determine BVAP is both incorrect and irrelevant. As a legal matter, the Supreme Court has instructed that in cases involving an examination of African-American vote dilution alone, rather than "a comparison of different minority groups," courts should look at "*all* individuals who identify themselves as black," regardless of whether they also identify as another minority group. *Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003). That Defendant's own experts cannot agree on the proper alternative metric, *see* 5 Tr. 901:4-7 (Hood), 999:7-9 (Johnson), with neither proposing the metric actually used by the State, PX059 at 3 n.2; 5 Tr. 904:9-905:3 (Hood), 999:2-6 (Johnson), illustrates the logic behind the Supreme Court's instruction. Indeed, it is a cruel irony that, whereas throughout most of Alabama's history the State enforced

an over-inclusive "one drop" metric to deny its citizens fundamental rights, 2 Tr. 312:4-12 (McCrary), it now seeks to use an under-inclusive metric to deny African Americans protections under the VRA.[7]

Most importantly, as a practical matter, Defendant's quarrel over the proper BVAP metric is immaterial. As Dr. Hood agrees, and as Defendant has stipulated, at least two of the Illustrative Plans contain two majority-African-American districts according to even the most restrictive metric. 5 Tr. 914:10-20; Joint List of Agreed & Disputed Principal Facts ("SF"), ECF No. 95, ¶ 86.

Finally, Plaintiffs disproved Defendant's irrelevant assertion that the Illustrative Plans would not "function" as opportunity districts. *See* Pls.' Br. at 10. Even if it were relevant, Plaintiffs offered unrefuted evidence that if any of the Illustrative Plans were in place during the most recent congressional election, African Americans in illustrative CDs 2 and 7 not only would have been a majority

---

[7] To the extent Dr. Johnson claims to be using a metric adopted by U.S. Department of Justice, his trial testimony exhibited a blatant misunderstanding of the relevant guidelines. The DOJ guidelines describe a two-step process in which it first examines the single-race minority population, and then "move[s] to the second step" by allocating multi-race responses "on an iterative basis to each of the component single-race categories for analysis." PX125 at 4. Contrary to the clear language of these guidelines and their explicit citation to Footnote 1 in the *Georgia v. Ashcroft* opinion, Dr. Johnson believes that this second step is "a second method as an option." 5 Tr. 1011:2.

of the actual voters, but would have elected their candidates of choice by margins of at least 16 percentage points. 1 Tr. 178:21-179:9; PX080 ¶¶ 8, 11. Defendants' experts did not dispute these results: Dr. Hood agreed that CDs 2 and 7 in each plan "would function as African-American opportunity districts," 5 Tr. 933:4-16, and Dr. Johnson did not "even read" Dr. Palmer's analysis, 5 Tr. 998:12-14.

**Compactness.** The African-American communities in CDs 2 and 7 of each Illustrative Plan are geographically compact because they are "consistent with traditional districting principles." *Davis*, 139 F.3d at 1425; *see* Pls.' Br. at 10-15.

As to nearly every relevant traditional redistricting principle, there is no dispute. The Illustrative Plans maintain population equality. 1 Tr. 20:1-5 (Cooper); 5 Tr. 1033:22-24 (Johnson); SF ¶ 87; PX059 figs. 5, 7, 9; PX001 fig. 18. Their districts fall in the normal range of objective compactness scores. 1 Tr. 91:8-16 (Cooper); 5 Tr. 1022:10-21 (Johnson) (noting there is no threshold score to determine sufficient compactness); PX001 ¶ 85; PX045; PX059 fig. 11. They also maintain as many, and often more, traditional boundaries than the current plan. 1 Tr. 20:22-21:2, 61:12-62:6, 64:6-12 (Cooper); PX059 fig. 12; 5 Tr. 1029:13-16, 1035:7-25 (Johnson); SF ¶¶ 89-91. The Illustrative Plans are contiguous. 1 Tr. 20:15, 64:21-65:3 (Cooper); 5 Tr. 1035:14-17 (Johnson). And they do not create contests between incumbents. 1 Tr. 21:8-24, 68:4-6 (Cooper); 5 Tr. 1035:18-20 (Johnson); SF ¶ 88.

Defendant's assertions that the Illustrative Plans do not preserve enough of the cores of existing districts is a distraction: because a Section 2 plaintiff is specifically required to create a new majority-minority district, she can hardly be faulted for failing to maintain prior unlawful districts. *See* PX059 ¶¶ 21-22. Defendant cannot identify a single case in which a proposed majority-minority district has been rejected under *Gingles* 1 because it inadequately retained the core of existing districts, *see* 5 Tr. 921:15-922:2, and Dr. Johnson admitted that core retention usually decreases when a plan creates a new majority-minority district, *id.* at 1024:18-1025:8, particularly where a map requires more than a "slight[] adjust[ment]" to fix the VRA violation, *id.* at 1025:5.

Ultimately, the parties diverge on just one issue in relation to *Gingles* compactness: whether placing the City of Mobile into CD 2 impermissibly separates a community of interest. While the vast majority of Defendant's evidence was in support of this one assertion, none of it negates Plaintiffs' demonstration that the African-American population in southern and central Alabama is reasonably compact. First, Defendant's assertion that the width of CD 1 in Plaintiffs' Illustrative Plans would make it an inconvenient district to represent is legally irrelevant. The first *Gingles* precondition asks whether the *majority-minority districts* in the illustrative plan comply with traditional redistricting principles, *Gingles*, 145 U.S. at

50, and CD 1 is not a majority-minority district under the Illustrative Plans. Moreover, the Guidelines do not recognize the ease of a congressmember's travel as a redistricting consideration. In any event, even if this argument were relevant, CD 1 in the Illustrative Plans would be no more inconvenient to represent than current CDs 4 or 5, which are comparably compact and just as "broad geographically," 4 Tr. 689:19-21 (Byrne), as Illustrative CD 1. 1 Tr. 140:5-141:2 (Cooper); PX015; PX045.

Defendant essentially argues that any plan that separates the alleged economic communities contained in current CD 1 cannot sufficiently respect communities of interest under *Gingles* 1. This argument fails for a host of reasons. It ignores that under the Reapportionment Committee's own Guidelines, "communities of interest" falls at the bottom of a long list of factors to be considered in drawing a redistricting plan. It comes after population equality, preservation of county boundaries, compactness, contiguity, incumbent protection, and well after compliance with the VRA. *See* PX084. And the Guidelines instruct that communities of interest are to be respected only "to the extent that they do not violate or subordinate [these other] policies," with "[p]riority . . . given" to the VRA. *Id.* §§ IV.7, IV.7.d. Moreover, economic ties are just one of many interests that create a community; in fact, while the Guidelines do not identify economic ties as such an interest, they explicitly recognize many others, including common race or ethnicity. *Id.* § IV.7.d.

- 16 -

Even assuming CD 1 currently contains an economic community of interest, the Illustrative Plans unite geographic, cultural, racial and ethnic, regional, historic, governmental, and social communities of interest that the current plan divides. *E.g.,* 1 Tr. 65:16-20, 68:15-18 (Cooper); 3 Tr. 543:16-544:3 (Sanders); Pls.' Br. at 13. The African-American communities both within and near the Black Belt share an undisputable history of racial discrimination that continues to play an important role today. 3 Tr. 576:6-13 (Sanders) ("[Lynching and land confiscation] in our collective memory is so powerful. . . . [I]t's still there in a very powerful way.").

Plaintiffs' witnesses further explained that the Illustrative Plans unite African-American communities with a wealth of similar interests and needs in the urban centers of Mobile and Montgomery. Rep. Knight testified, for example, that during his 25 years in the Alabama House he observed many of the same concerns from African Americans in Montgomery and Mobile relating to education, criminal justice reform, and healthcare—issues relevant to a wide swath of Alabamians, but which impact African Americans in unique ways. 2 Tr. 340:14-15, 340:24-341:8. As to education, Ms. Chestnut explained that Mobile's predominantly African-American public schools are failing. 2 Tr. 420:10-421:5, 421:6-421:22. Rep. Knight identified the exact same issue in Montgomery. 2 Tr. 365:10-13; *see also* 1 Tr. 220:25-221:15 (Jones); 2 Tr. 421:23-422:7 (Chestnut). Rep. Knight, Ms. Chestnut,

and Ms. Jones also described criminal justice issues facing African Americans in Mobile and Montgomery, such as disproportionately high incarceration rates, 2 Tr. 340:2-11 (Knight); 2 Tr. 423:25-424:5 (Chestnut); 1 Tr. 218:8-14 (Jones), police brutality and strained relationships with law enforcement, 2 Tr. 423:1-25 (Chestnut); 1 Tr. 222:19-224:9 (Jones), and reintegration of those leaving prison, 2 Tr. 424:6-19 (Chestnut); 1 Tr. 222:4-16 (Jones). They also spoke about the housing crises the African-American communities face in both cities. 2 Tr. 427:6-14, 427:22-428:1 (Chestnut); 1 Tr. 225:13-226:2 (Jones); 2 Tr. 339:17-340:1 (Knight). And they described similar employment issues facing African Americans. 1 Tr. 224:10-225:12 (Jones), 2 Tr. 354:22-357:25, 358:13-359:16 (Knight), 2 Tr. 424:20-425:24 (Chestnut). Similarly, the Illustrative Plans unite African-American communities with common socioeconomic conditions. PX001 ¶ 102; PX051-59; *Terrebonne Parish*, 274 F. Supp. 3d at 425 (finding minority population compact under *Gingles* 1 in part because African-American residents in illustrative districts shared similar socioeconomic characteristics as compared to whites).

Indeed, the State has already recognized the communities of interests that the Illustrative Plans connect: the State Board of Education ("SBOE") Plan, governed by the same Guidelines, PX084 at 1, unites the same communities. PX001 fig. 1; SF ¶¶ 80, 83. Senator Dial, the former co-chairman of the Reapportionment

Committee, confirmed that the SBOE plan was drawn to respect "[t]he integrity of communities of interest." 3 Tr. 646:10-13. So too do the Illustrative Plans. *See Terrebonne Parish*, 274 F. Supp. 3d at 425 (finding minority communities formed a community of interest where they shared a district under other districting plans).

As the Guidelines acknowledge, "[i]t is inevitable. . . that some interests will be advanced more than others by the choice of particular district configurations." PX084 § IV.7.b; *see also* 3 Tr. 647:11-13 (Dial) ("[I]t's not always possible to protect communities of interest."). Defendant asks this Court to hold Plaintiffs' Illustrative Plans to a standard the Guidelines themselves recognize is impossible for any districting plan. While the State may choose to prioritize different communities of interest, its policy preference as to which communities deserve representation, and which do not, does not undermine Plaintiffs' showing under *Gingles* 1.

## B.    *Gingles* 2 and 3

With respect to *Gingles* 2, Defendant stipulates that African-American voters in CDs 1, 2, 3, and 7 vote cohesively. SF ¶ 104. Dr. Palmer offered unrebutted evidence confirming that fact. 1 Tr. 145:15-158:3, 169:11-170:7 (Palmer); PX079 ¶¶ 13-21, 32-36. Dr. Hood had "no basis . . . to refute Dr. Palmer's analysis of the extent to which African-Americans vote cohesively." 5 Tr. 907:13-16, 898:1-4.

And as for *Gingles* 3, Dr. Palmer offered unrebutted evidence that white voters

in the same area vote as a bloc usually to defeat the candidates preferred by African-American voters. In the statewide races analyzed, white Alabamians voted as a bloc 16 out of 18 times to defeat the candidate preferred by African Americans. 1 Tr. 158:5-160:10 (Palmer); PX079 ¶¶ 22-24. And in congressional races outside of CD 7, white Alabamians vote as a bloc to defeat all candidates preferred by African Americans. 1 Tr. 172:4-10 (Palmer); PX079 ¶¶ 37-39. Again, Dr. Hood offered no basis to refute Dr. Palmer's conclusions. 5 Tr. 898:5-16; *see also* 5 Tr. 897:1-7.[8]

As explained at greater length in Plaintiffs' Pre-Trial Brief, *see* Pls.' Br. at 15-18, this evidence easily satisfies the second and third *Gingles* preconditions.

### C.    Totality of the Circumstances

The purpose of Section 2's totality of the circumstances test is to confirm what the *Gingles* preconditions suggest: that Alabama's congressional map "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47. The Senate Factors, which animate this test, identify specific aspects of day-

---

[8] To reach these conclusions, Dr. Palmer utilized ecological inference, a method that Dr. Hood not only uses himself when analyzing racially polarized voting, but also that Dr. Hood believes "provides the most reliable and realistic estimates of voter choice" among "the current statistical tools that can be employed to aid in vote dilution analysis." 5 Tr. 897:8-23.

to-day life that Congress has determined often impose barriers to a minority group's political participation. At trial, Plaintiffs offered unrebutted evidence that all of the relevant Senate Factors weigh heavily in favor of a finding of unlawful vote dilution.

As for the two factors the Supreme Court has recognized as most important— whether voting is racially polarized (Factor 2) and the extent to which African Americans have been elected to public office (Factor 7), *see Gingles*, 478 U.S. at 48 n.15—the evidence was overwhelming. With respect to Factor 2, voting in CDs 1, 2, 3, and 7 is not only racially polarized, but significantly so: nearly 95% of African Americans vote for the same candidates, and nearly 85% of white voters support the opposing candidates. 1 Tr. 157:2-20, 158:1-4, 169:11-170:7 (Palmer). This reality has produced jarring electoral outcomes relevant to the seventh factor: not a single African American has been elected to statewide office since the turn of the century— indeed, only two have ever been elected in the State's history, SF ¶ 159—and virtually all African-American representatives in the Alabama Legislature are elected from majority-minority districts, almost all of which were created as a result of judicial intervention. 2 Tr. 304:9-305:12 (McCrary); 2 Tr. 379:8-25 (Knight); 3 Tr. 577:13-20 (Sanders). This lack of representation in Alabama has a "profound impact" on the lives of African Americans. 3 Tr. 559:7-559:23 (Sanders).

With respect to the first and third Senate Factors, Plaintiffs have proven

Alabama's notorious history of official voting-related race discrimination and its ongoing use of voting practices that enhance such discrimination. Pls.' Br. at 19-25; *see* 2 Tr. 264:17-311:7 (McCrary); 3 Tr. 556:20-558:10 (Sanders). At trial, Alabamians who have lived this discrimination brought this reality to life, from bombings and lynchings, 2 Tr. 349:19-23 (Knight), 2 Tr. 442:22-443:14 (Chestnut), to racially-targeted, unfounded prosecutions of voter fraud, 3 Tr. 549:17-551:11 (Sanders). This terror and persecution continues to stoke fear among African Americans, depressing political participation. 2 Tr. 361:21-363:21 (Knight); 3 Tr. 551:17-553:23 (Sanders).

With respect to the fifth Senate Factor, it is undisputed that significant disparities exist between African-American and white Alabamians among virtually every dimension of life. 1 Tr. 99:14-100:2, 102:12-108:1 (Cooper); 5 Tr. 896:10-15 (Hood); SF ¶¶ 139-151. At trial, Plaintiffs' fact witnesses described the daily toll imposed by disparities in access to health care, 1 Tr. 220:3-24, 244:22-25 (Jones), 2 Tr. 425:25-427:5 (Chestnut), 2 Tr. 473:13-474:20 (Tyson); education, 1 Tr. 221:16-222:3 (Jones), 2 Tr. 365:10-366:3 (Knight), 2 Tr. 420:6-422:25 (Chestnut), 3 Tr. 562:5-25 (Sanders); criminal justice, 1 Tr. 221:20-224:9 (Jones), 2 Tr. 338:11-14, 340:2-11, 353:11-21 (Knight), 2 Tr. 423:1-424:5 (Chestnut), 2 Tr. 475:13-476:1 (Tyson); employment and income, 1 Tr. 224:10-225:12 (Jones), 2 Tr. 354:22-

357:25, 358:13-359:16 (Knight), 2 Tr. 424:20-425:24 (Chestnut); access to working utilities, 1 Tr. 226:3-25 (Jones); and affordable housing, 1 Tr. 225:13-226:2 (Jones), 2 Tr. 339:17-340:1 (Knight), 2 Tr. 427:6-428:1 (Chestnut), 2 Tr. 474:21-475:12 (Tyson). It cannot be disputed that such disparities stem from this State's long history of entrenched discrimination. *See* 2 Tr. 331:14-332:22 (McCrary); 2 Tr. 331:20-22, 364:24-366:3, 367:16-369:22 (Knight); 3 Tr. 562:5-563:13 (Sanders).

Though Plaintiffs are not required to prove that these disparities result in barriers to electoral participation among African Americans, their impact is clear. For example, because they disproportionately work multiple, lower-paying jobs, African Americans have less opportunity to spend time and resources obtaining an ID, registering to vote, visiting a polling place, and standing in long lines to cast a ballot. 2 Tr. 358:1-13, 359:17-360:17, 363:22-364:12, 375:16-24 (Knight). Because they have fewer resources, African Americans tend to move residences more often, and each time they do, they must pay a fee to alter the address on their ID before casting a vote. 2 Tr. 483:6-18, 488:21-491:12 (Tyson). At a certain point, the cumulative effect of socioeconomic difficulties African Americans disproportionately face makes the process of voting "prohibitive." 3 Tr. 564:24-565:11 (Sanders). And making matters worse, irregularities in the voting process disproportionately occur in African-American communities, including polling-place

changes without notification, registration-record mismanagement, and DMV closures. 1 Tr. 234:24-236:18 (Jones); 2 Tr. 375:25-376:19, 377:12-379:7 (Knight); 2 Tr. 488:2-20 (Tyson); 3 Tr. 545:18-549:17 (Sanders).

As to the sixth Senate Factor, the Court heard testimony regarding the various ways in which Alabama politicians use race to stereotype racial minorities and prey upon the fears of white voters. 1 Tr. 228:11-232:7 (Jones); 2 Tr. 345:23-346:6 (Knight); 2 Tr. 429:2-432:18, 437:11-442:6 (Chestnut); 3 Tr. 506:11-509:8 (Tyson). For example, Ms. Chestnut explained how Representative Brooks' assertions that there is an ongoing "war on whites" "incites fear" by suggesting to Alabamians that "white people should be afraid of people that don't look like them, people that look like me, people that look like my husband . . . [and] my granddaughter." 2 Tr. 430:2-6. And last year, the Chief Justice of the Alabama Supreme Court touted how he had "taken on" racial-justice organizations such as the Southern Poverty Law Center, the same organization that sought to determine who had planted a burning cross on Representative Knight's lawn. *See* 2 Tr. 382:6-383:11 (Knight); 2 Tr. 440:3-20 (Chestnut). Aside from deepening the racial divide within the electorate, these statements alienate African Americans by making them feel as if they "don't matter" and that they are "second class citizen[s]." 2 Tr. 431:9-15, 441:4-6 (Chestnut).

*          *          *

Ultimately, what emerged at trial were two very different political realities. From the perspective of Senator Sanders, for example, race has defined not only his childhood, but his present reality: his right to vote, his views on and experiences in education and criminal justice, and his continued fight for equality in all aspects of his professional, political, and civic life. *E.g.,* 3 Tr. 565:12-17, 568:2-569:25. But from the perspective of Congressman Byrne, race is of no import: he does not know the African-American composition of his district, he does not remember racially incendiary statements made by fellow politicians, and despite the universally recognized disparities discussed above, he sees no difference between the needs of his African-American constituents and those of his white constituents. *E.g.*, 4 Tr. 717:1-19, 723:8-724:22, 728:8-729:3. One need not disbelieve either of these two Alabama representatives to recognize that the reality of daily and political life is different for African-American and white Alabamians. That is precisely the scenario in which the totality-of-the-circumstances confirms that submergence of African-American voters into districts where they lack political power denies them "a seat at the table," 2 Tr. 455:5 (Chestnut), and violates the VRA.

## IV.    Conclusion

The trial evidence proved that Alabama's current congressional plan dilutes the voting strength of African Americans in violation of Section 2 of the VRA.

Dated:  December 13, 2019

Richard P. Rouco (AL Bar. No.
6182-R76R)
**Quinn, Connor, Weaver, Davies
& Rouco LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
Email: rrouco@qcwdr.com

Respectfully submitted,

By /s/ *Bruce V. Spiva*
Marc E. Elias (admitted *pro hac vice*)
Bruce V. Spiva (admitted *pro hac vice*)
Uzoma N. Nkwonta (admitted *pro hac vice*)
Aria C. Branch (admitted *pro hac vice*)
Lalitha D. Madduri (admitted *pro hac vice*)
Daniel C. Osher (admitted *pro hac vice*)
**Perkins Coie LLP**
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6200
Fax: (202) 654-9106
Email: MElias@perkinscoie.com
Email: BSpiva@perkinscoie.com
Email: UNkwonta@perkinscoie.com
Email: ABranch@perkinscoie.com
Email: LMadduri@perkinscoie.com
Email: DOsher@perkinscoie.com

Abha Khanna (admitted *pro hac vice*)
**Perkins Coie LLP**
1201 Third Avenue, Ste. 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
Email: AKhanna@perkinscoie.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 13, 2019, I filed a copy of the foregoing

Plaintiffs' Post-Trial Brief with the Clerk of the Court using the CM/ECF system,

which will send notification of such filing to all counsel of record.

> */s/ Bruce V. Spiva*
> Bruce V. Spiva
> **Perkins Coie LLP**
> 700 13th St. N.W., Suite 600
> Washington, D.C. 20005-3960
> Phone: (202) 654-6338
> Fax: (202) 654-9106
> Email: BSpiva@perkinscoie.com

- 27 -