FILED
2020 Mar-17 PM 01:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| LAKEISHA CHESTNUT, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 2:18-CV-00907-KOB |
| JOHN H. MERRILL, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

At the dawn of our nation, Alexander Hamilton adopted the words of the philosopher Montesquieu and wrote that "there is no liberty if the power of judging be not separated from the legislative and executive powers." *The Federalist No. 78*, at 465 (Alexander Hamilton) (Clinton Rossiter ed. 1961). The founding fathers instituted the separation of powers, which lies at the very foundation of American democracy, to protect liberty. Occasionally, that careful separation creates situations in which the court must abstain from delivering judgment, even where it might wish to interject, to respect the structure of our democratic government. This is one such case.

The Plaintiffs in this case raise issues under § 2 of the Voting Rights Act. However, the court cannot reach the merits of those issues because it lacks the ability to grant the Plaintiffs effective relief under the facts of the case. This inability to provide relief renders the case moot and, moreover, creates a situation in which any opinion issued by this court would be an advisory opinion addressed to the legislature in contravention of the separation of powers. This court's power of judging must remain separate from the legislative powers of creating new congressional districts, so the court must dismiss this case as moot and jurisdictionally barred.

### I. Background

Every ten years, the federal government conducts a census that provides the basis for congressional districting. *See 2020 Census: What is the Census?*, U.S. Census Bureau, https://www.census.gov/programs-surveys/decennial-census/2020-census/about.html (last visited Mar. 13, 2019). In 2011, the Alabama Legislature passed Alabama Act No. 2011-518 (S.B. 484), now codified as Ala. Code § 17-14-70, which redrew Alabama's congressional districts based on numbers from the 2010 federal census. *See* S.B. 484, 2011 Reg. Sess. (Ala. 2011). S.B. 484 established seven congressional districts throughout Alabama, with one majority-minority district in District 7.

The Plaintiffs in this case, ten African American voters residing in Alabama Congressional Districts 1, 2, 3, and 7, argue that Alabama's congressional districts as established by S.B. 484 violate § 2 of the Voting Rights Act, 52 U.S.C. § 10301, by "packing" and "cracking" African American voters between congressional districts to dilute African American voting strength. (Doc. 14). The Plaintiffs allege that Alabama only has one majority-minority congressional district—District 7—despite the fact that the African American population in Alabama is sufficiently numerous and geographically compact to support a second majority-minority district. Further, the Plaintiffs allege that § 2 of the VRA *requires* the creation of such a district.

The Plaintiffs argue that they can show evidence of a variety of factors indicating that, considering the totality of the circumstances, Alabama's current congressional districting plan based on the 2010 federal census violates § 2 of the VRA by impermissibly diluting African American voting strength such that African Americans have less opportunity to elect representatives of their choice than other members of the electorate. In relief, the complaint

requests that this court (1) declare the current districting scheme unconstitutional; (2) order adoption of a valid congressional districting plan that includes a second majority-minority district; (3) issue an injunction preventing Alabama from giving effect to the current district boundaries or conducting elections using those boundaries; (4) conduct any legal proceedings necessary to order a new districting plan that comports with § 2; and (5) grant any other relief the court might deem appropriate.

The Defendant, Alabama Secretary of State John Merrill, filed an answer admitting to certain of the Plaintiffs' factual allegations, but denying that Alabama's constitutional districting plan violates § 2 of the VRA. (Doc. 17). Secretary Merrill then filed a motion for judgment on the pleadings, arguing that jurisdiction lay with a three-judge panel, that the Plaintiffs had failed to establish a viable remedy, and that the Plaintiffs' claims were barred by the doctrine of laches. (Doc. 27).

This court entered a memorandum opinion and order finding that the case did not require a three-judge panel to establish jurisdiction because it was filed purely under § 2 of the VRA and did not raise a constitutional challenge to the apportionment of congressional districts. (Doc. 40). This court then entered a separate memorandum opinion addressing the remaining arguments in Secretary Merrill's motion for judgment on the pleadings. (Doc. 52). The court found that the Plaintiffs sufficiently pled the ability to create a second majority-minority congressional district to defeat the assertion that they had not pled a viable remedy. However, the court found that, pursuant to the doctrine of laches, the delay by the Plaintiffs in bringing their suit barred any relief except for declaratory relief. Thus, only declaratory relief remains available to the Plaintiffs at this time.

The parties did not file any additional dispositive motions. The Defendant did not raise the issue of mootness until pretrial conferences and pretrial briefing. (Doc. 79 at 3; doc. 101 at 17–22).

The court held a bench trial in which the Plaintiffs and the Defendant offered expert and lay testimony regarding whether Alabama's congressional districting complies with § 2 of the VRA. As part of their case, the Plaintiffs presented expert testimony from Mr. William Cooper, a redistricting and demographics expert, indicating that two majority-minority districts that complied with traditional districting principles could be created in central and south Alabama, each with slightly more than 50% black voting age population. (Doc. 103 at 19). To reach those numbers, Mr. Cooper reconstituted all of the current congressional districts except for District 5 in varying ways that allowed him to connect African American population centers.

Mr. Cooper testified that, in creating proposed redistricting plans, he relies primarily on data produced by the Census Bureau after the decennial census. (Doc. 103 at 15). He went on to state that his proposed illustrative districting plans were based on the numbers from the 2010 census, though he had also looked at some more recent population "estimates." (*Id.* at 15, 35). Mr. Cooper described his proposed congressional districting plans and explained why he believed that they complied with traditional redistricting principles. Mr. Cooper stated that his plans all had two districts with more than 50% black voting age population, although the black voting age population in each district was under 52%. (*Id.* at 81–86). The highest black voting age population in any of the majority-minority districts in Mr. Cooper's proposed plans was 51.95%, while the lowest was 50.33%. (*Id.*). Mr. Cooper also testified that he thought a "reasonable likelihood" exists that the African American population in Alabama would support two majority-minority districts even if Alabama went to a six-congressional-district plan after the

2020 census. (*Id.* at 22). In addition to testifying about proposed congressional districts, Mr. Cooper also testified about socioeconomic disparities between black and white voters.

During Mr. Cooper's direct examination, the Defendant argued that information about population growth after the 2010 census was not germane to the issues of Alabama's 2011 districting plans. (Doc. 103 at 38). Over the Plaintiffs' objection, the court agreed with the Defendant and found that information about the population in 2017 lacked relevance. (*Id.* at 38). The court later agreed with the caveat that witnesses for the Defendant also could not present testimony about evidence that was not related to the 2011 districting plan at issue in this case. (*Id.* at 98).

On cross-examination, Mr. Cooper testified that he did not believe that preserving the cores of existing congressional districts was a traditional districting criterion. (Doc. 103 at 121). Regarding the viability of his proposed congressional plans, Mr. Cooper testified that he had "no idea" if the Alabama Legislature could pass his proposed illustrative plans in 2020-2021 because "it's all speculative" and a possibility exists that the plans would have to be adjusted based on new census data. (*Id.* at 136). He also mentioned that he did not know if his proposed District 7 would need to be expanded or not because it includes Tuscaloosa County, a "fast-growing" county. (*Id.*) On redirect, Mr. Cooper clarified that core retention of existing districts did not appear in the State Reapportionment Committee's guide to redistricting. (*Id.* at 137–38).

The Plaintiffs then called multiple other expert and lay witnesses to testify regarding racially polarized voting in Alabama, the history of voter suppression in Alabama, communities of interest, and other relevant considerations necessary to assess the totality of the circumstances in this case. The Plaintiffs rested their case and the Defendant presented multiple of his own

expert and lay witnesses seeking to show that Alabama's current congressional districting scheme complies with § 2 of the VRA.

As one of his witnesses, Secretary Merrill called retired Alabama Senator Gerald Dial, who recently chaired the Alabama Legislature's Reapportionment Committee. Senator Dial testified that the Alabama Legislature has consistently understood preservation of the cores of existing congressional districts to be a traditional districting principle. (Doc. 105 at 633–34). A later expert witness for the Defendant, Dr. Trey Hood, admitted that while the Alabama redistricting guidelines for the 2000 redistricting cycle mentioned core retention, the revised 2011 guidelines do not explicitly reference retaining the cores of existing congressional districts. (Doc. 107 at 916–18). He also stated that, regardless, an interest in core preservation could not trump compliance with § 2 of the VRA as a redistricting consideration. (*Id.* at 918). In answer to a question regarding whether Alabama appeared to care about core retention based on its previous districting plans, Dr. Hood stated that "population has to be equalized across redistricting cycles. That's the chief goal always." (Doc. 107 at 951).

## II.     Principles of Law

Section 2 of the VRA renders unlawful any state "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A state's procedures violate § 2 of the VRA where the totality of the circumstances shows that "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by minorities, and members of the minority "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b). Dilution of minority voting strength through dispersal or concentration of minority

6

voters can constitute a violation of § 2. *Thornburg v. Gingles*, 478 U.S. 30, 46–47 & n. 11 (1986). In short, a state violates § 2 of the VRA if its districting plan provides less opportunity for a racial minority to elect representatives of their choice than other members of the electorate. *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 425 (2006).

Section 2 of Article III of the United States Constitution limits the jurisdiction of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2. From this limitation arises the doctrine of justiciability, which recognizes the federal judiciary's unelected status, "prevents courts from encroaching on the powers of the elected branches of government[,] and guarantees that courts consider only matters presented in an actual adversarial context." *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1335 (11th Cir. 2001). "The doctrine of mootness derives directly from the case-or-controversy limitation because 'an action that is moot cannot be characterized as an active case or controversy.'" *Id.* (quoting *Adler v. Duval County Sch. Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997)).

The Supreme Court has stated that "[i]t has long been settled that a federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green,* 159 U.S. 651, 653 (1895)). Stated differently, a court has no jurisdiction over a moot case, so the court must consider any issues of mootness before proceeding to the merits of a case. *Al Najjar*, 273 F.3d at 1336. A moot case must be dismissed for lack of jurisdiction, even where "all briefs have been filed, oral argument has been held, and nothing remains but the issuance of this Court's opinion," or, as in this case, after testimony has been heard. *United States v. Koblan*, 478 F.3d 1324, 1325 (11th Cir. 2007).

7

A case becomes moot when the issues "are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). Therefore, a court must find a case moot where it "can no longer offer any effective relief to the claimant." *Gagliardi v. TJCV Land Tr.*, 889 F.3d 728, 733 (11th Cir. 2018). Further, a "declaratory judgment devoid of 'sufficient immediacy and reality' cannot render a case justiciable." *Id.* at 735 (quoting *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975)).

In other words, a case is moot where the relief requested would not have any "practical effect on the rights or obligations of the litigants." *Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs, Georgia*, 868 F.3d 1248, 1264 (11th Cir. 2017). A decision on the merits of a moot case constitutes an "impermissible advisory opinion." *Al Najjar*, 273 F.3d at 1336.

### III. Discussion

Before the court can address whether Alabama's current legislative districting scheme violates § 2 of the VRA, it must determine whether it has jurisdiction or whether it must dismiss the case as moot. *See Al Najjar*, 273 F.3d at 1336. In his pretrial brief, Secretary Merrill argued for the first time that this court's decision denying injunctive relief based on the doctrine of laches rendered this entire case moot because conditions will have changed when the state conducts new districting after the 2020 census. (Doc. 101 at 18). Secretary Merrill argued that the congressional districting plan instituted after the upcoming census will necessarily reflect population shifts and perhaps even a change in the number of legislative districts, all of which would render a declaratory judgment in this case based on the 2010 census advisory at best. Further, Secretary Merrill asserted that any argument about the effectiveness of declaratory relief as a benchmark for future legislative plans is rooted in preclearance under § 5 of the VRA, which no longer applies.

8

The Plaintiffs' pretrial brief did not address the issue of mootness. (*See generally* doc. 102). However, after conducting the bench trial in this case, the court requested supplemental briefing from the parties on the mootness issue. (Doc. 109). In their post-trial briefing, the Plaintiffs argue that a declaratory judgment in this case "can prevent future dilution of Plaintiffs' voting strength." (Doc. 112 at 1–2). The Plaintiffs assert that the Defendant bears the burden of showing mootness and cannot meet that burden in this case because a declaratory judgment would significantly impact Alabama's 2021 redistricting. Because of limited evidence regarding population shifts offered at trial, Plaintiffs argue that the Defendant cannot meet the burden of showing that population demographics in Alabama will be sufficiently different after the 2020 census to render this case moot. They go on to assert, however, that the population of African Americans in Alabama has increased since the 2010 census in a way that supports their position that Alabama must have two majority-minority congressional districts. Plaintiffs also argue that even without retrogression analysis under § 5 of the VRA, a declaratory judgment would have an effect on future districting because of Alabama's focus on "core retention" in redistricting.

In his response to the Plaintiffs' mootness brief, Secretary Merrill argues that a declaratory judgment in this case would not obligate the Alabama Legislature to draw new districts in a particular manner in 2021, so a declaratory judgment has no practical effect on the parties. (Doc. 115 at 7). He elaborates that a declaratory judgment in this case would only have the effects the Plaintiffs desire if the opinion were advisory in nature.

The court finds that this case is indeed moot because this court's decision on the application of the doctrine of laches, combined with the impending 2020 census, prevents the court from being able to offer any meaningful relief to the Plaintiffs. As an initial matter, the court addresses the issue of who bears the burden of showing mootness in this case.

9

Citing *World Wide Supply OU v. Quail Cruises Ship Mgmt,* the Plaintiffs assert that "[t]he burden of establishing mootness rests with the party seeking dismissal." 802 F.3d 1255, 1259 (11th Cir. 2015) (quoting *Beta Upsilon Chi Upsilon Ch. at the Univ. of Fla. v. Machen*, 586 F.3d 908, 916 (11th Cir. 2009)). However, research reveals that the issue is not so straightforward. As the *Beta Upsilon* case relied upon by the Court in *World Wide Supply* and an abundance of other cases from the Eleventh Circuit show, the burden of showing mootness typically arises in cases involving mootness under the "voluntary cessation" doctrine, in which the party seeking dismissal on mootness grounds must show that the ceased objectionable behavior will not recur. *Beta Upsilon Chi Upsilon Ch. at the Univ. of Fla.*, 586 F.3d at 916; *see also, e.g., Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1247 (11th Cir. 1998) (discussing the "heavy burden" of demonstrating mootness in cases involving voluntary cessation); *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1355 (11th Cir. 2019) (stating that a party asserting mootness based on voluntary cessation bears a "heavy" and "formidable" burden). In fact, even *World Wide Supply* dealt with the potential reoccurrence of behavior after an alleged lapse in *in personam* jurisdiction. *World Wide Supply OU,* 802 F.3d at 1259 (stating that "the fact that the property had left the district did not moot the appeal because the district court would again have personal jurisdiction over [the defendant] if the attachment were reinstated").

The fact that mootness is a jurisdictional issue further undercuts the Plaintiffs' argument that the Defendant bears the burden of showing mootness in this case. *See Al Najjar*, 273 F.3d at 1336. The Eleventh Circuit has stated that, because mootness presents a threshold jurisdictional question, a court must consider mootness *sua sponte* even if the issue is not raised by the parties and must dismiss any case that "no longer presents a viable case or controversy." *Brooks v.*

10

*Georgia State Bd. of Elections*, 59 F.3d 1114, 1118 (11th Cir. 1995) (quoting *Pacific Ins. Co. v. General Development Corp.,* 28 F.3d 1093, 1096 (11th Cir. 1994)). The instant case does not involve mootness because of a voluntary cessation of behavior by the Defendant, but, rather, involves developments that may deprive the action of a viable case or controversy. Therefore, the court would have been required to consider mootness even if the issue had not been raised or argued by either party. *See id.* Because of the court's obligation to *sua sponte* determine jurisdiction, the court must consider the facts on the record and assess whether jurisdiction lies with this court, regardless of who bears the burden of proof. But, even if the burden rests on the Defendant, the Defendant could make the requisite showing in this case.

The facts in this case combine to show that the case no longer presents live issues in which the parties have a "legally cognizable interest in the outcome." *See Powell*, 395 U.S. 496. In its decision regarding the application of the doctrine of laches, this court found that the delay by the Plaintiffs in bringing this case barred them from seeking any injunctive relief. (Doc. 52 at 14). This court found, however, that the doctrine of laches did not bar declaratory relief because the Defendant could not make the requisite showing of prejudice. In finding that declaratory relief was still available to the Plaintiffs, the court noted that "finding the current plan unconstitutional—if it is—would prevent the committee from reusing the plan as the basis for the 2021 plan." (*Id.* at 14–15).

Upon further consideration of the law and the parties' arguments, the court finds it necessary to expand upon that statement. In stating that a declaratory judgment would prevent the legislature from using the current congressional districting plan as a "basis" for the 2021 plan, the court relied on a holding from the Eleventh Circuit that specifically stated that declaratory relief in a similar situation could prevent the use of an unconstitutional plan "as a

11

baseline for retrogression analysis" under § 5 of the VRA. *Sanders v. Dooly Cty., GA*, 245 F.3d 1289, 1291 (11th Cir. 2001).

The Supreme Court came to the same conclusion in another similar case, *Reno v. Bossier Par. Sch. Bd.*, in which it determined that an action for a declaratory judgment stating that a voting scheme was unconstitutional was not moot because the unconstitutional plan had the potential to be used to evaluate retrogression to obtain preclearance of a subsequent voting scheme under § 5. 528 U.S. 320, 327–28 (2000). In both of those cases, the Court emphasized that the cases were not moot because the prior schemes, if not found to be unconstitutional, would be used for retrogression analysis under § 5 of the VRA.

But since the decisions in those cases, the legal landscape regarding § 5 preclearance has changed.

Section 5 of the VRA prohibits covered jurisdictions from adopting any retrogressive districting change that has the purpose or effect of diminishing the ability of a minority group to elect their preferred candidates of choice. 52 U.S.C. § 10304(b). Under § 5, no covered jurisdiction can make a change in voting procedures without first obtaining "preclearance" from the federal government by showing that the proposed districting plan did not result in "retrogression" that diminished a minority group's proportionate strength such that the group no longer maintained its ability to elect candidates of its choice. *Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 535, 549 (2013). Thus, the retrogression analysis for § 5 preclearance requires the direct comparison of a new proposed districting plan with the previous plan. But, as the parties agreed in their proposed principles of law, the § 5 retrogression analysis and the need for a "benchmark" no longer apply after the Supreme Court's decision in the *Shelby County* case. *See Shelby Cty., Ala.*, 570 U.S. 529; (doc. 94 at 12).

Because § 5 preclearance no longer applies in Alabama, the court's previous statement about a declaratory judgment preventing the use of the current plan as a basis for the 2021 redistricting—a statement relying on a case involving a retrogression baseline—carries little practical weight. Without the strictures and procedures provided by § 5—which required comparing a new districting plan to an old districting plan to avoid retrogression—no legally mandated reason exists to treat Alabama's current congressional districting plan as a "baseline" or "basis" for the new districting plan that will go into effect after the 2020 census. Further, a finding in this case that a declaratory judgment would have a practical effect because of its use as a baseline for a future plan would go beyond the current jurisprudence of both the Supreme Court and the Eleventh Circuit, which places an emphasis on § 5 retrogression analysis as the reason that a declaratory judgment regarding a current voting scheme could still have a practical effect on the litigants.

The Plaintiffs attempt to sidestep this § 5 issue by arguing that if the court issues a declaratory judgment stating that the current congressional map "dilutes African American voting strength in central and southern Alabama in violation of the Voting Rights Act, the state will remedy that dilution when it redraws the congressional map following the 2020 census." (Doc. 112 at 3). They argue that, if this court issues declaratory relief, the state will not be able to use the current map as a "starting point" for redrawing the new congressional districts. However, without a requirement for a comparison of districting plans for retrogression purposes, the tenuous connection between Alabama's current districting plan and the upcoming 2021 plan simply does not support such an extension of the higher Courts' jurisprudence because of the differing factual circumstances that will necessarily underlie the 2011 and 2021 districting plans.

The Plaintiffs argue that the record contains insufficient evidence of the differing conditions between the 2011 districting and the upcoming 2021 districting to show mootness. It is true that, at trial, the court agreed with the Defendant's motion to limit the admission of specific evidence of post-2010 population shifts as irrelevant. (Doc. 103 at 38). Even so, the record reveals that the conditions underlying the current 2011 congressional districting plan are, at least when viewed within the framework of § 2 of the VRA, sufficiently different from the circumstances of the upcoming 2021 districting plan to render this case moot.

Electoral districts expire every ten years because the federal government conducts a new census, which the state then uses to create an updated redistricting plan. *See 2020 Census: What is the Census?*, U.S. Census Bureau, https://www.census.gov/programs-surveys/decennial-census/2020-census/about.html (last visited Mar. 13, 2019). It does not take a census scholar to recognize that the government conducts these periodic censuses and redistrictings because populations and their distributions change. *See id.* The parties acknowledge these population changes in their stipulated facts, stating that "Alabama's population shifts between every census" and agreeing that Alabama's African American population grew by around 5% between 2010 and 2017. (Doc. 95 at ¶¶ 47, 51).

These relatively abstract and limited changes in circumstances between redistrictings might not be significant in a mootness analysis were it not for the extremely factually specific nature of § 2 vote dilution cases. As the Eleventh Circuit noted, § 2 cases alleging vote dilution are "inherently fact-intensive." *Nipper v. Smith*, 39 F.3d 1494, 1498 (11th Cir. 1994). The fact-intensive nature of § 2 inquiries springs in large part from the fact-based showing necessary to prove a violation of § 2; to show that a particular districting plan violates § 2 of the VRA, a plaintiff must show effective vote dilution by establishing three threshold requirements, or

14

"preconditions," originally set forth in *Thornburg v. Gingles*. 478 U.S. at 48–51. One thing that a plaintiff must show to succeed on a § 2 claim is a geographically compact minority population sufficient to constitute a majority in a single member congressional district. *Id.*

This showing required under the first *Gingles* precondition can be extremely delicate and numerical in nature; the plaintiff must be able to show a minority voting age population of more than 50% in a proposed election district that is sufficiently compact, meaning that it takes "into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009); *Abrams v. Johnson*, 521 U.S. 74, 91 (1997) (quoting *Bush v. Vera,* 517 U.S. 952, 977 (1996) (plurality opinion)).

The delicacy of the redistricting calculus shows in the facts of the instant case. The Plaintiffs presented expert testimony asserting that they could make two reasonably compact majority-minority congressional districts various ways, but all of the Plaintiffs' proposed districting plans had two districts in which African-Americans exceeded 50% of the population of the proposed majority-minority districts by only razor-thin margins that were less than 2% and often less than 1%. (Doc. 103 at 81–86). Further, the parties argued strenuously about whether the Plaintiffs' proposed districts were sufficiently compact.

The narrowness of the numerical margins in the proposed plans and the heatedness of the compactness debate serves to emphasize that *any* change to the population makeup and distribution in Alabama will fundamentally change the districting calculus. The 2021 census will reveal new population statistics and there is simply no way to be at all confident that, especially in light of the bare majorities that the Plaintiffs were able to put forth for their proposed majority-minority districts, the new statistics will allow for districting similar to the current legislative districting plan or similar to the Plaintiffs' proposed plans.

Some of the Plaintiffs' testimony even glancingly acknowledges this fact. Mr. Cooper testified about the "reasonable likelihood" that Alabama could sustain two majority-minority districts if, as he admitted was possible, Alabama went to a six-district congressional plan. (Doc. 103 at 22). Mr. Cooper also admitted that Tuscaloosa County is "fast growing" and that his proposed districting plans were speculative and might have to be adjusted based on new census data. (Doc. 103 at 22, 136). This testimony shows the lack of certainty regarding what will happen with the upcoming census and emphasizes the fact that it will create a new factual background against which redistricting must be performed.

In short, even if this court were to find that Alabama's current congressional districting plan violates § 2 of the VRA, that finding would be based on such specific population numbers and distributions that the inevitable change brought by the upcoming census would render the finding obsolete and of no import.

The Plaintiffs attempt to assert the effectiveness of a declaratory judgment by arguing that a finding that the current congressional districting plan violates § 2 would provide a basis for the future redistricting plan because of the state's interest in retaining the cores of existing congressional districts. This argument falls prey to the same issues discussed above. Whether the state can or cannot retain the cores of its current congressional districts while complying with § 2 of the VRA will depend entirely on the population statistics shown by the 2020 census.

As an initial matter, to what extent the Alabama Legislature considers core retention as a redistricting principle is not clear. Mr. Cooper argued that core retention is not a traditional redistricting principle and the redistricting guidelines in Alabama do not explicitly mention core retention, but Senator Dial testified that the Alabama Legislature has consistently considered core retention when redistricting. (Doc. 103 at 121; doc. 107 at 916–918). Even giving

Plaintiffs the benefit of the doubt—or, more accurately, giving their current argument the benefit of the doubt, as they originally took the position that core retention is not a traditional districting principle—the issuance of a declaratory judgment in this case lacks sufficient practical effect to avoid mootness.

The 2021 congressional redistricting in Alabama will ultimately be determined by two things: the new 2020 census data and the governing law. Both the data and the law render any declaratory judgment by the court at the current juncture moot. As discussed above, the specifics of the "fact-intensive" § 2 analysis will change with the arrival of the new census information. *See Nipper*, 39 F.3d at 1498. As Dr. Hood testified, population equalization across redistricting cycles is "the chief goal" in redistricting after a new census, and that will depend entirely on the census data. (Doc. 107 at 951).

Another piece of Dr. Hood's testimony provides further context: an interest in core retention cannot trump compliance with the VRA. (*Id.* at 918). Regardless of Alabama's current congressional districting plan or any decision by this court in this case, § 2 of the VRA binds the Alabama Legislature and the 2021 redistricting process. *See Abbott v. Perez*, 138 S. Ct. 2305, 2315 (2018) (noting that a state is "required to comply" with § 2 of the VRA). Further, the Plaintiffs admit that "the state's redistricting guidelines have consistently required that any congressional plan adhere to the Voting Rights Act." (Doc. 112 at 3). Therefore, all of the Plaintiffs' arguments about a declaratory judgment in this case remedying future vote dilution under § 2 merely ask the court to reiterate an obligation already incumbent upon the Alabama Legislature. Because this request for relief effectively duplicates a standing obligation established by Congress, a declaratory judgment in this case would have no "practical effect" on the rights or obligations of the parties and the case is moot. *See Flanigan's Enterprises, Inc. of*

*Georgia,* 868 F.3d at 1264. The court finds the requested relief similar to an "obey-the-law injunction," and, thus, finds it similarly not to be countenanced. *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996) (stating that "appellate courts will not countenance injunctions that merely require someone to 'obey the law'").

Further, the 2021 redistricting completed after the 2020 census will be subject to a new § 2 challenge in which a court can effectively evaluate the specifics of the new districting plan and assess compliance with § 2. Moreover, such a case could be brought without the delay that foreclosed injunctive relief in this case. Accordingly, this case does not fall into the exception to mootness for cases "capable of being repeated *and* evading review." *Al Najjar*, 273 F.3d at 1336. Even if the same § 2 controversy were to occur upon redistricting and involve the same parties, the Plaintiffs would have more than adequate time to fully litigate the issue with the benefit of the specifically applicable factual background.

At this stage of the current congressional districting in which a new districting cycle looms on the horizon and the Plaintiffs have only the hope of declaratory relief as to the current districting scheme, this case fails to present a live controversy. *See Powell*, 395 U.S. at 496. The parties have no cognizable interest in the outcome of the case because—based on the unavailability of injunctive relief, the inevitable change in census numbers, and the binding nature of § 2 of the VRA—the court cannot offer effective relief, as a declaratory judgment will have no immediacy or reality. *See Gagliardi*, 889 F.3d at 733. To the extent that the Plaintiffs wish this court, without knowledge of what the upcoming census will bring or the ability to take action, to simply inform the Alabama Legislature that it should create two majority-minority districts when it next conducts redistricting, such an opinion would be impermissibly advisory. *See Al Najjar*, 273 F.3d at 1336.

## IV. CONCLUSION

This court chooses to heed Mr. Hamilton's exhortation from long ago urging the safeguarding of liberty through the separation of the powers of judgment and legislation. The power to draw new congressional districts belongs to the Alabama Legislature. The courts can analyze the legality of the Alabama Legislature's choices and even perhaps remedy them when those choices culminate in specific controversies that allow the courts to appropriately grant relief. This case does not present such a controversy. Accordingly, the court finds this case **MOOT** and **DISMISSES IT WITHOUT PREJUDICE** for lack of jurisdiction.

**DONE** and **ORDERED** this 17th day of March, 2020.

_____
**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE